UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 12-2194 _____

MICHELLE KOSILEK,

Plaintiff-Appellee,

v.

LUIS S. SPENCER, Commissioner of the
Massachusetts Department of Correction

Defendant-Appellant.

MASSACHUSETTS DEPARTMENT OF CORRECTION; UNIVERSITY OF
MASSACHUSETTS MEDICAL SCHOOL; HARRISON O'CONNOR; ARTHUR
BREWER; KENNETH APPLEBAUM; KAREN DEWEES; CORRECTIONAL
MEDICAL SYSTEMS; KATHLEEN M. DENNEHY; DOES 1 THROUGH 100

Defendants
_____

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
_____

BRIEF OF DEFENDANT-APPELLANT LUIS S. SPENCER
_____

NANCY ANKERS WHITE
Special Assistant Attorney General

Richard C. McFarland (#41993)
Legal Division
Department of Correction
70 Franklin Street, Suite 600
Boston, MA   02110-1300
(617) 727-3300, ext. 132

January 17, 2013

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

REASONS WHY ORAL ARGUMENT SHOUD BE HEARD . . . . . . . . . . . . . vii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUE PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    THE DISTRICT COURT ERRED IN DETERMINING THAT THE
      FAILURE TO PROVIDE KOSILEK WITH SEX REASSIGNMENT
      SURGERY CONSTITUTES INADEQUATE MEDICAL CARE IN
      VIOLATION OF THE EIGHTH AMENDMENT . . . . . . . . . . . . . . . . . . 15

      A.    The Eighth Amendment Requires That Inmates Receive Adequate
            Medical Care. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      B.    The Eighth Amendment Does Not Require Prisons To Provide
            Inmates With Curative Medical Care As Sought Here. . . . . . . . . . 18

      C.    The Department of Correction's Obligation to Provide Adequate
            Medical Care To Mentally Ill Inmates Who Face A Significant
            Risk For Self-Injurious Behaviors Was Met In This Case. . . . . . . . 21

      D.    Kosilek Has Received Adequate Medical Care For Treatment
            Of GID. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

E.     The Medical Care Proposed By Dr. Schmidt To Treat Kosilek's GID And Possible Self-Injurious Behavior Meets Prudent Professional Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

II.     THE DISTRICT COURT ERRED IN FINDING COMMISSIONER SPENCER DELIBERATELY INDIFFERENT TO KOSILEK'S NEED FOR TREATMENT FOR GID. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

A.     Commissioner Clarke's Decision To Deny Sex Reassignment Surgery For Kosilek Was Based On His Review Of The Record As Ordered By The District Court And His Extensive Experience As A Corrections Official, Not On Any Fear Of Criticism . . . . . . . 37

B.     The Testimony From Correction Professionals Attesting To The Significant Safety And Security Risks Posed By Providing Kosilek With SRS Was Reasonable And Made In Good Faith. . . . . 45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CERTIFICATE OF COMPLIANCE WITH APPELLATE RULE 32(A) . . . . . . 61

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

Page

*Barron v. Keohane*,
216 F.3d 692 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Battista v. Clarke*,
645 F.3d 449 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 45

*Bell v. Wolfish*,
441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Block v. Rutherford*,
468 U.S. 576 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Brown v. Plata*,
__ U.S. __, 131 S.Ct. 1910 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Chance v. Armstrong*,
143 F.3d 698 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Commonwealth v. Kosilek*,
423 Mass. 449, 668 N.E.2d 808 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Cortes-Quinones v. Jimenez-Nettleship*,
842 F.2d 556 (1st Cir. 1988), *cert. denied*, 488 U.S. 823 (1988) . . . . . . . . . . . . . 16

*De'Lonta v. Angelone*,
330 F.3d 630 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*DesRosiers v. Moran*,
949 F.2d 15 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 35

*Disability Law Center v. Massachusetts Department of Correction*,
2012 WL 1237760 (D. Mass. April 12, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Dobson v. Magnusson*,
923 F.2d 229 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

iii

*Estelle v. Gamble*,
429 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 29

*Farmer v. Brennan*,
511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 35, 36, 45

*Feeney v. Correctional Medical Services, Inc.*,
464 F.3d 158 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fernandez v. United States*,
941 F.2d 1488 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Fields v. Smith*,
653 F.3d 550 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Florence v. Board of Chosen Freeholders of County of Burlington*,
__ U.S. __, 132 S.Ct. 1510 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 44, 46, 60

*Hampe v. Hogan*,
388 F.Supp. 13 (M.D. Pa. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Helling v. McKinney*,
509 U.S. 25 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Henderson v. Thomas*,
2012 WL 6681773 (M.D. Ala. Dec. 21, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Hudson v. Palmer*,
468 U.S. 517 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 60

*Jackson v. Fair*,
846 F.2d 811 (1st Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Jackson v. Meachum*,
699 F.2d 578 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 56

*Kosilek v. Maloney*,
221 F.Supp.2d 155 (D. Mass. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 17, 36

iv

*Leavitt v. Correctional Medical Services, Inc.,*
645 F.3d 484 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Mahan v. Plymouth County House of Correction,*
64 F.3d 14 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Newman v. Alabama,* 557 F.2d 283 (5th Cir. 1977),
*modified on other grounds,* 438 U.S. 78 (1978),
*cert. denied,* 438 U.S. 915 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Norton v. Dimanzana,*
122 F.3d 286 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Praylor v. Texas Dept. of Criminal Justice,*
430 F.3d 1208 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rhodes v. Chapman,*
452 U.S. 337(1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sires v. Berman,*
834 F.2d 9 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Supre v. Ricketts,*
792 F.2d 958 (10th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Torraco v. Maloney,*
923 F.2d 231 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 26

*United States v. DeCologero,*
821 F.2d 39 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 26, 34

*West v. Keye,*
571 F.2d 158 (3rd Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*White v. Farrier,*
849 F.2d. 322 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Whitley v. Albers,*
475 U.S. 312 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Williams v. Branker*,
462 Fed. Appx. 348 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Wilson v. Seiter*,
501 U.S. 294 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Wolff v. McDonnell,*
418 U.S. 539 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## Statutes

28 U.S.C. § 1292(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . 1

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 15601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

M.G.L. c. 123, § 18(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

M.G.L. c. 124, § 1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## Regulations

28 Code Fed. Reg. §§ 114.41 – 115.43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

103 DOC 650.00 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## Rules of Court

Federal Rules of Evidence, 706(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## <u>REASONS WHY ORAL ARGUMENT SHOUD BE HEARD</u>

Pursuant to Fed. R. App. P. 34, Defendant-Appellant Luis S. Spencer, Commissioner of the Massachusetts Department of Correction, respectfully requests that this Court hear oral argument in this case. As reasons therefor, defendant Spencer states that this appeal concerns the scope of medical and mental health care to be provided inmates under the Eighth Amendment of the United States Constitution. This appeal also concerns the impact that safety and security concerns in a prison setting may have on the deliberate indifference standard of the Eighth Amendment. These issues have not been authoritatively decided to date and the decisional process would be significantly aided by oral argument. Defendant Spencer further requests that oral argument be permitted to answer any questions the Court may have and to address any new points plaintiff may raise in reply to defendant Spencer's appellate brief.

## JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction over the claims arising under the United States Constitution, 42 U.S.C. § 1983. The jurisdiction of the Court of Appeals arises under 28 U.S.C. § 1292(a)(1). On October 2, 2012, Defendant filed his Notice of Appeal from the District Court's Order for injunctive relief entered on September 6, 2012.

## ISSUE PRESENTED FOR REVIEW

Whether the District Court erred in finding that Luis S. Spencer, Commissioner of the Massachusetts Department of Correction, was deliberately indifferent to inmate Michelle Kosilek's ("Kosilek") need for treatment for a gender identity disorder by failing to provide sex reassignment surgery, in violation of the Eighth Amendment.

## STATEMENT OF THE CASE

Kosilek filed a *pro se* Complaint on December 12, 2000, alleging a denial of adequate treatment for a gender identity disorder ("GID"), including sex reassignment surgery ("SRS"), in violation of the Eighth Amendment of the United States Constitution. RA 5.[1]  Named as defendants were the Massachusetts Department of Correction ("DOC"); Michael T. Maloney, Commissioner of

---

[1] References to the Record Appendix are designated as "RA." References to the Addendum are designated as "Add."

1

Correction; Correctional Medical Services ("CMS"); University of Massachusetts Medical School Correctional Health program ("UMass"); Dr. Arthur Brewer, UMass Medical Director; Dr. Kenneth Appelbaum, UMass Mental Health Director; Dr. Harrison O'Connor, UMass psychiatrist; and Karen Dewees, UMass Mental Health Director for MCI-Norfolk. RA 5.

On August 7, 2001, the District Court stayed the instant action "pending final resolution of *Kosilek v. Maloney*, C.A. 92-12820-MLW, which will affect which, if any, of the claims in the instant case are viable." RA 8. A final decision was entered in *Kosilek v. Maloney*, C.A. 92-12820-MLW on August 28, 2002, determining that Commissioner Maloney was not deliberately indifferent to Kosilek's treatment for GID. *Kosilek v. Maloney*, 221 F.Supp.2d 156, 190-192 (D. Mass). On October 26, 2004, the District Court lifted the stay in the instant case. RA 11. Kosilek voluntarily dismissed the claims against defendants Brewer and CMS on June 14, 2005, and the claims against defendants UMass, Appelbaum, O'Connor, and Dewees on July 1, 2005. RA 13-14.

On July 15, 2005, Kosilek filed an Amended Complaint which named as defendants, Kathleen M. Dennehy, Commissioner of Correction, and Does 1 through 100. RA 14. The Amended Complaint alleged that defendants failed to provide Kosilek with adequate medical treatment for GID in violation of the

2

Eighth Amendment, and sought injunctive relief. *Id.*   The District Court denied Defendants' Motion for Summary Judgment on April 7, 2006. RA 18.  A bench trial commenced on May 30, 2006.  RA 19.

On June 23, 2006, the District Court issued an order advising the parties that it was considering appointing an independent expert, pursuant to Fed. R. of Evid. 706, "to assist the court in deciding whether Kosilek has satisfied the plaintiff's burden of proof on the objective prong of the deliberate indifference standard." RA 21.  The June 23, 2006 Order further required the parties to submit the "names and backgrounds of any Gender Identity Disorder specialists or other qualified doctors that they propose the court consider appointing pursuant to Federal Rule of Evidence 706 as an expert on the issue of whether the DOC's expert, psychiatrist Chester Schmidt, is recommending for Kosilek 'services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.'" *Id.* In response to the Order, Commissioner Dennehy identified psychiatrist Dr. Paul Fink for consideration as the independent expert, and Kosilek identified several psychiatrists, including Dr. Stephen Levine. RA 22.  On August 30, 2006, the District Court sent letters to Drs. Fink and Levine inquiring as to their willingness to serve as an independent expert. RA 24.

In response to the District Court's October 18, 2006 Order, the parties

submitted lists of trial exhibits and testimony to be considered by the independent expert. RA 25.  On October 31, 2006, the District Court appointed Dr. Levine as an independent expert to "provide an independent, expert medical opinion on whether the treatment recommended for Kosilek by Dr. Schmidt is, in view of the foregoing, within prudent professional standards and, therefore, would be at least minimally adequate if Kosilek were in the community rather than incarcerated." RA 26.  Dr. Levine submitted his expert report on November 27, 2006. RA 2994. Dr. Levine testified at trial on December 19, 2006. RA 27.

A February 29, 2008 Order of the District Court scheduled a status conference to discuss whether testimony from the recently appointed Commissioner of Correction, Harold W. Clarke, was necessary based on "the fact that Mr. Clarke was previously the Commissioner of the State of Washington's Department of Corrections, which reportedly agreed to accept and house a transsexual murderer from New Hampshire; this raises the possibility that Mr. Clarke might not share his predecessors' purported security concerns or position regarding the objective reasonableness of alternatives to Sex Reassignment Surgery for Kosilek." RA 34.

The April 1, 2008 Order of the District Court required Commissioner Clarke to review the trial testimony of several witnesses, including Kosilek, former

Commissioner Dennehy, MCI-Norfolk Superintendent Luis S. Spencer, MCI-Framingham Superintendent Lynn Bissonnette, and several trial exhibits, including the reports of Dr. Seil and the Fenway Clinic, prior to his trial testimony. RA 35. The District Court ordered Commissioner Clarke to provide a written statement of his conclusions regarding the safety and security concerns posed by Kosilek's request for sex reassignment surgery ("SRS"). RA 35. On May 7, 2008, Commissioner Clarke submitted his statement outlining his conclusion that providing Kosilek with SRS presented significant safety and security obstacles. RA 3315.

On May 5, 2009, Kosilek filed a Motion for Interim Relief seeking access to additional electrolysis for removal of facial hair. RA 37. The Motion for Interim Relief was denied, without prejudice, on August 11, 2009. RA 38. Kosilek's Renewed Motion for Interim Relief, filed on October 19, 2009, was denied on November 25, 2009. RA 39-40. On April 16, 2010, Kosilek filed a Second Amended Complaint adding a claim for electrolysis. RA 41, 63.

On September 4, 2012, the District Court entered a Memorandum and Order finding that the failure to provide Kosilek with SRS constituted a violation of the Eighth Amendment and ordering Commissioner Spencer to provide Kosilek with SRS. RA 44. The District Court also issued a Memorandum and Order Concerning

5

Electrolysis which denied, without prejudice, Kosilek's claim for electrolysis. RA 44. The District Court further issued a Memorandum and Order on Pending Motions, denying Kosilek's motions to exclude the reports and testimony of Cynthia Osborne, Dr. Schmidt, Robert Dumond and A.F. Beeler, and allowing Kosilek's motion to admit additional documents into evidence. Final Judgment was entered on September 6, 2012. *Id.*

On October 2, 2012, Commissioner Spencer filed his Notice of Appeal and a Motion for Stay of Execution of Final Judgment Pending a Decision on Defendant's Appeal. RA 44. On October 4, 2012, Kosilek filed a Motion to Amend Judgment, again seeking electrolysis. RA 45. On November 20, 2012, the District Court allowed the Motion to Stay Pending Appeal and denied the Motion to Amend Judgment. RA 47.

## <u>STATEMENT OF THE FACTS</u>

Plaintiff, Michelle Kosilek ("Kosilek"), was convicted of the First Degree Murder of Cheryl McCaul on January 25, 1993 and received a sentence of life without the possibility of parole. *See Commonwealth v. Kosilek*, 423 Mass. 449, 668 N.E.2d 808 (1996). Kosilek has been incarcerated at MCI-Norfolk since February 6, 1994 and has lived in a single cell in a general population housing unit. Kosilek has remained relatively free of disciplinary reports at MCI-Norfolk and

reports to get along with the other inmates and staff on the housing unit and with the vast majority of correctional staff at MCI-Norfolk. Kosilek also reports a lack of conflicts with other inmates at MCI-Norfolk, including the absence of any threats or assaults by other inmates. RA 4251-52, 4277 (Kosilek Tr.); 4502-04 (Spencer Tr.). Kosilek has access to all recreational and program activities. RA 4500-03 (Spencer Tr.). Kosilek also works as a janitor on the housing unit and otherwise has been consistently employed while incarcerated, based on his overall adjustment in prison. *Id.* RA 4246 (Kosilek Tr.); 4096-97 (Burrowes Tr.).

The Commissioner of the Massachusetts Department of Correction is responsible for the maintenance of security, safety, and order at all state correctional facilities.[2] M.G.L. c. 124, § 1(b). Add. 61. Luis S. Spencer presently serves as the Commissioner of Correction.[3]

---

[2] Kathleen M. Dennehy was named the Acting Commissioner of the DOC on December 1, 2003 and appointed Commissioner on March 16, 2004. Commissioner Dennehy served as the Commissioner of Correction through April 30, 2007. RA 30. James R. Bender was named the Acting Commissioner of Correction on April 30, 2007. *Id.* Harold W. Clarke was appointed Commissioner of Correction from November 26, 2007 and served through November 13, 2010. Ronald Duval served as Acting Commissioner of Correction from November 13, 2010 through January 14, 2011.

[3] Luis S. Spencer was named the Acting Commissioner on January 14, 2011 and was appointed Commissioner on May 24, 2011. Commissioner Spencer served as the Superintendent of MCI-Norfolk from December 11, 2000 through October 20, 2008, and as Assistant Deputy Commissioner, Southern Sector, from October 21, 2008 through January 13, 2011.

<u>Kosilek's Mental Health Treatment</u>

Kosilek has received treatment for mental health issues during the period of incarceration at MCI-Norfolk, including long-term psychotherapy. In addition to GID, Kosilek has been diagnosed by several mental health clinicians as suffering from a personality disorder and major depression. RA 4126-28 (Burrowes Tr.); 1566; 2103; 2162. Kosilek has been in psychotherapy with Mark Burrowes, a master's level mental health clinician, since 2001. RA 4083, 4097 (Burrowes Tr.). Kosilek's mental health has remained stable during the entire term of incarceration at MCI-Norfolk and has not required in-patient mental health treatment at the Bridgewater State Hospital. *See generally*, RA 78-1148. Nor has Kosilek made any attempts at suicide during the term of incarceration with the DOC, which began in January, 1993. RA 4290-91 (Kosilek Tr.).

Subsequent to the decision in *Kosilek v. Maloney, supra*, Kosilek was evaluated by Dr. David Seil concerning treatment for GID. Dr. Seil's February 23, 2003 report recommended that treatment for Kosilek's GID include female hormones, electrolysis, and access to female personal items. However, Dr. Seil indicated that an evaluation for SRS could not take place before completion of one year on hormones. RA 1566. Subsequent to a security review conducted by then

MCI-Norfolk Superintendent Spencer, Kosilek began treatment with the female hormones in August, 2003.   Kosilek's hormone therapy is monitored by an endocrinologist. RA 4264-65 (Kosilek Tr.); 3318.   In October, 2003, Kosilek received access to many of the clothing and personal items available to the female inmates at MCI-Framingham, including underwear and cosmetics. RA 4266-68 (Kosilek Tr.).  Kosilek was provided with permanent removal of facial hair using laser treatments in 2005 and electrolysis in 2008. RA 4268-69 (Kosilek Tr.).

The DOC's contractual medical and mental health services provider, UMass, subsequently entered into a contract for the Fenway Clinic to conduct evaluations and make treatment recommendations for inmates with GID. Fenway Clinic psychologist Randi Kaufman and psychiatrist Kevin Kappila conducted an evaluation of Kosilek and recommended that Kosilek receive SRS.  RA 1634.

In their April 15, 2005 Status Report to the District Court, Dr. Brewer, UMass Medical Director, and Dr. Appelbaum, UMass Mental Health Director, stated that they had "informed the DOC that they are presently unaware of any known medical or mental health contraindication to providing sex reassignment surgery to the plaintiff, although they are also unaware of any other case in which an inmate has undergone sex reassignment surgery while incarcerated." RA 1629.

On April 28, 2005, Susan Martin, Director of the DOC's Health Services

9

Division, requested that UMass provide a comprehensive review of the Fenway Clinic recommendation that Kosilek be provided with SRS, including a determination as to whether SRS was medically necessary treatment for GID within a prison environment. RA 1583.  In their May 10, 2005 response, Drs. Brewer and Appelbaum stated that UMass would continue to defer to the Fenway Clinic regarding the recommendation for SRS for Kosilek. RA 1576.

Seeking to determine whether or not SRS was medically necessary treatment in a prison environment, the DOC contracted with Cynthia Osborne, M.S.W., a mental health professional with experience in the treatment of GID, including within prison environments, to provide the DOC with a peer review of the Fenway recommendation that Kosilek be provided with SRS.  RA 1585.  Cynthia Osborne, a licensed clinical social worker and Assistant Professor of Psychiatry at Johns Hopkins School of Medicine, served as the Associate Director of the Sexual Behaviors Unit of the Johns Hopkins School of Medicine, where she was involved in the evaluation and counseling of individuals with GID. RA 4306-14 (Osborne Tr.).  Ms. Osborne's May 20, 2005 peer review report pointed to a number of concerns she had with the February, 2005 Fenway Clinic report on Kosilek, including: 1) the failure to formally assess whether Kosilek suffers from a personality disorder, unrelated to GID, as diagnosed in earlier evaluations and its

10

possible impact on Kosilek's threats of suicide; 2) the lack of corroborating reports which verify Kosilek's self-reports of history of GID and current functioning in prison; and 3) the failure to address the effect of the isolation of prison upon Kosilek's fixation on surgery as a solution to mental health issues. RA 2150. The Fenway Clinic responded to Ms. Osborne's peer review on October 7, 2005, addressing the specific concerns raised by Ms. Osborne. RA 1827.

Psychiatrist George Brown was retained as an expert for Kosilek. Dr. Brown's October 12, 2005 report indicated that Kosilek was appropriate for SRS and opined, based on Kosilek's threats to commit suicide if denied SRS and Kosilek's self-reported attempts at suicide twenty-three years earlier, that the failure to provide SRS would likely result in Kosilek's attempt at autocastration and/or suicide. RA 1811. Psychiatrist Chester Schmidt evaluated Kosilek on behalf of the DOC. Dr. Schmidt's November 23, 2005 evaluation determined that Kosilek has made significant progress in reducing the dysphoria of GID based on the current regimen of female hormones, psychotherapy, access to female clothing and cosmetics, and the permanent removal of facial hair, such that SRS was not medically necessary treatment for Kosilek. Dr. Schmidt also opined that should Kosilek become depressed and suicidal as a result of the denial of SRS, it would be appropriate to treat such a depression with intensive psychotherapy, access to

11

antidepressant medications and hospitalization, if necessary. Finally, Dr. Schmidt questioned whether any inmate could undergo the real life experience required under the Harry Benjamin Standards of Care, in a prison. RA 2103.  Cynthia Osborne also interviewed Kosilek and prepared an evaluation. Ms. Osborne's November 27, 2005 report stated that SRS was not medically necessary treatment based on Kosilek's positive response to the current medical and mental health treatment and stability within the prison.  Ms. Osborne indicated that SRS should not be provided as a response to threats of suicide.  RA 2162.

The Harry Benjamin Standards of Care, 6th version ("Standards of Care"), are clinical guidelines that "are intended to provide flexible directions for the treatment of persons with gender identity disorders." "Clinical departures from these guidelines may come about because of a patient's unique anatomic, social, or psychological situation, an experienced professional's evolving method of handling a common situation, or a research protocol."  The Standards of Care provide that treatment for GID may follow the triadic therapy model that includes hormones, followed by a "real life experience," followed by sex reassignment surgery. The Standards of Care hold that, very often, treatment with psychotherapy alone, or in conjunction with hormones, is sufficient to treat GID. RA 1545.

The clinical guidelines of the Standards of Care provide for transgender

12

care, but are not mandatory. "Certainly not every patient needs treatment or elects the full panoply of treatments." RA 3870-73 (Appelbaum Tr.); 4037-39 (Kaufman Tr.). Nowhere in the Standards of Care does it state that an individual diagnosed with GID must be provided with SRS. RA 3568-69, 3575 (Brown Tr.). The Standards of Care require the successful completion of the "real life experience" as a prerequisite to undertaking SRS. The Standards of Care provide a single paragraph directed toward the treatment of inmates diagnosed with GID, and recommend that an inmate who was receiving treatment with hormones and psychotherapy prior to incarceration continue to receive such treatment during incarceration. RA 1545. The Standards of Care do not state whether a real life experience can be accomplished in prison. *Id.*

Safety and Security Concerns Regarding Providing Kosilek With SRS

On May 19, 2005, Commissioner Dennehy met with MCI-Framingham Superintendent Bissonnette and MCI-Norfolk Superintendent Spencer to discuss their safety and security concerns regarding providing Kosilek with SRS. In response to a District Court order, Commissioner Dennehy submitted a report outlining her safety and security concerns to providing Kosilek with SRS. RA 13.

On May 7, 2008, Commissioner Clarke, who replaced Commissioner Dennehy for purposes of injunctive relief, submitted a statement in response to the

13

District Court's Order, based on his review of the trial materials identified by Kosilek's counsel, as directed by the District Court. RA 3315.  Commissioner Clarke's Statement set forth his significant safety and security concerns with regard to providing Kosilek with SRS, including: 1) the DOC had improved its ability to respond to and treat inmates who are potentially suicidal; 2) it is contrary to established correctional practices to provide specialized medical treatment or other benefits in response to threats of suicide; 3) housing Kosilek, post-surgery, at MCI-Framingham, the DOC's facility for female offenders, presented substantial security risks, both to the female offenders and Kosilek; 4) other options for housing Kosilek, post-surgery, such as creating a separate unit for GID inmates or a transfer out-of-state were considered and rejected as unfeasible; 5) the only other option, housing Kosilek in MCI-Norfolk's Special Management Unit ("SMU"), while secure, was extremely restrictive; and 6) transporting Kosilek out-of-state for SRS presented many security risks, including the risk of escape.  *Id.*

## SUMMARY OF THE ARGUMENT

The District Court erred in finding the medical and mental health treatment provided Kosilek to violate the Eighth Amendment and, in issuing an order requiring SRS, where Kosilek receives adequate medical and mental health care, the same as other inmates with mental health needs.  Kosilek has consistently

14

received psychotherapy to address mental health issues, as well as GID treatment in the form of female hormones, permanent hair removal, and access to the same clothing and cosmetics available to female offenders.  The District Court also erred in determining that the safety and security concerns, presented by numerous correctional officials using their best correctional judgment gleaned from years of correctional experience in support of the decision not to provide SRS, were not reasonable and were made in bad faith.

## ARGUMENT

I. THE DISTRICT COURT ERRED IN DETERMINING THAT THE FAILURE TO PROVIDE KOSILEK WITH SEX REASSIGNMENT SURGERY CONSTITUTES INADEQUATE MEDICAL CARE IN VIOLATION OF THE EIGHTH AMENDMENT.

The District Court erred in finding that the medical and mental health treatment provided Kosilek was inadequate and in violation of the Eighth Amendment.

The Eighth Amendment proscribes medical care that falls below "the evolving standards of decency that mark the progress of a maturing society" and results in a substantial risk of serious harm.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), *quoting Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  A serious medical need is one that has been diagnosed by a physician as mandating treatment.  *See*

15

*Leavitt v*, *Correctional Medical Services, Inc.,* 645 F.3d 484, 497 (1st Cir. 2011).

The Eighth Amendment requires that an inmate's serious mental health needs

receive adequate treatment.  *See Brown v. Plata*, __ U.S. __, 131 S.Ct. 1910, 1928

(2011); *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558-560 (1st Cir.

1988), *cert. denied*, 488 U.S. 823 (1988).

To succeed on a claim of cruel and unusual punishment, an inmate must

satisfy both an objective and a subjective component. *Farmer*, 511 U.S. at 846 n.9.

The objective component requires an inmate to show that he suffers from a serious

medical condition that has received inadequate treatment. *Mahan v. Plymouth*

*County House of Correction*, 64 F.3d 14, 18 (1st Cir. 1995); *Kosilek*, 221

F.Supp.2d at 180.

    A.    The Eighth Amendment Requires That Inmates Receive Adequate
            Medical And Mental Health Care.

To satisfy the objective prong of the Eighth Amendment's deliberate

indifference standard, an inmate must show that he has been harmed by the denial

of essential medical care. *Estelle*, 429 U.S. at 106.  Adequate medical services

have been defined as "services at a level reasonably commensurate with modern

medical science and of a quality acceptable within prudent professional standards,"

*United States v. DeCologero*, 821 F.2d 39, 42 (1st Cir. 1987); *Kosilek*, 221

F.Supp.2d at 180. However, it is well established that adequate medical care does not mean that an inmate is entitled to ideal care or the care of his choice. *DeCologero*, 821 F.2d at 43 ("And though it is plain that an inmate deserves *adequate* medical care, he cannot insist that his institutional host provide him with the most sophisticated care money can buy.") (emphasis in original). Thus, to establish a violation of the Eighth Amendment, an inmate must first prove that the medical care provided was "so inadequate as to shock the conscience." *Feeney v. Correctional Medical Services, Inc.,* 464 F.3d 158, 162 (1st Cir. 2006), *quoting Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987); *Torraco v. Maloney*, 923 F.2d 231, 235 (1st Cir. 1991) (Deliberate indifference may be found where the medical care is "so clearly inadequate as to amount to a refusal to provide essential care."); *DesRosiers v. Moran*, 949 F.2d 15, 19-20 (1st Cir. 1991) (to succeed on a claim of inadequate medical treatment, a prisoner must show that his treatment was "so grossly inadequate as to constitute a knowing denial of proper medical care"); *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988) ("Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice."); *Jackson v. Meachum*, 699 F.2d 578, 583 (1st Cir. 1983) (noting that to "make the Eighth Amendment a guarantor of a prison inmate's prior mental health … would

go measurably beyond what today would generally be deemed 'cruel and unusual'"); *Newman v. Alabama*, 557 F.2d 283, 291 (5th Cir. 1977), *modified on other grounds*, 438 U.S. 78 (1978), *cert. denied,* 438 U.S. 915 (1978) ("The Constitution does not require that prisoners, as individuals or as a group, be provided with any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration."); *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) ("Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement."). Thus, to violate the Eighth Amendment, the medical care provided must be shown to "have been so inadequate as to 'constitute an unnecessary and wanton infliction of pain' or to be repugnant to the conscience of mankind.'" *Leavitt*, 645 F.3d at 497, *quoting Estelle*, 429 U.S. at 105-106.

     B.     The Eighth Amendment Does Not Require Prisons To Provide Inmates With Curative Medical Care As Sought Here.

Nor does the Eighth Amendment's mandate that inmates be provided with minimally adequate treatment require that prisons provide inmates with curative medical or mental health treatment. In reviewing the treatment of mentally ill inmates under the Eighth Amendment, courts have focused on the adequacy of mental health treatment in terms of the reduction and management of the self-

injurious behaviors that are the direct consequence of the mental illnesses, not on the ability to cure the inmate's underlying mental illness. *See Torraco*, 923 F.2d at 235 (prison officials not deliberately indifferent to mentally ill inmate who committed suicide by providing treatment with a psychologist instead of a psychiatrist); *Williams v. Branker*, 462 Fed. Appx. 348, 354 (4th Cir. 2012) (mental health treatment that was not "effective" in preventing mentally ill inmate from engaging in self-injurious behavior did not violate Eighth Amendment); *Dobson v. Magnusson*, 923 F.2d 229, 231 (1st Cir. 1991) (failure to place prisoner on suicide watch did not constitute deliberate indifference); *Jackson*, 699 F.2d at 583.

Moreover, in the context of other types of medical care for inmates, courts have found that the provision of medical care that manages the symptoms of an inmate's disease, rather than curing it, satisfies the Eighth Amendment. *See Barron v. Keohane*, 216 F.3d 692 (8th Cir. 2000) (providing inmate with dialysis treatments, instead of a kidney transplant which would improve his long-term survival, did not constitute deliberate indifference to a serious medical need in violation of the Eighth Amendment); *Fernandez v. United States*, 941 F.2d 1488, 1493-1494 (11th Cir. 1991) (failure to provide inmate with a heart transplant or provide for his early release from prison, despite doctors' prediction that he would not live more than two years without a heart transplant, did not rise to level of

deliberate indifference to a serious medical need where records showed that the inmate had received excellent medical treatment); *Norton v. Dimanzana*, 122 F.3d 286, 291-292 (5th Cir. 1997) (prison officials and medical staff were not deliberately indifferent to inmate's painful prolapsed rectum in failing to provide curative medical treatment where prison medical staff prescribed medicine and assisted the inmate in managing his condition himself). *See also Hampe v. Hogan*, 388 F.Supp. 13, 14-15 (M.D. Pa. 1974) (in light of prior medical treatment provided inmate, failure to provide further treatment only performed by a few surgeons in private institutions did not violate the Eighth Amendment.).

Nor have other federal courts required that inmates diagnosed with GID receive treatment deemed "curative" of the mental illness. In *White v. Farrier*, 849 F.2d. 322, 327-328 (8th Cir. 1988), the Eighth Circuit Court of Appeals held that a transsexual inmate had no right to a particular treatment for GID, including SRS. Similarly, in *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir.1986), the Tenth Circuit held that where there were a variety of treatments available to treat transsexual inmate, treatment with female hormones was not required. *See also*, *Praylor v. Texas Dept. of Criminal Justice*, 430 F.3d 1208, 1209 (5th Cir. 2005) (denial of request of transsexual inmate for hormone therapy did not constitute deliberate indifference). In *Fields v. Smith*, 653 F.3d 550, 556-557 (7th Cir. 2011), the

20

Seventh Circuit held that the Eighth Amendment required the provision of adequate treatment, finding that the provision of hormones to GID inmates constituted effective treatment of GID.

Accordingly, the Eighth Amendment does not require prisons to provide inmates with medical or mental health care that is curative, or ideal or desirable, but to provide medical care that does not offend "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 347 n.13 (1981).

Here, Kosilek has been afforded adequate medical and mental health care, in the form of hormone therapy, psychotherapy, access to female clothing and cosmetics, and permanent removal of facial hair, that specifically treats both the gender disorder and other mental health disorders.

C.     The Department of Correction's Obligation to Provide Adequate Medical Care To Mentally Ill Inmates Who Face A Significant Risk For Self-Injurious Behaviors Was Met In This Case.

The District Court found that the mental anguish suffered by Kosilek was characterized by "the genuine high risk that he will again try to kill himself if denied sex reassignment surgery." Add. at 38. The District Court found that, because of the mental anguish arising from GID, Kosilek had made two suicide attempts and one attempt at self-castration prior to the current period of incarceration, over twenty years ago. Add. 23. Kosilek's risk for future self-

21

injurious behavior resulting from GID is indistinguishable from the risk of self-injurious behavior experienced by other mentally ill inmates who suffer from the mental anguish of their own mental illnesses.

Pursuant to DOC mental health procedures, inmates are required to be evaluated by qualified mental health staff within 14 days of reception in the DOC. *See* DOC mental health procedural statement, 103 DOC 650.00 *et seq*., RA 1527. Inmates can be provided with mental health services through self-referral or referral by staff members. *Id*. Inmates potentially at risk for self-injurious behavior, including suicide, are monitored by mental health staff and placed on a Mental Health Risk list. *Id* If necessary, inmates believed to be at risk for suicide may be placed in the Health Services Unit for direct observation, assessment for treatment with medications, and possible transfer to the Bridgewater State Hospital. *Id*.; M.G.L. c. 123, § 18(a). Add. 58. Moreover, in an effort to improve the DOC's ability to address the issue of suicidal inmates, the DOC contracted with Lindsay Hayes, a nationally recognized expert on inmate suicidal behavior, to conduct an assessment of the DOC and make recommendations. RA 2994. In response to Mr. Hayes' report, the DOC initiated a Corrective Action Plan to implement all of Mr. Hayes' recommendations. RA 3059.

Here, the District Court focused on Kosilek's past and future self-injurious behavior as the substantial risk of harm confronting Kosilek due to GID. Add. 36. Just as with other mentally ill inmates whose response to their mental anguish may be to engage in self-injurious behavior, the treatment recommended by Dr. Schmidt, and affirmed by Dr. Levine, is to treat the self-injurious behavior. Both Drs. Schmidt and Levine would apply well-established mental health tools, such as intensive psychotherapy, antidepressant medications, and if necessary, provide a protective environment, including hospitalization, to treat Kosilek's potential self-injurious behavior. RA 4165-67 (Schmidt Tr.); 5982-84, 5990-95, 6082-83 (Levine Tr.); 2103; 2944.[4]  Simply providing SRS in response to Kosilek's potential to attempt suicide if denied the surgery does not constitute medically necessary treatment. Similarly, mentally ill inmates diagnosed with a body dysmorphic disorder in which they believe that their bodies are deformed and become suicidal

---

[4] Dr. Chester Schmidt, M.D. provided expert testimony on behalf of the defendant regarding Kosilek's treatment for GID.  Dr. Schmidt is the Director of the Department of Psychiatry at the Johns Hopkins Bayview Medical Center, a Professor of Psychiatry at the Johns Hopkins University School of Medicine, and the co-founder and associate director of the Sexual Behaviors Consultation Unit of the Johns Hopkins University School of Medicine. The Sexual Behaviors Consultation Unit conducts evaluations of individuals with gender difficulties.  Dr. Schmidt has participated in the evaluation of at least 300 individuals diagnosed with GID, beginning in 1971 and continuing to the present.  RA 4141-46 (Schmidt Tr.); 2112.

when denied surgery to permanently alter their bodies, would be provided mental health care that treats the suicidal behavior, instead of surgery that may physically address the inmate's body dysmorphic disorder but not necessarily address the underlying psychiatric symptoms associated with this disorder.[5]

However, the District Court determined that instead of providing a mental health treatment plan for treating any self-injurious behavior Kosilek may experience in the future, in addition to the treatment already provided for GID, Commissioner Spencer is required to provide treatment that the District Court anticipates will cure Kosilek's GID.  This is a stark departure from the mental health care required of prisons to treat mentally ill inmates who are experiencing self-injurious behavior. Indeed, it raises the Eighth Amendment's requirement for inmate medical and mental health care to new heights.

Accordingly, in the instant case, the District Court erred in finding that the treatment necessary to curtail Kosilek's potential for self-injurious behavior is to provide "curative" SRS, an extraordinary treatment not typically available in the community for the treatment of GID. RA 5999 (Levine Tr.); 4037 (Kaufman Tr.) (stating that, of the 300 individuals with GID she has treated, the vast majority have received treatment with hormones and only 15 individuals out of the 300

---

[5]  Body Dysmorphic Disorder is a mental illness recognized in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Revised, 300.7.

were recommended for SRS). Further, no medical expert at trial could guarantee that Kosilek would not engage in self-injurious behavior if provided with SRS. Dr. Levine expounded upon the existential crisis that Kosilek might experience if provided SRS. RA 6001 (Levine Tr.). The treatment recommendations of Dr. Schmidt and Dr. Levine clearly constitute adequate mental health treatment by both reducing Kosilek's dysphoria and risk for self-injurious behavior through treatments known to be effective in treating GID, along with well-established treatments for mentally ill individuals whose risk of harm is their potential for self-injurious behavior, *i.e.* psychotherapy, medications, and hospitalization. Instead, the District Court found that Kosilek's potential for suicidal behavior requires medical treatment in the form of SRS, believing that only SRS will eliminate the risk of suicidal behavior by curing Kosilek's GID.

Numerous federal courts have determined that GID is a serious mental illness deserving adequate mental health treatment, just like other mental illnesses that result in mental anguish and the potential for suicide. However, the District Court erred in finding that the Eighth Amendment requires SRS, rather than treatment designed to adequately treat the disorder by reducing Kosilek's mental anguish and risk of suicide, as required for all other mental illnesses treated in prison. *See DeCologero*, 821 F.2d at 43; *Torraco*, 923 F.2d at 234.

25

D.     Kosilek Has Received Adequate Medical Care For Treatment Of GID.

It is uncontroverted that Kosilek receives medical and mental health treatment for GID, in the form of hormone therapy, psychotherapy, access to the same clothing and cosmetics available to female inmates, and permanent facial hair removal. Dr. Schmidt supports the continuation of the current treatment regimen for Kosilek, including the provision of female hormones, as providing relief from the gender dysphoria and increasing Kosilek's functionality in prison. RA 4164, 4167-68, 4214 (Schmidt Tr.); 2103. Similarly, other GID experts testified that the treatment regimen made available to Kosilek has been effective in reducing the dysphoria caused by GID. Dr. Brown testified that the severity of Kosilek's dysphoria had been reduced by treatment with hormones and psychotherapy, finding Kosilek to be "clearly less depressed, less anxious, less irritable, which are the cardinal hallmarks of dysphoria." RA 3483-84, 3496 (Brown Tr.); 1812. Dr. Kaufman testified that Kosilek's mood and self-esteem had improved and Kosilek had progressed in reducing the dysphoria under the current treatment regimen. RA 4006-07, 4045-46, 5687-88 (Kaufman Tr.); 1634. Dr. Levine testified that Kosilek had already obtained a large amount of relief from the dysphoria of GID based on the available GID treatment. RA 5985 (Levine Tr.). Dr. Appelbaum testified that Kosilek has made much improvement in the control of dysphoria under the current

26

treatment regimen. RA 3876-77 (Appelbaum Tr.).    In addition, Kosilek testified

that the hormone treatments have reduced the feelings of depression and provided

a feeling of greater patience.  RA 4265-66 (Kosilek Tr.).  Accordingly, the District

Court acknowledged that Kosilek has obtained some relief from the underlying

gender dysphoria and was functioning better under the present treatment regimen,

including treatment with hormones.  Add. at 14, 35.

Nor does the record demonstrate, and the District Court declined to find, that

Dr. Schmidt's opinion that SRS was not medically necessary treatment for Kosilek

was the result of his desire to provide treatment that was easier and less costly than

the treatment recommended by the Fenway Clinic. Add. at 48.  *Compare, Chance

v. Armstrong*, 143 F.3d 698, 703 (2nd Cir. 1998) (inmate alleged that dentist's

decision to extract teeth was based on financial incentives); *West v. Keye*, 571 F.2d

158, 162 (3rd Cir. 1978) (inmate stated an Eighth Amendment claim where

providing him with aspirin to treat post-operation pain may have been result of

decision to provide easier, less expensive medical care).  There was no evidence at

trial which demonstrated that Dr. Schmidt's recommendation against providing

Kosilek with SRS was intended to provide easier and less costly treatment.

To the contrary, Dr. Schmidt opined that providing Kosilek with SRS was

not medically necessary where: 1) the current treatment for Kosilek's GID had

significantly reduced the dysphoria associated with GID and Kosilek was functioning quite well within the prison; 2) Kosilek was unable to undergo the "real life experience" required under the Standards of Care in a prison; and 3) any suicidal ideation Kosilek might experience in the future would be the result of a depression due to not receiving the desired surgery, not a symptom of GID, and could be treated with increased psychotherapy, anti-depressant medications, and hospitalization, if necessary. RA 4164-68, 4202-03, 4214-15 (Schmidt Tr.); 2103. Dr. Levine, the District Court's independent expert, testified that if Kosilek was denied SRS, Dr. Schmidt's recommendations for treating a subsequent depression constitute adequate medical care. RA 5983-85, 6002-05 (Levine Tr.). Dr. Levine further testified that he was very concerned that providing Kosilek with SRS could also result in significant distress and harm to Kosilek due to exposure to repressed traumatic memories, causing a depression to occur. RA 6000-01 (Levine Tr.).

Here, the medical and mental health care provided Kosilek, in the form of hormone therapy, psychotherapy, access to female clothing and cosmetics, and permanent hair removal, specifically treats Kosilek's underlying mental illness, GID, and has effectively reduced the dysphoria of the gender disorder and has increased Kosilek's functionality in prison. *Compare Fields*, 653 F.3d at 556

(providing inmates with cancer with treatment which had no effect on cancer, *i.e.*, therapy and pain killers, would violate the Eighth Amendment).

The District Court erred in determining that the Eighth Amendment mandates treatment that will eliminate the dysphoria caused by GID rather than treatment that effectively reduces the dysphoria and enables the individual to function at a high level. Add. at 14, 36. The failure to provide Kosilek with SRS, a treatment for GID that, according to the independent expert, Dr. Levine, is rarely provided in the community, does not rise to the level of a denial of medical care that is "so grossly inadequate as to constitute a knowing denial of proper medical care." *DesRosiers*, 949 F.2d at 19; *Estelle*, 429 U.S. at 106. RA 5999 (Levine Tr.).

> E.    The Medical Care Proposed By Dr. Schmidt To Treat Kosilek's GID And Possible Self-Injurious Behavior Meets Prudent Professional Standards.

The District Court erred in determining that the recommendations made by Dr. Schmidt for treatment of Kosilek's GID failed to meet prudent professional standards. Based on his evaluation of Kosilek, Dr. Schmidt recommended that Kosilek continue to receive treatment with hormones, psychotherapy, and access to female clothing and cosmetics. Dr. Schmidt recommended that, if Kosilek became severely depressed in the future as a result of the denial of SRS, the depression could be treated with more intensive psychotherapy, the use of anti-depressant

medications, and hospitalization, if necessary. RA 4166-67 (Schmidt Tr.). Dr. Schmidt testified that SRS was not medically necessary treatment of Kosilek because it "will not confer any greater functional capacity than what has been achieved by hormonal reassignment for Kosilek." RA 4164, 4168 (Schmidt Tr.).

Dr. Schmidt also testified as to his belief that the real life experience, a prerequisite for SRS under the Standards of Care, cannot be undertaken in a prison environment which is an artificial setting, "In my opinion, it is virtually impossible to apply or implement the real life test because the standards were written to work with people who are out in the community. This is such a – to me, this is such an artificial and unusual setting that I cannot make the leap, if you will, of applying the Standards to the current setting." RA 4202-03 (Schmidt Tr.).

Dr. Levine, as the District Court's independent expert, determined that Dr. Schmidt's treatment recommendations for Kosilek were within prudent professional standards for treatment for GID in the community. RA 5982-83, 5985-87, 5999-6000 (Levine Tr.); 2944. Dr. Levine testified that he was in agreement with Dr. Schmidt's opinion that Kosilek had already obtained a large amount of relief from gender dysphoria due to the current treatment regimen. Dr. Levine also agreed with Dr. Schmidt's opinion that many individuals with GID are able to live reasonably without undergoing SRS, stating that living in a new gender

30

does not require SRS and the vast majority of individuals with GID in this country do not get SRS.  RA 5999 (Levine Tr.). Dr. Levine defined depression as an ordinary reaction to disappointment when one realizes that some cherished goal in one's life can't be realized and acknowledged that Kosilek would likely experience a depression if denied SRS. RA 5992 (Levine Tr.). Dr. Levine agreed that psychotherapy and antidepressant medications could help Kosilek overcome a depression resulting from the denial of SRS.  RA 5994-96, 6079-80 (Levine Tr.). Further, Dr. Levine expressed his concern that providing Kosilek with SRS could expose Kosilek to memories of victimization and abuse which may result in a depression.  RA 6001 (Levine Tr.).

Distancing himself from Drs. Brown, Kaufman, and Kapilla, who predicted to a degree of medical certainty that Kosilek would attempt suicide and likely succeed, Dr. Levine stated that their predictions of suicide were overstated, but that it is "very reasonable to say that she will have an existential crisis and she ought to be protected and assisted through that crisis if that is the Court's decision about Sex Reassignment Surgery." RA 6003-04 (Levine Tr.).

Dr. Levine recommended that if SRS is denied, Kosilek should have frequent access, even daily, to mental health professionals, who are able to understand the nature of the existential dilemma and provide the necessary

31

compassion. RA 6004-05, 6086-90, 6118-20 (Levine Tr.). Drs. Levine and Appelbaum acknowledged the limitations of psychiatry, noting that while psychiatrists would like to treat and cure mental illnesses, modern psychiatry primarily treats symptoms. RA 5996, 5998 (Levine Tr.); 5645-46 (Appelbaum Tr.).

The District Court found Dr. Levine's testimony credible and acknowledged that Dr. Levine found Dr. Schmidt's treatment recommendations to be "within prudent professional standards." Add. 39. However, the District Court was critical of Dr. Levine when he expressed his agreement with Dr. Schmidt that the real life experience, as defined in the Standards of Care, could not be accomplished in a prison. RA 1545. Thus, Dr. Levine agreed with Dr. Schmidt's assessment that Kosilek did not meet the readiness criteria for SRS based on the lack of a real life experience in prison.  RA 6102-03, 6108-09 (Levine Tr.).

However, the District Court instructed Dr. Levine that it believed that the real life experience could take place within a prison.  RA 6109-10 (Levine Tr.). Dr. Levine then altered his opinion, opining it would also be within prudent professional standards to provide Kosilek with SRS if the District Court found that the real life experience could be completed in a prison environment, thus meeting the "readiness" criteria for SRS under the Standards of Care.  RA 6091-95, 6108-10 (Levine Tr.). In advising Dr. Levine that it had determined that the real life

experience could take place in prison, the District Court improperly influenced and diametrically altered Dr. Levine's opinion as an independent expert. Relying upon the District Court's layman's finding that Kosilek had achieved the real life experience in prison, caused Dr. Levine to alter his opinion that Dr. Schmidt's recommendations were within prudent professional standards. *Id*. at 6107-10.

The District Court found Dr. Schmidt not to be a prudent professional. The basis for this legal finding rested largely on Dr. Schmidt's opinion that SRS was not medically necessary treatment for GID and that the real life experience could not be accomplished in a prison environment. Add. at 40. Instead, it was Dr. Schmidt's practice to leave the decision to undergo SRS to the individual. Dr. Schmidt testified that it was his practice to refer the patient to a SRS surgeon, forward the patient's file, and advise the SRS surgeon that there were no psychiatric contraindications to the surgery, thus opening the door to the SRS. RA 4149-51 (Schmidt Tr.). However, in taking a neutral position, neither promoting nor discouraging SRS for his patients, Dr. Schmidt is not acting contrary to the Standards of Care. *Id.* Importantly, Dr. Levine testified that he followed a similar practice of opening the door for a patient to obtain SRS. RA 5925-26 (Levine Tr.). Further, as described above, Dr. Levine similarly expressed doubts as to whether

the real life experience as defined in the Standards of Care could take place in prison.  RA 5955-59, 6102-03, 6108 (Levine Tr.).

The District Court erred in finding that the only adequate further treatment for Kosilek's GID was SRS, a treatment that is rarely available in the community. RA 5999 (Levine Tr.); 2944.  However, based on the expert testimony at trial, it is clear that the mental health treatment provided Kosilek has effectively reduced the dysphoria caused by GID and there are treatment modalities available to treat any future depression Kosilek may experience in the absence of SRS.  The current mental health treatment does not constitute inhumane treatment prohibited under the Eighth Amendment; instead, the District Court has conflated adequate medical care into the most sophisticated care available.  *See DeCologero*, 821 F.2d at 43.

II.    THE DISTRICT COURT ERRED IN FINDING COMMISSIONER SPENCER DELIBERATELY INDIFFERENT TO KOSILEK'S NEED FOR TREATMENT FOR GID.

The Supreme Court has defined the subjective component of the deliberate indifference standard as requiring that "the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *See Farmer*, 511 U.S. at 837; *Wilson v. Seiter*, 501 U.S. 294, 299-300 (1991).  Deliberate indifference requires more than mere negligence, thus to constitute a violation of the Eighth Amendment, the

34

prison official's conduct must rise to the level of recklessness as defined under criminal law. *Farmer*, 511 U.S. at 836-837; *Battista v Clarke*, 645 F.3d 449, 454 (1st Cir. 2011) (question is whether the prison official's action regarding medical care "was 'wanton' or outside the bounds of 'reasonable professional judgment.'"). In assessing an official's action under the subjective component, "deliberate indifference should be determined in light of the prison authorities' current attitudes and conduct." *Farmer*, 511 U.S. at 845. "A finding of deliberate indifference requires a strong likelihood, rather than a mere possibility, that self-infliction of harm will occur." *Toracco*, 923 F.2d at 236.

"In evaluating the quality of medical care in an institutional setting, courts must fairly weigh the practical constraints facing prison officials." *DesRosiers*, 949 F.2d at 19, *citing Wilson*, 501 U.S. at 302-303 ("assuming the conduct is harmful enough to satisfy the objective component of the Eighth Amendment claim, whether it can be characterized as 'wanton' depends upon the constraints facing the official"); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (deliberate indifference is "an appropriate vehicle to consider arguments regarding the realities of prison administration"). In *Battista*, 645 F.3d at 455, the First Circuit stated:

> Medical 'need' in real life is an elastic term: security considerations also matter at prisons or civil counterparts, and administrators have to balance conflicting demands. The known

35

risk of harm is not conclusive: so long as the balancing judgments are within the realm of reason and made in good faith, the officials' actions are not 'deliberate indifference.'

The Eighth Amendment also imposes upon prison officials the duty to provide for the safety of inmates. *See Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984); *Farmer*, 511 U.S. at 832; *Whitley v. Albers*, 475 U.S. 312, 320 (1986). In *Kosilek*, *supra* at 181-182, the Court held,

> It is conceivable that a prison official, acting reasonably and in good faith, might perceive an irreconcilable conflict between his duty to protect safety and his duty to provide an inmate adequate medical care. If so, his decision not to provide that care might not violate the Eighth Amendment because the resulting infliction of pain on the inmate would not be unnecessary or wanton. Rather, it might be reasonable and reasonable conduct does not violate the Eighth Amendment.

*Kosilek,* 221 F.Supp.2d at 181-182.

Furthermore, the Supreme Court has long held that courts should accord deference to the decisions of prison administrators concerning the security needs of prisons. *See Florence v. Board of Chosen Freeholders of County of Burlington*, __ U.S. __, 132 S.Ct. 1510, 1518 (2012) ("deference must be given to the officials in charge of the jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated"), *citing Block v. Rutherford*, 468 U.S. 576, 584-585 (1984). "The administration of a prison, we have said, is 'at best an

extraordinarily difficult undertaking.'" *Hudson*, 468 U.S. at 527, *quoting Wolff v. McDonnell,* 418 U.S. 539, 566 (1974)*; Bell v. Wolfish*, 441 U.S. 520 (1979) ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of constitutional rights of both convicted prisoners and pretrial detainees.").

     A.     Commissioner Clarke's Decision To Deny Sex Reassignment Surgery For Kosilek Was Based On His Review Of The Record As Ordered By The District Court And His Extensive Experience As A Corrections Official, Not On Any Fear Of Criticism.

The District Court found that the denial of SRS for Kosilek was not the result of "a good faith balancing judgment," but "in order to avoid public and political criticism," and constituted deliberate indifference. Add. 43. As a result, the District Court declined to accord deference to the legitimate safety and security concerns raised at trial. As its stated basis for Commissioner Dennehy and Commissioner Clarke's "fear of criticism and controversy," the District Court focused on criticism of Kosilek's request for SRS by the media and elected officials. For example, the District Court's September 4, 2012 decision quoted, in its entirety, a June 13, 2000 column published in the *Boston Globe* that was critical of Kosilek's request for SRS. Add. 24. The District Court also cited to the Lieutenant Governor's public statement of opposition to providing Kosilek with

SRS in 2006. Finally, the District Court seized upon unsolicited letters sent to Commissioner Clarke in May, 2008 by members of the Massachusetts Senate and House of Representatives, which voiced opposition to providing Kosilek with SRS. RA 3403-09. Add. 47-48.

Commissioner Spencer vigorously disputes the District Court's characterization of the impact of the public criticism of Kosilek's request for SRS upon Commissioner Dennehy and her successor, Commissioner Clarke, as having motivated their respective concerns for safety and security presented by the possibility of having to provide Kosilek with SRS. More importantly, Commissioner Spencer maintains that the merits of the safety and security concerns raised at trial must be considered on their own merit and not viewed in the context of questions raised in other cases concerning the medical care of other Massachusetts GID inmates whose circumstances differ significantly from those of Kosilek. The District Court's attempt to connect public controversy over Kosilek's request for SRS with the denial of the request relies on pure conjecture.

The District Court's analysis of the subjective prong of the deliberate indifference standard focused almost entirely upon Commissioner Dennehy's decision to deny SRS for Kosilek, going back to 2003 to describe then-Acting Commissioner Dennehy's perceived hostility to the treatment of GID inmates.

Add. at 101.  While it was stipulated at the commencement of trial in May, 2006 that Commissioner Dennehy was the decision-maker with regard to the determination of whether safety and security concerns prevented providing Kosilek with SRS, (Add. 41), it is clear that Harold Clarke, who succeeded Kathleen Dennehy as Commissioner, and provided testimony over two days in May, 2008, should be the focus of the subjective prong of the deliberate indifference standard regarding the reasonableness and good faith basis of the safety and security concerns asserted in response to providing Kosilek with SRS.

Harold Clarke was appointed Commissioner of Correction on November 26, 2007.  Prior to this position, Commissioner Clarke served as the Secretary of Corrections for the State of Washington Department of Correction from February 28, 2005 until November 25, 2007 and as the Director of the Nebraska Department of Correction from May, 1990 to February 27, 2005.  At the time of his trial testimony, Commissioner Clarke was the president-elect of the American Correctional Association ("ACA"), the largest professional association for corrections in the world.  In addition, as an auditor for the ACA, Commissioner Clarke had audited correctional facilities across the country regarding compliance with the ACA national correctional standards.  RA 6265-82 (Clarke Tr.).

When Harold Clarke was appointed Commissioner, the bench trial, which commenced in May, 2006 and included the testimony of 19 witnesses over 24 days, had been completed. Nevertheless, the District Court entered an Order requiring Commissioner Clarke's testimony because he might not share former Commissioner Dennehy's concerns with regard to providing Kosilek with SRS, in light of his prior experience. RA 39. Specifically, the District Court ordered Commissioner Clarke to read several witnesses' trial transcripts and exhibits identified by Kosilek's counsel, and to submit a written statement setting forth his conclusions regarding the safety and security concerns previously raised at trial in response to the recommendation for SRS for Kosilek, in preparation for his testimony on May 12, 2008.[6] RA 40-41.

On May 7, 2008, Commissioner Clarke submitted a statement outlining his conclusions concerning the safety and security concerns presented by Kosilek's request for SRS based on his review of the selected trial transcripts and exhibits and his 34 years as a corrections professional. RA 3315. Commissioner Clarke

---

[6] Pursuant to the April 1, 2008 Order, Kosilek requested that Commissioner Clarke review the trial transcripts of Kosilek, former Commissioner Dennehy, MCI-Norfolk Superintendent Luis Spencer, MCI-Framingham Superintendent, Lynn Bissonnette and several trial exhibits, including the reports of Dr. Seil and the Fenway Clinic, and correspondence between UMass and DOC Health Services Division staff as identified by Kosilek's counsel. RA 35.

presented testimony at trial on May 12, 2008 and May 13, 2008.  RA 6263-6450 (Clarke Tr.).  Certainly, in terms of the District Court's decision, Commissioner Clarke's testimony was the most recent and relevant evidence concerning the safety and security concerns raised with regard to providing Kosilek with SRS. Equally important, as made clear by the District Court's February 29, 2008 Order, Commissioner Clarke offered the perspective of an experienced corrections professional who served as  the head of the Department of Corrections of Nebraska and the state of Washington, and who was not influenced by relationships with prior Commissioners Dennehy and Maloney or other Massachusetts officials. Commissioner Clarke made good on his promise to provide a fresh look at the safety and security concerns previously raised at trial and scrupulously refrained from discussing the case with other trial witnesses, other employees of the DOC, or state officials.  RA 6288-93 (Clarke Tr.); 3315.

In its September 4, 2012 Memorandum, the District Court concluded that Commissioner Clarke's decision not to permit Kosilek to undergo SRS, culled from his May 7, 2008 statement and his trial testimony, was based solely on his efforts to avoid political and public criticism and amounted to an "abdication of [his] responsibility to obey the requirements of the Eighth Amendment." Add. 48. Again, this legal conclusion conflates and misstates the facts in the record below.

41

In support of its conclusion that Commissioner Clarke's decision to deny SRS for Kosilek was not made in good faith, the District Court points to the two unsolicited letters sent to Commissioner Clarke by members of the Massachusetts legislature and the fact that Commissioner Clarke did not personally consult with Superintendent Spencer or the other DOC trial experts in making his decision.[7] Add. at 44, 47-48. However, the record is devoid of any evidence which demonstrates that Commissioner Clarke's decision with regard to Kosilek's request for SRS was influenced by political or media criticism. In fact, Commissioner Clarke addressed this issue in his written statement and in his trial testimony, specifically denying the suggestion that his opinions regarding the significant safety and security concerns with providing Kosilek with SRS were influenced in any way by political or media considerations. RA 6291-92 (Clarke Tr.); 3315. Irrefutably, as Commissioner of Correction, Harold Clarke was expected to exercise his correctional expertise in fulfilling his statutory obligations to maintain safety and institutional order within the DOC.

The District Court's criticism of Commissioner Clarke for not speaking directly with Superintendent Spencer and the other DOC trial experts, is equally

---

[7] The April 4, 2008 letter sent by seventeen State Senators and the April 8, 2008 letter sent by twenty-five State Representatives, expressed their opposition to providing Kosilek with SRS. RA 3403-3408.

unfounded.  In ordering Commissioner Clarke to conduct a review of the decision

to deny SRS for Kosilek, the District Court required Commissioner Clarke to

review the trial testimony of certain witnesses and exhibits selected by Kosilek's

counsel, including the testimony transcripts of Superintendents Spencer and

Bissonnette. RA 41.  Nowhere in the District Court's orders were there instructions

to Commissioner Clarke to seek out other individuals to discuss the issue of

providing Kosilek with SRS.  In his testimony, Commissioner Clarke made clear

his understanding that his review of the matter was limited to the testimony and

exhibits identified by Kosilek's counsel pursuant to the April 1, 2008 Order.  RA

40-41; 6288-89, 6292-93, 6373 (Clarke Tr.).  Thus, based on the April 1, 2008

Order, Commissioner Clarke reviewed the trial testimony of former Commissioner

Dennehy and Superintendents Spencer and Bissonnette, but did not attempt to

speak personally with them or seek out other corrections experts who testified at

trial.  Accordingly, it is disingenuous for the District Court to criticize

Commissioner Clarke "for merely reviewing some testimony" when his review of

the issue was dictated by the parameters established by the District Court's Order.

Add. 44.  Moreover, the fact that Commissioner Clarke did not speak personally

with former Commissioner Dennehy, Superintendents Spencer and Bissonnette, or

other DOC correctional experts demonstrates that he was not subject to undue

43

influence from others, but gave his direct and honest opinion as an experienced correctional professional.

Undoubtedly, Commissioner Clarke possessed the authority to order that Kosilek be provided with the SRS, and clearly, this is what the District Court anticipated would happen as stated in its Order of February 29, 2008. RA 39. However, when Commissioner Clarke's review of the trial testimony and exhibits identified pursuant to the April 1, 2008 Order resulted in his determination, based on his experience, that the safety and security concerns presented at trial were valid and reasonable, the District Court sought to discredit Commissioner Clarke with the amorphous charge that his review was not conducted "with an open mind in a good faith effort to determine whether security considerations required denying Kosilek sex reassignment surgery." Add. 44.

Here, there is an absence of substantial evidence in the record demonstrating that Commissioner Clarke's significant safety and security concerns in providing SRS for Kosilek were exaggerated and made in bad faith. *See Florence*, 132 S.Ct. at 1518. Thus, the District Court was obligated to accord him the deference normally accorded prison administrators.

Nor should the District Court be permitted to minimize the impact of Commissioner Clarke's report and testimony by asserting that, because the instant

44

action was brought as an official capacity suit and seeks injunctive relief, it is not necessary to sort out the "separate roles of individual defendants." Add. 41, *citing Battista*, 645 F.3d at 452.   Here, the critical nature of the role played by Commissioner Clarke, as an intervening official with the independent authority to provide Kosilek with SRS, was made clear by the District Court's orders. RA 34-35. Accordingly, the analysis of the subjective prong of the Eighth Amendment's deliberate indifference standard should focus on Commissioner Clarke's subjective intent with regard to the reasonableness of his decision not to provide Kosilek with SRS based on his safety and security concerns, rather than his predecessors. *Farmer*, 511 U.S. at 837.

> B. The Testimony From Correctional Professionals Attesting To The Significant Safety And Security Risks Posed By Providing Kosilek With SRS Was Reasonable And Made In Good Faith.

At trial, experienced corrections professionals expressed their concerns that providing Kosilek with SRS posed significant obstacles to safety and security, including: 1) housing Kosilek, post-surgery, at MCI-Framingham, the DOC's facility for female offenders, presented substantial security risks, both to the female offenders and Kosilek; 2) other options for housing Kosilek, post-surgery, such as creating a separate unit for GID inmates or a transfer out-of-state were considered and rejected as unfeasible;) 3) the only other option, housing Kosilek in MCI-

45

Norfolk's Special Management Unit ("SMU"), while secure, was extremely restrictive; 4) the DOC had improved its ability to respond to and treat inmates who are potentially suicidal; 5) it is contrary to established correctional practices to provide specialized medical treatment or other benefits in response to threats of suicide; and 6) transporting Kosilek out-of-state for surgery presented numerous security risks, including the risk of escape.

These safety and security concerns were presented through the testimony of MCI-Framingham Superintendent Bissonnette, MCI-Norfolk Superintendent Spencer, Commissioner Dennehy, Commissioner Clarke, DOC Director of Research and Planning Robert Dumond, and Federal Bureau of Prisons Warden Arthur Beeler. The District Court improperly found Commissioner Clarke's decision to deny SRS for Kosilek to be deliberately indifferent despite the lack of the requisite "substantial evidence" that the safety and security concerns raised at trial were exaggerated. *See Florence*, 132 S.Ct. at 1518.

First, Kosilek failed to present testimony from any correctional expert to show that the safety and security concerns raised by defendant's witnesses were exaggerated. Thus, in the absence of any countervailing testimony from correctional experts, the District Court was left to engage in conjecture as to whether the safety and security concerns raised were legitimate or pretextual.

Second, the District Court did not find that the safety and security concerns raised by Superintendent Bissonnette (RA 5465-5531) and Superintendent Spencer (RA 4484-4610) at trial were tainted by a fear of public controversy or criticism or lacked good faith.  Superintendent Bissonnette, whose extensive knowledge of MCI-Framingham and its female offenders was not seriously contested at trial, testified regarding her concerns that placing Kosilek at MCI-Framingham, post-surgery, would present significant safety and security problems based on the design of the facility and the nature of its population. Since MCI-Framingham is the state's only admitting facility for female offenders, including pretrial detainees, county inmates, and females civilly committed for substance abuse, there is no maximum capacity limit.  On average, the prison has more than 4,200 admissions annually. MCI-Framingham has no single cells, except for the Health Services Unit ("HSU") and the restrictive Close Custody Unit ("CCU").  Generally, the female offenders are placed in double or triple person rooms, six person rooms or dormitory style housing units. RA 5471-73, 5476, 5479-80, 5490 (Bissonnette Tr).

Superintendent Bissonnette also testified that the security perimeter of MCI-Framingham does not have a concrete perimeter wall and manned observation towers like MCI-Norfolk, but consists of a chain link fence in many areas that permits the public to look into the facility from the street. Superintendent

47

Bissonnette testified that she considers Kosilek to be an escape risk if housed at MCI-Framingham, post-surgery, where the perimeter at the prison is much less than what exists at MCI-Norfolk.  RA 5493 (Bissonnette Tr.).

Superintendent Bissonnette also testified that approximately 60% of the female offenders at MCI-Framingham are diagnosed with mental illnesses, with about 50% of the offenders receiving medication for mental health issues.  A large majority of the female offenders have been the subject of sexual abuse or domestic violence at some point during their lifetime and suffer from Post-Traumatic Stress Disorder.  RA 5483-87 (Bissonnette Tr.).  Superintendent Bissonnette testified that there is no secure inpatient mental health facility for female offenders who need treatment at a secure facility like the DOC's Bridgewater State Hospital for males. Female offenders at MCI-Framingham who need inpatient mental health treatment are transferred to Department of Mental Health facilities, which are significantly less secure than MCI-Framingham.  RA 5485-88 (Bissonnette Tr.).

Superintendent Bissonnette testified as to her concern that Kosilek may be victimized by female offenders if transferred to MCI-Framingham based on the nature of Kosilek's violent crime against a woman. RA 5500 (Bissonnette Tr.). Superintendent Bissonnette also expressed concern that Kosilek would present a risk to the female offenders at MCI-Framingham, acting as a predator against

weaker female offenders.  She also testified that she was concerned, based on conversations with female offenders, that in light of Kosilek's murder of Cheryl McCaul in a domestic dispute, Kosilek's presence at the prison would dramatically increase the tension among the prison population, adversely affecting the climate of the prison. RA 5499-5500 (Bissonnette Tr.).

Seeking to minimize Superintendent Bissonnette's testimony that Kosilek would have a deleterious impact on the female offenders and the climate of MCI-Framingham, the District Court pointed to the tenuous testimony of Dr. Appelbaum, who "was familiar with the mental health treatment in the DOC's prisons," and who testified that he was "uncertain" whether Kosilek would disrupt the "climate" at MCI-Framingham. Add. 46. However, Dr. Appelbaum's knowledge of MCI-Framingham is minimal, limited to attending meetings at the facility and occasionally providing psychiatric coverage when the facility was short staffed.  RA 3926-27 (Appelbaum Tr.).

Robert Dumond, the DOC's Director of Research and Planning, testified as to the effect that Kosilek's placement, post-surgery, at MCI-Framingham would have upon the facility's population and the potential risk to Kosilek.  Mr. Dumond has a master's degree in psychology and considerable experience in corrections and the field of sexual violence and victimization in prison.  Mr. Dumond testified

that he had worked as a therapist at MCI-Framingham.  Mr. Dumond conducted exhaustive research into the area of sexual violence in both male and female prisons.  He has also reviewed Kosilek's institutional, medical, and mental health records.  RA 4976-4813 (Dumond Tr.).

Mr. Dumond testified that, in his professional opinion, placing Kosilek at MCI-Framingham, post-surgery, would destabilize the security and order of the prison and place Kosilek at risk for assault.  Mr. Dumond's opinion was based on his personal knowledge of MCI-Framingham's female offender population, his knowledge of the research on female offender populations in general, studies on risk factors for sexual violence, his review of Kosilek's records, and his experience as a corrections professional.  RA 4839-41, 4844-47, 4848-53 (Dumond Tr.).  Mr. Dumond further testified that the Prison Rape Elimination Act of 2003 ("PREA"), 42 U.S.C. § 15601, *et seq.*, provides additional support for his concerns regarding Kosilek's safety, post-surgery, where the statute identifies transgendered inmates as being at an increased risk for sexual assault and victimization.[8]  RA 4814-17, 4832 (Dumond Tr.).

Superintendent Spencer testified that MCI-Norfolk is one of the most secure

---

[8]   PREA, enacted into federal law on September 4, 2003, supports the elimination, reduction and prevention of sexual assaults in corrections systems; requires national data collection; provides for research; requires the development of standards; and applies to all federal, state and local prisons and jails.

prisons in Massachusetts. The superintendent described MCI-Norfolk's perimeter security, stating that the prison is surrounded by concrete walls topped with electric wire and five observation towers that are staffed 24 hours a day, seven days a week. He stated that approximately one third of the inmates are serving life sentences and one third are convicted sex offenders.  RA 4493-97 (Spencer Tr.).

Superintendent Spencer testified that he would have grave concerns should Kosilek return to MCI-Norfolk, post-surgery, since the other inmates at the prison would be aware of the surgery and Kosilek, now with female genitalia, would be at a high risk for sexual assault and victimization.  If Kosilek returned to MCI-Norfolk, post-surgery, Superintendent Spencer testified that he would have no alternative but to house Kosilek in the Special Management Unit ("SMU"). Superintendent Spencer described the very restrictive conditions of the SMU, including only one hour out of cell per day.  RA 4518-21 (Spencer Tr.).

Commissioner Clarke was identified by the District Court as having a unique and pivotal role in determining whether safety and security concerns raised by Commissioner Dennehy and Superintendents Spencer and Bissonnette at trial were reasonable.  Commissioner Clarke agreed to review the trial transcripts and exhibits identified by Kosilek's counsel and to provide a fresh look at the safety and security concerns raised in the trial, utilizing his 34 years as a corrections

51

professional.  RA 3315.

Commissioner Clarke testified that providing SRS in response to Kosilek's threats to attempt suicide runs counter to good correctional practices.  He testified that it is not uncommon for inmates to threaten to harm themselves in order to obtain a transfer to a different prison or other benefits.  He stated that it is his practice, and the practice among corrections professionals across the nation, not to respond to such manipulative threats by allowing the inmate to obtain the particular desired outcome.  RA 6299-6301 (Clarke Tr.). Superintendent Spencer testified that negotiating with inmates who threaten to harm themselves unless provided a specific benefit would compromise institutional security and undermine his authority as superintendent.  RA 4521-27 (Spencer Tr.).

Commissioner Clarke testified that he was aware of Kosilek's threats to attempt suicide if denied SRS and the opinion expressed by some mental health professionals that Kosilek would be at risk for suicide if denied SRS. Commissioner Clarke testified that while he was concerned about the possibility that Kosilek may attempt suicide in the future, he believed that MCI-Norfolk would be able to provide appropriate mental health treatment, including close observation by mental health staff or a transfer to the Bridgewater State Hospital, if necessary. RA 6301-02, 6304, 6395-97 (Clarke Tr.); 4528-34 (Spencer Tr.); 3315.

52

Commissioner Clarke acknowledged that prison officials cannot guarantee safety to every inmate who is at risk for suicide, but that in his considerable experience, across the nation, correctional mental health staff have worked successfully with suicidal inmates to prevent injury. Commissioner Clarke testified as to the improvements being made within the DOC to improve its response to suicidal inmates based on the recent report of Lindsay Hayes, a nationally known expert on prison suicide prevention. RA 6302-04 (Clarke Tr.); 2994-3101. In fact, the DOC's improved response to the treatment of mentally ill inmates, including suicidal inmates, has been borne out by the settlement agreement entered in the case of *Disability Law Center v. Massachusetts Department of Correction*, acknowledged by the District Court in its decision. Add. 16-17. *See Disability Law Center v. Massachusetts Department of Correction*, 2012 WL 1237760 (D. Mass. April 12, 2012) at *4. Add 65. Commissioner Clarke testified that he was aware of the fact that Kosilek had established an effective relationship with a mental health clinician at MCI-Norfolk. RA 6397-99 (Clarke Tr.). Commissioner Clarke testified to his reasonable belief that mental health and correctional staff at MCI-Norfolk would be able to effectively respond to any future suicidal behavior by Kosilek. *Id*. at 6302-04.

Arthur Beeler, a corrections official with over thirty years of experience with

the Federal Bureau of Prisons ("FBOP") provided testimony concerning the ability of MCI-Norfolk to provide necessary mental health treatment to inmates such as Kosilek who may become suicidal.  At the time of his testimony, Mr. Beeler was the warden of the FBOP's Federal Medical Center at Buckner, North Carolina.  In preparation for his expert testimony, Warden Beeler toured MCI-Norfolk, spoke with Superintendent Spencer and reviewed the prison's mental health policy and its procedures for treating suicidal inmates. RA 4929-42 (Beeler Tr.). Warden Beeler testified that the FBOP utilized the same policy as the DOC with respect to inmates who threaten suicide in order to obtain some benefit, *i.e.*, the FBOP responds to the suicidal behavior, but does not provide the benefits demanded by the inmate. RA 4942-44 (Beeler Tr.).  Warden Beeler also testified that MCI-Norfolk's mental health and suicide prevention plans were very similar to the policies utilized by the FBOP and provided adequate mental health treatment for suicidal inmates. *Id.*

Commissioner Clarke stated that another reason why prisons do not give into inmates who threaten self-harm is that if the inmate obtains the desired result through such threats, it sends the wrong message to the inmate population and encourages other inmates to engage in manipulative behavior to obtain benefits. RA 6299-6302, 6395-96 (Clarke Tr.); 3315; 4524-27 (Spencer Tr.). Similarly, Warden Beeler testified that providing an inmate with a desired benefit in response

to threats of suicide would be "opening Pandora's box." RA 4943 (Beeler Tr.).

Commissioner Clarke's May 7, 2008 statement and his testimony at trial also made clear his concern that placing Kosilek at MCI-Framingham, post-surgery, would present significant safety and security problems. Commissioner Clarke agreed with Superintendent Bissonnette that Kosilek's transfer to MCI-Framingham, post-surgery, would have a harmful impact on the climate of the prison due to Kosilek's notoriety and violent crime against a woman and the fact that many of the female offenders have themselves been battered by males. RA 6304-07, 6441-42 (Clarke Tr.); 3315. As a result, Commissioner Clarke expressed his concern that Kosilek would be at risk for assault by some female offenders at MCI-Framingham and could pose a risk to other offenders as well. RA 6305, 6353-54 (Clarke Tr.). He expressed his concern that Kosilek presented an escape risk if placed at MCI-Framingham. He testified that the perimeter security at MCI-Framingham is much less secure than the perimeter security at MCI-Norfolk. RA 6285-88 (Clarke Tr.); 3315. Commissioner Clarke testified that even if placed in MCI-Framingham's most secure unit, the CCU, once an inmate gets out of the CCU, the remaining perimeter security is weak. RA 6305 (Clarke Tr.).

Commissioner Clarke also considered the significant difficulties in returning Kosilek to MCI-Norfolk's general population, post-surgery. Commissioner Clarke

testified that if placed within the general population of MCI-Norfolk with female genitalia, there would be a very significant risk that Kosilek would be sexually assaulted by male inmates. RA 6307-08, 6440 (Clarke Tr.). Commissioner Clarke stated that Kosilek would have to be housed in MCI-Norfolk's restrictive SMU. *Id*.; 3315. However, as noted by the District Court, placing Kosilek in MCI-Norfolk's SMU is not a solution for long-term confinement given the very restrictive conditions of the unit. The District Court stated that confinement in the SMU would be "onerous," and likely unconstitutional, stating, "it may foreseeably be argued that keeping Kosilek in segregation is unnecessary and a form of extrajudicial punishment that is prohibited by the Eighth Amendment." Add. 46. *See e.g*., *Jackson,* 699 F.2d at 584-585. Thus, placing Kosilek in a SMU long-term, following SRS, is not a viable option.

Commissioner Clarke addressed the fact that other housing options, such as transfer to another state or creating a special unit for GID inmates, were not viable. He stated that transfer out-of–state via the Interstate Compact requires a state to agree to accept the inmate and the agreement provides that the transferred inmate could be returned to the sending state at any time. Then problems associated with housing Kosilek in Massachusetts, post-surgery, would again confront the DOC. RA 6349-50 (Clarke Tr.); 3315. Commissioner Clarke also considered and rejected

the idea of creating a separate unit for GID inmates as a housing solution.
Commissioner Clarke stated that creating a separate unit for GID inmates would be
difficult since GID inmates vary greatly in their crimes, security levels, level of
violence, enemy situations, and treatment and program needs. Nor was
Commissioner Clarke aware of any state which had created a separate unit for GID
inmates. RA 6444-46 (Clarke Tr.); 3315.[9]  *Cf Henderson v. Thomas*, 2012 WL
6681773 (M.D. Ala. Dec. 21, 2012) (slip opinion) (prison policy of segregating
HIV-positive inmates from other inmates violates ADA).

Commissioner Clarke also testified regarding his concern that transporting
Kosilek out-of-state for SRS presented significant security risks.   Commissioner
Clarke testified that his review of the earlier trial testimony indicated that SRS was
not available in Massachusetts, but that there were surgeons in two western states,
including Arizona, who could perform the surgery. RA 6294-95 (Clarke Tr.); 3315.

---

[9] The Department of Justice recently promulgated PREA standards which
acknowledge the safety and security concerns raised at trial with regard to the
housing of transgender inmates in state prison systems. *See generally*, 28 Code
Fed. Reg. §§ 114.41–115.43.  These national PREA standards identify transgender
inmates as being at risk for victimization by other inmates and provide criteria for
screening transgendered inmates for housing and programs. The PREA standards
provide that GID inmates should *not* be housed separately from other inmates in
special units. *See* 28 Code Fed. Reg. § 115.42. The new PREA standards support
Commissioner Clarke's conclusion that creating a separate housing unit for
Kosilek and other GID inmates is not a viable solution for housing Kosilek.

Commissioner Clarke testified that he was concerned that transporting Kosilek out-of-state for the surgery would present opportunities for escape en route and upon return.  Commissioner Clarke testified that he viewed Kosilek as a potential risk for escape based on Kosilek's criminal sentence of life without the possibility of parole and because Kosilek had fled Massachusetts following Kosilek's murder of Cheryl McCaul, and was arrested in the state of New York.  RA 6295 (Clarke Tr.).

Commissioner Clarke testified while Kosilek's age and lack of escape attempts were factors to be considered in determining Kosilek's risk for escape, he maintained that he considered Kosilek an escape risk.  RA 6427-28 (Clarke Tr.).  Commissioner Clarke testified that the fact that Kosilek had not attempted to escape from MCI-Norfolk had more to do with the high security perimeter of the prison, which discourages any escape attempts, than with Kosilek's lack of desire to escape from custody. RA 6366-67 (Clarke Tr.).  Nor does Kosilek's transportation outside of prison on numerous occasions for court and medical care without incident mean that Kosilek does not present a risk of escape whenever transported outside of a prison.  RA 6408-09, 6421-24 (Clarke Tr.).  While Commissioner Clarke agreed that the DOC would take all necessary precautions in transporting Kosilek, he testified that, in his experience, taking necessary precautions may not be sufficient.  Commissioner Clarke described three incidents

58

in which inmates escaped during out-of-prison transportation while he was Commissioner of the Nebraska Department of Correction. RA 6296-98, 6421-24 (Clarke Tr.). While the DOC's Classification Manual does not consider an inmate's flight from custody prior to incarceration to be a factor in classification decisions, Commissioner Clarke testified that, based on his experience, he considered Kosilek's flight from Massachusetts after murdering Cheryl McCaul, along with serving a life sentence without the possibility of parole, to be factors that rendered Kosilek a potential flight risk. RA 6295 (Clarke Tr.); 6795.

Accordingly, the District Court erred in finding that the safety and security concerns raised were pretextual and not made in good faith. While the District Court may disagree with the safety and security concerns raised by Commissioner Clarke, Superintendents Spencer and Bissonnette, Warden Beeler, and Mr. Dumond at trial, the record below lacks substantial evidence demonstrating that their safety and security concerns were exaggerated and not made in good faith. Indeed, Kosilek never refuted defendant's safety and security concerns with an expert of Kosilek's own choice. Thus, the testimony of Commissioner Clarke, Superintendents Spencer and Bissonnette, Mr. Dumond and Warden Beeler is entitled to deference. *See Florence,* 132 S.Ct. at 1517; *Hudson*, 468 U.S. at 527. In light of the constraints placed upon Commissioner Clarke, the decision to deny

SRS for Kosilek is not wanton and does not constitute deliberate indifference in violation of the Eighth Amendment.

## CONCLUSION

For the foregoing reasons, Commissioner Spencer requests that the September 4, 2012 Order requiring him to provide Kosilek with sex reassignment surgery be reversed.

Respectfully submitted,

NANCY ANKERS WHITE
Special Assistant Attorney General

January 17, 2013          /s/ Richard C. McFarland_____
Richard C. McFarland (#41993)
Legal Division
Department of Correction
70 Franklin Street, Suite 600
Boston, MA 02110-1300
(617) 727-3300

## **CERTIFICATE OF COMPLIANCE WITH APPELLATE RULE 32(a)**

I certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P.32(a)(7)(B) because this brief contains 13,233 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Local Rule 34.0.   In accordance with Fed. R. App. P. 32(a)(7)(C)(i), I have relied upon Microsoft Office Word 2003's word count utility in making this certification.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally-spaced typeface that contains serifs (fourteen point Times New Roman font) using Word 2003.

*/s/* Richard C. McFarland
Richard C. McFarland (#41993)

Dated: January 17, 2013

## **<u>CERTIFICATE OF SERVICE</u>**

I, Richard C. McFarland, counsel for Defendant-Appellant Luis S. Spencer, hereby certify that on this 17th day of January, 2013, I served two copies of the Brief of Defendant-Appellant Luis S. Spencer and two copies of the Joint Record Appendix on Frances S. Cohen, counsel for Plaintiff-Appellee, by hand delivering them to her address, Bingham McCutchen, One Federal Street, Boston, MA 02210.

<u>/s/ Richard C. McFarland</u>
Richard C. McFarland (#41993)

62

ADDENDUM

# **TABLE OF CONTENTS**

Page

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Memorandum and Order on Eighth Amendment Claim, September 4, 2012 . . . . . 2

Mass. Gen. Law. Ch. 123, § 18(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Mass. Gen. Law. Ch. 124, § 1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Disability Law Center v. Massachusetts Department of Correction,
2012 WL 1237760 (D. Mass. April 12, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . 65

Henderson v. Thomas,
2012 WL 6681773 (M.D. Ala. Dec. 21, 2012) . . . . . . . . . . . . . . . . . . . . . . . . 78

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHELLE L. KOSILEK,
        Plaintiff,

      v.                                    C.A. No. 00-12455-MLW

LUIS S. SPENCER, in his official
capacity as Commissioner of the
Massachusetts Department of
Correction,
        Defendant.

## NOTICE OF APPEAL

    Notice is hereby given that Luis S. Spencer, Commissioner of the Massachusetts Department of Correction, defendant in the above named case, hereby appeals to the United States Court of Appeals for the First Circuit from the Final Judgment entered in this action on September 6, 2012.

Dated: October 2, 2012                    Respectfully submitted,

                                      NANCY ANKERS WHITE
                                      Special Assistant Attorney General

                                    /s/ Richard C. McFarland
                                    Richard C. McFarland, BBO# 542278
                                    Joan T. Kennedy, BBO# 554935
                                    Legal Division
                                    Department of Correction
                                    70 Franklin Street, Suite 600
                                    Boston, MA 02110-1300
                                    (617) 727-3300, Ext. 132

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on 10/2/12.

                              /s/ Richard C. McFarland
                              Richard C. McFarland

Westlaw.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
Michelle L. KOSILEK, Plaintiff,
v.
Luis S. SPENCER, in his official capacity as Commis-
sioner of the Massachusetts Department of Correction,
Defendant.

C.A. No. 00–12455–MLW.
Sept. 4, 2012.

**Background:** Massachusetts prisoner suffering from a
gender identity disorder (GID) brought action, alleging
his rights were being violated by the Massachusetts De-
partment of Corrections' (DOC) refusal to provide him
with male-to-female sex reassignment surgery for his
severe gender identity disorder (GID), and seeking an
injunction requiring the DOC to provide him with the
surgery.

**Holdings:** The District Court, Wolf, J., held that:
(1) prisoner's gender identity disorder (GID) constituted
a serious medical need that triggered Eighth Amend-
ment protection;
(2) DOC officials had actual knowledge of prisoner's
serious medical need;
(3) DOC Commissioner's refusal to provide the surgery
in order to avoid public and political criticism was not a
legitimate penological purpose; and
(4) DOC Commissioner's deliberate indifference would
continue in absence of injunction.

Judgment for prisoner.

West Headnotes

**[1] Sentencing and Punishment 350H ⟨⟩1532**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
      350Hk1532 k. In general. Most Cited Cases

The treatment a prisoner receives in prison and the
conditions under which he is confined are subject to
scrutiny under the Eighth Amendment. U.S.C.A.
Const.Amend. 8.

**[2] Sentencing and Punishment 350H ⟨⟩1435**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(A) In General
      350Hk1434 Scope of Prohibition
       350Hk1435 k. In general. Most Cited Cases
"Cruel and unusual punishments," under the Eighth
Amendment, are those that are incompatible with the
evolving standards of decency that mark the progress of
a maturing society or that involve the unnecessary and
wanton infliction of pain on an inmate. U.S.C.A.
Const.Amend. 8.

**[3] Sentencing and Punishment 350H ⟨⟩1532**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
      350Hk1532 k. In general. Most Cited Cases
The Eighth Amendment imposes duties on prison
officials, who must provide humane conditions of con-
finement; prison officials must ensure that inmates re-
ceive adequate food, clothing, shelter, and medical care,
and must take reasonable measures to guarantee the
safety of inmates. U.S.C.A. Const.Amend. 8.

**[4] Sentencing and Punishment 350H ⟨⟩1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
      350Hk1546 k. Medical care and treatment.
Most Cited Cases
Not every claim by a prisoner that he has not re-
ceived adequate medical treatment states a violation of
the Eighth Amendment; a mere accident or even negli-
gence is insufficient. U.S.C.A. Const.Amend. 8.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

**[5] Sentencing and Punishment 350H ⟨—⟩1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment.
Most Cited Cases
    In order to state a cognizable claim under the Eighth Amendment based on inadequate medical care, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs; in other words, it must be proven that a prison official acted with deliberate indifference to a substantial risk of serious harm in order to establish a violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[6] Sentencing and Punishment 350H ⟨—⟩1532**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
         350Hk1532 k. In general. Most Cited Cases

**Sentencing and Punishment 350H ⟨—⟩1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
         350Hk1533 k. Deliberate indifference in general. Most Cited Cases
    The test for a violation of the Eighth Amendment has both an objective and a subjective component: the objective component is satisfied where an inmate demonstrates that he is incarcerated under conditions posing a substantial risk of serious harm, while the subjective component requires a showing that a prison official had a sufficiently culpable state of mind, namely one of deliberate indifference to an inmate's health or safety. U.S.C.A. Const.Amend. 8.

**[7] Sentencing and Punishment 350H ⟨—⟩1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment.

Most Cited Cases
    In cases involving a denial of medical care, in order to demonstrate he is incarcerated under conditions posing a substantial risk of serious harm, as required to establish a violation of the Eighth Amendment, an inmate must show that he has a serious medical need for which he has not received adequate medical care. U.S.C.A. Const.Amend. 8.

**[8] Sentencing and Punishment 350H ⟨—⟩1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment.
Most Cited Cases
    A prison official must know of the substantial risk of serious harm faced by the inmate in order to violate the Eighth Amendment; however, even a prison official who knows of such a risk does not violate the Eighth Amendment if the denial of particular medical care is based on reasonable, good faith judgments balancing the inmate's medical needs with other legitimate, penological considerations. U.S.C.A. Const.Amend. 8.

**[9] Sentencing and Punishment 350H ⟨—⟩1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
         350Hk1533 k. Deliberate indifference in general. Most Cited Cases
    The Eighth Amendment's deliberate indifference requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[10] Sentencing and Punishment 350H ⟨—⟩1532**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
         350Hk1532 k. In general. Most Cited Cases
    Generally, an inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm in order to prove a violation of the Eighth

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

Amendment. U.S.C.A. Const.Amend. 8.

**[11] Sentencing and Punishment 350H ⟾1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment.
Most Cited Cases
    A "serious medical need," in the context of an Eighth Amendment claim based on inadequate medical care, is one that involves a substantial risk of serious harm if it is not adequately treated. U.S.C.A. Const.Amend. 8.

**[12] Sentencing and Punishment 350H ⟾1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment.
Most Cited Cases
    A serious medical need may be mental or physical; therefore, deliberate indifference to an inmate's serious mental health needs violates the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[13] Sentencing and Punishment 350H ⟾1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment.
Most Cited Cases
    Adequate services, in the context of an Eighth Amendment claim based on the denial of medical care, are services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards; therefore, reference to established professional standards is important to determining the adequacy of medical care. U.S.C.A. Const.Amend. 8.

**[14] Sentencing and Punishment 350H ⟾1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment.
Most Cited Cases
    Adequate medical care, in the context of an Eighth Amendment claim based on the denial of medical care, is treatment that is the product of sound medical judgment, and sound medical judgment is based on the needs of the particular prisoner; the failure to consider an individual inmate's condition in making treatment decisions is precisely the kind of conduct that constitutes a substantial departure from accepted professional judgment, practice, or standards such as to demonstrate that the person responsible did not actually base the decision on such a judgment. U.S.C.A. Const.Amend. 8.

**[15] Sentencing and Punishment 350H ⟾1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment.
Most Cited Cases
    Absent legitimate countervailing penological considerations, adequate medical care, for purposes of an Eighth Amendment claim based on the denial of medical care, typically requires addressing the cause of the inmate's serious medical need rather than merely providing treatment to reduce the pain it causes. U.S.C.A. Const.Amend. 8.

**[16] Sentencing and Punishment 350H ⟾1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment.
Most Cited Cases
    The fact that an inmate is entitled to adequate medical care under the Eighth Amendment does not mean that he is entitled to ideal care or to the care of his choice. U.S.C.A. Const.Amend. 8.

**[17] Sentencing and Punishment 350H ⟾1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment.
Most Cited Cases

Prison officials have the right to exercise discretion in deciding which of several adequate medical treatments is chosen for a prisoner; therefore, so long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation. U.S.C.A. Const.Amend. 8.

**[18] Sentencing and Punishment 350H ⟜1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; specifically, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[19] Sentencing and Punishment 350H ⟜1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

State of mind, for purposes of an Eighth Amendment deliberate indifference claim, is often inferred from behavior. U.S.C.A. Const.Amend. 8.

**[20] Sentencing and Punishment 350H ⟜1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment.
Most Cited Cases

Deliberate indifference to the serious medical needs

of an inmate may be evidenced, for Eighth Amendment purposes, by denial, delay, or interference with prescribed health care. U.S.C.A. Const.Amend. 8.

**[21] Sentencing and Punishment 350H ⟜1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Certain constraints facing prison officials are relevant to the subjective state of mind component of the Eighth Amendment test for deliberate indifference; more specifically, assuming the conduct is harmful enough to satisfy the objective component of the Eighth Amendment claim, whether it can be characterized as "wanton" depends upon the constraints facing the official. U.S.C.A. Const.Amend. 8.

**[22] Sentencing and Punishment 350H ⟜1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

The inquiry into whether deliberate indifference has been proven under the Eighth Amendment is an appropriate vehicle to consider arguments regarding the realities of prison administration. U.S.C.A. Const.Amend. 8 .

**[23] Sentencing and Punishment 350H ⟜1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment.
Most Cited Cases

The duty to reasonably assure inmate security is one of the realities of prison administration, and thus is relevant to the deliberate indifference analysis; more specifically, in addition to an inmate's medical needs, security considerations also matter at prisons, and administrators have to balance conflicting demands, and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Add. 5

Page 5

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

so long as the balancing judgments are within the realm of reason and made in good faith, the officials' actions are not deliberate indifference. U.S.C.A. Const.Amend. 8.

**[24] Sentencing and Punishment 350H ⟨⟩1533**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
       350Hk1533 k. Deliberate indifference in general. Most Cited Cases
   The Eighth Amendment's deliberate indifference test leaves ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources. U.S.C.A. Const.Amend. 8.

**[25] Sentencing and Punishment 350H ⟨⟩1533**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
       350Hk1533 k. Deliberate indifference in general. Most Cited Cases
   Prison administrators are usually entitled to deference by the courts in their judgment concerning what is necessary to discharge their duty to maintain institutional security, for purposes of an Eighth Amendment deliberate indifference claim; deference does not extend, however, to actions taken in bad faith and for no legitimate purpose. U.S.C.A. Const.Amend. 8.

**[26] Sentencing and Punishment 350H ⟨⟩1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
       350Hk1546 k. Medical care and treatment. Most Cited Cases
   Prison officials forfeit their right to deference in their judgment concerning what is necessary to discharge their duty to maintain institutional security, for purposes of an Eighth Amendment deliberate indifference claim, when their stated, legitimate grounds for re-

fusing a prisoner's request for medical treatment are proven to be pretextual, and the prisoner establishes that the balancing judgments were not within the realm of reason and made in good faith; this is true even if those officials were not motivated by a sinister motive or purpose to do harm to the inmate. U.S.C.A. Const.Amend. 8.

**[27] Sentencing and Punishment 350H ⟨⟩1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
       350Hk1546 k. Medical care and treatment. Most Cited Cases
   Because deference is not due to actions taken for no legitimate purpose, prison officials may be found to be deliberately indifferent under the Eighth Amendment if they deny adequate treatment for a serious medical need for reasons that are not rooted in the responsibility to preserve internal order and discipline, and maintain institutional security; such a denial of treatment in the face of a known risk of serious harm to an inmate, taken without reasonable, good faith penological justification, is the sort of unnecessary and wanton infliction of pain that the Eighth Amendment prohibits. U.S.C.A. Const.Amend. 8.

**[28] Sentencing and Punishment 350H ⟨⟩1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
       350Hk1546 k. Medical care and treatment. Most Cited Cases
   The cost of adequate medical care is not a legitimate reason for not providing such care to a prisoner under the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[29] Sentencing and Punishment 350H ⟨⟩1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
       350Hk1546 k. Medical care and treatment. Most Cited Cases

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Add.  6

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

It is not permissible under the Eighth Amendment for a prison official to fail to provide adequate medical care to a prisoner because it would be unpopular or politically controversial to do so. U.S.C.A. Const.Amend. 8.

**[30] Sentencing and Punishment 350H ☞1435**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(A) In General
      350Hk1434 Scope of Prohibition
       350Hk1435 k. In general. Most Cited Cases
The right to be free of cruel and unusual punishments, like other guarantees of the Bill of Rights, may not be submitted to vote; it depends on the outcome of no elections. U.S.C.A. Const.Amend. 8.

**[31] Sentencing and Punishment 350H ☞1433**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(A) In General
      350Hk1433 k. Necessity of criminal conviction. Most Cited Cases
The whole point of the Eighth Amendment is to protect persons convicted of crimes; Eighth Amendment protections are not forfeited by one's prior acts. U.S.C.A. Const.Amend. 8.

**[32] Injunction 212 ☞1203**

212 Injunction
   212IV Particular Subjects of Relief
     212IV(C) Criminal Matters and Proceedings
      212k1200 Prisons and Prisoners
       212k1203 k. Health, medical, and nutritional issues. Most Cited Cases
In order to obtain an injunction on an Eighth Amendment claim based on the denial of medical care, an inmate must prove that a prison official was, at the time of trial, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and will continue to do so. U.S.C.A. Const.Amend. 8.

**[33] Evidence 157 ☞1**

157 Evidence
   157I Judicial Notice
     157k1 k. Nature and scope in general. Most Cited Cases
A court may take judicial notice of the existence and content of published articles, even if they are not in the record before it, particularly when they are not being considered for the truth of the matters reported. Fed.Rules Evid.Rule 201, 28 U.S.C.A.

**[34] Sentencing and Punishment 350H ☞1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
      350Hk1546 k. Medical care and treatment. Most Cited Cases
A serious medical need, in the context of an Eighth Amendment claim based on inadequate medical care, is, among other things, one that has been diagnosed by a physician as mandating treatment. U.S.C.A. Const.Amend. 8.

**[35] Sentencing and Punishment 350H ☞1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
      350Hk1546 k. Medical care and treatment. Most Cited Cases
Gender identity disorder (GID) constitutes a medical condition of sufficient seriousness that it triggers the Eighth Amendment requirement that prison officials not ignore or disregard it. U.S.C.A. Const.Amend. 8.

**[36] Evidence 157 ☞570**

157 Evidence
   157XII Opinion Evidence
     157XII(F) Effect of Opinion Evidence
      157k569 Testimony of Experts
       157k570 k. In general. Most Cited Cases
Even when the testimony is unequivocal, the court may not rubber stamp the conclusions reached by a court-appointed expert, but must recognize that even an impartial expert can be wrong, and that the impartial ex-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

pert must be subjected to the same evaluation of credibility as any other witness; this means, among other things, that the court must consider the reasons for the impartial expert's opinions and disregard them to the extent that they rely on unproven or erroneous assumptions.

**[37] Sentencing and Punishment 350H ⇐⇒1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases
    As a threshold matter, under the subjective prong of the Eighth Amendment's deliberate indifference test, which requires a showing that a prison official had a sufficiently culpable state of mind, it is usually necessary to identify the decisionmaker whose state of mind is to be analyzed. U.S.C.A. Const.Amend. 8.

**[38] Prisons 310 ⇐⇒204**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k204 k. Transsexuals; sex-change operations. Most Cited Cases

**Sentencing and Punishment 350H ⇐⇒1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
    Massachusetts Department of Corrections (DOC) officials had actual knowledge that prisoner faced a substantial risk of serious harm if prisoner did not receive male-to-female sex reassignment surgery, and therefore prisoner satisfied subjective prong of deliberate indifference test for establishing a violation of the Eighth Amendment; director of mental health of DOC's medical services contractor, which was responsible for making medical decisions for the DOC, communicated to the DOC on "many occasions" that there were risks

of suicide and self harm if the recommendation of sex reassignment surgery was not followed, and the Commissioner of the DOC stated that she credited the opinions of the clinicians who recommended sex reassignment surgery and did not dispute that prisoner's gender identity disorder (GID) constituted a serious medical need. U.S.C.A. Const.Amend. 8.

**[39] Prisons 310 ⇐⇒204**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k204 k. Transsexuals; sex-change operations. Most Cited Cases

**Sentencing and Punishment 350H ⇐⇒1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
    Massachusetts Department of Corrections (DOC) Commissioner's refusal to provide prisoner male-to-female sex reassignment surgery, as the only adequate treatment for prisoner's serious medical need, in order to avoid public and political criticism, was not a legitimate penological purpose, and, therefore, the Commissioner's conduct in denying prisoner the prescribed treatment was wanton and violated the Eighth Amendment. U.S.C.A. Const.Amend. 8 .

**[40] Evidence 157 ⇐⇒48**

157 Evidence
    157I Judicial Notice
        157k48 k. Official proceedings and acts. Most Cited Cases
    District court could take judicial notice of Massachusetts Department of Correction's (DOC) Classification Manual, as it was a record of a state agency not subject to reasonable dispute.

**[41] Evidence 157 ⇐⇒47**

157 Evidence

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

157I Judicial Notice
 157k47 k. Administrative rules and regulations.
Most Cited Cases
A district court may take judicial notice of state regulations.

**[42] Injunction 212 ⟶1203**

212 Injunction
 212IV Particular Subjects of Relief
  212IV(C) Criminal Matters and Proceedings
   212k1200 Prisons and Prisoners
    212k1203 k. Health, medical, and nutritional issues. Most Cited Cases
A district court should approach the issuance of injunctive orders to prevent a substantial risk of serious injury from ripening into actual harm, in an Eighth Amendment deliberate indifference case, with caution. U.S.C.A. Const.Amend. 8.

**[43] Injunction 212 ⟶1203**

212 Injunction
 212IV Particular Subjects of Relief
  212IV(C) Criminal Matters and Proceedings
   212k1200 Prisons and Prisoners
    212k1203 k. Health, medical, and nutritional issues. Most Cited Cases
Massachusetts Department of Corrections (DOC) Commissioner's deliberate indifference to serious medical need of prisoner suffering severe gender identity disorder (GID) would continue in the future unless the district court granted relief, and, therefore, prisoner was entitled to narrowly-tailored injunction, requiring DOC to provide prisoner male-to-female sex reassignment surgery, under the Prison Litigation Reform Act (PLRA); sex reassignment surgery was the only adequate treatment for prisoner's severe GID, and the

DOC had persisted in presenting pretexts for impermissible reasons for denying prisoner the sex reassignment surgery, which had been prescribed by DOC doctors. U.S.C.A. Const.Amend. 8; 18 U.S.C.A. § 3626(a)(1)(A).

**[44] Evidence 157 ⟶47**

157 Evidence
 157I Judicial Notice
  157k47 k. Administrative rules and regulations.
Most Cited Cases

**Evidence 157 ⟶48**

157 Evidence
 157I Judicial Notice
  157k48 k. Official proceedings and acts. Most Cited Cases
District court could take judicial notice of Massachusetts Department of Correction's (DOC) policy prohibiting sex reassignment surgery for inmates, as a record of a state agency not subject to reasonable dispute, or as a state regulation.

Frances S. Cohen, Jared A. Craft, Bingham McCutchen LLP, Joseph L. Sulman, Law Office of Joseph L. Sulman, Esq., Boston, MA, for Plaintiff.

Joan T. Kennedy, Richard C. McFarland, Department of Correction, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER ON EIGHTH AMENDMENT CLAIM*
WOLF, District Judge.

I. SUMMARY                                                    ——

II. THE APPLICABLE STANDARDS                                 ——

III. FINDINGS OF FACT AND CONCLUSIONS OF LAW                 ——
   A. Kosilek has a Gender Identity Disorder                 ——
   B. *Kosilek I*                                            ——
   C. The Aftermath of *Kosilek I*                           ——

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

D. The Trial of *Kosilek II* _____
E. The Eighth Amendment Analysis _____
   1.   Kosilek has a Serious Medical Need _____
   2.   Sex Reassignment Surgery is the Only Adequate Treatment for Kosilek's Serious Medical Need _____
   3.   Kosilek Has Satisfied the Subjective Prong of the Deliberate Indifference Test _____
   4.   The Defendant's Stated Security Concerns are Pretextual and d o not Justify Denying Kosilek Sex Reassignment Surgery _____
   5.   Defendant's Deliberate Indifference Will Continue and, Therefore, Kosilek is Entitled to a Narrowly–Tailored Injunction _____

IV. ORDER _____

## I. SUMMARY

*1 This is an unusual case for an obvious reason and another that is less evident. This case is unusual because a transsexual prisoner, plaintiff Michelle Kosilek, seeks an unprecedented court order requiring that the defendant Commissioner of the Massachusetts Department of Correction (the "DOC") provide him with sex reassignment surgery to treat his major mental illness, severe gender identity disorder. This case is also unusual because until recently inmates suing for medical care have typically sought treatment that prison doctors were unwilling to prescribe. In this case, however, Kosilek is seeking the treatment that has been prescribed for him by the DOC's doctors as the only form of adequate medical care for his condition. Such cases have recently become more common in Massachusetts because the DOC has repeatedly denied transsexual prisoners prescribed treatment for reasons that the courts have found to be improper. *See Battista v. Clarke,* 645 F.3d 449 (1st Cir.2011); *Soneeya v. Spencer,* 851 F.Supp.2d 228 (D.Mass.2012); *Brugliera v. Comm'r of Mass. Dep't of Corr.,* No.07–40323, 2009 U.S. Dist. LEXIS 131002 (D.Mass. Dec. 16, 2009); *Kosilek v. Maloney,* 221 F.Supp.2d 156 (D.Mass.2002) (" *Kosilek I* ").

Kosilek is serving a life sentence, without possibility of parole, for murdering his wife. Kosilek suffers from a gender identity disorder, which is recognized as a major mental illness by the medical community and by the courts. Kosilek is, therefore, a transsexual—a man who truly believes that he is a female cruelly

trapped in a male body. This belief has caused Kosilek to suffer intense mental anguish. This anguish has caused Kosilek to attempt to castrate himself and to attempt twice to kill himself while incarcerated, once while he was taking the antidepressant Prozac.

The Harry Benjamin Standards of Care (the "Standards of Care") are protocols used by qualified professionals in the United States to treat individuals suffering from gender identity disorders.[FN1] According to the Standards of Care, psychotherapy with a qualified therapist is sufficient treatment for some individuals. In other cases psychotherapy and the administration of hormones provide adequate relief. There are, however, some cases in which sex reassignment surgery is medically necessary and appropriate.

This fact that sex reassignment surgery is for some people medically necessary has recently become more widely recognized. For example, in 2010, the United States Tax Court held that the costs of feminizing hormones and sex reassignment surgery are for certain individuals tax deductible as forms of necessary "medical care" for a serious, debilitating condition that is sometimes associated with suicide and self-castration, rather than nondeductible expenses for "cosmetic" treatment. *See O'Donnabhain v. Comm'r of Internal Revenue,* 134 T.C. 34, 70, 76–77 (U.S.Tax Ct.2010). Similarly, in 2010, the Seventh Circuit held that a state statute prohibiting hormone therapy and sex reassignment surgery for any prisoner violated the Eighth Amendment because such forms of treatment could be medically ne-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

cessary to treat some inmates adequately. *See Fields v. Smith,* 653 F.3d 550, 556 (7th Cir.2011).

*2 In the instant case, Kosilek alleges that his rights under the Eighth Amendment are being violated by the DOC's refusal to provide him with the sex reassignment surgery that, following the Standards of Care, the DOC's doctors have found to be the only adequate treatment for the severe gender identity disorder from which Kosilek suffers. Kosilek still severely suffers from this major mental illness despite the fact that he is receiving psychotherapy and female hormones. After a long period of pretense and prevarication, DOC Commissioner Kathleen Dennehy testified in 2006 that she understood and accepted the DOC doctors' view that Kosilek is at substantial risk of serious harm and that sex reassignment surgery is the only adequate treatment for his condition.[FN2] However, she claimed that providing such treatment would create insurmountable security problems and that she denied Kosilek sex reassignment surgery because of those security considerations.

Kosilek has proven, however, that the Commissioner's purported security concerns are a pretext to mask the real reason for the decision to deny him sex reassignment surgery—a fear of controversy, criticism, ridicule, and scorn. Therefore, Kosilek has proven that the DOC is violating his rights under the Eighth Amendment. He has also established that this violation will continue if the court does not now order the DOC to provide the treatment its doctors have prescribed. Therefore, such an injunction is being issued.

In summary, the reasons for these conclusions are as follows. The Eighth Amendment prohibits cruel and unusual punishment. The Supreme Court has explained that "[t]he Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal quotation omit- ted).

Among other things, the Eighth Amendment does not permit the unnecessary infliction of pain on a prisoner, either intentionally or because of the deliberate indifference of the responsible prison official. Any such

infliction of pain is deemed "wanton." The wanton infliction of pain on an inmate violates the Eighth Amendment.

Prisoners have long been held to have a right to humane treatment, including a right to adequate care for their serious medical needs. It may seem strange that in the United States citizens do not generally have a constitutional right to adequate medical care, but the Eighth Amendment promises prisoners such care. The Supreme Court recently explained the reason for this distinction:

To incarcerate, society takes from prisoners the means to provide for their own needs. Prisoners are dependent on the State for food, clothing, and necessary medical care. A prison's failure to provide sustenance for inmates may actually produce physical torture or a lingering death. Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized soci- ety.

*3 *Brown v. Plata,* —— U.S. ——, 131 S.Ct. 1910, 1928, 179 L.Ed.2d 969 (2011) (internal quotations and citations omitted).

Nevertheless, because the Eighth Amendment prohibits only certain punishments, to establish a violation when a prisoner's health is at issue, it is not sufficient for an inmate to prove only that he has not received adequate medical care. Rather, he must also prove that the official responsible for his care has intentionally ignored a serious medical need or otherwise been deliberately indifferent to it.

The deliberate indifference test has an objective and subjective prong. To satisfy the objective prong in a case involving medical care, a prisoner must show that he has a serious medical need. A serious medical need is one that involves a substantial risk of serious harm if it is not adequately treated. Typically, it is a need that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Add. 11

Page 11

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

would easily recognize the necessity for a doctor's attention.

Adequate medical care requires treatment by qualified personnel, who provide services that are of a quality acceptable when measured by prudent professional standards in the community. Adequate care is tailored to an inmate's particular medical needs and is based on medical considerations. Absent legitimate countervailing penological considerations, adequate care addresses the cause of the person's suffering rather than merely the symptoms. As the Seventh Circuit recently wrote in finding that a statute prohibiting hormones and sex reassignment surgery for all prisoners violated the Eighth Amendment:

Surely, had the Wisconsin legislature passed a law that DOC inmates with cancer must be treated only with therapy and pain killers, this court would have no trouble concluding that the law was unconstitutional. Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture.

*Fields,* 653 F.3d at 556 (citation omitted).

An inmate is not entitled to ideal care or the care of his choice. Courts must defer to the decisions of prison officials concerning what form of adequate treatment to provide an inmate. However, courts must decide if the care being provided is minimally adequate.

With regard to the subjective prong, to establish deliberate indifference it must be proven that the responsible official knows that the prisoner is at high risk of serious harm if his condition is not adequately treated. In certain cases even proof that a prison official knew that an inmate was suffering severely from a serious condition that was not being adequately treated might not violate the Eighth Amendment. As this court wrote in 2002:

Because the Eighth Amendment proscribes the *unnecessary* infliction of pain on a prisoner, the practical constraints imposed by the prison environment are relevant to whether the subjective component of the

Eighth Amendment test has been satisfied. The duty of prison officials to protect the safety of inmates and prison personnel is a factor that may properly be considered in prescribing medical care for a serious medical need. It is conceivable that a prison official, acting reasonably and in good faith, might perceive an irreconcilable conflict between his duty to protect safety and his duty to provide an inmate adequate medical care. If so, his decision not to provide that care might not violate the Eighth Amendment because the resulting infliction of pain on the inmate would not be unnecessary or wanton. Rather, it might be reasonable and reasonable conduct does not violate the Eighth Amendment.

**\*4** *Kosilek I,* 221 F.Supp.2d at 161.

In 2011, the First Circuit addressed this issue in *Battista.* In affirming an order that the DOC provide prescribed female hormones to a transsexual prisoner, the First Circuit stated that:

Medical "need" in real life is an elastic term: security considerations also matter at prisons ..., and administrators have to balance conflicting demands. The known risk of harm is not conclusive: so long as the balancing judgments are within the realm of reason and made in good faith, the officials' actions are not "deliberate indifference."

*Battista,* 645 F.3d at 454. However, as the First Circuit also explained in *Battista,* prison officials forfeit the deference to their decisions by the courts to which they are generally entitled when their stated reasons for refusing treatment are proven to be pretexts for a purpose that does not serve a legitimate penological objective. *See id.* at 455.

Even if a violation of the Eighth Amendment is proven, a court may not issue an injunction unless it is also established that the violation will continue in the future. In addition, if an injunction is justified, it must be narrowly drawn to remedy the constitutional violation and not otherwise displace the discretion of prison officials.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

Therefore, in this case to obtain an order directing the DOC to provide sex reassignment surgery, Kosilek has been required to prove that: (1) he has a serious medical need; (2) sex reassignment surgery is the only adequate treatment for it; (3) the defendant knows that Kosilek is at high risk of serious harm if he does not receive sex reassignment surgery; (4) the defendant has not denied that treatment because of good faith, reasonable security concerns or for any other legitimate penological purpose; and (5) the defendant's unconstitutional conduct will continue in the future.

All of the requirements for an injunction ordering the DOC to provide Kosilek sex reassignment surgery have been met in the instant case, which is essentially a continuation of *Kosilek I.* In *Kosilek I,* a specialist retained by the DOC to treat Kosilek found that he was suffering from a severe gender identity disorder. Consistent with the Standards of Care, that doctor recommended that Kosilek be provided female hormones and, after a year of living as a female, be evaluated for possible sex reassignment surgery. After receiving that recommendation, the DOC fired the specialist and retained instead a Canadian doctor known for his view that hormones should never be prescribed for a prisoner, like Kosilek, for whom they were not prescribed before his incarceration.

After trial, the court found that Kosilek did indeed have a serious medical need. It also found that Kosilek was being denied adequate medical care. More specifically, the court found that the Canadian doctor's rigid "freeze-frame" policy, which had been adopted by the DOC, effectively prohibited DOC doctors from considering whether Kosilek should have hormone therapy and sex reassignment surgery, which were forms of treatment prescribed by qualified professionals for some, but not all, individuals suffering from gender identity disorders. As a result of that policy, no individualized medical evaluation had been done for the purpose of prescribing treatment for Kosilek's serious medical need.

**\*5** Nevertheless, the court did not order Michael Maloney, the Commissioner of the DOC at the time, to provide Kosilek with female hormones for several reasons. First, it found that Maloney had not adopted the Canadian doctor's policy with the intent to inflict pain on Kosilek or otherwise as a result of deliberate indifference. Rather, Maloney had not focused on Kosilek's medical condition and did not have the understanding of Kosilek's suffering necessary to justify a finding of deliberate indifference. The court also found that while Maloney had some sincere security concerns about providing Kosilek with hormones or sex reassignment surgery, his reluctance to authorize these treatments was substantially attributable to his fear of public and political criticism that any expenditure for hormones or sex reassignment surgery would be an improper use of public funds. As the court explained, however: "[S]ecurity is a legitimate consideration for Eighth Amendment purposes. A concern about political or public criticism for discharging a constitutional duty is not." *Kosilek I,* 221 F.Supp.2d at 162. The court also did not issue the requested injunction because it expected that, educated by the decision in *Kosilek I,* Maloney would make future decisions concerning Kosilek in a manner that did not violate the Eighth Amendment. *Id.* at 192.

The court concluded its summary in *Kosilek I* by stating that:

> If Maloney, in good faith, reasonably decides that there is truly no way that he can discharge both his duty to protect safety and his duty to provide Kosilek with adequate medical care, and concludes that security concerns must trump the recommendations of qualified medical professionals, a court will have to decide whether the Eighth Amendment has been violated. That question is not now before this court. *If, however, concerns about cost or controversy prompt Maloney to deny Kosilek adequate care for his serious medical need, Maloney will have violated the Eighth Amendment. Kosilek will then likely be entitled to the injunction that he has unsuccessfully sought in this case.*

> *Id.* at 162 (emphasis added).

The First Circuit has cited *Kosilek I* as the first in a series of cases demonstrating the DOC's "resistance" to providing adequate medical care for transsexual prison-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

ers. *See Battista,* 645 F.3d at 454 (citing *Kosilek I,* 221 F.Supp.2d at 159–60; *Brugliera,* 2009 U.S. Dist. LEXIS 131002). In 2012, a district court found that the DOC continued this resistance in the case of Katheena Soneeya. *See Soneeya,* 851 F.Supp.2d at 248–50.

If Maloney had remained the Commissioner of the DOC, he might have heeded the court's warning that an injunction would issue if he denied Kosilek adequate medical care because of a fear of controversy or criticism. Despite testifying at trial that it would be impossible to reasonably assure Kosilek's safety if he were given female hormones, Maloney subsequently revised his view. The DOC engaged a specialist in treating gender identity disorders to evaluate Kosilek and, in 2003, Maloney allowed Kosilek to begin receiving the hormone treatments that the specialist prescribed. Kosilek has since lived in the general population of a male prison, MCI Norfolk, with breasts and other feminine characteristics, without being assaulted or engaging in any sexual activity.

*6 However, in December, 2003, Maloney was succeeded as Commissioner by Dennehy. Dennehy was determined not to be the first prison official to provide an inmate sex reassignment surgery. Indeed, she testified that she would retire rather than obey an order from the Supreme Court to do so. Acting on this determination, Dennehy engaged in a pattern of pretense, pretext, and prevarication to deny Kosilek the sex reassignment surgery that the DOC doctors prescribed after Kosilek had completed more than a year of "real life experience" living as a female in prison.

When a specialist retained by the DOC doctors recommended that Kosilek receive sex reassignment surgery, as Deputy Commissioner Dennehy participated in the decision to have him fired. When Dennehy became Commissioner, she halted certain prescribed treatments for Kosilek and other transsexual prisoners, purportedly to review their cases, and long delayed decisions on whether such treatments would be allowed. Departing from the DOC's standard practice of relying on its doctors to retain specialists, Dennehy had the DOC hire Cynthia Osborne, a social worker who worked in the Johns Hopkins psychiatric department, which was long

led by a doctor known for his religious and moral opposition to sex reassignment surgery. That department was also known for its view that a prisoner should never be provided sex reassignment surgery. Osborne had advised several states that sex reassignment surgery was not appropriate for each of the prisoners she had evaluated. Dennehy was not truthful when she testified that the DOC did not hire Osborne because of her predictable position that Kosilek should not receive sex reassignment surgery. In addition, Dennehy long falsely claimed that she did not understand whether the DOC doctors were recommending sex reassignment surgery for Kosilek.

In this case, Kosilek has proven that he still has a severe gender identity disorder. Although female hormones have helped somewhat, he continues to suffer intense mental anguish because of his sincere and enduring belief that he is a female trapped in a male body. That anguish alone constitutes a serious medical need. It also places him at high risk of killing himself if his major mental illness is not adequately treated.

As the DOC doctors responsible for treating Kosilek and the experts who testified on Kosilek's behalf credibly concluded, sex reassignment surgery is the only adequate treatment for Kosilek's serious medical need. The DOC's trial expert, Dr. Chester Schmidt, a psychiatrist from Johns Hopkins, proposed providing Kosilek with psychotherapy and antidepressants, rather than sex reassignment surgery. Dr. Schmidt's recent work focuses primarily on medical billing procedures rather than treatment of gender identity disorders. Dr. Schmidt does not accept the Standards of Care, which as explained earlier are followed by prudent professionals. His approach to dealing with Kosilek's condition would not be employed by prudent professionals in the community. Moreover, providing Kosilek antidepressants would not reduce his suffering to a level at which he would no longer have a serious medical need. Kosilek has already tried to kill himself once while taking Prozac and his experts credibly testified that he would remain at high risk of doing so again.

*7 Although Dennehy long falsely claimed that she did not know whether the DOC's doctors were recom-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

mending sex reassignment surgery as medically necessary for Kosilek, she eventually testified at trial that she understood and accepted that Kosilek was at a significant risk of serious harm if not provided such treatment. She never claimed, let alone proved, that she believed that Dr. Schmidt's approach would provide adequate treatment for Kosilek. Dennehy correctly concluded that she was not competent to make clinical judgments.

Rather, Dennehy testified that she was denying the sex reassignment surgery prescribed for Kosilek solely because of insurmountable security concerns. Kosilek has proven, however, that this contention is not credible. As described in detail in the Memorandum, Dennehy testified untruthfully on many matters. This contributes to the conclusion that her stated reasons for refusing to allow Kosilek to receive the surgery were pretextual. In addition, Dennehy announced that security concerns made it impossible to provide Kosilek sex reassignment surgery without conducting the security review required by the DOC's established procedures. Such a review would have included a written assessment from the Superintendent of MCI Norfolk, who had previously advised Commissioner Maloney that providing Kosilek female hormones would not create unmanageable security problems. Dennehy incredibly claimed that, despite Kosilek's excellent record in prison and while being transported to medical appointments and court, there was an unacceptable risk that Kosilek would attempt to flee while being transported to get the treatment that he had dedicated twenty years of his life to receiving. In any event, Dennehy ultimately admitted that the safety of Kosilek and others could be reasonably assured by placing him in an onerous form of protective custody after receiving sex reassignment surgery.

As explained in detail in the Memorandum, Dennehy did not decide to deny Kosilek sex reassignment surgery because of a sincere or reasonable concern for security. Rather, she was motivated by her understanding that providing such treatment would provoke public and political controversy, criticism, scorn, and ridicule. She had ample reasons to expect such a reaction. The Lieutenant Governor in whose administration Dennehy

served publicly opposed using tax revenues to provide Kosilek sex reassignment surgery. Many members of the state legislature, including one who was close to Dennehy, did the same. In addition, the media regularly ridiculed the idea that a murderer could ever be entitled to such "bizarre" treatment. See, e.g., Brian McGrory, "A test case for a change," The Boston Globe, June 13, 2000.

Elected officials are entitled to express their views on whether a prisoner should receive sex reassignment surgery. The media has the right to comment critically on the conduct of prison officials and judges as well. Every citizen has a right to criticize public officials, including judges, too.

*8 However, a prison official acts with deliberate indifference and violates the Eighth Amendment if, knowing of a real risk of serious harm, she denies adequate treatment for a serious medical need for a reason that is not rooted in the duties to manage a prison safely and to provide the basic necessities of life in a civilized society for the prisoners in her custody. Denying adequate medical care because of a fear of controversy or criticism from politicians, the press, and the public serves no legitimate penological purpose. It is precisely the type of conduct the Eighth Amendment prohibits.

As the Supreme Court has explained, "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Therefore, "[t]he right to be free of cruel and unusual punishments, like other guarantees of the Bill of Rights, may not be submitted to vote; it depends on the outcome of no elections." Furman v. Georgia, 408 U.S. 238, 268, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring) (internal quotation omitted). Prisoners who have lost their liberty by murdering others may understandably be unsympathetic candidates for the humane treatment that they denied their victims. However, as future Supreme Court Justice Anthony Kennedy wrote in 1979: "[T]he whole point of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

[Eighth] [A]mendment is to protect persons convicted of crimes. Eighth [A]mendment protections are not forfeited by one's prior acts." *Spain v. Procunier,* 600 F.2d 189, 194 (9th Cir.1979). It is despised criminals, like Kosilek, who are most likely to need the protection of the Eighth Amendment and its enforcement by the courts.

This court fully understands that special care should be exercised before judges intrude on matters of prison administration. It recently expressed this view in approving a settlement by the DOC of a class action in which it was alleged that the practice of placing mentally ill prisoners in prolonged segregation was unconstitutional, in part because it was causing many inmates to kill themselves. *See Disability Law Ctr. v. Mass. Dep't of Corr.,* No. CIV.A. 07–10463, 2012 WL 1237760, at *1 (D.Mass. Apr. 12, 2012). Like the district court in *Battista,* this court has been cautious in deciding to grant the relief sought in order to assure that it was both justified and necessary. *See Battista,* 645 F.3d at 455 (stating that district judge was initially "far from anxious to grant the relief sought" but did so after perceiving a "pattern of delays"). It has given the defendant many opportunities to consider relevant information and reconsider its decision to deny Kosilek sex reassignment surgery. It required Dennehy to read certain trial testimony so she could make a more fully informed decision on whether to permit the prescribed surgery. The court obtained the views of the DOC's doctors and an independent expert on whether Dr. Schmidt's proposed approach would provide Kosilek adequate medical care. In addition, it required Dennehy's immediate successor as Commissioner, Harold Clarke, to report on whether he would reverse Dennehy's decision. However, the DOC, through several Commissioners, has continued, without proper justification, to refuse to discharge its constitutional duty to provide Kosilek the adequate care required for his serious condition. It is evident that the defendant will continue to violate Kosilek's Eighth Amendment rights if a court order is not issued.

**\*9** As the Supreme Court has held, "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution." *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Rather, as the Court more recently instructed:

> If government fails to fulfill [its] obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation. Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals. Courts nevertheless must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners. Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.

*Brown,* 131 S.Ct. at 1928–29 (internal quotations and citations omitted).

Therefore, an injunction must issue in this case. As indicated earlier, any such order must be narrowly drawn to extend no further than necessary to correct the proven violation of the inmate's federal rights. *See* 18 U.S.C. § 3626(a)(1)(A). In this case, Kosilek has proven that his Eighth Amendment rights have been violated by the DOC's refusal to provide the sex reassignment surgery prescribed by its doctors. The court is ordering the defendant to take all of the steps reasonably necessary to provide Kosilek that treatment as promptly as possible.

The court is not deciding where the surgery should be done or who should perform it. Nor is the court deciding where Kosilek should be incarcerated after the surgery. It is the duty of the DOC to make those decisions reasonably and in good faith.

As indicated earlier, in another case before this court, the DOC recently demonstrated that it could and would properly discharge its constitutional duty to provide adequate medical care to mentally ill prisoners who were committing suicide at a high rate when held

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

in segregated confinement. *See Disability Law Ctr.,* 2012 WL 1237760, at *1. In that case the DOC worked long, hard, and successfully to develop innovative ways to address both the serious medical needs of those inmates and the genuine concerns for safety that they presented. As a result, a challenging class action was settled on a basis that this court found to be fair and reasonable.

The DOC has an equal obligation under the Eighth Amendment to make decisions affecting Kosilek that are not cruel and unusual. It has long been well-established that it is cruel for prison officials to permit an inmate to suffer unnecessarily from a serious medical need. It is unusual to treat a prisoner suffering severely from a gender identity disorder differently than the numerous inmates suffering from more familiar forms of mental illness. It is not permissible for prison officials to do so just because the fact that a gender identity disorder is a major mental illness is not understood by much of the public and the required treatment for it is unpopular.

*10 Kosilek shares with every other inmate in the DOC's custody the right to have decisions concerning him made by prison officials reasonably and in good faith in order to assure that he is not again subject to the cruel and unusual punishment that the Eighth Amendment prohibits. The court hopes that the DOC will in the future recognize and respect that right.

## II. THE APPLICABLE STANDARDS

[1][2][3] As the Supreme Court wrote in another case involving a transsexual inmate, "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotation omitted). The Eighth Amendment, in pertinent part, prohibits the infliction of "cruel and unusual punishments." U.S. Const., Am. VIII. Such punishments are those that are "incompatible with the evolving standards of decency that mark the progress of a maturing society" or that involve the "unnecessary and wanton infliction of pain" on an inmate. *Estelle,* 429 U.S. at 102–104, 97 S.Ct. 285 (internal quotations omitted);

*see also Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The Eighth Amendment, therefore, "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. 1970 (internal quotation omitted).

The Supreme Court has recently explained the reasons for the Eighth Amendment, and the important values that it both represents and protects:

As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.

*Brown,* 131 S.Ct. at 1928 (internal quotations and citations omitted). Because incarceration "takes from prisoners the means to provide for their own needs," society must provide for these basic needs or cause prisoners to suffer starvation, torture, and death. *Id.* "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Id.; see also Farmer,* 511 U.S. at 832, 114 S.Ct. 1970; *Kosilek I,* 221 F.Supp.2d at 177–78.

[4][5] At issue in this case is a prisoner's right to medical care. As indicated earlier, "prison officials must ensure that inmates receive adequate ... medical care." *Farmer,* 511 U.S. at 832, 114 S.Ct. 1970. However, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S.Ct. 285. A mere accident or even negligence is insufficient. *Id.* at 105–06, 97 S.Ct. 285; *see also Feeney v. Corr. Med. Servs.,* 464 F.3d 158, 162 (1st Cir.2006). "In order to state a cognizable claim, a prisoner must allege acts or

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Estelle,* 429 U.S. at 106, 97 S.Ct. 285; *see also Braga v. Hodgson,* 605 F.3d 58, 61 (1st Cir.2010); *Flanory v. Bonn,* 604 F.3d 249, 253–54 (6th Cir.2010). As the Supreme Court explained in *Farmer,* it must be proven that a prison official acted with "deliberate indifference" to a substantial risk of serious harm in order to establish a violation of the Eighth Amendment. 511 U.S. at 835–47, 114 S.Ct. 1970.

**\*11** [6][7][8][9] The test for a violation of the Eighth Amendment has both an objective and a subjective component. *See id.* at 846 n. 9, 114 S.Ct. 1970; *Wilson v. Seiter,* 501 U.S. 294, 298–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *DesRosiers v. Moran,* 949 F.2d 15, 18 (1st Cir.1991); *De'Lonta v. Angelone,* 330 F.3d 630, 634 (4th Cir.2003). The objective component is satisfied where an inmate demonstrates that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. In cases involving a denial of medical care, an inmate must show that he has a serious medical need for which he has not received adequate medical care. *See Kosilek I,* 221 F.Supp.2d at 161; *see also Estelle,* 429 U.S. at 104, 97 S.Ct. 285. However, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable state of mind, namely one of deliberate indifference to an inmate's health or safety." *Leavitt v. Corr. Med. Servs., Inc.,* 645 F.3d 484, 497 (1st Cir.2011) (internal quotations omitted). This requirement is subjective. A prison official must know of the substantial risk of serious harm faced by the inmate in order to violate the Eighth Amendment. *See id.; see also Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. However, even a prison official who knows of such a risk does not violate the Eighth Amendment if the denial of particular medical care is based on reasonable, good faith judgments balancing the inmate's medical needs with other legitimate, penological considerations. *See Battista,* 645 F.3d at 454. The deliberate indifference requirement "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth

Amendment.' " *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson,* 501 U.S. at 297, 111 S.Ct. 2321).

[10][11] As stated earlier, an inmate alleging a violation of the Eighth Amendment must first prove that he has a serious medical need. Generally, an inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm in order to prove a violation of the Eighth Amendment. *See Farmer,* 511 U.S. at 828, 835–43, 114 S.Ct. 1970. Therefore, "a serious medical need" is one that involves a substantial risk of serious harm if it is not adequately treated. *See McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir.1992) ("A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " (quoting *Estelle,* 429 U.S. at 104, 97 S.Ct. 285) ).

The First Circuit has also defined a serious medical need as one " 'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " *Mahan v. Plymouth Cnty. House of Corr.,* 64 F.3d 14, 18 (1st Cir.1995) (quoting *Gaudreault v. Mun. of Salem, Mass.,* 923 F.2d 203, 208 (1st Cir.1990)). Similarly, the Second Circuit has held that courts should look to the following factors in determining whether an inmate has a serious medical need:

**\*12** (1) whether a reasonable doctor or patient would perceive the medical need in question as "important and worthy of comment or treatment," (2) whether the medical condition significantly affects daily activities, and (3) "the existence of chronic and substantial pain."

*Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

[12] A serious medical need may be mental or physical. *See Torraco v. Maloney,* 923 F.2d 231, 234 (1st Cir.1991) (stating that there is "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart")

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

Page 18

(internal quotations omitted). Therefore, deliberate indifference to an inmate's serious mental health needs violates the Eighth Amendment. *See id.; see also Clark–Murphy v. Foreback,* 439 F.3d 280, 292 (6th Cir.2006); *Steele v. Shah,* 87 F.3d 1266, 1269 (11th Cir.1996).

[13] With regard to the level of care to be provided, the First Circuit has stated that, "it is plain that an inmate deserves *adequate* medical care." *United States v. DeCologero,* 821 F.2d 39, 42 (1st Cir.1987). "Adequate services" are "services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *Id.* at 43. Therefore, as this court wrote in *Kosilek I,* "reference to established professional standards is important to determining the adequacy of medical care." 221 F.Supp.2d at 180.

[14] Adequate medical care is also treatment that is "the product of sound medical judgment." *Chance,* 143 F.3d at 703. Sound medical judgment is based on the needs of the particular prisoner. "The failure to consider an individual inmate's condition in making treatment decisions is ... precisely the kind of conduct that constitutes a substantial departure from accepted professional judgment, practice, or standards such as to demonstrate that the person responsible did not actually base the decision on such a judgment." *Roe v. Elyea,* 631 F.3d 843, 862–63 (7th Cir.2011) (internal quotation omitted); *see also Soneeya,* 851 F.Supp.2d at 242, 249–50 (holding that the DOC violated a transsexual prisoner's rights under the Eighth Amendment by relying on a blanket policy denying certain treatment, and stating that "[a]dequate care is based on an individualized assessment of an inmate's medical needs in light of relevant medical considerations"); *Kosilek I,* 221 F.Supp.2d at 193 ("[D]ecisions as to whether psychotherapy, hormones, and/or sex reassignment surgery are necessary to treat Kosilek adequately must be based on an 'individualized medical evaluation' of Kosilek rather than as 'a result of a blanket rule.' ") (quoting *Allard v. Gomez,* 9 Fed.Appx. 793, 795 (9th Cir.2001)).

[15] Absent legitimate countervailing penological considerations, adequate medical care typically requires

addressing the cause of the inmate's serious medical need rather than merely providing treatment to reduce the pain it causes. *See Fields,* 653 F.3d at 556. As indicated earlier, in holding that a state statute prohibiting hormone therapy and sex reassignment surgery for inmates with severe gender identity disorders violated the Eighth Amendment, the Seventh Circuit recently wrote that "[s]urely, had the [ ] legislature passed a law that DOC inmates with cancer must be treated only with therapy and pain killers, this court would have no trouble concluding that the law was unconstitutional." *Id.; see also Wolfe v. Horn,* 130 F.Supp.2d 648, 653 (E.D.Pa.2001) (although transsexual inmate was prescribed Prozac for depression, there was a fact question precluding summary judgment as to whether inmate received any treatment for transsexualism); *West v. Keve,* 571 F.2d 158, 162 (3d Cir.1978) (providing aspirin rather than recommended post-operative treatment may not constitute adequate medical care); *Sulton v. Wright,* 265 F.Supp.2d 292, 300 (S.D.N.Y.2003) ("[E]ven if an inmate receives 'extensive' medical care, a[n] [Eighth Amendment] claim is stated if, as here, the gravamen of his problem is not addressed.").

**\*13** [16][17] However, the fact that an inmate is entitled to adequate medical care does not mean that he is entitled to ideal care or to the care of his choice. *See DeCologero,* 821 F.2d at 42; *DesRosiers,* 949 F.2d at 18; *Barron v. Keohane,* 216 F.3d 692, 693 (8th Cir.2000); *Norton v. Dimazana,* 122 F.3d 286, 292 (5th Cir.1997); *Fernandez v. United States,* 941 F.2d 1488, 1493–94 (11th Cir.1991). Prison officials have the right to exercise discretion in deciding which of several *adequate* treatments is chosen for a prisoner. *See DeCologero,* 821 F.2d at 42–43; *DesRosiers,* 949 F.2d at 19–20. Therefore, " *[s]o long as the treatment given is adequate,* the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703 (emphasis added).

[18] Moreover, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Add. 19

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

health or safety." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. Therefore, if a prisoner satisfies the objective component of the test by establishing the denial of adequate medical care to treat a serious medical need, he must also demonstrate that prison officials had a "sufficiently culpable state of mind"—that of " 'deliberate indifference' to an inmate's health or safety." *Leavitt,* 645 F.3d at 497. This component of the test is subjective. It does not require deliberate intent to harm an inmate, but does require that the official know of the substantial risk of harm to the inmate. *See Farmer,* 511 U.S. at 837, 114 S.Ct. 1970; *Battista,* 645 F.3d at 453. Specifically, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970; *see also Flanory,* 604 F.3d at 254; *Chance,* 143 F.3d at 702; *De'Lonta,* 330 F.3d at 634.

[19][20] State of mind "is often inferred from behavior." *Battista,* 645 F.3d at 453. Deliberate indifference to the serious medical needs of an inmate may be "evidenced 'by denial, delay, or interference with prescribed health care.' " *Id.* (quoting *DesRosiers,* 949 F.2d at 19); *see also Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005) ("[A] deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians."); *Durmer v. O'Carroll,* 991 F.2d 64, 68 (3d Cir.1993) (sending inmate to several specialists after first doctor prescribed expensive physical therapy for a stroke could violate the Eighth Amendment, depending on doctor's motives). Similarly:

> while a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to [inmates'] agony ... Indeed, it is well-settled in [the Second] [C]ircuit that a series of incidents closely related in time ... may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners.

*14 *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977) (internal quotation omitted); *see also Guglielmoni v. Al-*

*exander,* 583 F.Supp. 821, 826 (D.Conn.1984) (same).

[21][22] Certain constraints facing prison officials are relevant to the subjective state of mind component of the Eighth Amendment test. *See Wilson,* 501 U.S. at 303, 111 S.Ct. 2321. More specifically, "assuming the conduct is harmful enough to satisfy the objective component of the Eighth Amendment claim, whether it can be characterized as 'wanton' depends upon the constraints facing the *official.* " *Id.* (internal citation omitted); *see also DesRosiers,* 949 F.2d at 19. As the Supreme Court reiterated in 1993, the inquiry into whether deliberate indifference has been proven is "an appropriate vehicle to consider arguments regarding the realities of prison administration." *Helling v. McKinney,* 509 U.S. 25, 37, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).[FN3]

[23] The duty to reasonably assure inmate security is one of the realities of prison administration and, therefore, is relevant to the deliberate indifference analysis. *See Farmer,* 511 U.S. at 833, 114 S.Ct. 1970; *Battista,* 645 F.3d at 454–55. More specifically, in addition to an inmate's medical needs, "security considerations also matter at prisons ... and administrators have to balance conflicting demands. The known risk of harm is not conclusive: so long as the balancing judgments are within the realm of reason and made in good faith, the officials' actions are not 'deliberate indifference.' " *Battista,* 645 F.3d at 454 (quoting *Farmer,* 511 U.S. at 844–45, 114 S.Ct. 1970).

[24][25] Therefore, the deliberate indifference test "leave[s]ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources." *Battista,* 645 F.3d at 453. Prison administrators are usually entitled to deference by the courts in their judgment concerning what is necessary to discharge their duty to maintain institutional security. *See Whitley v. Albers,* 475 U.S. 312, 321–22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

[26] However, deference does not extend to "actions taken in bad faith and for no legitimate pur-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

pose." *Whitley,* 475 U.S. at 322, 106 S.Ct. 1078; *see also Fields,* 653 F.3d at 558. Rather, prison officials forfeit their right to deference when their stated, legitimate grounds for refusing treatment are proven to be pretextual, and the plaintiff establishes that the "balancing judgments" were not "within the realm of reason and made in good faith." *Battista,* 645 F.3d at 454–55. This is true even if those officials were not motivated by a "sinister motive or 'purpose' to do harm to" the inmate. *Id.* at 455.

[27] Because deference is not due to actions taken "for no legitimate purpose," *Whitley,* 475 U.S. at 322, 106 S.Ct. 1078, prison officials may be found to be deliberately indifferent if they deny adequate treatment for a serious medical need for reasons that are not rooted in the responsibility to preserve internal order and discipline, and maintain institutional security. *See Battista,* 645 F.3d at 454–55; *cf. Fields,* 653 F.3d at 558 (deference not appropriate where blanket ban on hormone therapy not shown to have any security benefit). Such a denial of treatment in the face of a known risk of serious harm to an inmate, taken without reasonable, good faith penological justification, is the sort of "unnecessary and wanton infliction of pain" that the Eighth Amendment prohibits. *Hope v. Pelzer,* 536 U.S. 730, 737, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ("[A]mong unnecessary and wanton inflictions of pain are those that are totally without penological justification.") (internal quotations omitted); *White v. Farrier,* 849 F.2d 322, 325 (8th Cir.1988) (stating, in a case involving a transsexual prisoner, that "[a]ctions without a penological justification may constitute an unnecessary infliction of pain").

*15 [28] As explained in *Kosilek I,* the cost of adequate medical care is not a legitimate reason for not providing such care to a prisoner. *See* 221 F.Supp.2d at 182. More specifically:

[I]t would not be reasonable to deny an inmate adequate medical care because it would be expensive to do so. *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 705 (11th Cir.1985); *Harris v. Thigpen,* 941 F.2d 1495, 1509 (11th Cir.1991). "Lack of funds ... cannot justify an unconstitutional lack of competent medical

care and treatment for inmates." *Ancata,* 769 F.2d at 705.

*Id.* As the Eleventh Circuit stated in 1991:
We do not agree that "financial considerations must be considered in determining the reasonableness" of inmates' medical care to the extent that such a rationale could ever be used by so-called "poor states" to deny a prisoner the minimally adequate care to which he or she is entitled. Minimally adequate care usually requires minimally competent physicians. It may also sometimes require access to expensive equipment, e.g. CAT scanners or dialysis machines, or the administration of expensive medicines.

*Harris,* 941 F.2d at 1509 (quoting district court opinion); *see also Wilson,* 501 U.S. at 301–02, 111 S.Ct. 2321 (Court unaware of any officials ever attempting to use a cost defense to avoid the holding of *Estelle* ); *Fields,* 653 F.3d at 556 ("[A]t oral argument ... [the state] disclaimed any argument that [the statute prohibiting hormone therapy or sex reassignment surgery] is justified by cost savings"); *Chance,* 143 F.3d at 704 (finding that plaintiff's allegations that doctors "recommended extraction [of tooth] not on the basis of their medical views, but because of monetary incentives," if proven, would contribute to a showing of deliberate indifference on the part of the defendants); *Durmer,* 991 F.2d at 68–69 (finding that evidence that doctor wanted to avoid providing physical therapy to a prisoner because it "would have placed a considerable burden and expense on the prison and was therefore frowned upon throughout the prison health system" might contribute to a showing of deliberate indifference); *Jones v. Johnson,* 781 F.2d 769, 771 (9th Cir.1986) ("We find no other explanation in the record than budget concerns for denying Jones's surgery. Budgetary constraints, however, do not justify cruel and unusual punishment."); *Gates v. Collier,* 501 F.2d 1291, 1320 (5th Cir.1974) ("Where state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts."); *Soneeya,* 851 F.Supp.2d at 243 ("Cost of treatment,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Add. 21

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

however, may not be used as a reason to deny an inmate medically necessary care."); *Rosado v. Alameida,* 349 F.Supp.2d 1340, 1349 (S.D.Cal.2004) ("[C]ase law suggests that the high costs associated with the [liver] transplant procedure do not preclude success on a deliberate indifference claim."); *Renelique v. Doe,* No. CIV.A. 99–10425, 2003 WL 23023771, at *15 (S.D.N.Y. Dec. 29, 2003) ("[C]onstitutionally deficient medical care of inmates cannot be justified by a facility's lack of funds.").[FN4]

*16 [29][30][31] Nor would it be permissible for a prison official to fail to provide adequate medical care to a prisoner because it would be unpopular or politically controversial to do so. As noted earlier, the Supreme Court has explained that "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *Barnette,* 319 U.S. at 638, 63 S.Ct. 1178. "The right to be free of cruel and unusual punishments, like other guarantees of the Bill of Rights, may not be submitted to vote; it depends on the outcome of no elections." *Furman,* 408 U.S. at 268, 92 S.Ct. 2726 (Brennan, J., concurring) (internal quotation omitted). "The whole point of the [Eighth] [A]mendment is to protect persons convicted of crimes. Eighth [A]mendment protections are not forfeited by one's prior acts." *Spain,* 600 F.2d at 194.

[32] Finally, with regard to the generally applicable legal standards, the fact that this case only involves a request for declaratory and prospective injunctive relief, rather than monetary damages, has significance. In order to obtain an injunction, an inmate must prove that a prison official was, at the time of trial, "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and ... will continue to do so." *Farmer,* 511 U.S. at 846, 114 S.Ct. 1970.

In addition, if a prisoner proves that he has been deprived of adequate medical care in violation of the Eighth Amendment and that a court order is required to correct that violation, under the Prison Litigation Reform Act (the "PLRA") the injunction issued must be

"narrowly drawn, extend[ ] no farther than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The PLRA also provides that "[t]he court [must] give substantial weight to any adverse impact on public safety or the operation of the [prison] system caused by the relief." *Id.*

The foregoing general principles concerning the Eighth Amendment as applied to the alleged denial of adequate medical care provide the following framework for analyzing Kosilek's claim. To prevail in this case, Kosilek must prove that: (1) he has a serious medical need; (2) sex reassignment surgery is the only adequate treatment for it; (3) the defendant knows that Kosilek is at high risk of serious harm if he does not receive sex reassignment surgery; (4) the defendant has not denied that treatment because of good faith, reasonable security concerns or for any other legitimate penological purpose; and (5) the defendant's unconstitutional conduct will continue in the future. If Kosilek proves that he is entitled to relief, the injunction issued must be narrowly tailored to remedy the violation of his Eighth Amendment rights and not unnecessarily restrict the discretion of prison officials.

III. FINDINGS OF FACT AND CONCLUSIONS OF LAW
*17 The following facts have been proven by a preponderance of the credible evidence at a 28–day trial, in which the court had the opportunity to observe the witnesses and to consider the extent to which their testimony was corroborated or contradicted by other evidence that was introduced. Some of the following facts were also found in *Kosilek I,* and their correctness was confirmed, rather than undermined, by the credible evidence presented in the instant case.[FN5] *See* 221 F.Supp.2d at 156.

A. *Kosilek has a Gender Identity Disorder*
It is not disputed that Kosilek has long had a gender identity disorder. As indicated earlier, gender identity disorder is widely recognized by the medical community and the courts as a major mental illness. *See, e.g.,* Diagnostic and Statistical Manual of Mental Dis-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 22

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

orders, Fourth Edition—Text Revisions ("DSM–IV–TR"); *Farmer,* 511 U.S. at 829, 114 S.Ct. 1970; *Battista,* 645 F.3d at 450. As also described earlier, the Tax Court has recently characterized gender identity disorder as "a serious psychologically debilitating condition." *O'Donnabhain,* 134 T.C. at 61.

In *Kosilek I,* this court found that while a gender identity disorder is a major mental illness, it is not "necessarily a serious medical need for which the Eighth Amendment requires treatment" because "[a]s with other mental illness, gender identity disorders have differing degrees of severity." 221 F.Supp.2d at 184. The evidence in the instant case confirmed that "merely because someone is a transsexual, it does not inexorably follow that he or she needs" any particular form of treatment. *Farmer v. Moritsugu,* 163 F.3d 610, 615 (D.C.Cir.1998); *see also Kosilek I,* 221 F.Supp.2d at 184.

Therefore, it is necessary for the court to decide, among other things, the current severity of Kosilek's gender identity disorder and what is necessary to treat it adequately. These, and the other relevant questions, are best understood in the context of the facts found in *Kosilek I.*

### B. *Kosilek I*

As described more fully in *Kosilek I,* "Kosilek has long held a strong and persistent belief that he is a woman trapped in a man's body." 221 F.Supp.2d at 163. The belief was steadily manifest before Kosilek was ten years old. He suffered regular abuse, including being stabbed by his stepfather, because of his announced desire to live as a girl. Kosilek later obtained female hormones that were prescribed by a physician in exchange for sex. As a result of taking the hormones, Kosilek " 'felt normal' " for the first time in his life.

While in a drug rehabilitation facility, Kosilek met Cheryl McCaul, who was working as a volunteer counselor. McCaul told Kosilek that his transsexualism would be cured by "a good woman," and married him. However, Kosilek's distress did not abate. In 1990, after McCaul became angry when she found Kosilek wearing her clothes, Kosilek murdered her. He then fled and was

arrested in New York while wearing female clothing.

*18 While awaiting trial, Kosilek again took female hormones in the form of birth control pills that were illegally provided by a guard. He also tried to obtain treatment, including eventually by filing the suit that resulted in the 2002 decision in *Kosilek I.*

Kosilek hired an expert who recommended psychotherapy with a qualified specialist in gender identity disorders, but the Bristol County Sheriff denied him this treatment. Kosilek then twice tried to kill himself before his trial, once while he was taking the antidepressant Prozac. In addition, Kosilek attempted to castrate himself.

In 1992, Kosilek was convicted of murder and sentenced to life in prison without the possibility of parole. At MCI Norfolk, a medium security male prison operated by the DOC, Kosilek began living like a woman to the maximum extent possible. He had his name legally changed from "Robert" to "Michelle" and did everything he could to present himself as a female.

Prior to 2002, Kosilek had not been assaulted sexually while in the custody of the DOC at MCI Norfolk. Nor did he voluntarily have sexual relations with any other inmate.

At the time of both *Kosilek I* and the instant case, the DOC contracted with the University of Massachusetts Correctional Health Program ("UMass") to provide medical services, including mental health services, to inmates at MCI Norfolk and other facilities. As occurred in the instant case, UMass contracted with outside specialists when it lacked expertise in a particular area.

In *Kosilek I,* the court found that Kosilek had a severe form of gender identity disorder that caused him to suffer constant mental anguish. That anguish had prompted his attempts to kill and castrate himself. Kosilek's severe gender identity disorder was held to be a "serious medical need" within the meaning of the Eighth Amendment. This court also found that:

The Harry Benjamin Standards of Care (the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

"Standards of Care") are protocols used by qualified professionals in the United States to treat individuals suffering from gender identity disorders. According to the Standards of Care, psychotherapy with a qualified therapist is sufficient treatment for some individuals. In other cases psychotherapy and the administration of female hormones provide adequate relief. There are, however, some cases in which sex reassignment surgery is medically necessary and appropriate.

221 F.Supp.2d at 158–59.

Kosilek, however, had not been provided any of the treatment prescribed by the Standards of Care. This decision did not result from the DOC's established process for addressing inmates' medical needs. It was the then-Commissioner of the DOC Maloney's:

policy and usual practice to rely on the social workers and medical professionals employed by the DOC, and the outside experts they often consult, to determine whether an inmate has a serious medical need and, if so, what is necessary to treat it adequately. Kosilek, however, [was] dealt with differently. Because of Kosilek's lawsuit Maloney as a practical matter ... made the major decisions relating to Kosilek's medical care.

**\*19** *Id.* at 159.

The court found in 2002 that Maloney's refusal to allow Kosilek to get the female hormones DOC doctors had prescribed and possibly, sex reassignment surgery, was "rooted in sincere security concerns, and in a fear of public and political criticism as well." *Id.* at 162.

[33] Maloney knew that there was substantial public and political opposition in Massachusetts to providing female hormones and sex reassignment surgery to a prisoner, particularly including Kosilek. For example, in 2000, a *Boston Globe* columnist prominently wrote:

Robert Kosilek is as remarkable a man as you would ever want to meet.

First, he's a certified wife killer, having been con-

victed of taking a wire to the throat of his beloved Cheryl, then hiding her body in the trunk of their car in the parking lot of a North Attleboro mall.

Then he showed up at his trial in a dress, calling himself Michelle, telling anyone who would listen that his inner woman was trying to overcome his, well, outer man. Even his lawyer seemed unsure whether to call him he or she.

Now in prison, serving a life term without possibility of parole, he's grown his stringy brown hair all the way down his back. He wears polish on his fingernails. He says he pines every moment of every day to be the woman he was always meant to be. And he's demanding that the state, meaning you and me, pay the $25,000 for a sex-change operation, which the more politically correct call a "sexual reassignment."

But none of this is remarkable, just standard-issue bizarre. What's truly remarkable is his ability to make a complete and utter fool out of an otherwise thoughtful and respected federal jurist, U.S. District Judge Mark L. Wolf.

Indeed, (s)he's actually made a mockery of our entire penal system, and in the process is costing us thousands of dollars and dozens of hours of valuable court time.

Brian McGrory, "A test case for a change," *The Boston Globe,* June 13, 2000. [FN6] In addition, "[a]t the time of trial [of *Kosilek I* in February, 2002] the DOC was supporting proposed legislation that would prohibit inmates with gender identity from changing their names [and] ... had not expressed a view on another bill that would prohibit providing inmates with hormones and sex reassignment surgery." *Kosilek I,* 221 F.Supp.2d at 171 n. 8. The court concluded that:

Maloney did not regard sex reassignment surgery as an appropriate use of taxpayers' money. Maloney and his colleagues ... thought that any such expenditure would be politically unpopular. Maloney did not want to authorize hormones or sex reassignment surgery for Kosilek or any other inmate unless he was legally obligated to do so.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

*Id.* at 170–71.

Relying on his lawyers rather than on the DOC's doctors, Maloney did several things designed to avoid the virtually unprecedented, and foreseeably unpopular, step of providing female hormones to a male prisoner. The DOC initially engaged Dr. Marshall Forstein to serve as an expert in the litigation. Dr. Forstein recommended that Kosilek receive psychotherapy from an expert in gender identity disorders, be provided female hormones, and be given a consultation with an experienced surgeon who specialized in sexual reassignment surgery. This was not what Maloney wanted to hear. "When Dr. Forstein stated that his recommendations regarding what was required to treat Kosilek adequately were not altered by the fact that Kosilek was incarcerated, the DOC terminated its relationship with him." *Id.* at 173.

**\*20** As part of what the First Circuit has characterized as a pattern of "resistance," to providing recommended treatment to transsexual prisoners, *Battista,* 645 F.3d at 454, Maloney made it clear to Dr. Ira Packer of UMass "that [he] did not want to provide Kosilek or any other inmate hormones or sex reassignment surgery." *Kosilek I,* 221 F.Supp.2d at 169. As a result, Dr. Packer, who had no experience with gender identity disorders, looked for an expert who would support Maloney's determination not to provide such treatment.

Dr. Packer found the published work of a Canadian doctor, Robert Dickey, who had opined that sex reassignment surgery should never be considered for an inmate. Rather, it was Dr. Dickey's view that transsexual prisoners should be frozen in the "frame" in which they entered prison and receive female hormones only if they had been prescribed prior to incarceration.

Subsequently, without having read Dr. Forstein's report, Dr. Dickey's article on treatment of transsexual inmates, Dr. Packer's memorandum summarizing Dr. Dickey's article, or the Standards of Care, Maloney adopted Dr. Dickey's recommended, inflexible "freeze-frame" policy for the DOC. Dr. Dickey was later engaged to testify at trial as the DOC's expert.

Dr. Dickey testified in support of the DOC's decision not to provide Kosilek hormones pursuant to its "freeze-frame" policy. The court did not find Dr. Dickey to be a persuasive witness, in part because he did not believe in the Standards of Care, which prudent professionals in the United States follow, and in part because his approach did not permit the individualized decision-making concerning an inmate's medical care that is required by the Eighth Amendment.

Rather, the court relied on the testimony of Kosilek's experts, Drs. George Brown and Forstein, and professionals employed by the DOC, including Dr. Packer and Kosilek's social worker Mark Burrowes, in finding that certain facts important to the Eighth Amendment analysis had been proven. Those facts included the following. In 2002, Kosilek's severe, untreated gender identity disorder was causing him intense mental anguish. As a result, he was at high risk of killing himself if his mental illness was not properly treated. Thus, Kosilek had a serious medical need. *Id.* at 160, 184–85. In addition, Kosilek had not been offered adequate medical treatment. Rather, the mere counseling Kosilek was being provided was found to be " 'so clearly inadequate as to amount to a refusal to provide essential care.' " *Id.* at 185 (quoting *Torraco,* 923 F.2d at 234). Therefore, the objective component of the Eighth Amendment standard had been proven. *Id.* at 161, 189.

However, the court found that Kosilek had not satisfied the subjective component of the deliberate indifference test. Rather, it found that "Maloney knew many facts from which it could have been inferred that Kosilek was at substantial risk of serious harm if he did not receive adequate treatment. Maloney did not, however, actually draw that [required] inference." *Id.* at 161.

**\*21** The court concluded its summary of *Kosilek I* by writing:

This court's decision [in *Kosilek I* ] puts Maloney on notice that Kosilek has a serious medical need which is not being properly treated. Therefore, he has a duty to respond reasonably to it. The court expects that he

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

will.

In essence, the court expects that Maloney will allow qualified medical professionals to recommend treatment for Kosilek. At a minimum, psychotherapy with, or under the direction of, a professional with training and experience concerning individuals with severe gender identity disorder is required. Such therapy should raise no security concerns.

If hormones or sex reassignment surgery are recommended, Maloney may properly consider whether security issues make it impossible to provide adequate medical care in prison for Kosilek's serious medical need. The court expects that any such consideration will include the following facts.

Kosilek is already living largely as a woman in a medium security male prison. This has not presented a security problem. The policy Maloney adopted contemplates continuing female hormones for transsexuals for whom they have been prescribed prior to incarceration. Maloney expects that he would keep such inmates in the general population of a male prison. This has, evidently, been done safely in several states, in the United States Bureau of Prisons system, and in Canada.

If Maloney, in good faith, reasonably decides that there is truly no way that he can discharge both his duty to protect safety and his duty to provide Kosilek with adequate medical care, and concludes that security concerns must trump the recommendations of qualified medical professionals, a court will have to decide whether the Eighth Amendment has been violated. That question is not now before this court. *If, however, concerns about cost or controversy prompt Maloney to deny Kosilek adequate care for his serious medical need, Maloney will have violated the Eighth Amendment. Kosilek will then likely be entitled to the injunction that he has unsuccessfully sought in this case.*

*Kosilek I,* 221 F.Supp.2d at 162 (emphasis added).

The court also explained the reasons for its expecta-

tion that, having been educated by the *Kosilek I* decision, Maloney would provide proper treatment for Kosilek's serious medical need. The court anticipated that Maloney would in the future follow the DOC's usual practice of allowing medical professionals, including experts retained by UMass, to decide what was necessary to treat Kosilek. The court relied upon Maloney's testimony that if the doctors for the DOC who were engaged to provide mental health care to inmates decided to bring in a specialist to treat Kosilek, he would not interfere. Maloney asserted that such medical judgments are "what [he was] paying them for." *Id.* Maloney claimed he had "never in [his] career interfered with a doctor's order for treatment and [had] no intention of doing so in the future," with regard to Kosilek or anyone else. *Id.* In 2002, the court relied upon these representations.

**\*22** Therefore, the court did not order the DOC to do anything. Rather, it expected that the DOC would begin to treat Kosilek's situation as a medical matter and rely on qualified professionals to decide what care was necessary to adequately address his serious medical needs.

*C. The Aftermath of Kosilek I*

Following the August 28, 2002 decision in *Kosilek I,* under Maloney the DOC began to respond, equivocally, to the court's ruling. In December, 2002, the DOC replaced its inflexible freeze-frame policy for inmates with gender identity disorders with a presumptive policy that would provide inmates hormones if they had been previously prescribed, but allowed increased or decreased treatment if it was determined by UMass to be medically necessary, and approved by both the Director of the Department's Health Services Division and the Commissioner. This policy and procedure is unique. It makes gender identity disorder the only condition that presumptively would not be treated differently as it became more or less severe. In addition, gender identity disorder is the only condition that requires DOC doctors to obtain approval of the Commissioner to provide treatment that they find to be medically necessary.

In February, 2003, after consultation with DOC staff, UMass engaged a gender identity disorder special-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 26

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

ist, Dr. David Seil, to evaluate Kosilek and make re-
commendations for his care. Dr. Seil evaluated Kosilek
and submitted his report on about February 23, 2003.
Dr. Seil, like every other specialist who had evaluated
Kosilek, found that he suffered from a severe gender
identity disorder. He also found that Kosilek was not
then suicidal because the hope of getting hormone ther-
apy and sex reassignment surgery was sustaining him.
However, Dr. Seil wrote that, "[s]he has made two seri-
ous suicide attempts around this issue and an attempted
mutilation in the past ... If transitioning to female is not
within her control, she may take control of the situation
by ending her own life." Ex. 10 at 4.

Dr. Seil also wrote that the Standards of Care had
"been implemented for tens of thousands of individuals
with GID [FN7] internationally for decades." *Id.* He
opined that those "Standards of Care need to be ob-
served" in Kosilek's case. *Id.* He reached this opinion
after considering possible security concerns, writing,
"[i]n respect to security, Ms. Kosilek already is living
as a female within a male environment without threat to
herself or others." *Id.*

Therefore, consistent with the Standards of Care, Dr.
Seil recommended that Kosilek be provided estro-
gen therapy; electrolysis to remove facial hair, which
"is a major signifier of male gender"; and access to fe-
male clothing and makeup. *Id.* at 5. With regard to pos-
sible sex reassignment surgery, Dr. Seil wrote:

Such surgery is the final step in the treatment of GID.
As it is highly traumatic and painful surgery, and is
irreversible, evaluation of its necessity must wait until
the year of living as a female has occurred. Ms.
Kosilek has lived for many years as female, but not
with the beneficial effect of hormone therapy and
electrolysis. A future assessment needs to be made by
an experienced gender specialist with Ms. Kosilek
after treatment with hormones for a year as to wheth-
er this step definitely need be taken.

**23 *Id.*

Dr. Seil's report put the DOC on notice that Kosilek
might require sex reassignment surgery after a year of

real life experience on hormones and living even more
fully as a female in prison. Once again Maloney and his
staff, including Deputy Commissioner Dennehy, had re-
ceived advice they did not like. Just as the DOC in 2000
had terminated Dr. Forstein as its litigation expert after
he recommended that Kosilek be treated in accordance
with the Standards of Care, it decided not to employ Dr.
Seil any longer.

In March, 2003, Dr. Kenneth Appelbaum, the Dir-
ector of Mental Health at UMass, was directed by DOC
staff to seek other psychiatrists to evaluate Kosilek and
other inmates with gender identity disorders in the fu-
ture. At the same meeting, the National Commission on
Correctional Health Care (the "NCCHC") position that
sex reassignment surgery should not be done in prison
was discussed with Dr. Appelbaum in what he under-
stood to be an effort to direct him to find a specialist
who agreed with this view.[FN8]

In addition, after Dr. Seil's report was received, fol-
lowing established DOC security procedure regarding
gender identity disorder, *see* Ex. 8, Maloney asked Luis
Spencer, the Superintendent of MCI Norfolk where
Kosilek was incarcerated, to prepare a written report on
whether providing Kosilek hormones would create any
security risks. In *Kosilek I,* Maloney had expressed seri-
ous concerns about security in the prison if Kosilek or
any other inmate were to receive hormones or sex reas-
signment surgery. Maloney reasoned that many inmates
were sex offenders and was worried that a prisoner with
breasts, living as a female in a male prison, would cre-
ate a risk of violence that could injure prison guards, as
well as inmates. He testified that even allowing an in-
mate to have make-up could facilitate attempts to es-
cape.

However, on July 29, 2003, Spencer reported to
Maloney, in a memorandum delivered to then Deputy
Commissioner Dennehy, that he had considered the pro-
posal for estrogen therapy. He stated:

I have reviewed the possible cause and effect as it
relates to the security and operations of MCI Norfolk
and do not feel that there are any concerns at this
time. However, as these treatments continue and In-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

mate Kosilek begins to develop physical changes, our security concerns may have to be re-evaluated.

Ex. 21.

Therefore, Spencer approved providing Kosilek hormones from a security perspective. In August, 2003, Kosilek began taking estrogen hormones. In October, 2003, Kosilek was allowed to begin wearing female undergarments. In addition, Kosilek was scheduled to begin laser removal of his masculine hair. As planned, Spencer monitored the situation to see if Kosilek's increasing feminization raised any security issues. Three years later, by 2006, there had been no reported issues or problems.[FN9]

However, in December, 2003, Deputy Commissioner Dennehy became the Acting Commissioner of the DOC. She received the position permanently in March, 2004. Dennehy had been an integral part of the DOC's previous efforts to deny Kosilek treatment for his severe gender identity disorder. She knew that such treatment for prisoners was unpopular with the public and many politicians. Dennehy was determined not to be the first prison official in the United States to authorize sex reassignment surgery for an inmate. Indeed, she testified in the instant case that she would retire rather than obey an order from the Supreme Court to do so. Therefore, as described below, Dennehy began taking a series of actions intended to delay, and ultimately deny, the medical care that was being prescribed for Kosilek.

**24** Promptly upon becoming Commissioner, Dennehy told her staff that she wanted to "regroup" on the treatment being provided to prisoners with gender identity disorders. Ex. 47 at 196. Among other things, she ordered a reevaluation of Kosilek "before approving laser hair removal or anything else." Id. at 199. There was no medical reason, or other justification, for the reevaluation concerning the hair removal. The direction was a substantial departure from Dennehy's practice, pursuant to the UMass contract, of playing no role in the treatment of inmates.

In September, 2004, Kosilek had been taking hormones for a year and, under the Standards of Care, was

due to be evaluated for possible sex reassignment surgery. Kosilek had not yet been reevaluated for laser hair removal. Under its contract with the DOC, UMass was solely responsible for selecting outside specialists with expertise in medical and mental health matters that the UMass staff did not have. UMass decided to retain doctors at the Fenway Community Health Center of Massachusetts (the "Fenway Clinic"), which is the foremost referral center in New England for individuals with gender identity disorders. However, in view of the Fenway Clinic's reputation, it was foreseeable that Fenway doctors might recommend laser hair removal and sex reassignment surgery for Kosilek. Therefore, Dennehy's representative, Greg Hughes, expressed reservations to Dr. Appelbaum of UMass about retaining Fenway. He relented, however, when Dr. Appelbaum explained that he had no other options.

Within a week, however, Dennehy had taken the unprecedented step of having the DOC, on its own, find an expert to potentially evaluate Kosilek and other inmates with gender identity disorder for treatment, rather than relying on UMass to do so. Hughes informed Dr. Appelbaum that the DOC was planning to retain Cynthia Osborne, a Licensed Social Worker, who was assisting Virginia and Wisconsin in litigation brought by transsexual prisoners seeking treatment that those states did not wish to provide. Hughes communicated to Dr. Appelbaum that Osborne was being selected because she was more "sympathetic" to the DOC's opposition to providing sex reassignment surgery and other treatment. See June 1, 2006 Tr. at 93; Ex. 47 at 223.

However, UMass continued to work with the Fenway Clinic, and in the fall of 2004, Drs. Randi Kaufman and Kevin Kapila of the Fenway Clinic began their evaluation of Kosilek for possible sex reassignment surgery. Drs. Kaufman and Kapila are specialists on gender identity disorders, and have treated many individuals with that mental illness. Dr. Appelbaum correctly characterized them as "well trained, credentialed ... [and] very knowledgeable." June 1, 2006 Tr. at 88.

On February 24, 2005, the Fenway doctors issued a report on their evaluation of Kosilek. See Ex. 25 (the "Fenway Report"). Applying the Standards of Care,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 28

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

Drs. Kaufman and Kapila found that Kosilek had demonstrated his ability to live as a female in a male prison while taking prescribed hormones. Despite the hormones, however, they found that continued to be "quite distressed" about his male anatomy. *Id.* at 5–6. The doctors opined that "[g]iven her previous suicide attempts, her ongoing distress, and the lack of other goals in her life, it is quite likely that Michelle will attempt suicide again if she is not able to change her anatomy." *Id.* at 5. Therefore, Drs. Kaufman and Kapila stated that it was their "recommendation ... that Michelle be able to have sex reassignment surgery." *Id.* at 6.

*25 Dennehy and her staff received the Fenway Report from UMass and read it shortly after it was issued. The court finds that Dennehy understood, from the report, that Kosilek was still suffering from a severe gender identity disorder, that the experts retained to advise the DOC were recommending sex reassignment surgery, and that there was a significant risk that Kosilek would try to kill himself if his hope of getting that surgery was lost.

On April 12, 2005, the DOC retained Osborne to complete a peer review of the Fenway Report. Osborne was then on the faculty of the John Hopkins School of Medicine, whose Psychiatry Department had long been led by Dr. Paul McHugh. Dr. McHugh was well-known for his strongly held view that sex reassignment surgery is "religiously abhorrent." Dec. 19, 2006 Tr. at 162. Indeed, Dr. McHugh was an advisor to the Vatican and had urged it to condemn sex reassignment surgery. June 8, 2006 Tr. at 165. The John Hopkins psychiatric department was substantially influenced by Dr. McHugh's views.

Prior to being hired by the DOC in April, 2005, Osborne had opined that an inmate could not have the real life experience required by the Standards of Care to be eligible for sex reassignment surgery and, in any event, such surgery was rarely medically necessary. After the Virginia Department of Corrections retained Osborne and terminated hormone therapy for a transsexual inmate named Ophelia De'lonta, De'lonta mutilated his genitals and Osborne was replaced by Dr. Brown. *See*

*De'Lonta,* 330 F.3d at 632; May 30, 2006 Tr. at 102; May 31, 2006 Tr. at 15; June 8, 2006 Tr. at 161–62. After Osborne advised the Wisconsin Department of Corrections that sex reassignment surgery was not necessary for an inmate named Donna Dawn Konitzer, Konitzer castrated himself. *See* June 8, 2006 Tr. at 163.

Dennehy testified that Osborne's opposition to providing sex reassignment surgery to prisoners was not a factor in her selection. This court finds that this contention is not credible or correct. Rather, the court concludes that Osborne's known positions and foreseeable advice that Kosilek should not be provided sex reassignment surgery were precisely the reasons that Dennehy decided to hire her.

As Dennehy's hiring of Osborne indicates, Dennehy remained determined to delay and defeat Kosilek's effort to get the surgery that had been prescribed. Among other things, she falsely claimed that she did not know whether the Fenway Clinic doctors viewed sex reassignment surgery as medically necessary.

On April 15, 2005, in a status report to the court, UMass referenced the Fenway Report's recommendation that Kosilek receive sex reassignment surgery and stated that UMass, Dr. Arthur Brewer, and Dr. Appelbaum "are presently unaware of any known medical or mental health contraindication to providing sex reassignment surgery to [Kosilek], although they are also unaware of any other case in which an inmate has undergone sex reassignment surgery while incarcerated." Ex. 23 at 2. Nevertheless, Dennehy pretended that she did not understand whether UMass was recommending sex reassignment surgery for Kosilek.

*26 In successive responses to inquiries prompted by Dennehy, UMass confirmed and clarified that it was indeed recommending sex reassignment surgery for Kosilek. On May 10, 2005, UMass wrote that, "[w]e have consistently indicated ... that we defer to the Fenway staff regarding the propriety of sexual reassignment surgery in the case of Michelle Kosilek." Ex. 15 at 2. However, on May 25, 2005, the DOC again asked UMass for its recommendation. Ex. 18. UMass responded on June 14, 2005, that "[b]ased on the opinions of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Add. 29

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

Dr. Kapila and Dr. Kaufman, and notwithstanding the report of Dr. Osborne, we would again suggest that solely from a clinical perspective it appears that sex re-assignment surgery should be offered to Michelle Kosilek." Ex. 16 at 3.

On September 1, 2005, in response to letters from Peter Heffernan, Acting Director of the DOC's Health Services Division, regarding the treatment of Kosilek and other inmates with gender identity disorder, Drs. Brown and Appelbaum wrote to the DOC that, "[f]rom what we have been told by Dr. Kapila and Dr. Kaufman, it is our understanding that further delay in providing the recommended treatment likely will result in continued or increased levels of distress for each afflicted individual, with the possibility of self-inflicted injury. To that extent, we also view the treatment recommendations as medically necessary." Ex. 42 at 3.

Dennehy was fully informed of the communications from UMass and understood that the DOC's doctors were recommending sex reassignment surgery as the only adequate treatment for Kosilek's condition. For example, on November 23, 2005, she wrote the Director of the United States Bureau of Prisons that, "[o]ur medical providers[,] the Commonwealth's medical school, is supporting their consultant's recommendation for the surgery!!!!!!!" Ex. 88; June 20, 2006 Tr. at 39. Nevertheless, eight months later at trial in June, 2006, Dennehy testified that she was still "awaiting clear recommendations and directions from UMass. Medical." June 19, 2006 Tr. at 88–89.

The court finds, however, that Dennehy at all relevant times knew that the DOC's doctors viewed sex reassignment surgery as the only adequate treatment for Kosilek's severe gender identity disorder and, therefore, were recommending it. She also knew that Kosilek was suffering mental anguish as a result of his severe gender identity disorder, and that he was at high risk of attempting again to kill himself if not given sex reassignment surgery. However, she remained determined not to be the first corrections official to authorize such treatment, which she believed would be unpopular with elected officials, the media and the public. Therefore, she continued, and indeed intensified, her effort to resist,

delay, and interfere with the DOC's doctors' prescription for providing Kosilek what she understood was the only adequate, and therefore the essential, medical care for his condition.

In the spring of 2005, during the period in which Dennehy falsely claimed that she did not understand whether UMass was recommending sex reassignment surgery for Kosilek as the only adequate treatment, Dennehy selectively gave interviews to some members of the media in an effort to demonstrate that she was responsive to the political and public opposition to using tax revenues to provide a prisoner sex reassignment surgery. Dennehy denied a request from an independent producer to do a documentary on inmates with gender identity disorder because the "matter was in litigation." June 19, 2006 Tr. at 79–80; Ex. 85. At the same time, however, she provided wide access to DOC facilities and inmates, and an interview, to the Channel 4 "Eyewitness News Team," so it could do a news piece that she knew would be hostile to providing treatment to inmates suffering from gender identity disorders.

*27 On May 16, 2005, Dennehy was interviewed for the Channel 4 piece, which was broadcast on May 25, 2005. The piece reported that the DOC would, later that week, inform the court of the security concerns posed by providing sex reassignment surgery to Kosilek. Although Dennehy made only brief remarks in the Channel 4 piece, she coordinated her comments to Channel 4 with a State Senator, who lived in the same town as Dennehy and called her on her cell phone to discuss the television piece. The piece reported that, prompted by Kosilek's case, the Senator was sponsoring proposed legislation to prohibit the use of tax revenues to provide sex reassignment surgery for prisoners in Massachusetts. June 19, 2006 Tr. at 64; Ex. 64. It featured the Senator as saying: "I think it's unconscionable that the Commonwealth of Massachusetts ... would have to pay for any type of elective sex change operations for any prisoners." Ex. 64. The head of Citizens for Limited Taxation echoed this theme, stating: "I can't even imagine seriously considering this. Never mind doing this. Never mind paying for it." Id. The piece reported that "[s]ex changes for all [12 prisoners diagnosed with

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

gender identity disorder] would cost [taxpayers] at least a quarter of a million dollars." *Id.*

The Channel 4 piece ended by reporting that:

Later this week, the state will tell the federal court that sex surgery for Michelle Kosilek would result in a security nightmare. When that happens, expect Kosilek to pursue her lawsuit. Then a federal judge will eventually decide whether you will pay the bill for Kosilek's operation and beyond that, sex surgeries for other convicts serving time for horrendous crimes.

*Id.*

The Channel 4 piece made it clear that Dennehy opposed the provision of sex reassignment surgery to Kosilek on the basis of purported security concerns. However, when the piece was recorded on May 16, 2005, Dennehy had not conducted the security review included in the DOC's written procedures for making decisions concerning prisoners with gender identity disorders. Nor had she had any discussion about security concerns with key DOC personnel, including Spencer, the Superintendent of MCI Norfolk where Kosilek was incarcerated. [FN10] According to the DOC's established procedures, if UMass prescribed treatment for a prisoner's gender identity disorder, the Superintendent of the facility in which the inmate was incarcerated was to be asked to assess the impact such treatment would have on security and make a written recommendation to the Commissioner on whether the treatment should be allowed. *See* Ex. 8. Spencer understood that this was the standard operating procedure with regard to Kosilek and anyone else similarly situated. Dennehy also knew that this was the DOC's standard decision-making process with regard to inmates with gender identity disorders. She testified that having Superintendents complete such security assessments was valuable because the Superintendents had the security background and familiarity with their respective institutions to make informed, accurate judgements.

**\*28** As described earlier, although Commissioner Maloney had testified in *Kosilek I* that it would be too dangerous to provide female hormones to Kosilek, following the court's decision in that case Maloney asked Spencer to conduct a security assessment in accordance with the DOC's established procedure. Spencer did so and determined that the provision of hormones to Kosilek would not create any security concerns. That prediction proved to be correct. Although Spencer was aware in 2005 that the DOC doctors had recommended sex reassignment surgery for Kosilek, he was not asked to provide Dennehy with the written security assessment and recommendation that established procedure included.

Rather, only after indicating to Channel 4 on May 16, 2005, that she would deny sex reassignment surgery for Kosilek because of purported security considerations did Dennehy meet for the first time with her lawyers, Spencer, and Lynn Bissonette, the Superintendent of the woman's prison, MCI Framingham, on May 19, 2005, to discuss security matters in preparation for a report to the court that was then due on May 27, 2005. [FN11] At the time of this meeting, Dennehy had not received any written materials from either Spencer or Bissonette concerning any possible security concerns.

Following the May 19, 2005 meeting, trial counsel for the DOC drafted a report concerning the security implications of sex reassignment surgery for Kosilek, which was reviewed by Dennehy a day or two before being filed on June 14, 2005. June 19, 2005 Tr. at 63. The report described a series of purported security concerns and concluded that it was necessary for the Commissioner to deny Kosilek sex reassignment surgery because the DOC would be unable to protect his safety if the surgery was performed. However, as explained below, Dennehy's stated security concerns were largely false and, in any event, were not her real reason for denying the surgery. Rather, the real reason was to avoid public and political criticism that providing the prescribed treatment would foreseeably provoke.

In the fall of 2005, the DOC had already engaged Osborne to prepare a peer review of the Fenway Report, and decided to retain her as a medical expert at trial. In addition, based on her recommendation, the DOC also retained Dr. Schmidt, a psychiatrist at the Johns Hopkins University School of Medicine, to serve as a med-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

ical expert.

The court-ordered deadline for disclosure of experts and their opinions was December 2, 2005. On November 23, 2005 Dennehy contacted Harley Lappin, the Director of the United States Bureau of Prisons, looking for trial experts. Dennehy clearly communicated to Lappin her opposition to providing Kosilek sex reassignment surgery. The DOC subsequently retained Robert Dumond of the DOC and Arthur Beeler of the Bureau of Prisons as litigation experts on security issues. Each opined that insurmountable security problems would make it impossible to protect Kosilek's safety if he were provided sex reassignment surgery. However, Beeler formed his opinion before visiting any DOC facility or learning anything specific to Kosilek. In addition, although Dumond testified as to the risks of sexual assault and violence to transsexuals in prison and to Kosilek specifically, he failed to consider Kosilek's history of living safely as a woman at MCI Norfolk in forming his opinion.

**\*29** In February, 2006, Dr. Loren Schechter, a Chicago surgeon with substantial experience in performing sex reassignment surgery who was found by Kosilek's lawyers, testified in a deposition that he would be willing to evaluate Kosilek, and if appropriate, perform sex reassignment surgery on Kosilek in Massachusetts. Schechter is not licensed to practice in Massachusetts, but could perform the surgery in the state if he receives a sponsorship to do so.

*D. The Trial of Kosilek II*

As the trial began in the spring of 2006, the Lieutenant Governor of the Commonwealth of Massachusetts publicly stated her opposition to using tax revenues to fund sex reassignment surgery for a prisoner. Dennehy, who served under the Governor and Lieutenant Governor, was well aware of the Lieutenant Governor's position.

The media also continued to oppose sex reassignment surgery for Kosilek. For example, a June 11, 2006 *The Boston Globe* column began:

The [Kosilek] trial underway in federal court in Bo-

ston is not about the rights of transsexuals. It's about the manipulations of a murderer.

Ex. 95, "Eileen McNamara," "When gender isn't relevant," *The Boston Globe,* June 11, 2006. Soon after, *The Boston Globe* opined in an editorial that:

Kosilek's case is not compelling for reasons even beyond the obvious distastefulness of a wife killer angling to serve out his sentence of life without parole in a women's prison. Private insurers rarely pay for sex-change operations.... Kosilek, like any inmate, deserves proper mental health care, including hormone treatment and expert therapy. If he is at risk of suicide, he should be placed under constant observation. But that's sufficient.

Ex. 94, "Set limits on sex change," *The Boston Globe* (June 15, 2006). Dennehy was aware of these statements, and the wide-spread public hostility to providing sex reassignment surgery for prisoners that they expressed as well.

Because Kosilek is seeking only injunctive relief, his case must be decided by a judge alone, rather than by a jury. The trial of *Kosilek II* before this court began on May 30, 2006.

Several doctors testified at trial. Each one opined that Kosilek has a gender identity disorder. Dr. Brown, a specialist in gender identity disorders who was on the board of directors of the Harry Benjamin International Gender Dysphoria Association at the time of the trial, testified for Kosilek. Dr. Brown estimated that, at the time of trial, he had treated or evaluated over 1,000 patients with gender identity disorders. He had then authored or co-authored 25 peer-reviewed articles and fourteen book chapters on gender identity disorder. After reviewing Kosilek's medical records, conducting a clinical interview with Kosilek, and speaking with Kosilek's treating mental health professional at MCI Norfolk, Burrowes, Dr. Brown diagnosed Kosilek with "chronic and severe" gender identity disorder. May 30, 2006 Tr. at 94.

Dr. Kaufman, a psychotherapist at the Fenway Clinic from 1999 to July 2005, who specializes in ther-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

apy with transsexual patients, also testified for Kosilek. At the Fenway Clinic, Dr. Kaufman served as the co-chair of the Transgender Clinical Team from 1999 to 2003, and the coordinator of the transsexual health program. *See* Ex. 56. Dr. Kaufman estimated that, at the time of trial, she had evaluated and treated about 300 patients for gender identity disorder. After reviewing Kosilek's medical record, speaking with Burrowes, and conducting an in-person evaluation with Kosilek, Dr. Kaufman also diagnosed Kosilek with severe gender identity disorder.

*30 Osborne, a social worker and assistant professor at Johns Hopkins School of Medicine, testified for the defendant, and agreed that Kosilek has a severe gender identity disorder. June 8, 2006 Tr. at 186. Dr. Schmidt, Director of Psychiatry at Johns Hopkins Bayview Medical Center, a satellite facility of the Johns Hopkins School of Medicine, also testified for the defendant. At the time of the trial, Dr. Schmidt was the medical director of the managed care group known as Johns Hopkins Health Care, and was an associate director at the Center for Sexual Health and Medicine at Johns Hopkins School of Medicine. His recent professional focus was then on "Coding Procedural Technology," a technical script used by psychiatrists to communicate with third-party providers, such as managed care companies, for the purposes of billing services. Dr. Schmidt also diagnosed Kosilek with gender identity disorder, though he stopped short of characterizing it as severe.

Kosilek testified regarding his gender identity disorder and the extreme mental anguish and emotional distress it causes him. He testified that he would not want to continue living if he were denied sex reassignment surgery. As indicated earlier, Drs. Kaufman and Kapila, in their evaluation of Kosilek, reported that, despite receiving hormones, Kosilek "continues to feel quite distressed, both with having male genitalia, as well as not having female genitalia." Ex. 25 at 5. They opined that "[g]iven her previous suicide attempts, her ongoing distress, and the lack of other goals in her life, it is quite likely that Michelle will attempt suicide again if she is not able to change her anatomy." *Id.* Burrowes

testified that, even after taking hormones, Kosilek continued to be "distressed" and "disgusted" by his male genitalia. June 7, 2006 Tr. at 115.

Several of the doctors testified that the Standards of Care are the generally accepted, widely-used treatment standards for gender identity disorder. In accordance with the Standards of Care, many of the doctors testified that sex reassignment surgery is medically necessary and the only adequate treatment for Kosilek's gender identity disorder. The Fenway clinicians, Drs. Kaufman and Kapila, had written that "[g]iven her continued psychological distress, despite the treatment she has already had for GID in making a social and hormonal transition, sex reassignment surgery is the only treatment at this point that would ameliorate Kosilek's continued gender dysphoria." Ex. 53 at 159. Dr. Kaufman testified that, even though Kosilek had received hormones and hair removal and was dressing like a woman, "she still shows a level of dysphoria that really can't be treated in any other way but surgery." June 5, 2006 Tr. at 104. Dr. Kaufman also testified that if Kosilek does not receive sex reassignment surgery, "she would be at great risk for committing suicide." *Id.* at 104–05. Dr. Brown opined that sex reassignment surgery, together with hormones and psychotherapy, is necessary to provide Kosilek with "minimally adequate medical care." May 31, 2006 Tr. at 13. Dr. Brown testified that he could say, to a reasonable degree of medical certainty, that there is a substantial risk of serious harm to Kosilek if he does not receive sex reassignment surgery. Finding the opinions of Drs. Kaufman and Kapila to be reliable, Dr. Appelbaum of UMass concluded that sex reassignment surgery "is not only clinically appropriate and should be offered to Miss Kosilek, but ... it is medically necessary." Oct. 3, 2006 Tr. at 36.

*31 On the other hand, Dr. Schmidt, who as described below does not follow the Standards of Care, testified that sex reassignment surgery was not medically necessary for Kosilek. Dr. Schmidt opined that if Kosilek were denied sex reassignment surgery and became depressed, his depression and distress could be treated with antidepressants and psychotherapy, and that this would alleviate his distress to a point at which he

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

was no longer at substantial risk of serious harm. However, Dr. Schmidt also acknowledged that Kosilek's distress will probably intensify and become severe if he is denied sex reassignment surgery. Osborne also testified that sex reassignment surgery was not medically necessary for Kosilek, in part because she believed that it was not possible to have the "real life experience" required by the Standards of Care in prison.

After hearing this evidence, the court instructed Dennehy to review the medical evidence and consider further whether the DOC would permit the sex reassignment surgery that UMass had prescribed for Kosilek. Dennehy did not, however, revise her position. The court also instructed Dr. Appelbaum to review Dr. Schmidt's testimony and inform the court of his opinion concerning whether Dr. Schmidt's recommendations were within prudent professional standards. After consulting Drs. Kaufman and Kapila, in whom he continued to have confidence, Dr. Appelbaum concluded that "[t]he recommendations of Dr. Schmidt do not meet prudent professional standards." Ex. 90 at 6–7.

In a further effort to ascertain whether Dr. Schmidt's treatment recommendations were within prudent professional standards, the court, pursuant to Federal Rule of Evidence 706, appointed Dr. Stephen Levine as an expert witness. Dr. Levine is a psychiatrist and co-director at the Center for Marital and Sexual Health in Cleveland, Ohio. Dr. Levine was the chairman of the Harry Benjamin International Gender Dysphoria Association committee for the fifth version of the Standards of Care. At the time of trial, Dr. Levine testified that he had evaluated about 325 to 400 individuals with gender identity disorders and had recommended sex reassignment surgery for approximately 24 of them.

In his initial report to the court, Dr. Levine stated that, "[i]t is my opinion that Dr. Schmidt's view, however unpopular and uncompassionate in the eyes of some experts in GID, is within prudent professional standards." Ex. 98 at 18. However, when he testified, Dr. Levine clarified this statement and testified that, in his view, Dr. Schmidt's recommendations would be a professionally prudent response to Kosilek's condition only if, for some reason such as cost or the fact that

Kosilek was incarcerated, sex reassignment surgery was not an option. See Dec. 19, 2006 Tr. at 190–91, 200–01. Despite instructions by the court to the contrary, see Oct. 31, 2006 Order, in formulating his initial report Dr. Levine had assumed Kosilek had not had the real life experience required by the Standards of Care and that Kosilek could not afford to pay for sex reassignment surgery. Id. at 179–80, 189–91. Eliminating these considerations and any security concerns, Dr. Levine opined that a prudent professional would not deny Kosilek sex reassignment surgery. Id. at 179, 190.

*32 Dennehy also testified during the trial, after reviewing the medical testimony pursuant to the court's order. Although she initially testified that it was not clear to her that UMass was recommending sex reassignment surgery as medically necessary, she eventually, and credibly, testified that she understood that UMass had found that Kosilek had a serious medical need and required sex reassignment surgery. See Oct. 18, 2006 Tr. at 11–18. At that point, Dennehy also testified that, because she had no clinical background, she was not in a position to question the DOC's doctors' evaluation of Kosilek's condition and recommendation concerning what was necessary to treat it properly. In essence, she understood that Kosilek was at significant risk of suffering serious harm if he did not receive sex reassignment surgery. Id. at 11.

Dennehy further testified that she was not influenced by cost or controversy, and only safety and security concerns were preventing her from allowing Kosilek to receive sex reassignment surgery. Id. at 17–18; June 19, 2006 Tr. at 45–46. Specifically, Dennehy claimed to be concerned about safety and security both during and after the surgery, with regard to the risk of escape and whether Kosilek would either pose a danger to or be at risk of assault from other inmates after surgery at either a male or female prison. Id. at 21. Dennehy also testified that she would retire rather than obey a Supreme Court order requiring her to provide sex reassignment surgery to Kosilek. June 20, 2006 Tr. at 117.

With regard to security, defendant provided two expert witnesses: Dumond, director of the Research and Planning Division at the DOC, and Beeler, Warden of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

the Federal Medical Center in Butner, North Carolina. Both testified as to the general risks of violence and sexual assault facing transsexuals in prison. Although Dumond provided some testimony about Kosilek, he failed to consider his history of living safely as a woman at MCI Norfolk when forming his opinion. In addition, Beeler was not permitted to testify as to Kosilek's specific situation because he was not sufficiently informed about the facts concerning Kosilek to be qualified to express an opinion concerning any risk to, or posed by, Kosilek particularly. See Fed.R.Evid. 702.

Susan Martin, Director of the Health Services Division of the DOC until July 2005, and Greg Hughes, the Regional Director of Mental Health for the DOC until July 2005, also testified regarding the DOC's decision-making process on the provision of treatment to Kosilek.

Dennehy resigned on April 30, 2007, and was replaced by Acting Commissioner James R. Bender, who did not testify. Harold W. Clarke became Commissioner on November 26, 2007. The court directed Clarke to consider some of the evidence presented at trial and decide whether he would permit Kosilek to have the sex reassignment surgery that had been prescribed. Clarke submitted a report on May 7, 2008, stating that, like Dennehy, he did not profess to have any clinical expertise regarding the appropriate treatment for Kosilek. Also like Dennehy, he claimed that he was not influenced by cost or controversy. Rather, he stated that "the safety and security concerns presented by the prospect of undertaking sex reassignment surgery for Michelle Kosilek [we]re insurmountable" and precluded the provision of sex reassignment surgery. Ex. 107 at 1. He subsequently testified and reiterated these views. As a result, the testimony at trial did not conclude until May, 2008.

**\*33** The court has not taken any testimony since then. As described earlier, see fn. 2, supra, the parties have agreed that there have been no material changes in the facts since the testimony was completed and that the court should decide this case without hearing any additional testimony. However, to address more recent judicial decisions and developments, further arguments

were heard in 2009 and 2011.

In May, 2011, Luis Spencer, the former Superintendent of MCI Norfolk, became Commissioner of the DOC, and was substituted as the defendant.

E. The Eighth Amendment Analysis

As stated earlier, in order to prevail in this case, Kosilek must prove that: (1) he has a serious medical need; (2) sex reassignment surgery is the only adequate treatment for it; (3) the defendant knows Kosilek is at high risk of serious harm if he does not receive sex reassignment surgery; (4) the defendant has not denied that treatment because of good faith, reasonable security concerns or for any other legitimate penological purpose; and (5) the defendant's unconstitutional conduct will continue in the future.

1. Kosilek has a Serious Medical Need

The credible evidence at trial has proven that there is a substantial risk that Kosilek will suffer serious harm if his continuing severe gender identity disorder is not adequately treated and, therefore, that he now has a serious medical need. See Farmer, 511 U.S. at 828, 835–47, 114 S.Ct. 1970. Kosilek has been functioning better since being provided female hormones and retaining the hope of receiving sex reassignment surgery. However, he continues to suffer intense mental anguish because of his belief that he is a female trapped in a male body. As indicated earlier, Kosilek testified that he will kill himself if the hope of getting sex reassignment surgery as a result of the instant case is lost. This is a credible threat, resulting from genuine mental anguish, rather than a calculated effort to manipulate prison officials or deceive the court.

**[34]** The court concludes Kosilek has a serious medical need. The reasons for this conclusion include the following. As described earlier, a serious medical need may be mental as well as physical. See Torraco, 923 F.2d at 234; Clark–Murphy, 439 F.3d at 292; Steele, 87 F.3d at 1269. A serious medical need is, among other things, one " 'that has been diagnosed by a physician as mandating treatment.' " Mahan, 64 F.3d at 18 (quoting Gaudreault, 923 F.2d at 208); see also Brock, 315 F.3d at 162.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

As also described earlier, the medical community and the courts have recognized that a gender identity disorder can cause intense mental anguish and require further treatment for some individuals who are already receiving psychotherapy and hormones. *See, e.g., Fields,* 653 F.3d at 559; *O'Donnabhain,* 134 T.C. at 38–40. Severe gender identity disorder, when not adequately treated, may lead to self-mutilation and sui- cide.

***34** The highly qualified doctors employed and retained by the DOC have diagnosed Kosilek as having such a condition. Their diagnosis is supported by the credible testimony of Drs. Brown and Forstein. The court is persuaded that Kosilek is now suffering a degree of mental anguish that itself constitutes a serious harm that requires adequate treatment. *See Farmer,* 511 U.S. at 828, 835–47, 114 S.Ct. 1970; *McGuckin,* 974 F.2d at 1059. The court also finds that Kosilek's severe emotional distress will intensify if he loses the hope of receiving sex reassignment surgery. The genuine high risk that he will again try to kill himself if denied sex reassignment surgery indicates the intensity of his mental anguish.

[35] The finding that Kosilek's severe gender identity disorder is a serious medical need is consistent with the conclusions regularly reached in comparable cases. As the Tax Court wrote in 2010:

Seven of the U.S. Courts of Appeals that have considered the question have concluded that severe GID or transsexualism constitutes a "serious medical need" for purposes of the Eighth Amendment. *See De'Lonta* [ ], 330 F.3d [at] 634 [ ]; *Allard[ ],* 9 Fed.Appx. [at] 794[ ]; *Cuoco v. Moritsugu,* [222 F.3d 99, 106 (2d Cir.2000) ]; *Brown v. Zavaras,* 63 F.3d 967, 970 (10th Cir.1995); *Phillips v. Mich. Dept. of Corr.,* 932 F.2d 969 (6th Cir.1991), *affg.* 731 F.Supp. 792 (W.D.Mich.1990); *White[ ],* [849 F.2d at 325]; *Meriwether v. Faulkner,* 821 F.2d 408, 411–413 (7th Cir.1987); *see also Maggert v. Hanks,* 131 F.3d 670, 671 (7th Cir.1997) (describing gender dysphoria as a "profound psychiatric disorder"). No U.S. Court of Appeals has held otherwise.

*O'Donnabhain,* 134 T.C. at 62 (footnote omitted). Since the Tax Court's decision, the First Circuit has also found severe gender identity disorder to be a serious medical need in the context of a civil commitment. *See Battista,* 645 F.3d at 452. Other courts have reached comparable conclusions. *See Soneeya,* 851 F.Supp.2d at 244–45; *Fields,* 653 F.3d at 555; *Norwood v. Tobiasz,* No. CIV.A. 11–507, 2012 WL 506580, at *4 (E.D.Wis. Feb. 15, 2012) (slip copy); *Norington v. Daniels,* No. CIV.A. 11–282, 2011 WL 5101943, at *2 (N.D.Ind. Oct. 25, 2011); *Adams v. Federal Bureau of Prisons,* 716 F.Supp.2d 107, 112 (D.Mass.2010); *Konitzer v. Frank,* 711 F.Supp.2d 874, 905 (E.D.Wis.2010); *Briones v. Grannis,* No. CIV.A. 09–08074, 2010 WL 3636139, at *5 (C.D.Cal. Sept. 14, 2010); *Barnhill v. Cheery,* No. CIV.A. 06–922–T–23TGW, 2008 WL 759322, at *11 (M.D.Fla. Mar. 20, 2008); *Sundstrom v. Frank,* 630 F.Supp.2d 974, 983 (E.D.Wis.2007); *Gammett v. Idaho State Bd. of Corr.,* No. CIV.A. 05–257, 2007 WL 2186896, at *3 (D.Idaho Jul. 27, 2007); *Brooks v. Berg,* 289 F.Supp.2d 286, 287 (N.D.N.Y.2003); *Barrett v. Coplan,* 292 F.Supp.2d 281, 286 (D.N.H.2003). These decisions "reflect a clear consensus that GID constitutes a medical condition of sufficient seriousness that it triggers the Eighth Amendment requirement that prison officials not ignore or disregard it." *O'Donnabhain,* 134 T.C. at 63 (footnote omitted).

*2. Sex Reassignment Surgery is the Only Adequate Treatment for Kosilek's Serious Medical Need*

***35** As described earlier, Kosilek is entitled to adequate care for his serious medical need, but not to ideal care or to the care of his choice. *See DeColergo,* 821 F.2d at 42; *DesRosiers,* 949 F.2d at 18. Therefore, it is necessary to decide whether the DOC has offered an adequate alternative to the sex reassignment surgery Kosilek is seeking and the DOC's doctors have prescribed.

As also explained earlier, "adequate services" are "services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *DeColergo,* 821 F.2d at 43. Such services are "the product of sound medical judgment." *Chance,* 143 F.3d at 703. Absent legitimate

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

countervailing penological considerations, adequate medical care requires addressing the causes of a prisoner's serious medical need rather than merely providing treatment to reduce the pain it causes. *See Fields,* 653 F.3d at 556; *West,* 571 F.2d at 162; *Sulton,* 265 F.Supp.2d at 300; *Wolfe,* 130 F.Supp.2d at 653. Adequate medical care also requires an individualized assessment of a patient's medical needs. *See Roe,* 631 F.3d at 862–63; *Soneeya,* 851 F.Supp.2d at 242–43; *Kosilek I,* 221 F.Supp.2d at 193.

As this court wrote in *Kosilek I,* "reference to established professional standards is important to determining the adequacy of medical care." 221 F.Supp.2d at 180. In *Kosilek I,* the court found that the Standards of Care "describe the generally accepted treatment for individuals with gender identity disorders in the community." *Id.* at 166. The credible evidence in the instant case demonstrates that the Standards of Care continue to describe the quality of care acceptable to prudent professionals who treat individuals suffering from gender identity disorders.

This conclusion has subsequently been confirmed in other cases. For example, the Seventh Circuit recently characterized these standards as "[t]he accepted standards of care." *Fields,* 653 F.3d at 553. In addition, in 2010 the Tax Court concluded that:

The Benjamin standards are widely accepted in the psychiatric profession, as evidenced by the recognition of the standards' triadic therapy sequence as the appropriate treatment for GID and transsexualism in numerous psychiatric and medical reference texts. Indeed, every psychiatric reference text that has been established as authoritative in this case endorses sex reassignment surgery as a treatment for GID in appropriate circumstances. No psychiatric reference text has been brought to the Court's attention that fails to list, or rejects, the triadic sequence or sex reassignment surgery as the accepted regimen for GID.

*O'Donnabhain,* 134 T.C. at 65–67; *see also Alexander v. Weiner,* 841 F.Supp.2d 486, 488–89 (D.Mass.2012); *Battista v. Dennehy,* No. CIV.A. 05–11456, 2006 WL 1581528, at *10 n. 18 (D.Mass.

Mar. 22, 2006); *Barrett,* 292 F.Supp.2d at 286; *Hare v. Dep't of Human Servs.,* 666 N.W.2d 427, 429 n. 1 (Minn.Ct.App.2003).

*36 The Standards of Care "triadic sequence is comprised of: (1) hormone therapy; (2) a real-life experience of living as a member of the opposite sex; and (3) sex reassignment surgery." *Kosilek I,* 221 F.Supp.2d at 166. Although the Standards of Care have been revised somewhat since *Kosilek I* was decided in 2002, the prerequisites for complete sex reassignment surgery remain the same.[FN12] *See* Ex. 9; *Alexander,* 841 F.Supp.2d at 488–89.

The Standards of Care recognize that, "[m]any adults with gender identity disorder find comfortable, effective ways of living that do not involve all of the components of the triadic sequence." Ex. 9 at 11. Therefore, "[n]ot all persons with gender identity disorders need or want all these elements of triadic therapy." *Id.* at 3. For some, taking cross-sex hormones may be sufficient. *Id.* at 14. If they are not, the Standards of Care provide for a "real life experience" in which a male suffering from a gender identity disorder must live for a year as a woman to test his determination and ability to do so. *Id.* at 17–18.

The credible evidence in the instant case confirmed the conclusion in *Kosilek I* that a person can have a "real life experience" in prison. [FN13] For someone like Kosilek who is serving a sentence of life without the possibility of parole, prison is, and always will be, his real life. *See* 221 F.Supp.2d at 167.

The Standards of Care address the third possible stage of the treatment of gender identity disorder, surgery. They state:

*Sex Reassignment is Effective and Medically Indicated in Severe GID.* In persons diagnosed with transsexualism or profound GID, sex reassignment surgery, along with hormone therapy and real life experience, is a treatment that has proven to be effective. Such a therapeutic regimen, when prescribed or recommended by qualified practitioners, is medically indicated and medically necessary. Sex reassignment

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 37

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

is not "experimental," "investigational," "elective," "cosmetic," or optional in any meaningful sense. It constitutes very effective and appropriate treatment for transsexualism or profound GID.

Ex. 9. at 18.

As indicated earlier, Drs. Brown, Kaufman, and Forstein, who each specialize in treating individuals with gender identity disorders, all testified that sex reassignment surgery is medically necessary for some individuals suffering from severe gender identity disorders. By contrast, Dr. Schmidt testified that he disagreed with the Standards of Care to the extent they provided that sex reassignment surgery is medically necessary for some transsexuals.[FN14] The court finds the views of Drs. Brown, Kaufman, and Forstein to be persuasive on the issue of whether such surgery is ever medically necessary. As previously described, the Standards of Care are accepted by prudent professionals in the community and provide that sex reassignment surgery is medically necessary for some individuals.

**\*37** All of the doctors who testified at trial, except for Dr. Schmidt, provided evidence that sex reassignment surgery for Kosilek is both medically necessary and the only adequate treatment for his severe gender identity disorder. For example, the Fenway clinicians, Drs. Kaufman and Kapila, wrote that "[g]iven her continued psychological distress, despite the treatment she has already had for GID in making a social and hormonal transition, sex reassignment surgery is the only treatment at this point that would ameliorate Kosilek's continued gender dysphoria." Ex. 53 at 159. Finding the opinions of Drs. Kaufman and Kapila to be reliable, Dr. Appelbaum of UMass concluded that sex reassignment surgery "is not only clinically appropriate and should be offered to Miss Kosilek, but ... it is medically necessary." Oct. 3, 2006 Tr. at 36. Dr. Brown opined that sex reassignment surgery, together with hormones and psychotherapy, is necessary to provide Kosilek with "minimally adequate and medically necessary" care. May 31, 2006 Tr. at 13. Dr. Forstein testified that "the only prudent treatment for Michelle Kosilek at this point is Sexual Reassignment Surgery." Mar. 15, 2007 Tr. at 116. Dr. Forstein further explained that sex reas-

signment surgery is "the only reasonable treatment to prevent the potentially catastrophic effect of refusing treatment to her at this point in her life." Id. at 132.

In contrast, as indicated earlier, Dr. Schmidt testified that he did not agree with the Standards of Care to the extent that they state, "Sexual Reassignment is Effective and Medically Indicated in Severe GID." See June 7, 2006 Tr. at 82. Nor did he agree with the Standards of Care that sex reassignment surgery "when prescribed or recommended by qualified practitioners, is medically indicated and medically necessary." Id.

In addition, the Standards of Care provide that in order to obtain sex reassignment surgery an individual must obtain two "letters of recommendation" from qualified mental health professionals. See Ex. 9 at 7–8. Accordingly, prudent professionals who treat individuals suffering from severe gender identity disorders write such letters of recommendation when sex reassignment surgery is necessary to treat a particular patient adequately. However, consistent with his view that sex reassignment surgery is never medically necessary, Dr. Schmidt never recommends sex reassignment surgery for any patients. See June 7, 2006 Tr. at 77, 80. At most, Dr. Schmidt writes letters taking a neutral position on sex reassignment surgery for a particular patient. Id. at 77, 80.

Dr. Schmidt also opined that sex reassignment surgery is not medically necessary for Kosilek particularly. Dr. Schmidt based his opinion in part on his general opposition to sex reassignment surgery. He also relied on his view that it is impossible to have a "real life experience" in prison and, therefore, Kosilek is not eligible for sex reassignment surgery under the Standards of Care.

**\*38** Dr. Schmidt recognized that Kosilek would likely suffer severe emotional distress if denied sex reassignment surgery, become depressed, and be at risk of committing suicide. Id. at 103. However, as described earlier, Dr. Schmidt recommended that instead of sex reassignment surgery, Kosilek be provided psychotherapy and antidepressants, and be put on a "suicide watch" to keep him from succeeding in killing himself.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

*Id.* at 38–39, 91, 106. As Dr. Schmidt described it, his approach would not be aimed at curing the mental illness that caused Kosilek's suffering, but at managing the symptoms of that illness to reduce the intensity of the suffering and the risk of suicide. *Id.* at 106. In his opinion, this approach would be sufficient to diminish Kosilek's mental anguish to a point at which he no longer suffers serious harm from his gender identity disorder and, therefore, no longer has a serious medical need. *Id.* at 106–07.

Although Drs. Brown, Kaufman, Kapila, Appelbaum, and Forstein recommended sex reassignment surgery for Kosilek, if Dr. Schmidt's recommended alternative treatment for Kosilek is "of a quality acceptable within prudent professional standards," it would constitute adequate medical care for the purpose of the objective prong of the Eighth Amendment deliberate indifference standard. *See DeCologero,* 821 F.2d at 43. Therefore, as described earlier, the court ordered the DOC to have UMass review the transcripts of the medical testimony and address, among other things, whether the "approach advocated by [Dr.] Schmidt constitutes 'adequate medical care' for Kosilek, meaning 'services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.'" June 29, 2006 Order at ¶ 2 (quoting *Kosilek I,* 221 F.Supp.2d at 180). After consulting Drs. Kaufman and Kapila, in whom he continued to have confidence, Dr. Appelbaum explained in a lengthy letter, and credibly concluded, that "[t]he recommendations of Dr. Schmidt do not meet prudent professional standards." Ex. 90 at 6–7.

As also explained earlier, in a further effort to make a well-informed decision concerning whether Dr. Schmidt's recommended treatment for Kosilek constituted adequate medical care, pursuant to Federal Rule of Evidence 706, the court appointed Dr. Levine as an additional expert.

[36] Dr. Levine's credible testimony at trial also contributes to the court's conclusion that Dr. Schmidt is not a prudent professional and his recommendations concerning Kosilek are not within the range that would be acceptable by prudent professionals. In his initial report to the court, Dr. Levine stated that, "[i]t is my opinion that Dr. Schmidt's view, however unpopular and uncompassionate in the eyes of some experts in GID, is within prudent professional standards." Ex. 98 at 18. However, Dr. Levine's testimony demonstrated that the opinion expressed in his report was based on several erroneous assumptions and that in his view there were many respects in which Dr. Schmidt was not a prudent professional.[FN15]

**\*39** Most significantly, Dr. Levine testified that he did not believe a prudent professional would deny Kosilek sex reassignment surgery. In his view, Dr. Schmidt's recommendations would be a professionally prudent response to Kosilek's condition only if, for some reason such as cost or the fact that Kosilek was incarcerated, sex reassignment surgery was not an option. *See* Dec. 19, 2006 Tr. at 190, 201. Despite instructions by the court to the contrary, *see* Oct. 31, 2006 Order, in formulating the opinion expressed in his report Dr. Levine relied on the assumptions that Kosilek had not had the real life experience required by the Standards of Care and that Kosilek could not afford to pay for sex reassignment surgery. *Id.* at 180, 190. Eliminating these considerations and any security concerns, Dr. Levine opined that a prudent professional would not deny Kosilek sex reassignment surgery. *Id.* at 179, 190. Rather, he stated that, as contemplated by the Standards of Care, a prudent professional would write a letter recommending sex reassignment surgery, and stated that a "qualified mental health professional" working with patients with gender identity disorders would not adopt a uniform policy of refusing to write letters of recommendation, as Dr. Schmidt did. *Id.* at 164–65.

Dr. Levine also testified that antidepressants would not provide treatment for Kosilek's gender identity disorder. *Id.* at 174–75. According to Dr. Levine, a prudent professional would not deny an eligible individual in the community sex reassignment surgery and provide him with antidepressants instead. *Id.* at 176.

As indicated earlier, based on the credible evidence, the court finds that Dr. Schmidt is not a prudent professional and that the treatment that he proposed for Kosilek is not "of a quality acceptable within prudent

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

professional standards." *DeCologero,* 821 F.2d at 43. Therefore, the court concludes that Dr. Schmidt's proposal would not provide adequate medical care for Kosilek's condition.

The court finds that Dr. Schmidt is not a prudent professional for several reasons. First, he does not accept certain fundamental features of the Standards of Care, which "describe the generally accepted treatment for individuals with gender identity disorders in the community." *Kosilek I,* 221 F.Supp.2d at 166; *see also Fields,* 653 F.3d at 553; *O'Donnabhain,* 134 T.C. at 65–67. Contrary to the Standards of Care, Dr. Schmidt does not believe that sex reassignment surgery is ever medically necessary. In further contrast to prudent professionals who follow the Standards of Care, Dr. Schmidt will not write a letter recommending that an eligible patient receive sex reassignment surgery.

In addition, contrary to this court's conclusion, Dr. Schmidt does not believe that Kosilek has had the real life experience required by the Standards of Care because, in his view, it is not possible to have the required real life experience in prison. *See* June 7, 2006 Tr. at 78–79. This is one reason that he believes that sex reassignment surgery has not been shown to be medically necessary for Kosilek. *See* June 7, 2006 Tr. at 79. However, as Drs. Kaufman and Kapila wrote, in their response to Osborne's peer review of their evaluation of Kosilek, "[t]he point of having a [real life experience] is to provide the person with an awareness of what to expect in a different gender role." Ex. 53 at 154. Kosilek's real life experience living as a woman in prison provides him with an awareness of what to expect in a different gender role, as he is serving a life sentence and will never have the opportunity to live as a woman outside of prison. Indeed, the evidence at trial indicated that the prison environment has provided Kosilek with a an even more stringent "real life experience" test than many transsexuals have outside prison, because inmates are constantly under observation and any failure to live as a woman would be readily noted. Except for his assumption that Kosilek has not had a real life experience, Dr. Schmidt acknowledges that there are no medical contraindications to providing Kosilek sex reassignment surgery. *See* June 7, 2006 Tr. at 79.

**\*40** In addition, Dr. Schmidt's opinion that Kosilek should not be provided sex reassignment surgery is not based on Kosilek's unique circumstances, but on Dr. Schmidt's categorical view, unsupported by the Standards of Care, that sex reassignment surgery for a prisoner is never justified. Such a "failure to consider an individual inmate's condition in making treatment decisions is .... precisely the kind of conduct that constitutes a substantial departure from accepted professional judgment, practice, or standards such as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Roe,* 631 F.3d at 862–63 (internal quotation omitted); *see also Soneeya,* 851 F.Supp.2d at 249–50; *Kosilek I,* 221 F.Supp.2d at 193.

Moreover, the treatment Dr. Schmidt recommends, psychotherapy and antidepressants, would not treat the cause of Kosilek's intense mental anguish, but rather would only attempt to diminish its symptoms. As both Drs. Kapila and Appelbaum credibly testified, prudent medical professionals typically treat the cause of a disease or disorder, not merely the symptoms. Once again, absent genuine countervailing penological considerations, adequate medical care requires addressing the cause of the inmate's serious medical need rather than merely providing treatment to reduce the pain it causes. *See Fields,* 653 F.3d at 556; *Wolfe,* 130 F.Supp.2d at 653; *West,* 571 F.2d at 162; *Sulton,* 265 F.Supp.2d at 300.

In any event, the approach proposed by Dr. Schmidt would not reduce Kosilek's suffering to the point that he no longer had a serious medical need. As Drs. Kapila, Kaufman, Appelbaum, and Brown persuasively testified, antidepressants and psychotherapy would not eliminate Kosilek's distress or diminish it to the point where there was no longer a significant risk of serious harm. Indeed, antidepressants could increase, rather than diminish, the risk of serious harm to Kosilek. At times antidepressants may, as Dr. Kaufman testified, give a depressed person the emotional energy to kill himself that he would otherwise lack. Kosilek has already attempted to kill himself while taking Prozac. [FN16]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

Accordingly, the court finds that Dr. Schmidt is not a prudent professional. His approach is not within the range of treatment that a prudent professional would prescribe, and the treatment he recommends is not adequate to treat Kosilek's serious medical need. While based on the evidence in this case, the court's conclusion concerning whether Dr. Schmidt is a prudent professional and his proposal for treating Kosilek is comparable to the Tax Court's assessment of his testimony in *O'Donnabhain*. There, the Tax Court rejected Dr. Schmidt's characterization of the Standards of Care as "merely guidelines" rather than a true "community standard." *O'Donnabhain*, 134 T.C. at 45. It also characterized Dr. Schmidt's view that sex reassignment surgery was not ever medically necessary, or medically necessary for O'Donnabhain, as "idiosyncratic and unduly restrictive." *Id.* at 75. This court agrees with that characterization of Dr. Schmidt's views.

**\*41** In any event, Kosilek has proven that he has a serious medical need that has not been adequately treated because sex reassignment surgery is the only adequate treatment for it. Kosilek has, therefore, satisfied the objective prong of the deliberate indifference test. *See Farmer*, 511 U.S. at 835–47, 114 S.Ct. 1970; *Wilson*, 501 U.S. at 298–99, 111 S.Ct. 2321; *DesRosiers*, 949 F.2d at 18; *De'Lonta*, 330 F.3d at 634.

*3. Kosilek Has Satisfied the Subjective Prong of the Deliberate Indifference Test*

As explained earlier, a prison official cannot be found to be deliberately indifferent to a prisoner's serious medical need unless he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970; *see also Flanory*, 604 F.3d at 254; *Chance*, 143 F.3d at 702; *De'Lonta*, 330 F.3d at 634.

[37] As a threshold matter, it is usually necessary to identify the decisionmaker whose state of mind is to be analyzed. *See Kosilek I*, 221 F.Supp.2d at 190; *cf. Farmer v. Moritsugu*, 163 F.3d at 614–15. Prior to trial the DOC stipulated that the defendant, Commissioner

Dennehy, was "the sole decision-maker for determining whether safety and/or security concerns prevent the provision of sex reassignment surgery to Kosilek." May 26, 2006 Second Amended Stipulations at ¶ 10. During trial, it was confirmed that this stipulation means that Dennehy should not be the focus for the court's determination of whether the defendant knew that Kosilek had a serious medical need for which sex reassignment surgery was medically necessary, but only for the purpose of deciding whether safety and security concerns precluded the provision of sex reassignment surgery. Ultimately, the defendant agreed that the court should focus on Dr. Appelbaum of UMass, rather than Dennehy, to determine whether the DOC knew that Kosilek was at a substantial risk of serious harm if not provided sex reassignment surgery. *See* Oct. 18, 2006 Tr. at 16; May 13, 2008 Tr. at 44. However, it was also confirmed that the court should focus on Dennehy to determine the relevant facts regarding the existence and implications of any good faith security concerns for the purpose of the subjective prong of the deliberate indifference standard. *See* Oct. 18, 2006 Tr. at 16. In *Battista*, however, the First Circuit stated that where, as here, the suit is against defendants only in their official capacities and seeks injunctive relief, it is unnecessary to sort out "the separate roles of individual defendants." 645 F.3d at 452.[FN17]

[38] On the record before the court, it does not matter whether Dennehy or Dr. Appelbaum is the focus for determining whether the relevant decisionmaker actually knew that Kosilek was at substantial risk of serious harm if he did not receive sex reassignment surgery. The evidence on the record clearly establishes that both Dr. Appelbaum and Dennehy were aware of facts from which they could infer that a substantial risk of serious harm to Kosilek existed, and drew the inference. *See Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

**\*42** As explained earlier, Dr. Appelbaum held this view and repeatedly expressed it to Dennehy. Dr. Appelbaum read the court's decision in *Kosilek I* at the time it was issued. Therefore, he was aware of the court's conclusion that "there is a high risk that Kosilek will harm himself if he does not receive adequate treat-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 41

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

ment for his severe mental illness." *See* 221 F.Supp.2d at 165. Dr. Appelbaum also read and accepted the February 24, 2005 report of Drs. Kaufman and Kapila, which concluded that it was "quite likely" that Kosilek would attempt to commit suicide again if unable to change his anatomy. *See* Ex. 25 at 5.

Dr. Appelbaum communicated to the DOC on "many occasions" that there were risks of suicide and self harm if the recommendations of Drs. Kaufman and Kapila were not followed. *See* June 2, 2006 Tr. at 9. In a June 14, 2005 letter on which Dennehy was copied, Drs. Appelbaum and Brewer recommended sex reassignment surgery from a clinical perspective, describing, among other things, Drs. Kaufman and Kapila as having concluded that Kosilek "would likely attempt suicide in the event she were denied such treatment." Ex. 16. On September 1, 2005, Drs. Appelbaum and Brown wrote to the DOC regarding treatment recommendations involving Kosilek and other inmates with gender identity disorder, stating that "further delay in providing the recommended treatment likely will result in continued or increased levels of distress for each afflicted individual, with the possibility of self-inflicted injury." Ex. 42. Dennehy was copied on this letter too. In response to a court order, Drs. Appelbaum and Brewer also reviewed certain trial testimony and wrote to Dennehy on September 18, 2006, endorsing the testimony of Dr. Kaufman that Kosilek would face a substantial risk of serious harm if he did not receive sex reassignment surgery. *See* Ex. 90.

Dennehy also read the court's decision in *Kosilek I*, including the court's conclusion that Kosilek's gender identity disorder was causing him severe emotional distress, and accepted that as an accurate statement of Kosilek's condition. *See* June 19, 2006 Tr. at 86–87. In addition, Dennehy read the report of Drs. Kaufman and Kapila, and Dr. Appelbaum's letters about Kosilek, each of which discussed the likelihood that Kosilek's gender identity disorder could cause him to attempt suicide or inflict injuries upon himself. *See* Exs. 16, 25, 90. Finally, after being ordered to read the medical testimony at trial, Dennehy stated that she credited the opinions of the clinicians and did not dispute that Kosilek's gender

identity disorder constituted a serious medical need. *See* Oct. 18, 2006 Tr. at 11. Instead, she testified that only safety and security concerns were preventing Kosilek from receiving the prescribed treatment. *Id.* at 17.[FN18]

Kosilek has proven that both Dr. Appelbaum and Dennehy actually knew that Kosilek faced a substantial risk of serious harm. *See Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. Therefore, each knew that Kosilek had a serious medical need. *See id.; McGuckin,* 974 F.2d at 1059.

4. *The Defendant's Stated Security Concerns are Pretextual and do not Justify Denying Kosilek Sex Reassignment Surgery*

**\*43** In view of the foregoing, Kosilek has proven that: he had a serious medical need; sex reassignment surgery is the only adequate treatment for it; and both the Commissioner of the DOC and UMass, which is responsible for making medical decisions for the DOC, know that Kosilek is suffering serious harm and will continue to do so if not provided such surgery. However, the Commissioner claims that security considerations preclude providing the treatment DOC doctors have prescribed for Kosilek.

In essence, the court is required to determine whether the issue anticipated in *Kosilek I* truly exists and, if so, how it must be decided. As indicated earlier, in *Kosilek I,* the court wrote:

It is conceivable that a prison official, acting reasonably and in good faith, could perceive an irreconcilable conflict between his duty to protect the safety of inmates and his duty to provide a particular inmate with adequate medical care. If so, his decision not to provide that medical care might not violate the Eighth Amendment because the resulting infliction of pain on the inmate would not be unnecessary or wanton. Rather, such a decision might be reasonable. The Supreme Court has held that "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer,* 511 U.S. at 845, 114 S.Ct. 1970; *see also White[ ],* 849 F.2d [at] 325[ ] ("Denial of medical care that results in *unnecessary* suffering in prison is inconsistent with con-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

temporary standards of decency and gives rise to a cause of action under 42 U.S.C. § 1983. Actions *without penological justification* may constitute an unnecessary infliction of pain.") (emphasis added).

221 F.Supp.2d at 182.

This statement of the law has been confirmed and clarified by decisions since *Kosilek I,* particularly the First Circuit's 2011 decision in *Battista,* which, as explained previously, also involved the treatment of a transsexual by the DOC during the time Kosilek has been denied sex reassignment surgery. 645 F.3d at 449.

As indicated earlier, the Supreme Court has stated that to violate the Eighth Amendment "the offending conduct must be wanton." *Wilson,* 501 U.S. at 302, 111 S.Ct. 2321. Where, as here, "the conduct is harmful enough to satisfy the objective component of the Eighth Amendment claim, whether it can be characterized as 'wanton' depends upon the constraints facing the official." *Id.* at 303, 111 S.Ct. 2321 (internal citation omitted).

The duty to reasonably assure the security of the inmate, and others, is one of the realities of prison administration which may compete with a prison official's duty to provide an inmate medical care. *See Farmer,* 511 U.S. at 833, 114 S.Ct. 1970; *Battista,* 645 F.3d at 454–55. As the First Circuit stated in *Battista:*

[S]ecurity considerations also matter at prisons ... and administrators have to balance conflicting demands. The known risk of harm is not conclusive: so long as the balancing judgments are *within the realm of reason and made in good faith,* the officials' actions are not deliberate indifference.

**\*44** 645 F.3d at 454 (internal quotation omitted). Therefore, if the decision to deny Kosilek sex reassignment surgery has been made in good faith and is based on reasonable security concerns, the court must defer to the DOC. *Id.* at 454–55; *Whitley,* 475 U.S. at 321–22, 106 S.Ct. 1078.

Deciding whether an official has acted in good faith requires that the court determine subjective intent.

"[S]ubjective intent is often inferred from behavior." *Battista,* 645 F.3d at 453. Among other things, deliberate indifference may be "evidenced by 'denial, delay, or interference, with prescribed health care.' " *Id.* (quoting *DesRosiers,* 949 F.2d at 19).

[39] As described below, in the instant case the court is persuaded that defendant's stated reasons for denying Kosilek the care the DOC doctors have prescribed are not reasonable and made in good faith. Rather, they are pretextual. More specifically, Kosilek has not been denied sex reassignment surgery because of a good faith belief that his security, or anyone else's, could not be reasonably assured if he is provided sex reassignment surgery. Rather, the defendant has refused to provide the only adequate treatment for Kosilek's serious medical need in order to avoid public and political criticism. This is not a legitimate penological purpose. Therefore, the defendant's conduct is wanton and violates the Eighth Amendment.

This conclusion is based on a combination of corroborating considerations. They include the following.

Dennehy was the Deputy Commissioner of the DOC at the time of *Kosilek I.* She was then integrally involved in decisions that the court found were motivated in part by the belief that sex reassignment surgery was not an appropriate use of taxpayer's money and that any such expenditure would be unpopular. *See Kosilek I,* 221 F.Supp.2d at 162. She also participated in the decision to terminate the employment of Dr. Seil after he recommended sex reassignment surgery for Kosilek.

As described earlier, when Dennehy became Acting Commissioner in 2003, she immediately halted the provision of certain prescribed treatments for Kosilek and other transsexual prisoners, purportedly to review their cases, and long delayed decisions on such treatments. When Kosilek had completed a year of real life experience taking hormones, Dr. Appelbaum, despite reservations expressed on behalf of Dennehy, decided to engage the Fenway Clinic doctors to perform an evaluation to determine whether Kosilek should be provided sex reassignment surgery. Departing from the DOC's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 43

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

standard practice of relying on its doctors to retain specialists, Dennehy had the DOC hire Osborne, who Dennehy knew opposed sex reassignment surgery and had testified against allowing inmates prescribed treatment for gender identity disorder in two other states, to counter the Fenway Clinic's recommendation. Dennehy then testified falsely that her decision to hire Osborne was not based on Osborne's known opposition to ever providing a prisoner sex reassignment surgery.

**\*45** Dennehy also testified falsely that she did not understand that the DOC's doctors were recommending sex reassignment surgery as the only adequate treatment for Kosilek. Although Dennehy testified in June 2006 that up to and during the trial UMass had not clearly communicated to her whether it recommended sex reassignment surgery as the only adequate treatment for Kosilek, this contention is not credible. As discussed earlier, on November 23, 2005, about eight months before the trial, Dennehy wrote to Lappin, the Director of the Bureau of Prisons that, "[o]ur medical providers[,] the Commonwealth's medical school, is supporting their consultant's recommendation for the surgery!!!!!!!." Ex. 88. The court finds that Dennehy was pretending not to understand UMass's treatment recommendations in order to delay having to announce that she would not allow Kosilek to receive sex reassignment surgery.

In addition, the court finds that Dennehy's purported safety and security concerns regarding the provision of sex reassignment surgery to Kosilek are pretextual and unreasonable. The process by which Dennehy decided that security concerns precluded the provision of sex reassignment surgery contributes to this conclusion. In making the initial security determination, Dennehy departed from the DOC's established, written procedure and did not get a recommendation from Spencer, as Superintendent of MCI Norfolk, before declaring to the media, and later to the court, that providing sex reassignment surgery for Kosilek would create insurmountable security problems. Dennehy did not get any advice from the experts that the DOC retained to testify on security issues at trial, Beeler and Dumond, before stating her position. Therefore, she did not rely on their opinions in forming her position and they are not relevant to

the question of her good faith.

Similarly, Clarke did not consult Spencer about these security concerns or claim to have relied on the DOC's trial experts in deciding that he agreed with Dennehy's position. Rather, he merely reviewed some testimony, responded to questions posed by the DOC's trial counsel, and provided comments on the report that they prepared for submission to the court. As with Dennehy, Clarke's position did not result from a process pursued with an open mind in a good faith effort to determine whether security considerations required denying Kosilek sex reassignment surgery.

In addition, the court finds that the purported security considerations that Dennehy and Clarke claim motivated their decisions to deny Kosilek sex reassignment surgery are largely false and any possible genuine concerns have been greatly exaggerated to provide a pretext for denying the prescribed treatment. Dennehy and Clarke each ultimately accepted the DOC doctors' assessment that Kosilek is suffering genuine mental anguish, and that there is a substantial risk that he will again attempt to kill himself if not provided sex reassignment surgery. Yet they claim that they will not permit him to receive that treatment in part because doing so would encourage other prisoners to try to manipulate prison officials by pretending to be similarly situated to Kosilek. However, Dr. Brown testified in this case that he had "never seen" a patient seek to remove his genitals, as Kosilek has, for the purpose of gaining some other benefit. May 30, 2006 Tr. at 113; *see also Kosilek I,* 221 F.Supp.2d at 164–65 ("As Dr. Marshall Forstein persuasively put it, he has never known a 'heterosexual man want to voluntarily give us his penis to get something like hormones.' "). The court agrees that there is no real risk that a male prisoner will attempt to cut off his testicles unless he is suffering from a severe gender identity disorder. The court understands that some prisoners may threaten suicide in order to obtain something of value to them. However, the court finds that a desire to deter such efforts by others did not motivate Dennehy's decisions concerning Kosilek and, in any event, would not be a reasonable justification for denying him adequate medical care for his serious med-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

ical need.

*46 Dennehy also claimed that she was motivated to deny Kosilek sex reassignment surgery by her understanding that there is no one in Massachusetts to perform the sex reassignment surgery Kosilek requires and her belief that there is too great a risk that Kosilek would flee if transported to another state to receive it. As discussed below, it is not now necessary or, indeed, permissible for the court to decide where Kosilek should receive such surgery. That is a decision to be made by the DOC. However, Massachusetts is a medical mecca and there may now be a doctor who regularly practices in the state who could perform the surgery. In addition, Dr. Schechter, who is experienced in performing sex reassignment surgery, expressed a willingness to provide it to Kosilek in Massachusetts if he receives the sponsorship to do so that is required because Dr. Schechter is not licensed to practice in Massachusetts.

[40][41] In any event, Dennehy knew that there are other states in which Kosilek's sex reassignment surgery could be performed, including Illinois, where Dr. Schechter is licensed. Dennehy claimed, however, that there is an unacceptable risk that Kosilek would flee if transported out of Massachusetts for the procedure. She justified her position in part on the fact that Kosilek fled Massachusetts after murdering his wife. Dennehy's purported concern that Kosilek would flee if transported to receive treatment is plainly pretextual. The DOC's Male Classification Manual, which is used to determine the level of the security risk posed by a prisoner, states with regard to how past flight should influence an inmate's security classification that "escapes or attempts to escape ... do not include ... fugitive from justice, resistance at time of arrest or other incidents in which custody is not determined." *See* Classification Manual at 2. FN19 More significantly, Dennehy knew that Kosilek had never attempted to flee during the many times he was transported to medical appointments and court. She did not truly believe that Kosilek would do so while being transported to get the treatment he had dedicated the past twenty years of his life to receiving. Nor did she have a genuine fear that Kosilek would flee after the procedure, while still recovering from it.

Clarke too initially opined that Kosilek posed an unacceptable risk of flight if transported out of Massachusetts in part because he had fled the state after killing his wife. *See* Ex. 107. However, Clarke ultimately testified that he could say "[w]ith some degree of certainty" that the DOC would "take all the precautions necessary to secure that transport, secure the place where it's going to take place, and care for [Kosilek] in terms of providing appropriate custody prior to returning [Kosilek] back to the state." May 12, 2008 Tr. at 114. Clarke also admitted that, in characterizing Kosilek as an escape and security risk, he had not reviewed Kosilek's disciplinary record and classification history, reflecting Kosilek's record of excellent behavior in prison, and was unaware that Kosilek was in his late fifties and, therefore, was likely to be less dangerous than younger inmates. He acknowledged that these factors weigh in favor of a finding that Kosilek posed fewer security risks than he originally claimed.

*47 Dennehy and Clarke also claimed that they denied Kosilek sex reassignment surgery because they could not reasonably assure his safety, or the safety of others, after the surgery. The court continues to recognize, as it did in *Kosilek I,* that "[p]rison officials must 'take reasonable measures to guarantee the safety of inmates,' as well as to provide them adequate medical care.'" 221 F.Supp.2d at 194 (quoting *Farmer,* 511 U.S. at 832, 114 S.Ct. 1970, and *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)); *see also Battista,* 645 F.3d at 454 (quoting *Farmer,* 511 U.S. at 833, 114 S.Ct. 1970). As the DOC's experts, Beeler and Dumond, testified, there are real risks of sexual assault and other violence in prison. However, as indicated earlier, those experts did not express these views to Dennehy before she announced that security presented an insurmountable obstacle to providing sex reassignment surgery to Kosilek. Nor was Beeler sufficiently informed about the facts concerning Kosilek to be permitted to testify concerning any risk to, or posed by, Kosilek particularly.FN20

Nevertheless, there is superficial appeal to Dennehy's claim that there is an unacceptable security risk involved in either incarcerating someone who is ana-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

tomically a female in a male prison or placing a person who has murdered his wife in a female prison. The court, however, finds that these concerns were not reasonable, and did not actually motivate the decisions of Dennehy or Clarke to deny Kosilek sex reassignment surgery. Rather, each of them ultimately agreed that it would be possible for the DOC to reasonably assure the safety of Kosilek and others after sex reassignment surgery by housing Kosilek in a segregated protective custody unit.

As explained below, it is not now necessary or permissible for the court to decide where Kosilek should be incarcerated after receiving sex reassignment surgery. That is a matter that must be decided, reasonably and in good faith, by the DOC. However, there are a range of potentially viable options, and this contributes to the conclusion that the defendant's position that safety considerations present an insurmountable barrier to providing sex reassignment surgery is pretextual.

First, Kosilek could continue to be housed in the general population at MCI Norfolk, a male prison. Prior to the decision in *Kosilek I*, the defendant claimed it would be too dangerous to provide Kosilek female hormones, or even make-up, and allow him to remain at MCI Norfolk. *See* 221 F.Supp.2d at 170. However, after the court's decision Superintendent Spencer found that doing so would not present any security concerns. *See* Ex. 21. Kosilek was then provided with hormones, make-up, and feminine apparel. He has been living at MCI Norfolk with breasts, long hair, makeup, and feminine clothes for many years. This has not provoked any assaults or created any other problems. In view of this history, neither Dennehy nor Clarke has provided a credible explanation for their purported belief that if Kosilek's genitalia are altered the risk to him and others at MCI Norfolk will be materially magnified.

**\*48** Kosilek would much prefer to be incarcerated in the women's prison, MCI Framingham. That, however, is not his decision to make. The claims of Dennehy and Clarke that they have denied sex reassignment surgery for Kosilek in part because MCI Framingham is not sufficiently secure to prevent an escape by Kosilek, who has never attempted to flee, are not cred-

ible. There is conflicting testimony on whether Kosilek's mere presence at MCI Framingham would disturb the "climate" of the prison and possibly provoke violence. The Superintendent, Bissonette, testified that it would. Dr. Appelbaum, who was in charge of the UMass mental health program at the DOC and was, therefore, familiar with the provision of mental health treatment in the DOC's prisons, stated that it was at most uncertain whether Kosilek would disrupt the "climate" at MCI Framingham, but that any "climate" issues could be managed.

In any event, as Dennehy and Clarke each acknowledged, there are alternatives to placing Kosilek in the general population of either MCI Norfolk or MCI Framingham. As they knew, the Interstate Corrections Compact, M.G.L. c. 125, App. § 2–1 (2006) (the "ICC") could be used to transfer Kosilek to a prison in another state, where he would be less notorious and, therefore, at less risk of harm. The ICC was used to transfer Joseph/Josephine Shanley, a transsexual who murdered his sister, from New Hampshire to Washington. Shanley was housed there in a women's prison so uneventfully that while Clarke was Commissioner of Corrections in Washington he did not know Shanley was in his custody. The Commissioners' refusal to explore the option of an interstate transfer further undermines their credibility concerning the reason Kosilek has been denied sex reassignment surgery.

Most significantly, all of the responsible DOC officials testified that after sex reassignment surgery the safety of Kosilek and others could be reasonably assured if Kosilek was placed in a segregated unit at either MCI Norfolk or MCI Framingham, in a form of protective custody.[FN21] The conditions of incarceration they contemplated would be onerous for Kosilek. After sex reassignment surgery, it may foreseeably be argued that keeping Kosilek in segregation is unnecessary and a form of extrajudicial punishment that is prohibited by the Eighth Amendment.

That issue, however, is not now before the court. Indeed, it may never be. In *Battista*, "for some time, the defendants portrayed the choice facing the court as one between keeping Battista in a severely constraining pro-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

tective custody unit and denying her hormone therapy." 645 F.3d at 455. However, "[f]inally faced with a decision by the district court to require therapy, defendants ... offered to create a modified protective custody arrangement that would provide Battista and others with both protection from other residents and 'access to treatment, work, educational programs, and recreation.' " *Id.* at n. 5. The DOC may decide that the same measures would be appropriate for Kosilek after he receives sex reassignment surgery.[FN22]

*49 The immediate issue is limited to whether the defendant reasonably and in good faith determined that security concerns required denying Kosilek the only adequate treatment for his serious medical need. *See Battista,* 645 F.3d at 454. Kosilek has proven the defendant did not make that decision in good faith or reasonably, but rather delayed and interfered with the prescribed treatment based on pretextual and unreasonable security concerns. Such a pattern of prevarication, "denial," "delay," and "interference" has contributed to judicial findings that the DOC had violated the Eighth Amendment rights of other transsexual inmates. *See Battista,* 645 F.3d at 455 ("It was only after what the judge perceived to be a pattern of delays, new objections substituted for old ones, misinformation and other negatives that he finally concluded that he could not trust the defendants [with regard to whether hormones should be provided].... [T]he record contains support for [this] conclusion."); [FN23] *Soneeya,* 851 F.Supp.2d at 236 (finding deliberate indifference where the DOC's response to transsexual plaintiff's "requests for treatment has been characterized by a series of delays, bureaucratic mismanagement, and seemingly endless security review with no clear rhyme or reason"); *Brugliera,* 2009 U.S. Dist. LEXIS 131002, at *33 (finding that defendant had acted with deliberate indifference in relying on "exaggerated security risks" to avoid providing adequate care to inmate and defendant had demonstrated no willingness to consider abiding by the treatment advice of the DOC's medical professionals for over three-and-a-half years); *see also Todaro,* 565 F.2d at 52 ("[A] series of incidents closely related in time ... may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners.") (internal quotation omitted).

Accordingly, the court finds that defendant's decision to deny Kosilek sex reassignment surgery was not based on good faith and reasonable security concerns, and is not entitled to deference. Rather, the court finds that the decision to deny Kosilek sex reassignment surgery was made to avoid political and public criticism. Dennehy and her successor, Clarke, had an unusual motive to deny Kosilek the treatment that DOC doctors prescribed and to testify falsely about their reason for doing so. Issues concerning medical care for prisoners rarely attract political or public attention. In this case, however, the Lieutenant Governor in whose administration Dennehy served publicly expressed her opposition to Kosilek receiving sex reassignment surgery. A State Senator, who was close to Dennehy, called her to discuss the television piece Dennehy was facilitating and then introduced legislation to prohibit the DOC from paying for sex reassignment surgery.

When the court ordered Clarke to reconsider the issue when he became Commissioner, many Senators and State Representatives immediately wrote to him to express their strong opposition to the idea of public funds being used for a prisoner's sex change operation. *See* Ex. 111, 112. More specifically, on April 4, 2008, three days after the court instructed Clarke to review some of the testimony and reconsider the issue, seventeen State Senators sent a letter to Clarke, stating:

*50 We write to you today to express our concern about recently published reports pertaining to your interest in reviewing the sex-change/hormone therapy case of convicted murderer Robert Kosilek. It is our opinion that taxpayer's money should not be used for such procedures.

Due to the present condition of our state's economic situation, along with our opposition to Mr. Kosilek's argument that the state should bear responsibility for paying for these treatments, we urge you to deny his request.

The granting of this request would not only be an affront to the taxpayers of the Commonwealth, but

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

would also raise a significant security risk. A decision in favor of Mr. Kosilek would lead to negative consequences for his safety and send the wrong message to the citizens of Massachusetts in the ability of their government to effectively use state funds to manage corrections facilities.

Ex. 111. The Senators' reference to "the wrong message" would have reasonably been interpreted as a veiled threat that appropriations for the DOC might be reduced if Clarke reversed Dennehy's position. On April 8, 2008, 25 State Representatives wrote to Clarke to express "outrage" at the request that taxpayers fund a "sex-change" operation for Kosilek. Ex. 112.

In addition, as described earlier, over many years, the media consistently published articles, columns, and editorials opposing the provision of sex reassignment surgery to prisoners generally and Kosilek particularly, often ridiculing the idea and specifically opposing the expenditure of taxpayer funds to provide such treat- ment.

As stated earlier, elected officials, the media, and members of the public have every right to express their opinions on matters of interest to them. Nevertheless, prison officials must comply with the Eighth Amendment, and cannot deny prisoners adequate medical care because of cost concerns, or fear of political controversy or public criticism.

As explained previously, it is not legally permissible to deny a prisoner adequate medical care because the required treatment would be expensive. *See Ancata,* 769 F.2d at 705; *Harris,* 941 F.2d at 1509; *Durmer,* 991 F.2d at 68–69; *Chance,* 143 F.3d at 703–04; *Jones,* 781 F.2d at 771; *Rosado,* 349 F.Supp.2d at 1349; *Renelique,* 2003 WL 23023771, at *15; *Gates,* 501 F.2d at 1320. In the instant case, however, the court does not find that the defendant has denied Kosilek the sex reassignment surgery prescribed for him primarily because it would be expensive. The DOC provides many prisoners with Hepatitis B medication that costs $18,000 a year. Other prisoners receive dialysis, which is also costly.

In this case, the defendant has denied Kosilek sex

reassignment surgery because of the belief that the idea of providing such treatment for a transsexual who murdered his wife is offensive to many members of the community, many of their elected representatives, and to the actively interested media as well. Dennehy, who formulated the position of the DOC, and her successors have denied Kosilek the prescribed sex reassignment surgery to avoid controversy, criticism, and, indeed, ridicule, and scorn. This represents an abdication of the defendant's responsibility to obey the requirements of the Eighth Amendment.

**\*51** Once again, it is important to recognize that, "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials, and to establish them as legal principles to be applied by the courts." *Barnette,* 319 U.S. at 638, 63 S.Ct. 1178. Therefore, "[t]he right to be free of cruel and unusual punishment, like other guarantees of the Bill of Rights, may not be submitted to vote; it depends on the outcome of no elections." *Furman,* 408 U.S. at 268, 92 S.Ct. 2726 (Brennan, J., concurring) (internal quotation omitted). Even prisoners who have committed the most despicable or controversial crimes are protected because "Eighth [A]mendment protections are not forfeited by one's prior acts." *Spain,* 600 F.2d at 194.

In summary, the court is persuaded that the decision to deny Kosilek sex reassignment surgery is not the result of a good faith balancing judgment and is not reasonable. *See Battista,* 645 F.3d at 454. Rather, that decision was based on fear of criticism and controversy, articulated at times as a concern about cost to the taxpayer. Neither cost nor fear of controversy is a legitimate penological objective. This court may not defer to the defendant's decision to deny Kosilek sex reassignment surgery because deference does not extend to "actions taken in bad faith and for no legitimate purpose." *Whitley,* 475 U.S. at 322, 106 S.Ct. 1078; *see also Battista,* 645 F.3d at 454. Because there is no penological justification for denying Kosilek the treatment prescribed for him, he is now being subject to the "unnecessary and wanton infliction of pain" prohibited by the Eighth Amendment. *Hope,* 536 U.S. at 737, 122

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

S.Ct. 2508 (internal quotation omitted); *see also White,* 849 F.2d at 325. Therefore, Kosilek has proven that, as in *Battista,* the DOC has violated the Eighth Amendment by being deliberately indifferent to his serious medical need. 645 F.3d at 455.

5. *Defendant's Deliberate Indifference Will Continue and, Therefore, Kosilek is Entitled to a Narrowly–Tailored Injunction*

In *Kosilek I,* the court warned that:

> If ... concerns about cost or controversy prompt [the Commissioner] to deny Kosilek adequate medical care for his serious medical need, [the Commissioner] will have violated the Eighth Amendment. Kosilek will then likely be entitled to the injunction that he has unsuccessfully sought in this case.

221 F.Supp.2d at 162. This warning was not heeded and the requirements for an order directing the DOC to provide Kosilek sex reassignment surgery have now been met.

The Supreme Court stated the standards for obtaining injunctive relief in *Farmer,* writing in part:

> In a suit such as petitioner's, insofar as it seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct: their attitudes and conduct at the time suit is brought and persisting thereafter.... [T]o establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future. In so doing, the inmate may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction. If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief. Of course, a district court should approach issuance of injunctive orders with the usual caution, and may, for example, exercise its discretion if appropriate by giv-

ing prison officials time to rectify the situation before issuing an injunction.

**\*52** 511 U.S. at 845–47, 114 S.Ct. 1970 (internal quotations, citations, and footnote omitted).

[42] This court understands and shares the Supreme Court's view that "a district court should approach the issuance of injunctive orders with ... caution." *Id.* at 846–47, 114 S.Ct. 1970. Indeed, when asked during the pendency of the instant matter to mediate a case brought in response to the high number of suicides by mentally ill inmates in the custody of the DOC, this court:

> informed the parties of its view that judges should become involved in the administration of prisons only as a last resort and then only to the most limited extent necessary. It urged the parties to develop a settlement that would be consistent with these principles or risk having any proposed resolution requiring judicial approval rejected by the court.

*Disability Law Ctr.,* 2012 WL 1237760, at *1 (footnote omitted).

[43] Like the district judge in *Battista,* this court has been "far from anxious to grant the relief sought" unnecessarily because of its strong preference for having prison officials discharge their duties by properly making decisions concerning the medical care inmates require. 645 F.3d at 455. However, beginning with hormone therapy, for more than a decade the DOC has refused to provide Kosilek with the medical care its doctors deemed necessary and prescribed. Although the court found Commissioner Maloney to have been motivated in part by concerns about cost and controversy, in *Kosilek I* the court did not find him deliberately indifferent in part because it found that he had not actually drawn the inference that Kosilek was at substantial risk of serious harm if he did not receive adequate treatment. *See* 221 F.Supp.2d at 161, 189–192. In addition, the court found that, instructed as to his obligations by the decision in *Kosilek I,* the Commissioner was not likely to be indifferent to Kosilek's serious medical needs in the future. *Id.* at 193–95.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

The court's trust proved to be misplaced when Dennehy succeeded Maloney as Commissioner. In *Kosilek I,* "[t]he court fully accept[ed] Maloney's testimony that if the doctors from the University of Massachusetts who are engaged to provide mental health care to inmates decided to bring in a specialist to treat Kosilek, he would not interfere ... Indeed, Maloney sincerely believe[d] that he ha[d] 'never in [his] career interfered with a doctor's order for treatment and [had] no intention of doing so in the future,' with regard to Kosilek or anyone else." *Id.* at 176.

However, as described earlier, immediately upon becoming Acting Commissioner Dennehy began interfering with the treatment prescribed by the specialists engaged by UMass. In an effort to ascertain whether Dennehy would refuse to permit Kosilek to have sex reassignment surgery if more fully informed, the court ordered her to read certain trial testimony. However, Dennehy persisted in denying Kosilek the treatment the DOC doctors had prescribed. In an attempt to determine whether the treatment advocated by Dr. Schmidt was, or was believed to be, within prudent professional standards, the court ordered Dr. Applebaum of UMass to provide his view on this question for the purpose of both the objective and subjective prongs of the deliberate indifference test. When Dr. Applebaum opined that Dr. Schmidt was not a prudent professional, the court appointed Dr. Levine as an impartial expert to assist it in deciding that question as it related to the objective prong of the test. When Clarke succeeded Dennehy as Commissioner, the court ordered him to review the matter and state his position on whether Kosilek would be provided sex reassignment surgery.

**\*53** [44] However, the DOC has persisted in presenting pretexts for impermissible reasons for denying Kosilek the treatment its doctors have prescribed. This is part of a pattern of unconstitutional conduct by the DOC with regard to transsexual prisoners that has been demonstrated in other cases. See *Battista,* 645 F.3d at 455 ("In the end, there is enough in this record to support the district court's conclusion that 'deliberate indifference' has been established—or an unreasonable professional judgment exercised—even though it does

not rest on any established sinister motive or 'purpose to do harm.' "); *Soneeya,* 851 F.Supp.2d at 251 ("[G]iven the DOC's long history of obstruction and delay, it is likely that the DOC will persist in not providing Ms. Sooneya with an individualized evaluation by a qualified medical professional.") [FN24]; *Brugliera* 2009 U.S. Dist. Lexis 131002, at *26, *33 (granting preliminary injunction after finding that purported security concerns about providing hormones were pretextual and stating that, "given that [the DOC] has demonstrated no willingness to consider abiding by the treatment advice of the DOC's medical professionals for over three-and-a-half years now, the court sees no reason to believe that the [DOC's] deliberate indifference is likely to cease in the future").

In these circumstances, even without regard to the DOC's conduct in other cases, the court is persuaded that defendant's violation of Kosilek's Eighth Amendment rights will continue in the future unless the court grants Kosilek relief now. This court believes deeply in the principle of judicial restraint. However, as explained earlier, the Supreme Court has instructed that, "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution." *Procunier,* 416 U.S. at 405, 94 S.Ct. 1800. Therefore, an appropriate injunction must issue.

The PLRA establishes the proper scope of injunctive relief. *See* 18 U.S.C. § 3626. It provides, in part, that:

Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

18 U.S.C. § 3626(a)(1)(A).

The federal right violated in the instant case is Kosilek's Eighth Amendment right to the only adequate treatment for his serious medical need, sex reassignment surgery. Therefore, the DOC is being ordered to provide Kosilek that treatment. The court finds that there is no less intrusive means to correct the prolonged violation of Kosilek's Eighth Amendment right to adequate medical care.

**\*54** In part because of the requirement that prospective relief be narrowly drawn, the court is not deciding who should perform the necessary surgery or where it should be done. That is up to the DOC.

Similarly, the court is not now deciding where Kosilek should be incarcerated after the surgery. The DOC has the discretion to make good faith, reasonable decisions concerning security if the surgery genuinely creates or increases any risk to Kosilek or others. If the DOC decides that Kosilek must be segregated and locked up 23 hours a day to reasonably assure his safety, it is foreseeable that the court may be asked to decide whether that decision is reasonable and made in good faith. *See Battista*, 645 F.3d at 454. That issue, however, is not now ripe for resolution.

Rather, the court is issuing only an injunction that is narrowly drawn, extends no further than necessary to correct the continuing violation of Kosilek's Eighth Amendment right to adequate medical care for his serious medical need, and is the least intrusive means necessary to correct the violation of that right. *See* 18 U.S.C. § 3626(a)(1)(A). It is doing so after carefully considering the defendant's purported security concerns and finding that with regard to Kosilek they are either pretextual or can be dealt with by the DOC. The court is allowing the DOC to decide how any real security issues, or other issues, should be addressed. *Id.* Therefore, the injunction being issued satisfies the requirements of the PLRA.

IV. ORDER
In view of the foregoing, it is hereby ORDERED that:

1. Judgment shall enter for plaintiff Michelle Kosilek.

2. Defendant shall take forthwith all of the actions reasonably necessary to provide Kosilek sex reassignment surgery as promptly as possible.

3. The possible award of reasonable costs and attorneys fees, pursuant to 42 U.S.C. § 1988, is reserved for future consideration.

FN1. The Harry Benjamin International Dysphoria Association has been renamed and is now known as the World Professional Association on Transgender Health (the "WPATH"). The Standards of Care have been renamed the "Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People," published by WPATH.

FN2. The testimony in this case was presented primarily in 2006 and concluded in 2008. Later legal and factual developments generated further hearings, most recently in October, 2011.

The parties have repeatedly agreed, including in October, 2011, that there have been no material changes in the facts since the testimony was completed and that the court should decide the case without hearing additional testimony. *See* Dec. 21, 2009 Tr. at 16; Nov. 2, 2010 Plaintiff's Response to Court's October 21, 2010 Order and Objection to Defendant's Motion to Supplement the Record (Under Seal); Nov. 3, 2010 Defendant's Response to the Court's Order of October 21, 2010 (Under Seal); Aug. 18, 2011 Tr. at 10; Oct. 12, 2011 Tr. at 4–5. The court also agrees that it is appropriate to decide the case without hearing any additional testimony. The court is, however, ruling on several pending motions relating to proffered evidence and admitting some, but not all, of it. *See* Sept. 4, 2012 Memorandum and Order on Pending Motions.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

FN3. In 1991, prior to the Supreme Court's 1993 decision in *Helling* and the 1994 decision in *Farmer,* the First Circuit discussed the practical constraints facing prison officials in considering the objective adequacy of medical care. *See DesRosiers,* 949 F.2d at 19. *Helling* and *Farmer* indicate that these constraints should instead be considered in determining whether prison officials acted with deliberate indifference.

FN4. This court does not construe the First Circuit's brief reference in *Battista,* 645 F.3d at 453, in general dicta, to "administrators who have to make difficult trade-offs as to risks and resources," to contradict the conclusion that cost is not a legitimate reason to deny an inmate adequate treatment for a serious medical need. Rather, this language may, at most, suggest that cost can properly be considered in choosing between adequate options for treating a prisoner.

FN5. Kosilek argues that the defendant is collaterally estopped from challenging several facts that he asserts were litigated and determined in *Kosilek I,* specifically: (1) that gender identity disorder is a major mental illness; (2) that gender identity disorder is biological and innate and not a result of choice or upbringing; (3) that the Standards of Care describe the generally-accepted treatment for individuals with gender identity disorder; (4) that a real life experience as defined by the Standards of Care is possible in a prison setting; (5) that sex reassignment surgery is a possible, valid treatment for Kosilek despite her incarceration; and (6) that Kosilek's risk of suicide is sincere and not manipulative. Defendant disagrees.

The First Circuit has held that "[t]he principle of collateral estoppel, or issue preclusion ... bars relitigation of any factual or legal issue that was actually decided in previous litigation between the parties, whether on the same or a different claim." *Keystone Ship-*

*ping Co. v. New England Power Co.,* 109 F.3d 46, 51 (1st Cir.1997) (internal quotations and emphasis omitted). The Supreme Court has stated that "[t]o determine the appropriate application of collateral estoppel ... necessitates three further inquiries: first, whether the issues presented by this litigation are in substance the same as those resolved against [defendant] in [the prior case]; second, whether controlling facts or legal principles have changed significantly since [the prior final judgment]; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion." *Montana v. United States,* 440 U.S. 147, 154–55, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

It was necessary for the court to hear evidence on the disputed issues to determine whether any of the controlling facts found in *Kosilek I* have changed significantly. In addition, the court must decide Kosilek's condition at the time of trial, and the defendant's knowledge and state of mind then too. Although some of the disputed six issues might merit being given preclusive effect, the court has not done so. Rather, it has decided these issues again based on the evidence presented in the instant case.

There are, however, historical facts found concerning Kosilek's life before the 2002 decision in *Kosilek I* and the prior conduct of the DOC which could not be altered by subsequent events, and which were generally not disputed by the evidence in the instant case. Some of those facts provide valuable context for the issues that must now be decided and are, therefore, included in the court's discussion of *Kosilek I.*

FN6. The court may take judicial notice of the existence and content of published articles, even if they are not in the record before it, particularly when, as here, they are not being con-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

sidered for the truth of the matters reported. *See* Fed.R.Evid. 201; *United States v. W.R. Grace,* 504 F.3d 745, 766 (9th Cir.2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 569 n. 13, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (observing that, on appeal, courts have the discretion to expand the existing record to take judicial notice under Rule 201 of the existence and content of published articles); *Ieradi v. Mylan Laboratories, Inc.,* 230 F.3d 594, 598 n. 2 (3d Cir.2000) (taking judicial notice of an article published in the New York Times that was not in the record); *United States v. Isaacs,* No. CR.A.07–732, 2008 WL 4346780, at *2 n. 4 (C.D.Cal. Sept. 19, 2008) (taking judicial notice of articles published in the Los Angeles Times and rejecting argument that those articles were not actually "spread on the record in this case"); *Northwest Bypass Grp. v. U.S. Army Corps of Engineers,* 488 F.Supp.2d 22, 25–26 (D.N.H.2007) (taking judicial notice of newspaper article, though limiting consideration of facts contained in article to those that appeared undisputed); *U.S. ex rel. Lam v. Tenet Healthcare Corp.,* 481 F.Supp.2d 673, 680 (W.D.Tex.2006) ( "Pursuant to Rule 201(b), Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles."). In this case, the quoted article is not hearsay because it is not being considered for the truth of the matters reported in the article, but rather as evidence that such statements were made. *See* Fed.R.Evid. 801(c).

FN7. Gender identity disorder is often referred to as "GID" in both the medical and legal communities.

FN8. On October 18, 2009, the NCCHC revised its Position Statement on "Transgender Health Care in Correctional Settings." It now states that, "[t]he management of medical (e.g. medically necessary hormone treatment) and surgical (e.g. genital reconstruction) trans-

gender issues should follow accepted standards developed by professionals with expertise in transgender health," and cited the Standards of Care. *See* Kosilek's Mar. 2, 2010 Motion to Supplement the Record at Ex. A. Kosilek moved to have the NCCHC Position Statement made part of the record in this case. *See id.* The Defendant opposed this request. Kosilek's motion is being denied because the Position Statement is hearsay, and there has been no testimony or cross-examination concerning it. While the court has not relied on the revised Position Statement in making its findings, it is consistent with the conclusions the court has reached based on the evidence that was admitted in this case.

FN9. Nor have there been any issues or problems resulting from Kosilek's feminization since Kosilek and Spencer testified in 2006.

FN10. As described below, Dennehy's position that insurmountable security concerns precluded providing Kosilek with sex reassignment surgery was also not based on the advice of any experts. The officials who provided expert testimony for the defendant at trial, one from the DOC and one from the Bureau of Prisons, were not retained until six months after Dennehy announced her position.

FN11. In deciding that Dennehy met with Spencer and Bissonette to discuss the security implications of sex reassignment surgery for Kosilek for the first time on May 19, 2005, the court credits her deposition testimony and does not find to be believable her testimony that the first such meeting occurred on September 14 or 19, 2004.

FN12. In September, 2011, WPATH published the Seventh Version of the Standards of Care. *See* WPATH, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, 7th Version, *http://www.wpath.org/documents/SOCV703–17–*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 53

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
(Cite as: 2012 WL 3799660 (D.Mass.))

*12.pdf.*

Kosilek requested that the court take judicial notice of the Seventh Version of the Standards of Care. *See* Kosilek's Oct. 4, 2011 Response to Defendant's Memorandum of Law in Response to Court's August 18, 2011 Order. However, it is not appropriate for the court to do so because the Standards of Care do not qualify as facts not subject to reasonable dispute. *See* Fed.R.Evid. 201. Rather, the testimony in the instant case demonstrated that the parties disputed various facts in the Sixth Version of the Standards of Care. Because there was no testimony or opportunity for cross-examination regarding the Seventh Version of the Standards of Care, the court has not considered it in making its findings. However, the court notes that the Seventh Version continues to require hormones and a one-year real life experience as prerequisites for the complete sex reassignment surgery Kosilek seeks.

FN13. The Seventh Version of the Standards of Care states that the Standards of Care in their entirety "apply to all transsexual, transgender, and gender nonconforming people, irrespective of their housing situation," and that "[h]ealth care for transsexual, transgender, and gender nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community." Standards of Care, Seventh Version at 67. Although the court did not consider the Seventh Version of the Standards of Care in reaching its conclusions, it is consistent with the court's finding that a transsexual prisoner can have the required real life experience in prison.

FN14. Osborne also testified in a manner consistent with Dr. Schmidt, her colleague at Johns Hopkins. As she is a social worker rather than a medical doctor, there is a question concerning whether she should be regarded as among those eligible to be found a prudent professional for the purpose of diagnosing what is medically necessary and prescribing treatment for Kosilek. However, the court's assessment and analysis of Dr. Schmidt's testimony is equally applicable to Osborne. Therefore, while the court has fully considered Osborne's testimony, it is not discussing it separately.

FN15. Even when the testimony is unequivocal, "[t]he court may not rubber stamp the conclusions reached by a court-appointed expert." *Gonzales v. Galvin,* 151 F.3d 526, 535 (6th Cir.1998). Rather, the court must recognize "that even an impartial expert can be wrong, and that the impartial expert must be subjected to the same evaluation of credibility as any other witness." *DeAngelis v. A. Tarricone,* 151 F.R.D. 245, 247 (S.D.N.Y.1993). This means, among other things, that the court must consider the reasons for the impartial expert's opinions and disregard them to the extent that they rely on unproven or erroneous assumptions. The court must also "decide how much of [the] witness's testimony to believe, and how much weight it should be given." First Circuit Pattern Jury Instr. 2.07 (6/14/02).

FN16. At least one other transsexual prisoner reportedly also attempted suicide while taking Prozac. *See Wolfe,* 130 F.Supp.2d at 650–51. In addition, it appears that De'lonta attempted to mutilate himself while taking Prozac. *See De'Lonta,* 330 F.3d at 635.

FN17. UMass, Dr. Appelbaum, Dr. Arthur Brewer, Dr. Harrison O'Connor, Karen Dewees, and Correctional Medical Services, Inc. were originally named as defendants in this case in their official capacities. The claims against them were dismissed before trial.

FN18. This was the same position taken by Clarke. On May 7, 2008, Clarke informed the court that, like Dennehy, he did not "profess to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

http://web2.westlaw.com/print/printstream.aspx?mt=Westlaw&prft=HTMLE&vr=2.0&destination=atp&sv=...    1/11/2013

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

have any clinical training that would enable [him] to render an opinion regarding the validity of the clinical opinions expressed at trial." Ex. 107. Those opinions included Dr. Appelbaum's advice to Dennehy that Kosilek was at substantial risk of serious harm if not provided sex reassignment surgery. Also like Dennehy, however, Clarke stated in his report to the court that "the safety and security concerns presented by the prospect of undertaking sex reassignment surgery for Michelle Kosilek are insurmountable." *Id.* Clarke subsequently testified and reiterated these views.

FN19. On June 2, 2008, Kosilek moved to supplement the record to add the Classification Manual as an exhibit. *See* Plaintiff's Mot. for Leave to Supplement Record and for Rule 37 Sanctions. Defendant opposed its admission on relevance grounds. The court finds that the Classification Manual is relevant to Commissioners Dennehy and Clarke's assessment of Kosilek as a flight risk, which in turn is relevant to the credibility of their stated security concerns. Neither party challenges the reliability of the Classification Manual. The Classification Manual is admissible under the public records exception to the hearsay rule. *See* Fed.R.Evid. 803(8).

Moreover, the court may take judicial notice of the Classification Manual, as it is a record of a state agency not subject to reasonable dispute. *See Brown v. Valoff,* 422 F.3d 926, 931 n. 7 (9th Cir.2005) (taking judicial notice of the California Department of Corrections Operations Manual and stating, " '[w]e may take judicial notice of a record of a state agency not subject to reasonable dispute' " (quoting *City of Sausalito v. O'Neill,* 386 F.3d 1186, 1224 n. 2 (9th Cir.2004))). The court may also take judicial notice of state regulations. *See Getty Petroleum Marketing, Inc. v. Capital Terminal Co.,* 391 F.3d 312, 325 n. 19 (1st Cir.2004) (Lipez, J., concur-

ring) (stating that "[f]ederal courts and most state courts take judicial notice of [state administrative] regulations" and citing McCormick on Evidence § 335 ("State and national administrative regulations having the force of law will also be noticed, at least if they are published so as to be readily available.")); *Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 742 n. 4, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (taking judicial notice of rules and regulations adopted by the Board of Public Works of Maryland). Although the DOC's Classification Manual is not published in a regulation, it is referenced in two published regulations: 103 Mass.Code Regs. § 420.06 and 103 Mass.Code Regs. § 420.08(3)(d).

Accordingly, the court has considered the Classification Manual to be evidence in this case. It is not essential, however, to the court's conclusions.

FN20. The court has given little weight to the testimony of Dumond and Beeler because both experts failed to consider material aspects of Kosilek's history and personal characteristics in forming their opinions. Although Dumond testified as to the general risks of sexual assault and violence in prisons and provided some testimony concerning Kosilek particularly, his opinions did not take into account Kosilek's history of being safely incarcerated in a male prison, while long living as a woman. In addition, although Dumond testified as to the risks of housing Kosilek at MCI Framingham, this testimony was not based on any studies or literature, and was speculative. With regard to Beeler, as indicated earlier, he did not review Kosilek's medical records as he would normally do before making a decision regarding prescribed medical treatment for an inmate, and did not have sufficient facts concerning Kosilek to be qualified to express an opinion on any risk to, or posed by, Kosilek particu-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

larly. Accordingly, the court limited his testimony to general security concerns and the reasonableness of those concerns.

FN21. More specifically, Dennehy testified that it was not "truly impossible" for the DOC to provide a safe and secure place of incarceration for Kosilek if he had sex reassignment surgery. *See* June 20, 2006 Tr. at 53. Rather, after sex reassignment surgery "the only acceptable result from [Dennehy's] perspective would be placement in either ... at Norfolk, the Special Management Unit, or at Framingham in the Closed Custody Unit, in 23 hour lock down." *Id.; see also id.* at 77.

> Clarke agreed, stating that he could and would place Kosilek in the Special Management Unit at MCI Norfolk after surgery. *See* May 12, 2008 Tr. at 50–51; Ex. 107. As then Superintendent of MCI Norfolk, Spencer also testified that he could and would place Kosilek in that unit at MCI Norfolk. *See* June 9, 2006 Tr. at 52–53. Bissonnette testified that if Kosilek were assigned to MCI Framingham after sex reassignment surgery, she would place Kosilek in the Closed Custody Unit at MCI Framingham "for as long as [Bissonnette] felt that the security and operation of the institution were at risk." June 21, 2006 Tr. at 42.

FN22. The possibility of a special unit for transsexual prisoners was discussed in the testimony at the trial of *Kosilek I* and of the instant case.

FN23. As the First Circuit further explained in *Battista:*

> First, for some time, the Department refused to take the GID diagnosis and request for hormone therapy seriously. Its representatives resisted it in other cases, and when their own medical advisers supported the request for Battista, the defendants went back and

forth apparently looking for an out. It may take some education to comprehend that GID is a disorder that can be extremely dangerous. But the education seems to have taken an unduly long time in this instance, especially in light of the self-mutilation attempt.

645 F.3d at 455.

District Judge Douglas P. Woodlock characterized the period 110 from about 2004 to 2008, which included all of Dennehy's tenure as Commissioner, as "the period of obstruction of the clinicians' diagnosis and treatment." *Battista v. Dennehy,* 05–11456–DPW, Aug. 23, 2010 Tr. at 52. As described above, this court has relied on the evidence in the instant case to reach the same conclusion.

FN24. In *Soneeya,* the court was addressing, in part, a policy the DOC adopted in 2010 which categorically prohibits sex reassignment surgery because of "overwhelming safety and security concerns." 851 F.Supp.2d at 240. As demonstrated, such concerns are pretextual and do not exist in Kosilek's case. The DOC policy described in *Soneeya* is just the type of categorical approach to denying treatment that this court found to be unlawful in *Kosilek I,* 221 F.Supp.2d at 171, 186–87, and the Seventh Circuit condemned in *Roe,* 631 F.3d at 862–63. The fact that the DOC adopted this categorical prohibition after the decision in *Kosilek I* and the trial of this case reinforces the court's conclusion that it is not appropriate to give prison officials further time to rectify the situation before issuing an injunction. *See Farmer,* 511 U.S. at 847, 114 S.Ct. 1970.

Kosilek filed a motion to supplement the record with and/or take judicial notice of the DOC's 2010 policy, published as 103 DOC 652 on the DOC's website, on gender identity disorder. *See* Feb. 2, 2010 Plaintiff's Mot. to Supplement the Record or in the Alternative Request for Judicial Notice. The defendant

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 56

--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)
**(Cite as: 2012 WL 3799660 (D.Mass.))**

did not file an opposition. The policy is admissible under the public records exception to the hearsay rule. *See* Fed.R.Evid. 803(8).

In addition, the court may take judicial notice of the policy, as a record of a state agency not subject to reasonable dispute, *see Brown,* 422 F.3d at 931 n. 7, or as a state regulation, *see Getty,* 391 F.3d at 325 n. 19 (Lipez, J., concurring). However, while the 2010 policy prohibiting sex reassignment surgery for inmates is consistent with the court's conclusion that the DOC will not provide the prescribed treatment for Kosilek in the future without a court order, the court has not relied upon it in reaching its factual and legal conclusions, largely because it has not heard any testimony concerning that policy.

D.Mass.,2012.
Kosilek v. Spencer
--- F.Supp.2d ----, 2012 WL 3799660 (D.Mass.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

### 123:17.  Periodic review of incompetence to stand trial;  petition;  hearing;  continued treatment;  defense to charges;  release

Section 17.  (a) The periodic review of a person found incompetent to stand trial shall include a clinical opinion with regard to the person's competence to stand trial, which opinion shall be noted in writing on the patient's record.  If any person found incompetent to stand trial is determined by the superintendent of the facility or the medical director of the Bridgewater state hospital to be no longer incompetent, the superintendent or medical director shall notify the court, which shall without delay hold a hearing on the person's competency to stand trial.  Any person found incompetent to stand trial may at any time petition the court for a hearing on his competency.  Whenever a hearing is held and the court finds that the person is competent to stand trial, his commitment, if any, to a facility or to the Bridgewater state hospital shall be terminated and he shall be returned to the custody of the court for trial.  However, if the person requests continued care and treatment during the pendency of the criminal proceedings against him and the superintendent or medical director agrees to provide such care and treatment, the court may order the further hospitalization of such person at the facility or the Bridgewater state hospital.

(b) If either a person or counsel of a person who has been found to be incompetent to stand trial believes that he can establish a defense of not guilty to the charges pending against the person other than the defense of not guilty by reason of mental illness or mental defect, he may request an opportunity to offer a defense thereto on the merits before the court which has criminal jurisdiction.  The court may require counsel for the defendant to support the request by affidavit or other evidence.  If the court in its discretion grants such a request, the evidence of the defendant and of the commonwealth shall be heard by the court sitting without a jury.  If after hearing such petition the court finds a lack of substantial evidence to support a conviction it shall dismiss the indictment or other charges or find them defective or insufficient and order the release of the defendant from criminal custody.

(c) Notwithstanding any finding of incompetence to stand trial under the provisions of this chapter, the court having jurisdiction may, at any appropriate stage of the criminal proceedings, allow a defendant to be released with or without bail.

### 123:18.  Hospitalization of mentally ill prisoners;  examination;  reports;  hearing;  commitment;  voluntary admission;  reduction of sentence;  discharge

Section 18.  (a) If the person in charge of any place of detention within the commonwealth has reason to believe that a person confined therein is in need of hospitalization by reason of mental illness at a facility of the department or at the Bridgewater state hospital, he shall cause

272

such prisoner to be examined at such place of detention by a physician or      5
psychologist, designated by the department as qualified to perform such      6
examination. Said physician or psychologist shall report the results of      7
the examination to the district court which has jurisdiction over the place      8
of detention or, if the prisoner is awaiting trial, to the court which has ju-      9
risdiction of the criminal case. Such report shall include an opinion, with      10
reasons therefore, as to whether such hospitalization is actually re-      11
quired. The court which receives such report may order the prisoner to      12
be taken to a facility or, if a male, to the Bridgewater state hospital to be      13
received for examination and observation for a period not to exceed      14
thirty days. After completion of such examination and observation, a      15
written report shall be sent to such court and to the person in charge of      16
the place of detention. Such report shall be signed by the physician or      17
psychologist conducting such examination, and shall contain an evalua-      18
tion, supported by clinical findings, of whether the prisoner is in need of      19
further treatment and care at a facility or, if a male, the Bridgewater      20
state hospital by reason of mental illness. The person in charge of the      21
place of detention shall have the same right as a superintendent of a fa-      22
cility and the medical director of the Bridgewater state hospital to file a      23
petition with the court which received the results of the examination for      24
the commitment of the person to a facility or to the Bridgewater state      25
hospital; provided, however, that, notwithstanding the court's failure, af-      26
ter an initial hearing or after any subsequent hearing, to make a finding      27
required for commitment to the Bridgewater state hospital, the prisoner      28
shall be confined at said hospital if the findings required for commitment      29
to a facility are made and if the commissioner of correction certifies to      30
the court that confinement of the prisoner at said hospital is necessary to      31
insure his continued retention in custody. An initial court order of com-      32
mitment issued subject to the provisions of this section shall be valid for      33
a six-month period, and all subsequent commitments during the term of      34
the sentence shall take place under the provisions of sections seven and      35
eight and shall be valid for one year.      36

(b) Notwithstanding any contrary provision of general or special law, a      37
prisoner who is retained in any place of detention within the common-      38
wealth and who is in need of care and treatment in a facility may, with      39
the approval of the person in charge of such place of detention apply for      40
voluntary admission under the provisions of paragraph (a) of section ten.      41

(c) At the commencement of hospitalization under the provisions of      42
paragraph (a) or paragraph (b) the department of correction shall enter      43
in the patient record of such prisoner the date of the expiration of the      44
sentence of the prisoner. Where applicable, the provisions of sections      45
one hundred and twenty-nine, one hundred and twenty-nine A, one hun-      46
dred and twenty-nine B and one hundred and twenty-nine C of chapter      47
one hundred and twenty-seven may be applied to reduce such sentence,      48
and on such date the prisoner shall be discharged; provided, however,      49

273

that if the superintendent or other head of a facility or the medical direc- 50
tor of the Bridgewater state hospital determines that the discharge of 51
the prisoner committed subject to the provisions of paragraph (a) would 52
create a likelihood of serious harm by reason of mental illness, he shall 53
petition the district court having jurisdiction over the facility prior to the 54
date of expiration to order the commitment of such person to a facility or 55
to the Bridgewater state hospital under the provisions of this chapter 56
other than paragraph (a); and provided, further, that any prisoner resi- 57
dent in a facility subject to the provisions of paragraph (b) shall be free 58
to leave such facility subject to the provisions of section eleven. 59

(d) In the event the provisions of this chapter require the release of a 60
prisoner from a facility or from the Bridgewater state hospital prior to 61
the date of expiration of his sentence calculated under the provisions of 62
paragraph (c), such prisoner shall be forthwith returned to the place of 63
detention from which he was transferred to such facility or to said hospi- 64
tal. 65

## 23:18A.   Facility residents; contribution towards cost of counsel

Section 18A.   A person who is a resident in a facility of the depart- 1
ment of mental health or in the Bridgewater state hospital and who has 2
funds held in trust for him by the department of mental health or the de- 3
partment of correction, shall contribute toward the cost of any counsel 4
appointed pursuant to chapter two hundred and eleven D to provide rep- 5
resentation in proceedings under this chapter, in an amount not exceed- 6
ing five hundred dollars unless a larger contribution has been ordered by 7
a court pursuant to sections two and five of chapter two hundred and 8
eleven D. Whenever the department of correction or the department of 9
mental health holds funds in trust for such a person, the department 10
shall turn over such funds, but not exceeding five hundred dollars, to the 11
treasurer to be credited toward the cost of providing such counsel. 12

## 23:19.   Parties or witnesses; determination of mental condition

Section 19.   In order to determine the mental condition of any party 1
or witness before any court of the commonwealth, the presiding judge 2
may, in his discretion, request the department to assign a qualified physi- 3
cian or psychologist, who, if assigned shall make such examinations as 4
the judge may deem necessary. 5

## 23:20.   Extradition of mental institution escapees

Section 20.   (a) The governor may upon demand deliver to the execu- 1
tive of any other state any person who has escaped from an institution 2
for the mentally ill to which he has been committed under the laws of 3
such state, and who may be dangerous to the safety of the public, or may 4
upon application appoint an agent to demand of the executive authority 5

274

# TITLE XVIII

## PRISONS, IMPRISONMENT, PAROLES AND PARDONS

CHAPTER
124.   Powers and Duties of the Department of Correction.
125.   Correctional Institutions of the Commonwealth.
126.   Jails, Houses of Correction and Reformation, and County Industrial Farms.
127.   Officers and Inmates of Penal and Reformatory Institutions.  Paroles and Pardons.

---

# CHAPTER 124

## POWERS AND DUTIES OF THE DEPARTMENT OF CORRECTION

Section
1.   Powers and duties of commissioner of correction.
2.   Deputy commissioners; duties.
3, 4.   Repealed, 1955, 770, Sec. 122.
5.   Reports to governor.
6.   Annual reports to general court.
7.   Repealed, 1954, 567, Sec. 3.

Section
8.   Reports of criminal cases by clerks of courts.
9.   Monthly reports of arrests.
10.   Corporate status of department for purpose of grants, gifts or bequests; site selection for new facilities; title to property.

### 124:1.  Powers and duties of commissioner of correction

Section 1.  In addition to exercising the powers and performing the duties which are otherwise given him by law, the commissioner of correction, in this chapter called the commissioner, shall:

(a) designate, establish, maintain, and administer such state correctional facilities as he deems necessary, and may discontinue the use of such state correctional facilities as he deems appropriate for such action; provided that no state or county correctional facility named in paragraph (n) of section one of chapter 125 shall be discontinued without specific authorization and approval of the General Court;

(b) maintain security, safety and order at all state correctional facilities, utilize the resources of the department to prevent escapes from any such facility, take all necessary precautions to prevent the occurrence or spread of any disorder, riot or insurrection at any such facility, including but not limited to the development, planning, and coordination of emergency riot procedures with the colonel of state police, and take suitable measures for the restoration of order;

(c) establish and enforce standards for all state correctional facilities;

315

(d) establish standards for all county correctional facilities and secure compliance with such standards, if necessary, through the enforcement provisions of section one B of chapter one hundred and twenty-seven; 18 19 20

(e) establish, maintain and administer programs of rehabilitation, including but not limited to education, training and employment, of persons committed to the custody of the department, designed as far as practicable to prepare and assist each such person to assume the responsibilities and exercise the rights of a citizen of the commonwealth; 21 22 23 24 25

(f) establish a system of classification of persons committed to the custody of the department for the purpose of developing a rehabilitation program for each such person; 26 27 28

(g) determine at the time of commitment, and from time to time thereafter, the custody requirements and program needs of each person committed to the custody of the department and assign or transfer such persons to appropriate facilities and programs; 29 30 31 32

(h) establish training programs for employees of the department and, by agreement, other corrections personnel; 33 34

(i) investigate grievances and inquire into alleged misconduct within state correctional facilities; 35 36

(j) maintain adequate records of persons committed to the custody of the department; 37 38

(k) establish and maintain programs of research, statistics and planning, and conduct studies relating to correctional programs and responsibilities of the department; 39 40 41

(l) utilize, as far as practicable, the services and resources of specialized community agencies and other local community groups in the rehabilitation of offenders, development of programs, recruitment of volunteers and dissemination of information regarding the work and needs of the department; 42 43 44 45 46

(m) make and enter any contracts and agreements necessary or incidental to the performance of the duties and execution of the powers of the department, including but not limited to contracts to render services to committed offenders, and to provide for training or education for correctional officers and staff; 47 48 49 50 51

(n) seek to develop civic interest in the work of the department and educate the public and advise the general court as to the needs and goals of the corrections process; 52 53 54

(o) expend annually in the exercise of his powers, performance of his duties, and for the necessary operations of the department such sums as may be appropriated therefor by the general court; 55 56 57

316

(p) report annually to the secretary of health and human services, the governor and the general court; 58 59

(q) make and promulgate necessary rules and regulations incident to the exercise of his powers and the performance of his duties including but not limited to rules and regulations regarding nutrition, sanitation, safety, discipline, recreation, religious services, communication and visiting privileges, classification, education, training, employment, care, and custody for all persons committed to correctional facilities. 60 61 62 63 64 65

(r) adopt policies and procedures, in consultation with the county sheriffs, establishing reasonable fees for haircuts that are provided to inmates at any county or state correctional facility. Except as otherwise provided, the commissioner or a county sheriff may charge each inmate a reasonable fee for any haircut provided. The commissioner of correction may deduct such fee from the inmate's account as provided for in section 48A of chapter 127. 66 67 68 69 70 71 72

(s) adopt policies and procedures establishing reasonable medical and health service fees for the medical services that are provided to inmates at any state jail or correctional facility. Except as otherwise provided, the commissioner may charge each inmate a reasonable fee for any medical and mental health services provided, including prescriptions, medication, or prosthetic devices. The fee shall be deducted from the inmate's account as provided for in section 48A of chapter 127. The commissioner shall exempt the following inmates from payment of medical and health services fees: medical visits initiated by the medical or mental health staff, consultants, or contract personnel of the department, prisoners determined to be terminally ill, pregnant, or otherwise hospitalized for more than 30 days successively during the term of incarceration and juvenile inmates and inmates who are undergoing follow-up medical treatment for chronic diseases. Notwithstanding any other provision of this section, an inmate shall not be refused medical treatment for financial reasons. The commissioner shall also establish criteria for reasonable deductions from moneys credited to the inmate's account as provided for in section 48A of chapter 127 to repay the cost of medical treatment for injuries that were self-inflicted or inflicted by the inmate on others. 73 74 75 76 77 78 79 80 81 82 83 84 85 86 87 88 89 90 91

(t) in accordance with clause (s), the commissioner shall as part of the rules and regulations on payments for medical services, require the department of corrections or the county correctional facility to ascertain whether any inmate seeking medical services has health insurance coverage and if said inmate does have health insurance coverage, said health insurance plan shall be billed for any services provided. 92 93 94 95 96 97

(u) adopt policies and procedures establishing reasonable fees for maintenance and administration of inmate accounts maintained at any state correctional facility. The commissioner may charge each inmate 98 99 100

317

|  |  |
|---|---|
| reasonable fees for the maintenance and administration of inmate accounts and may deduct such fees from each inmate's accounts. | 101<br>102 |

## 124:2.  Deputy commissioners; duties

Section 2.   Subject to the supervision and control of the commissioner, the deputy commissioner for institutional services shall be responsible for planning and directing the efficient administration of each correctional institution of the commonwealth by the officers and employees of the institution. — 1, 2, 3, 4, 5

Subject to the supervision and control of the commissioner, the deputy commissioner for classification and treatment shall be responsible for planning and directing the rehabilitation services of all the correctional institutions of the commonwealth, including the classification, medical, educational, industrial, vocational and recreational programs of each such institution. — 6, 7, 8, 9, 10, 11

Subject to the supervision and control of the commissioner, the deputy commissioner for personnel and training shall be responsible for planning and directing departmental procedures for the appointment, assignment, transfer, training, supervision, discipline and compensation of officers and employees of the department and the correctional institutions of the commonwealth. — 12, 13, 14, 15, 16, 17

Subject to the supervision and control of the commissioner, the deputy commissioner for community services shall be responsible for planning and directing community programs and services provided to committed offenders. — 18, 19, 20, 21

Each of the said deputy commissioners shall perform such other duties as may be assigned to him from time to time by the commissioner. — 22, 23

## 124:3, 4.  Repealed, 1955, 770, Sec. 122

## 124:5.  Reports to governor

Section 5.   The commissioner shall, at least once in six months, report in writing to the governor the condition of the correctional institutions of the commonwealth, and shall so report to the governor when, in his judgment, the conditions of administration, financial management or discipline in any of said institutions require executive action. — 1, 2, 3, 4, 5

## 124:6.  Annual reports to general court

Section 6.   He shall make an annual report setting forth fully and in detail the actual condition on November thirtieth of each correctional institution of the commonwealth, and on December thirty-first of each jail and house of correction, the number of inmates in each, such statistics — 1, 2, 3, 4

318

Westlaw.

Slip Copy, 2012 WL 1237760 (D.Mass.)
(Cite as: 2012 WL 1237760 (D.Mass.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
DISABILITY LAW CENTER, Plaintiff,
v.
MASSACHUSETTS DEPARTMENT OF COR-
RECTION, et al., Defendants.

C.A. No. 07–10463–MLW.
April 12, 2012.

James S. Rollins, Alison Hickey Silveira, Carol E.
Head, David Yamin, Bingham McCutchen LLP,
Bonita P. Tenneriello, James R. Pingeon, Mas-
sachusetts Correctional Legal Services Inc., Karen
O. Talley, Richard M. Glassman, Disability Law
Center, Boston, MA, Nancy J. Murphy, Disability
Law Center, Robert D. Fleischner, Center for Pub-
lic Representation, Northampton, MA, for Plaintiff.

William D. Saltzman, Charles W. Anderson, Jr.,
Sheryl F. Grant, Commonwealth of Massachusetts,
Department of Correction, James A. Bello, Morris-
on, Mahoney LLP, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER*
WOLF, District Judge.
I. INTRODUCTION
*1 This case was brought in March, 2007, fol-
lowing reports of a number of suicides by mentally
ill prisoners in the custody of the Massachusetts
Department of Correction (the "Department"), in-
cluding many held in segregated confinement.
Plaintiff Disability Law Center (the "DLC") repres-
ents all Massachusetts prisoners with mental ill-
nesses. It alleges that the Department, and certain
individuals sued only in their official capacities, vi-
olated the federal constitutional rights of mentally
ill inmates by subjecting those inmates to disciplin-
ary and other forms of segregation for prolonged
periods of time. The complaint seeks declaratory
and injunctive relief.

In November, 2007, in the context of the De-
partment's independent initiatives to improve con-
ditions for mentally ill inmates in correctional facil-
ities, the parties began attempting to settle this case.
In 2008, they asked the court to conduct a settle-
ment conference. This court has long believed that
the settlement of cases involving the constitutional-
ity of the conduct of public officials is important in
our democracy. As the court explained in 1990,
judges:

> should understand that in some cases the values
> to be protected by the Bill of Rights may best be
> served when other officials are required to recog-
> nize and wrestle with their responsibilities for
> constitutional interpretation. As a corollary of
> this, judges should realize that they may often
> best serve constitutional interests by encouraging
> the responsible public officials and their constitu-
> ents to settle constitutional controversies on prop-
> er terms, rather than by deciding the questions
> such controversies present.

*Spacco v. Bridgewater School Department,* 739
F.Supp. 30, 35 (D.Mass.1990). [FN1] With these
principles in mind, the court agreed to the parties'
request that it mediate their settlement discussions.
However, the court informed the parties of its view
that judges should become involved in the adminis-
tration of prisons only as a last resort and then only
to the most limited extent necessary.[FN2] It urged
the parties to develop a settlement that would be
consistent with these principles or risk having any
proposed resolution requiring judicial approval re-
jected by the court.

> FN1. This is also the express intention of
> Congress, which has enacted a statute con-
> cerning state correctional and other institu-
> tions that states: "It is the intent of Con-
> gress that deplorable conditions ... amount-
> ing to deprivations of rights protected by
> the Constitution or laws of the United
> States be corrected, not only by litigation

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Add. 65

Slip Copy, 2012 WL 1237760 (D.Mass.)
(Cite as: 2012 WL 1237760 (D.Mass.))

..., but also by the voluntary good faith efforts of agencies of Federal, State, and local governments." 42 U.S.C. § 1997g; *see also* 42 U.S.C. § 1997.

FN2. As explained in this Memorandum, the court's view regarding its proper role in prison litigation is consistent with the principles codified in the Prison Litigation Reform Act (the "PLRA"), 18 U.S.C. § 3626.

The parties' initial two-year effort to negotiate a settlement was frustrated by a fiscal crisis that constrained the Department's ability to agree to certain reforms. However, they eventually resumed settlement discussions. In December, 2011, the parties informed the court that they had agreed to a comprehensive Settlement Agreement (the "Agreement"). The Agreement, however, does not become effective unless the court approves it and agrees to retain jurisdiction over the case. Essentially, the court is asked to review the Agreement to ensure that it is fair, reasonable, and adequate, and if it is, stay the case while the parties perform under the Agreement.

The court continues to believe that a reasonable settlement of this case would be in the public interest. However, the Agreement raises a series of questions which the parties briefed and argued at hearings in February and March, 2012.

**\*2** First, the court has considered its authority to approve the Agreement and stay the litigation. As discussed in this Memorandum, a federal court has inherent authority to stay litigation in order to manage its docket. The Supreme Court has recognized that a district court can retain jurisdiction to enforce a private settlement agreement when it dismisses a case. *See Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 381–82, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). It follows that a federal court can also retain jurisdiction to enforce a private settlement agreement when it exercises its inherent authority to stay a case and remove it from the active docket.

It is permissible and appropriate for the court to evaluate the parties' Agreement before deciding whether to stay this case. While the court does not have the authority to review and approve private settlement agreements in ordinary litigation, it has the discretion, if not the duty, to do so here because the settlement is entered into by DLC acting in a representative capacity, and the rights of individuals who are not parties will be affected. Since the individuals whose interests are at stake are alleged to have serious mental illness, it is particularly appropriate that the court evaluate the fairness of the Agreement in deciding whether to stay litigation that was brought to protect their constitutional rights. Therefore, the court has evaluated the fairness of the settlement.

The court has also considered whether approving the Agreement and staying the litigation would comport with the requirements of the PLRA. The PLRA prohibits the court from granting or approving "prospective relief" unless it finds such relief "extends no further than necessary to correct the violation of a Federal right." 18 U.S.C. § 3626(a)(1)(A). In this case, as in most prison litigation resolved by agreement, the Department denies that it is violating the federal rights of any inmate and the stay of litigation for which the Agreement provides precludes the court from deciding whether such a violation has been proven. Therefore, if the judicial action required by the Agreement is "prospective relief," the findings required by § 3626(a)(1)(A) could not be made and the required approval of the Agreement could not be granted.

However, as explained in this Memorandum, § 3626(a)(1)(A) is not now implicated in this case because the court is not now ordering any "prospective relief" or, indeed, any "relief" at all. The requirements of § 3626(a)(1)(A) must be satisfied in a case resolved by a "consent decree," but not in a case resolved by a "private settlement agreement." While the review and approval of a settlement agreement and retention of jurisdiction to enforce it are not typical of a private settlement

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1237760 (D.Mass.)
**(Cite as: 2012 WL 1237760 (D.Mass.))**

agreement, they are also not incompatible with a private settlement agreement generally or as defined in the PLRA. The order requested in this case is not enforceable by contempt, which is an essential characteristic of a consent decree. The order requested is not enforceable by contempt because the court is not ordering the parties to comply with their Agreement or to do anything at all. Instead, the court is merely staying the litigation and providing the parties with an opportunity to perform under their Agreement.[FN3] As explained in this Memorandum, the parties' Agreement is, therefore, far more similar to a "private settlement agreement" than to a "consent decree," as these terms are used in the PLRA. As the court is not now being asked to enter an order that constitutes a consent decree and provides "prospective relief," the requirements of § 3626(a)(1) (A) do not now apply.

> FN3. If the stay is lifted, DLC would be required to prove a violation of a federal right as well as a breach of the Agreement to obtain prospective relief that will be subject to the narrow tailoring requirements of § 3626(a)(1)(A).

*3 Because the PLRA's limitations on "prospective relief" are not now implicated, the court has evaluated the Agreement solely to determine whether it is fair, reasonable, and adequate. The court finds that the Agreement should be approved.

Where, as here, a settlement has been negotiated at arm's length after discovery that is sufficient for a plaintiff to make informed decisions, the settlement is presumed reasonable. This presumption of reasonableness is confirmed by the terms of the Agreement. The Agreement addresses the fundamental issue in this case—prison suicides—by providing a process for minimizing the possibility that inmates with serious mental illnesses will be confined in segregation and for reviewing the mental health of inmates in segregation. Its reliance on Secure Treatment Units as a therapeutic alternative to confinement in segregation represents the best

current practices concerning mentally ill inmates. Moreover, the implementation of many of the reforms required by the Agreement has already succeeded in decreasing self-injurious behavior and enhancing the safety of prison personnel.

In assessing the reasonableness of the settlement, the court has also considered the limited judicial role that the Agreement provides. The Agreement requires that the parties attempt to resolve any future disputes before requesting a lifting of the stay to litigate any issues that are truly intractable. The court is asked to retain jurisdiction generally for only three years and, in any event, for no more than five years if the Department breaches the Agreement. The limited role provided for the court contributes to the conclusion that the Agreement should be approved.

This is a case in which DLC has zealously represented the interests of mentally ill inmates. The Department has vigorously represented the interests of the Commonwealth of Massachusetts, which include deciding itself how to discharge the constitutional duty to provide adequate medical care for mentally ill inmates and to protect their safety. The Department has resisted any temptation to abdicate its responsibility to meet the challenges these inmates present and thus compel the courts to make the legally required, difficult decisions.

In these circumstances, it is particularly appropriate that the court approve the fair settlement that the parties have agreed upon and stay the litigation as they perform under their Agreement. In view of the constructive cooperation that has led to the settlement, the court hopes and trusts that its active involvement in this case is now concluded.

## II. PROCEDURAL HISTORY

This case was filed by DLC on March 8, 2007, on behalf of all Massachusetts prisoners with mental illnesses. As the Massachusetts agency designated pursuant to the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §§ 10801 *et seq.,* DLC is authorized to pursue legal

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1237760 (D.Mass.)
**(Cite as: 2012 WL 1237760 (D.Mass.))**

and other remedies to ensure that individuals with mental illness are protected from abuse and neglect.

**\*4** The complaint alleges that the isolation experienced in disciplinary and other forms of segregation within correctional facilities exacerbates existing mental illnesses suffered by some inmates and generates new mental illness in others who were previously healthy. In its complaint, DLC describes the alleged experiences of numerous inmates in Department facilities who it contends engaged in self-destructive behavior or committed suicide while being held in segregated confinement, including inmates who were held in segregation for years at a time despite recommendations from clinicians that they be removed from segregation. DLC further alleges that Department officials were aware of the serious risk of harm that segregation posed for mentally ill inmates and did not provide adequate mental health screening and services, or adequate alternatives to segregation for mentally ill inmates. It is alleged that these inmates were, therefore, subjected to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and that the defendants also violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*

In its Answer, the Department denied the allegations in the Complaint. However, at the same time, it described the reforms it had initiated before the suit was filed to address the plight of mentally ill inmates. These reforms were based on recommendations made by the Department's expert consultant on prison suicide prevention, Dr. Lindsay M. Hayes.

The parties began attempting to settle this case in November, 2007. In 2008, they asked the court to try to mediate a settlement. Expressing its previously described confidence that such constitutional cases are best resolved by the agreement of the parties themselves, the court accepted the parties' invitation to mediate their settlement discussions. [FN4] However, as also discussed earlier, the court

urged the parties to reach an agreement that would not unnecessarily involve the court in prison administration and would only require judicial action as a last resort.

> FN4. The parties agreed that they would not request the court's recusal based on its participation in their settlement discussions.

While discovery and litigation were generally stayed, the court allowed discovery important to the settlement discussions, including visits by DLC and its experts to Department facilities. The court met periodically with the parties. In addition, the Department continued to implement certain reforms relating to mentally ill inmates.

However, after almost two years of settlement discussions, the parties could not progress further because a fiscal crisis imposed new constraints on the Department's ability to agree to additional reforms. Therefore, in February, 2010, the stay of litigation was lifted.

Subsequently, the parties engaged in extensive discovery. This involved, among other things, visits by DLC and its experts to several Department facilities, and interviews with more than 100 inmates.

The parties eventually privately resumed their settlement discussions. On December 12, 2011, after years of discovery, litigation, and negotiations, the parties reported that they had reached a settlement and requested the court's approval of their Agreement.

**\*5** Except in certain circumstances, the Agreement prohibits the placement of inmates with serious mental illness in Departmental Disciplinary Units, a form of segregation, and limits the use of other forms of segregation of inmates with serious mental illness. In the Agreement, the Department undertakes to screen inmates both before and during confinement in segregation. The Department has also agreed to maintain a number of Secured

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1237760 (D.Mass.)
**(Cite as: 2012 WL 1237760 (D.Mass.))**

Treatment Units to provide an alternative to segregation for inmates with serious mental illness, and to integrate mental health professionals into the disciplinary process. Pursuant to the Agreement, the Department will seek to place inmates who have serious mental illness or who are at risk of substantial deterioration of their mental health in alternatives to segregation. The Agreement provides that when inmates with serious mental illness are held in segregation, they will receive additional mental health services, and their status will be regularly reviewed by facility administrators and at least one mental health professional to determine whether alternatives to segregation exist. The parties assert that these measures achieve the plaintiff's main goals in bringing this case, while institutionalizing initiatives the Department has begun to implement and which have already caused a significant reduction in self-injurious behavior by inmates and harm to prison staff.

Pursuant to the Agreement, the Department will periodically provide DLC with data and documents concerning whether the Department is complying with its contractual obligations. In addition, the Department will give limited access to its facilities, personnel, and inmates to an expert retained and paid by DLC to monitor and assess the Department's compliance with the Agreement.

The Agreement establishes a process for DLC to notify the Department of any concerns about compliance and for the parties to attempt to resolve any disputes privately. If the parties are not successful in privately resolving a dispute regarding compliance with the Agreement, they may seek relief from this court, which is the sole forum for its enforcement.

The Agreement also provides that the court will retain jurisdiction over the case for three years with respect to any provision for which there is no outstanding determination that the Department is not in substantial compliance. If during the three year period the court decides that the Department is not in substantial compliance with a provision of the Agreement, the court may extend its jurisdiction with regard to that provision for up to two years from the date of the finding of substantial noncompliance. Therefore, it is possible that the court will retain jurisdiction for up to five years.

The Agreement provides that if the court finds that the Department is not in substantial compliance with any provision of the Agreement, it may issue an order designed to achieve compliance, but not initially an order of contempt. Pursuant to § X.B.3 of the Agreement, any such remedial order must comply with the requirements of the PLRA. As the parties agree, this means that to obtain an order providing relief that is enforceable by contempt, plaintiff must prove not only that a provision of the Agreement has been violated but also that there has been a violation of a federal right, and that the relief ordered is limited only to what is necessary to remedy that violation as required by the PLRA, 18 U.S.C. § 3626(a)(1)(A). *See* March 9, 2012 Tr. at 11–12.

**\*6** Finally, pursuant to the Agreement, without stipulating that the plaintiff is the prevailing party, the Department will pay $1,250,000 to DLC as attorney's fees and costs. This amount settles any claim by DLC for fees and costs incurred prior to the date of approval of the Agreement. It does not cover possible future fees and costs incurred during any proceeding to enforce the Agreement, for which DLC may seek an award if it is the prevailing party. The Agreement requires that the plaintiff pay all fees and costs incurred by the expert designated to monitor the Department's compliance with the Agreement.

On January 6, 2012, the court ordered the parties to submit additional briefing on a number of issues, including the proper standard for the court's consideration of the request for approval of the settlement and proposed attorney's fees, the impact of the Agreement on the claims of inmates, and the role of the court in enforcing the settlement. After a hearing on February 2, 2012, the court ordered additional briefing on the implications of the PLRA

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1237760 (D.Mass.)
**(Cite as: 2012 WL 1237760 (D.Mass.))**

for the court's authority to approve the Agreement and retain jurisdiction over the case as the parties request. A further hearing was held on March 9, 2012.

Although memoranda generally discussing the Agreement have been part of the public record, as requested by the parties the Agreement itself has been under seal because it has been uncertain whether the court would approve it. The parties agree, however, that the Agreement should be unsealed if and when it is approved by the court.

III. ANALYSIS

A. *It is Appropriate for the Court to Stay Further Proceedings and Retain Jurisdiction*

The Supreme Court recognized in *Kokkonen* that a United States district court may retain jurisdiction to enforce the provisions of a private settlement agreement even as it dismisses the litigation that the settlement resolves. 511 U.S. at 381–82. If the court does not issue an order of dismissal that states it is retaining jurisdiction or incorporate the terms of the settlement agreement into the order of dismissal, enforcement of the settlement agreement is left for state courts, unless there is an independent basis for federal jurisdiction. *Id.* However, the Supreme Court explained that:

If the parties *wish* to provide for the court's enforcement of a dismissal-producing settlement agreement, they can seek to do so. When the dismissal is pursuant to Federal Rule of Civil Procedure 41(a)(2), which specifies that the action "shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper," the parties' compliance with the terms of the settlement contract (or the court's "retention of jurisdiction" over the settlement contract) may, in the court's discretion, be one of the terms set forth in the order. Even when, as occurred here, the dismissal is pursuant to Rule 41(a)(1)(ii) (which does not by its terms empower a district court to

attach conditions to the parties' stipulation of dismissal) we think the court is authorized to embody the settlement contract in its dismissal order (or, what has the same effect, retain jurisdiction over the settlement contract) if the parties agree.

\*7 *Id.*

As described earlier, in this case the court has been asked to approve the settlement, stay the case while the parties perform the Agreement, and retain jurisdiction for at least three years and up to five years in certain circumstances. As *Kokkonen* instructs that it is permissible for a federal court to retain jurisdiction to enforce a settlement agreement after a case has been dismissed, it follows that a court may also take the lesser step of staying the case while retaining jurisdiction over possible disputes concerning compliance with a settlement agreement. The court may do so because "federal district courts possess the inherent power to stay pending litigation when the efficacious management of court dockets reasonably requires such intervention." *Marquis v. FDIC,* 965 F.2d 1148, 1154 (1st Cir.1992). This "power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North America Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). The First Circuit has endorsed the "familiar" use of administrative closings in order to remove litigation from a court's active files "in circumstances in which a case, though not dead, is likely to remain moribund for an appreciable period of time." *Lehman v. Revolution Portfolio L.L.C.,* 166 F.3d 389, 392 & n. 3 (1st Cir.1999).

In the circumstances of this matter, the court finds that it is permissible and appropriate to stay further proceedings and retain jurisdiction as requested by the parties if the Agreement is fair. Permitting the parties to perform under their Agreement and return to this court as a last resort will conserve judicial resources, particularly where, as here, the cooperation that led to the Agreement

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1237760 (D.Mass.)
**(Cite as: 2012 WL 1237760 (D.Mass.))**

provides the realistic hope that no future involve-
ment of the court will be necessary.

B. *The Court has the Discretion, if not the Duty, to
Evaluate the Settlement*

As explained previously, the Agreement
provides that it becomes effective only if the court
approves it. This requirement has prompted the
court to consider whether it has the authority to ap-
prove the settlement and, if so, whether it should
exercise it. This inquiry is necessary because feder-
al courts generally "have neither the authority nor
the resources to review and approve the settlement
of every case brought in the federal court system."
*Caplan v. Fellheimer Eichen Braverman & Kaskey,*
68 F.3d 828, 835 (3d Cir.1995). Settlement "is
solely in the hands of the parties" in the case of
"ordinary litigation, that is, lawsuits brought by one
private party against another private party that will
not affect the rights of any other persons." *Ibarra v.
Texas Employment Comm'n,* 823 F.2d 873, 878 (5th
Cir.1987) (internal quotations omitted); *see also
Gardiner v. A.H. Robins Co.,* 747 F.2d 1180, 1189
(8th Cir.1984).

The instant case, however, is not "ordinary lit-
igation" brought by one private party against anoth-
er. Rather, it is a suit against the state brought on
behalf of mentally ill individuals by an organization
that is designated pursuant to federal law to protect
their rights. The fact that the case was filed on be-
half of people who are not litigating it makes it sim-
ilar to a class action or to an action litigated by a re-
ceiver, neither of which may, under the Federal
Rules of Civil Procedure, be settled and dismissed
without court approval. *See* Fed.R.Civ.P. 23(e), 66.
The relevant Federal Rules of Civil Procedure are
codifications of the common law, which "may call
for review and approval in a variety of contexts
where the settlement requires court action, particu-
larly if it affects the rights of nonparties or nonset-
tling parties, or where the settlement is executed by
a party acting in a representative capacity." *Manual
for Complex Litigation* (Fourth) § 13.14 (2004) at
172 (footnotes omitted). As the individuals whose

interests are at stake in this case are alleged to be
mentally ill, it is particularly important that the
court determine whether the settlement was reached
without collusion and is fair to them. In essence,
the nature of this case provides the court the discre-
tion, if not the duty, to exercise its previously dis-
cussed inherent authority to grant the requested stay
of the claims DLC has made on behalf of mentally
ill inmates only if the Agreement is found to be fair
to them. *See Bragg v. Robertson,* 54 F.Supp.2d 653,
662–63 (S.D.W.Va.1999) (court had authority to re-
view settlement agreement before dismissing
claims, where litigation was "citizen suit" brought
by plaintiffs acting as surrogate attorneys general
rather than typical private litigant, and parties had
emphasized that the litigation affected rights of
people who were not parties to the suit and in-
volved matters of public interest); *Gaxiola v.
Schmidt,* 508 F.Supp. 401, 402–03 (E.D.Tenn.1980)
(approving settlement involving minor plaintiffs
after holding evidentiary hearing to determine
whether the settlement was in their best interest).

**\*8** The conclusion that the court may, and in
this case should, condition the requested stay on a
finding that the Agreement is fair is reinforced by
the fact that the parties have made approval a pre-
requisite to the Agreement taking effect. In the ab-
sence of an independent duty to approve a settle-
ment, the parties do not have the power to compel
the court to do so. However, the Agreement in-
volves matters that may affect whether mentally ill
inmates will live or die. Therefore, regardless of
whether the court has a duty to decide whether to
approve the Agreement or only the discretion to do
so, it is important that the court not unnecessarily
frustrate the implementation of the Agreement by
declining to evaluate its merits.

C. *The Settlement is Fair, Reasonable, and Ad-
equate*

Therefore, the court has examined the Agree-
ment to determine whether it is fair, reasonable, and
adequate. This limited inquiry is comparable to that
which is made in analogous contexts. *See Voss v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1237760 (D.Mass.)
**(Cite as: 2012 WL 1237760 (D.Mass.))**

*Rolland,* 592 F.3d 242, 251 (1st Cir.2010) (district court approving class action settlement must decide whether it is "fair, reasonable, and adequate"); *City Of Bangor v. Citizens Communications Co.,* 532 F.3d 70, 93 n. 10 (1st Cir.2008) (private settlements in cases involving Comprehensive Environmental Response Compensation and Liability Act evaluated to ensure fairness, adequacy, and reasonableness); *see also Robidoux v. Rosengren,* 638 F.3d 1177, 1179 (9th Cir.2011) (district court considering settlement agreement involving federal claims of minors must consider whether settlement's provisions as to each minor plaintiff are fair and reasonable); *Bragg,* 54 F.Supp.2d at 670 (approving and retaining jurisdiction to enforce private settlement after finding settlement to be "fair, adequate, reasonable, and faithful to the environmental statutes under which the litigation was brought").

Generally, "[i]f the parties negotiated at arm's length and conducted sufficient discovery, the district court must presume the settlement is reasonable." *In re Pharm. Indus. Average Wholesale Price Litig.,* 588 F.3d 24, 32–33 (1st Cir.2009) (class action settlement). This presumption applies here. The Agreement was reached after the plaintiff received substantial formal and informal discovery, and was the result of years of arduous, arm's length negotiations by energetic and experienced counsel. The plaintiff also had the benefit of the informed advice of a prison psychiatrist, Dr. Kathryn Burns, who has significant experience as an expert witness and as a monitor in prison mental health litigation. In addition, the Agreement follows a previous, unsuccessful attempt between 2007 and 2009 to reach a settlement, during which the court observed the integrity of the negotiations, including the absence of collusion. In these circumstances, the proposed settlement is presumed to be reasonable.

This presumption is confirmed by the terms of the settlement. In Dr. Burns' opinion, the Agreement "reflects best correctional practices in working with seriously mentally ill [ ] prisoners." Jan. 25, 2012 Aff. of Kathryn Burns, Exh. O to Joint

Supplemental Submission in Support of Motion to Approve Settlement Agreement, at ¶ 14. The Agreement, among other things, provides a reasonable process for minimizing the confinement of inmates with serious mental illness in segregation and for reviewing the mental health of inmates in segregation. It also provides Secure Treatment Units as a reasonable therapeutic alternative to segregation. The Department has already begun to implement the provisions of the Agreement, and the evidence indicates its efficacy in improving the mental health of inmates and enhancing the safety of prison personnel.

**\*9** In addition, the Agreement involves an approach to protecting mentally ill prisoners that is similar to that employed in recent settlements and court orders in other jurisdictions. *See Mast v. Donahue,* No. 2:05–cv–00037 LJM/WGH, at ¶¶ 11–16 (S.D.Ind. Jan. 23, 2007) (settlement agreement excluding seriously mentally ill prisoners from Secured Housing Unit); *Austin v. Wilkinson,* Civ. No. 4:01–CV–071, at ¶ 17 (N.D.Ohio. Jan. 8, 2002) (stipulation for injunctive relief excluding inmates with serious mental illness from particular facility); *Jones'el v. Berge,* No. 00–C–421–C, at § 4.6 (W. D. Wis. June 24, 2002) (settlement specifying that no seriously mentally ill prisoners will be sent to, or remain in, supermax prison); *Disability Advocates, Inc. v. New York State Office of Mental Health,* 02–Civ–4002 (GEL), at §§ 1–5 (S.D.N.Y. Apr. 27, 2007) (settlement increasing therapeutic programming for inmates with serious mental illness who are subject to confinement sanction, and establishing new housing units with increased mental health services); *Office of Prot. and Advocacy for Persons with Disability v. Choinsky,* Civ. No. 3:03–1352(RNC), at §§ B.3–.4 (D.Conn. Mar. 8, 2004) (settlement removing seriously mentally ill inmates from Connecticut's Northern Correctional Institution and excluding them from segregation, with limited exceptions); *see also* Erica Goode, *Prisons Rethink Isolation, Saving Money, Lives and Sanity,* N.Y. Times, March 10, 2012 (reporting many states taking steps to reduce number of in-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1237760 (D.Mass.)
**(Cite as: 2012 WL 1237760 (D.Mass.))**

mates in long-term isolation). The fact that the Agreement provides a manner of dealing with mentally ill inmates that is comparable to recent initiatives to address similar issues in other jurisdictions is added evidence that the Agreement is reasonable.

The Agreement provides for the payment to DLC of attorney's fees and costs of $1,250,000, although the Department does not agree, and the court does not now find, that DLC is a "prevailing party" with a statutory right to fees pursuant to 42 U.S.C. § 1988 or any other federal fee shifting law. This payment does not cause the Agreement to be unfair. Rather, it is itself reasonable.

The amount of the payment is not the result of collusion between the Department and DLC, or its outside counsel from other nonprofit entities and private law firms. Rather, the payment was negotiated separately from the other terms of the Agreement. *See* Jan. 26, 2012 Aff. of Alison Silveira, Exh. P to Joint Supplemental Submission, at ¶ 12. The amount to be paid is less than a conservative calculation of the lodestar and costs counsel incurred before the other terms of the settlement were agreed upon. *See* 42 U.S.C. § 1988; *Hutchinson ex rel. Julien v. Patrick,* 636 F.3d 1, 13 (1st Cir.2011). In addition, the amount to be paid does not include compensation for the substantial work performed by plaintiff's counsel to conclude the settlement negotiations and seek judicial approval of the Agreement, and the Agreement precludes the plaintiff from seeking an award of additional fees and costs for work performed prior to the approval of the Agreement. The plaintiff does not waive its statutory right to seek reasonable attorney's fees and costs if it prevails in any future litigation to enforce its terms. However, the Agreement makes no provision for such fees.

**\*10** Moreover, the Agreement obligates the plaintiff to pay the expense of the monitoring required by the Agreement. In addition, three of the entities that will be receiving counsel fees-DLC, Prisoners' Legal Services, and the Center for Public Representation—are public interest organizations

that will use the payments that they receive in service of their missions. Therefore, the attorney's fees and costs now being approved as part of the settlement will be substantially used to serve public purposes. In view of the foregoing, the provision for costs and fees is reasonable.

Finally, in assessing the reasonableness of the Agreement, the court has considered the role the Agreement provides for it. As described earlier, in agreeing to attempt to mediate a settlement in 2008, this court told the parties that it believed that judges should become involved in prison administration only as a last resort and then only to the most limited extent necessary. This view is consistent with the manifest purpose of the PLRA, particularly 18 U.S.C. § 3626(a)(1)(A). The parties have agreed to a settlement that is compatible with these principles. As explained below, the Agreement does not require the issuance of a consent decree, or any order that provides prospective relief or is enforceable by contempt. The Agreement merely provides for a stay of this litigation while the parties work cooperatively to address the needs of inmates with serious mental illness. It also provides a process for only bringing truly intractable disputes on serious issues to the court for future litigation. The court is retaining jurisdiction over the case for only a limited time. As indicated earlier, in view of the parties' successful efforts to settle this case, the court hopes and trusts that its approval of the Agreement will be the end of its involvement in this matter. In any event, the limited role provided for the court contributes to the conclusion that the Agreement is reasonable, as well as fair and adequate.

D. *The Implications of the PLRA*

As this case involves prison conditions, the court must assure that its approval of the Agreement comports with the PLRA. In particular, it is necessary to determine whether the requirement of 18 U.S.C. § 3626(a)(1)(A) that any prospective relief not extend further than necessary to remedy the violation of a federal right is implicated by the re-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1237760 (D.Mass.)
**(Cite as: 2012 WL 1237760 (D.Mass.))**

quest for approval of the Agreement and, if so, whether that requirement has been satisfied. As indicated earlier and explained below, § 3626(a)(1)(A) does not apply and prohibit the judicial action now being taken—approving the Agreement and staying the case—because the court is not now ordering any "prospective relief" or any "relief" at all. Indeed, the court is not now ordering any party to do anything.

The PLRA was enacted in 1996 "partially in an effort to curb the involvement of the federal judiciary in day-to-day prison management ." *Morales Feliciano v. Rullan,* 378 F.3d 42, 50 (1st Cir.2004). It prohibits a court from granting or approving "prospective relief" unless such relief meets the requirements of § 3626(a)(1) (A), which states:

*11 Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

In essence, § 3626(a)(1)(A) requires that a court find a violation of a federal right before ordering any prospective relief and then narrowly tailor the remedy ordered to assure that it does no more than correct that violation.

The PLRA defines "prospective relief" as "all relief other than compensatory money damages." § 3626(g)(7). "Relief" is defined circularly as "all relief in any form that may be granted or approved by the court." § 3626(g)(9). As has been correctly observed:

The statutory definition sheds no light on the disputed term's meaning since "relief" is in essence defined as all relief. Thus, while the definition teaches that it encompasses all instances of the

term, it does not tell us what demarks and distinguishes those instances from others.

*Coleman v. Wilson,* 933 F.Supp. 954, 956 (E.D.Cal.1996).

The PLRA generally contemplates that prison litigation may be resolved by agreement in one of two ways: by a "consent decree" or by a "private settlement agreement." *See* § 3626(c). By definition, a consent decree is a form of "relief" subject to the constraints of § 3626(a)(1)(A). *See* §§ 3626(c)(1), (g)(9). The PLRA defines a "consent decree" as "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements ." § 3626(g)(1). A "private settlement agreement" is defined as "an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled." § 3626(g)(6).[FN5] Section § 3626(a)(1)(A) does not have to be satisfied where the litigation is resolved by a "private settlement agreement," because a "private settlement agreement" is not "relief" subject to the requirements of that provision. *See* §§ 3626(c)(2), (g) (9); *see also Austin v. Hopper,* 15 F.Supp.2d 1210, 1218 (M.D.Ala.1998).

FN5. However, "[n]othing in this section shall preclude any party claiming that a private settlement agreement has been breached from seeking in State court any remedy available under State law." 18 U .S.C. § 3626(c)(2)(B).

Outside the context of the PLRA, because they are entered as judicial orders, generally consent decrees are evaluated by the court and approved only if they are fair and lawful. *See Aronov v. Napolitano,* 562 F.3d 84, 91 (1st Cir.2009). In addition, "[w]hile a consent decree begins as a settlement, it is one that 'includes an injunction, or some other form of specific relief,' which may ultimately be enforceable by contempt." *Id.* (quoting Charles A. Wright & Mary Kay Kane, *Law of Federal Courts*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1237760 (D.Mass.)
**(Cite as: 2012 WL 1237760 (D.Mass.))**

§ 98, at 702 n. 2 (6th ed.2002)); *see also Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) ("A consent decree ... is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees."); *Local No. 93, Int'l Ass'n of Firefighters, AFL–CIO C.L.C. v. City of Cleveland,* 478 U.S. 501, 518–19, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). Therefore, an order enforceable by contempt is a fundamental feature of a consent decree. *See Local No. 93,* 478 U.S. at 518; *Aronov,* 562 F.3d at 91–92. Consistent with this, consent decrees in PLRA cases are commonly defined as orders enforceable by contempt. *See, e.g., Rowe v. Jones,* 483 F.3d 791, 796–97 (11th Cir.2007) (per curiam); *Hazen ex rel. LeGear v. Reagen,* 208 F.3d 697, 699 (8th Cir.2000); *Benjamin v. Jacobson,* 172 F.3d 144, 157 (2d Cir.1999) .

**\*12** "By contrast, a private settlement does not, *ordinarily,* receive court approval." *Aronov,* 562 F.3d at 91 (emphasis added). In addition, a private settlement agreement is generally not subject to judicial enforcement except in an action for breach of contract. *See Kokkonen,* 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391; *see also United States v. City of Miami,* 664 F.2d 435, 439 (former 5th Cir.1981) (opinion of Rubin, J.) ("If the parties agree to compose their differences by a settlement agreement, however, the only penalty for failure to abide by the agreement is another suit."). This understanding is reflected in the PLRA's provision for the enforcement of private settlement agreements through "reinstatement of the civil proceeding that the agreement settled" or through an action in state court by a party claiming that the agreement has been breached. *See* 18 U.S.C. §§ 3626(c)(2), (g)(6); *see also Hazen,* 208 F.3d at 699 (distinguishing consent decrees from private settlement agreements, which are "enforceable only through a new action for breach of contract").

In the instant case, the fact that the court is re-

quired to approve the Agreement before it becomes effective and to retain jurisdiction to enforce the Agreement may suggest that it constitutes a consent decree which is subject to § 3626(a)(1)(A). *See Ingles v. Toro,* 438 F.Supp.2d 203, 214–15 (S.D.N.Y.2006); *Gaddis v. Campbell,* 301 F.Supp.2d 1310, 1313–14 (M.D.Ala.2004). However, the fact that "a private settlement does not, ordinarily, receive court approval," *Aronov,* 562 F.3d at 91, does not mean that a private settlement agreement may never involve approval by the court. As explained earlier, in this case the court is not evaluating and approving the settlement to determine whether any agreed-upon relief should be ordered. Rather, the court is approving the settlement as an exercise of its inherent authority to decide how to manage its docket, and to condition the requested stay—and, therefore, the retention of jurisdiction—on a finding that a settlement which affects the rights of individuals not before the court is fair.

In these circumstances, the court is not now ordering any "relief" or "prospective relief." In cases involving the court appointment of monitors or special masters, courts have relied on the common legal usage of the term "relief" and found that no "relief" or "prospective relief" is issued by an order that pertains to the "means of obtaining the relief" rather than to the " 'ultimate form of the remedy.' " *Carruthers v. Jenne,* 209 F.Supp.2d 1294, 1300–01 (S.D.Fla.2002) (quoting *Benjamin v. Fraser,* 156 F.Supp.2d 333, 342–43 & n. 11 (S.D.N.Y.2001)); *Madrid v. Gomez,* 940 F.Supp. 247, 250 (N.D.Cal.1996); *Coleman,* 933 F.Supp. at 957. Similarly, in the instant case, the court is only approving an Agreement that provides a means of obtaining relief for any future violation of federal law and not now ordering any form of remedy.

**\*13** The court recognizes that in *Benjamin* the Second Circuit noted in dicta that because of the monitoring body's "substantial responsibilities," the distinction between "relief itself and the monitoring of relief" might be difficult to make. *Benjamin v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Add. 75

Slip Copy, 2012 WL 1237760 (D.Mass.)
**(Cite as: 2012 WL 1237760 (D.Mass.))**

*Fraser,* 343 F.3d 35, 49 (2d Cir.2003). However, in contrast to *Benjamin* and the other foregoing cases in which the court ordered monitoring or the use of special masters, this court is not now ordering the parties to comply with the Agreement, including its monitoring provision, or to do anything else. It is only deciding to stay the case because the Agreement is fair and reasonable. If in the next three years DLC perceives a material breach of the Agreement and the parties are unable to resolve any dispute themselves, either party may request a lifting of the stay. Removing the stay would be comparable to the reinstatement of the case, which is a feature of a "private settlement agreement" as defined in the PLRA. *See* § 3626(g)(6). As explained earlier, any proven violation of the Agreement will not be a basis for finding that the Department is in civil or criminal contempt. This too is generally a characteristic of a private settlement agreement, rather than a consent decree. *See Aronov,* 562 F.3d at 91. Once again, under the Agreement, to obtain a future order that is enforceable by contempt, the plaintiff would have to prove both a breach of the Agreement and a violation of federal law. Any such order, whether entered by consent or as a result of a decision on a disputed issue, would be an order subject to the narrow tailoring requirements of § 3626(a)(1)(A). This approach is consistent with the purposes of the PLRA because the court is not now, in the absence of a demonstrated violation of a federal right, becoming involved in prison administration, *see Morales Feliciano,* 378 F.3d at 50, and may do so in the future only as a last resort, if the plaintiff demonstrates both a violation of the Agreement and a violation of a federal right.

In view of the foregoing, the Agreement is substantially similar to a private settlement agreement and materially different than a consent decree, both generally and as defined in the PLRA.[FN6] The findings required by § 3626(a)(1)(A) could not now be made because a violation of a federal right by the Department has not been admitted or proven. However, such findings are not required because

the court is not now ordering any "relief" or "prospective relief" and, therefore, § 3626(a)(1)(A) is not implicated.

> FN6. The court recognizes that the distinction between consent decrees and private settlement agreements has been addressed somewhat differently in cases involving the question whether a plaintiff is a "prevailing party" entitled to a statutory award of attorney's fees pursuant to 42 U.S.C. § 1988 and other federal fee shifting statutes. *See, e.g., Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health & Human Res.,* 532 U.S. 598, 604 & n. 7, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); *Hutchinson,* 636 F.3d at 9–11. Generally, these cases have recognized a distinction, similar to that made in the PLRA and the cases implementing it, between consent decrees enforceable by contempt and private settlements enforceable through new litigation. *See, e.g., Aronov,* 562 F.3d at 91; *Smyth,* 282 F.3d at 281; *Christina A. ex rel. Jennifer A. v. Bloomberg,* 315 F.3d 990, 993 (8th Cir.2003). Courts in these cases, however, have analyzed this distinction in a different context, in order to determine whether there is a sufficient "judicial imprimatur" to qualify the plaintiff as a "prevailing party" in the litigation. *See Buckhannon,* 532 U.S. at 604; *Hutchinson,* 636 F.3d at 11; *Roberson v. Giuliani,* 346 F.3d 75, 81–83 (2d Cir.2003). In so doing, several courts, including the First Circuit, have concluded that retaining jurisdiction to enforce a settlement agreement is not materially different from entering a consent decree, and found that the plaintiffs in such cases are "prevailing parties" entitled to attorney's fees. *See Hutchinson,* 636 F.3d at 10–11; *see also Roberson,* 346 F.3d at 82–83 (finding district court's inability to use contempt power without the "extra

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Slip Copy, 2012 WL 1237760 (D.Mass.)
**(Cite as: 2012 WL 1237760 (D.Mass.))**

step" of first ordering specific performance is not "significant enough to deprive plaintiffs of prevailing party status," where retention of jurisdiction did not "simply preserve a federal forum" but, rather, *"effectuated* the obligations of the parties under the Agreement"); *but see Christina A.,* 315 F.3d at 993–94 (holding that settlement agreement does not make a plaintiff a "prevailing party" because violation of court order dismissing the case would not be punishable by contempt).

The foregoing cases, including the First Circuit's decision in *Hutchinson,* do not qualify this court's conclusion that § 3626(a)(1)(A) is not implicated in this case. None of these decisions, except *Christina A.,* involve the PLRA generally. *Christina A.* only addressed the fee shifting provisions of the PLRA, 42 U.S.C. § 1997e(d). *See* 315 F.3d at 994–95. Therefore, the foregoing decisions only construe the term "prevailing party" for the purpose of 42 U.S.C. § 1988 and comparable fee shifting statutes. They do not address the meaning of the terms "relief" and "prospective relief," which is the issue involved in determining whether § 3626(a)(1)(A) is implicated in the instant case.

## IV. ORDER

In view of the foregoing, the court finds that: it has the inherent authority to stay this case, and to condition the requested stay of this case upon a finding that the Agreement is fair, reasonable, and adequate; that such a finding is justified; and that because the court is not now ordering any prospective relief, the requirements of § 3626(a)(1)(A) are not now implicated. Accordingly, it is hereby ORDERED that:

**\*14** 1. The Joint Motion to Approve the Settlement Agreement (Docket No. 248) is ALLOWED.

2. This case is STAYED and the court, therefore, retains jurisdiction.

3. Unless otherwise ordered, this case will be dismissed three years after the date of this Order.

4. The Settlement Agreement (Docket No. 252) is UNSEALED.

D.Mass.,2012.
Disability Law Center v. Massachusetts Dept. of Correction
Slip Copy, 2012 WL 1237760 (D.Mass.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
(Cite as: 2012 WL 6681773 (M.D.Ala.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
M.D. Alabama,
Northern Division.
Louis HENDERSON, Dana Harley, Dwight Smith,
Albert Knox, James Douglas, Alqadeer Hamlet, and
Jeffrey Beyer, on behalf of themselves and of those
similarly situated, Plaintiffs,
v.
Kim THOMAS, Commissioner, Alabama Depart-
ment of Corrections; Billy Mitchem, Warden,
Limestone Correctional Facility; Frank Albright,
Warden, Julia Tutwiler Prison for Women; Bettina
Carter, Warden, Decatur Work Release/Community
Work Center; Edward Ellington, Warden, Mont-
gomery Women's Facility, in their official capacit-
ies, Defendants.

Civil Action No. 2:11cv224–MHT.
Dec. 21, 2012.

Amanda C. Goad, Rose Saxe, American Civil
Liberties Union Foundation Aids Project, New
York, NY, Carl Takei, Gabriel B. Eber, Margaret
Winter, Jennifer A. Wedekind, Washington, DC,
Robert David Segall, Copeland, Franco, Screws &
Gill, Montgomery, AL, for Plaintiffs.

Elizabeth Anne Sees, Alabama Department of Cor-
rections, Montgomery, AL, Mitchell David Greggs,
Maynard Cooper & Gale, PC, Birmingham, AL, for
Defendants.

*OPINION*
MYRON H. THOMPSON, District Judge.
**\*1** The seven plaintiffs (Louis Henderson,
Dana Harley, Dwight Smith, Albert Knox, James
Douglas, Alqadeer Hamlet, and Jeffery Beyer)
bring this lawsuit on behalf of themselves and a
class of all current and future HIV-positive prison-
ers incarcerated in Alabama Department of Correc-
tions (ADOC) facilities. They challenge the AD-
OC's policy of categorically segregating HIV-
positive prisoners from the general prison popula-
tion, arguing, among other things, that, despite the
dramatic advances in the treatment of HIV and des-
pite the plaintiffs' differing individual circum-
stances, the plaintiffs are being denied the oppor-
tunity to be even considered for various rehabilitat-
ive services and programs offered to other prison-
ers. They have named as defendants ADOC Com-
missioner Kim Thomas and the wardens of the four
ADOC facilities that house HIV-positive prisoners.

The plaintiffs claim that the HIV-segregation
policy discriminates against them on the basis of a
disability (HIV status) in violation of Title II of the
Americans with Disabilities Act (ADA), 42 U.S.C.
§ 12101 et seq., and § 504 of the Rehabilitation
Act, 29 U.S.C. § 794. Jurisdiction is proper under
28 U.S.C. § 1331 (federal question).

Based on the evidence presented during a
month-long non-jury trial and for the reasons that
follow, this court holds that the ADOC has violated
the ADA's Title II and the Rehabilitation Act's § 504.

I. BACKGROUND
A. HIV/AIDS
The human immunodeficiency virus, or HIV, is
a chronic disease. If left untreated, it weakens the
immune system and eventually leads to death. The
disease unfolds in several stages. Soon after con-
tracting the virus, an infected person enters acute
infection. During this time, the person's viral load
(the extent to which the virus is present in the
blood) rockets upward. People in this stage of the
disease can have hundreds of thousands of copies
of the virus. Despite that, people in this stage test
negative for HIV. This phase, known as the
"window period," generally lasts for a few weeks,
but can extend as long as three months, and the
people experiencing it represent the most infectious
group of individuals with HIV.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

Acute HIV gives way to chronic-HIV infection. During this stage, the viral load lowers. The final stage, advanced-HIV infection, occurs when the body's CD4 T-cells, which play a critical role in the immune system, drop to low levels and the viral load rises.[FN1] More commonly, this final stage is known as acquired immunodeficiency virus, or AIDS.

> FN1. As the facts will show, not everyone with HIV will enter this final stage.

HIV emerged in the United States in the early 1980s and soon grew into an epidemic. HIV inevitably progressed to AIDS. Virtually everyone infected died. Meanwhile, no one, including the medical community, understood how HIV was transmitted. Fearing that even casual contact could spread it, doctors treating patients with HIV wore protective gear so extensive it was nicknamed a "space suit." The profound consequences of the disease, combined with lack of knowledge about how it could spread, created an era of hysteria in the epidemic's early days.

**\*2** The tide began to turn in the decade that followed. In 1996, the first protease inhibitors were approved to treat HIV. Highly active antiretroviral therapy (HAART), emerged as an effective weapon against the disease. These treatments did not eliminate the virus, but they did restrict its ability to progress and could stave off AIDS. However, while important developments, early treatment combinations had many deficiencies. The medications had to be administered multiple times each day; they had severe side effects, including diarrhea and peripheral neuropathy; and because the regimes were so complicated and so punished patients with side effects, many HIV patients failed to take their medication.

Today, advances in HIV treatment have profoundly changed the disease. There is still no cure for HIV: indeed, there is only one known case in which a person was completely cured of it. However, modern treatment regimes have rendered

it manageable. The vast majority of HIV patients can be treated by one pill once a day; side effects are less severe, and, where they do occur, multiple treatment options allow patients to try different medications until they find one that works; and, most importantly, although people with HIV will require treatment for their entire lives, HIV is no longer invariably fatal. People who receive treatment for HIV can expect to enjoy near-normal lifespans.

HIV can be transmitted through contaminated blood and bodily secretions, commonly during unprotected sex (between a man and a woman or between men) and needle sharing (for drug use or tattooing, for example). It is not transmitted through casual contact or through the food supply.[FN2] A person would have to drink a 55-gallon drum of saliva in order for it to potentially result in a transmission. There is no documented case of HIV being sexually transmitted between women.

> FN2. The U.S. Centers for Disease Control and Prevention excludes HIV from its list of diseases that can be transmitted through the food supply.

Moreover, simply because HIV can be transmitted in certain contexts does not mean that it will be, or even that it is likely to be, transmitted by that means. Advances in antiretroviral treatment have not only ameliorated the effects of HIV, but have also powerfully reduced (and in some contexts, even vitiated) the possibility of transmission, even when individuals engage in high-risk behavior. This is true because transmission typically occurs only when a person's viral load is at a certain minimum threshold. Modern treatments, however, if successful (which they generally are), result in "viral suppression," a state in which the person's viral load is so low that the likelihood of HIV transmission is, generally speaking, virtually non-existent.

Because modern treatment is effective as prevention, the medical community now recommends that antiretroviral treatment be offered to everyone

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
(Cite as: 2012 WL 6681773 (M.D.Ala.))

living with HIV who is ready and willing to take it. This approach represents a sea change that has revolutionized the public-health strategy for preventing transmissions.

While in 2012, outcomes are better, treatment simpler, and prevention possible, social perceptions of HIV have yet to catch up with the modern realities of the illness. Undoubtedly exacerbated by the terror that accompanied the disease in its early history, a relentless stigma adheres to HIV. This stigma has at least two plausible sources. First, HIV is most frequently found among historically marginalized populations: particularly, gay men. Prejudice against homosexuals intensifies prejudice against HIV, and prejudice against HIV becomes a proxy for prejudice against members of the gay community. Because HIV is also more common among minorities and the poor, the stigma attached to HIV deeply implicates race and class prejudice, as well as homophobia.

*3 A second source of stigma stems from the means of HIV transmission. The plaintiffs' expert, Dr. Frederick Altice, an international authority on HIV and the Director of the HIV in Prisons Program at Yale University School of Medicine, explained: "People make judgments just by the virtue of HIV that you must have done ... something dirty or something awful to have acquired HIV. Being gay. Being a prostitute. Being sexually promiscuous." [FN3] These impressions build upon negative stereotypes about the groups most commonly affected by HIV.

> FN3. Unfortunately, the transcript from the trial is not yet available, and the court is therefore unable to cite to it.

The progression of how HIV has been handled in American prisons somewhat mirrors its progression in the free world: initial (and understandable) terror about its spread gave rise to drastic prevention measures, which subsided as both treatment and understanding of HIV improved.

The first report of HIV in prisons was made in 1983. Soon after, a critical minority (but never a majority) of state-correctional systems began segregating HIV-positive prisoners from the general prison population. In the mid-1990s, as the fear surrounding HIV began to subside, most States that had enacted such policies reversed them. By 2006, only three States still segregated HIV-positive prisoners: South Carolina, Mississippi, and Alabama. In 2010, Mississippi ended its segregation policy as well. Today, preeminent public-health organizations, including the U.S. Centers for Disease Control and the National Commission on Correctional Healthcare, uniformly recommend against segregating prisoners with HIV.

B. The ADOC's HIV–Segregation Policy
As in the rest of the nation, the advent of the AIDS epidemic generated panic within the ADOC. Billy Mitchem, the former warden of Limestone Correctional Facility, explained: "[E]verybody was ... afraid. The inmates were afraid. The staff was afraid. We didn't understand, really, how you could get AIDS. I mean, you used your imagination, and most of that was wrong.... And people were dying."

It was in this atmosphere that the ADOC established its original HIV-segregation policy. The initial policy was austere. HIV-positive prisoners were segregated in every aspect of their daily lives, from the dorms in which they were housed to the chapels in which they worshiped. They had no access to the myriad programs available to the general-population prisoners. At Limestone, the dorms where HIV-positive prisoners were housed were cordoned off from the rest of the prison by a fence with a locked-metal gate. Plaintiff Dana Harley described the circumstances of HIV-positive women in a letter to the warden of Tutwiler:

"We are in isolation from general population like we are contagious animals. Officers only come and see about us when they see fit.... Basketballs are flat and playing cards are beyond recognition. It's enough to be living every day with our virus and trying to cope. We are confined and can't

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

even participate in everyday activities such as
trade schools or state jobs to stay occupied.... It's
like punishment three times over: Prison, the vir-
us, then the denial of an education or trade. We
are secluded from everyday life."

*4 Pls.' Ex. 82.

During this time, a class of HIV-positive pris-
oners twice challenged the ADOC's segregation
policy. In the first challenge, the plaintiffs alleged
that the segregation of recreational, religious, and
educational programs violated the Rehabilitation
Act. The district court denied their claims, and,
after a decade of litigation, the Eleventh Circuit
Court of Appeals upheld that decision. *See Onishea
v. Hopper,* 171 F.3d 1289 (11th Cir.1999) (*en banc*
). Before the *Onishea* litigation had concluded on
appeal, the same class of HIV-positive prisoners
challenged the same policies, this time under the
ADA and the Eighth Amendment. *See Edwards v.
Ala. Dep't of Corr.,* 81 F.Supp.2d 1242
(M.D.Ala.2000) (Thompson, J.). This court found
that the plaintiffs' claims in *Edwards* were identical
to those denied in *Onishea* and therefore barred un-
der the doctrine of *res judicata.*

In 2007 and 2008, the ADOC relaxed its se-
gregation policy. HIV-positive prisoners were in-
tegrated into trade schools, substance-abuse pro-
grams, and other activities, and, for the first time,
they were permitted to participate in the work-re-
lease program.

At trial, the parties offered competing charac-
terizations of the department's policy as it operates
today. The court finds that the policy itself is best
described as, in general, a series of categorical,
non-individualized determinations that the depart-
ment makes with regard to HIV-positive prisoners.
Simply put, in a number of aspects of institutional
life, HIV results in automatic placement and auto-
matic exclusion. Outcomes that depend on a com-
plex web of factors for HIV-negative prisoners are
determined based on a prisoner's HIV-positive dia-
gnosis alone. Because the policy differs with re-

spect to male and female prisoners, the respective
practices are discussed separately below.

**1. Men**

Every male prisoner entering the ADOC first
reports to Kilby Correctional Facility to undergo
classification. There, each prisoner is given a phys-
ical and mental-health evaluation, is interviewed by
a classification specialist, and his behavioral history
(particularly his criminal history) is reviewed. As a
result of this process, the prisoner is assigned a cus-
tody level. Custody levels for men include "close,"
"medium," "minimum-in," and "minimum-out,"
and this designation determines the ADOC facilit-
ies to which the prisoner may be sent.[FN4] Different
facilities provide varying levels of freedoms and re-
strictions. For instance, if a prisoner's classification
number signifies that he is medium security, he
may be placed at only a major facility that has
armed guards. On the other hand, a prisoner who is
designated as minimum-out can be placed at a com-
munity-work center.

> FN4. Close custody is the most restrictive
> custody level. Prisoners who are classified
> at this level must be housed in a single
> cell, with movement outside of the housing
> area restrained, and the prisoner must be
> accompanied by armed correctional per-
> sonnel. Medium custody prisoners may
> live in dormitories or double cells, must be
> assigned to a medium- or close-security in-
> stitution, and must be supervised by armed
> correctional personnel when outside of the
> institution. Prisoners classified as minim-
> um-in can participate in work assignments
> at ADOC facilities or off ADOC property
> with the supervision of correctional offi-
> cers. Minimum-out prisoners can be as-
> signed to off-property work details without
> the direct supervision of correctional staff.

The classification team also evaluates the pris-
oner's need for educational programs, trade school,
substance-abuse treatment, and certain mental-
health programs. As Stephanie Atchison, Classific-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

ation Assistant Director for the ADOC, explained, this impacts the department's placement decisions. If, for example, a prisoner "needed to participate in a substance abuse program," the classification team would "approve a group of institutions that offered substance abuse treatment, and whichever one had the space available, that's the one he would go to." Finally, each prisoner is subject to a medical and mental assessment, which can further limit the number of facilities for which he is eligible.

**\*5** For the approximately 250 men within the ADOC who are HIV-positive, however, all of the factors normally considered in the classification process are overridden by an HIV-positive diagnosis.[FN5] Upon entering the system, every prisoner is given an enzyme-linked immunosorbent assay (ELISA) test, which measures an antibody to HIV. [FN6] If the test is preliminarily positive, the prisoner is placed in an isolation cell to await confirmatory testing with a Western blot test.[FN7] If the Western blot test confirms the diagnosis, the prisoner is transferred to Limestone Correctional Facility.[FN8] This occurs regardless of whether the prisoner has complex medical needs or very simple ones. HIV is the only disease or medical condition listed on the ADOC's medical-classification chart for which diagnosis alone, without any consideration of actual treatment needs, limits the prisoner's placement possibilities to a single facility. This placement is also made without regard to security-classification procedures. Limestone is equipped to house only general-population prisoners who are medium and minimum custody; the only close-custody prisoners there are those who have HIV.

> FN5. Atchison explained that the automatic decision with regard to HIV is a "placement directive." Placement directives come from the commissioner rather than from the classification specialists and override normal classification considerations.

> FN6. The diagnostic test upon entry is required by state law. *See* 1975 Ala.Code §

22–11A–17(a).

> FN7. Testimony at trial demonstrated that, in addition to the stress of being confined in an isolation cell, this practice is harmful because it comes across as a punishment for being diagnosed with HIV. Plaintiff Albert Knox explained: "I didn't feel like I deserved to be locked up in [a segregation cell].... I always considered seg to be a place where you [go when you] screw up in prison or whatever ... that's a disciplinary that you get.... [F]or me to be locked up in there, and I didn't do anything wrong, I didn't think it was right. It was punishment."

> FN8. The testing process cannot reliably diagnose all HIV-positive prisoners, however, because, as discussed above, individuals who have recently been infected and fall in the "window" period will not test positive for HIV, despite being very contagious.

The decision to house men exclusively in Limestone results in a number of inevitable consequences. For instance, prisoners who are not HIV-positive are assigned a mental-health code of zero through six; any prisoner with a mental-health code that requires special housing is sent to Bullock Correctional Facility (which can house codes three though six) or Donaldson Correctional Facility (which can house codes three and four). However, regardless of their mental-health needs, HIV-positive prisoners are precluded from Bullock and Donaldson and instead placed at Limestone, which is only designed to house codes zero through two.

Program opportunities are also necessarily limited. For instance, the ADOC's sole 12–15 month therapeutic-community program for substance-abuse treatment is offered at St. Clair Correctional Facility. HIV-positive prisoners are never placed at St. Clair, no matter how dire their addictions. Further, while approximately 85% of HIV infections in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

Alabama come from Mobile, Montgomery, and Birmingham, all of which are in central or southern Alabama, Limestone is located on the State's northern border, far from these cities (Mobile is an over five-hour drive from the prison). Therefore, while general-population prisoners are by no means guaranteed a placement near their homes and families, most HIV-positive prisoners are completely barred from this possibility. For many of them, this makes family visits difficult or impossible.

The segregation policy continues within Limestone. There, HIV-positive men are separated into two HIV-only dormitories: Dorms B and C. Together, these dorms are known as the "Special Unit." HIV-positive prisoners who are mentally ill, because they are barred from going to Bullock or another facility equipped to treat serious mental health needs, are housed in the Residential Treatment Unit, a set of nine cells in Dorm C cordoned off by a large metal cage, which juts out into the dorm's common area. If an HIV-positive prisoner is placed in administrative or disciplinary isolation (for example, as punishment for his conduct), he is placed in the same isolation dormitory as the HIV-negative prisoners, Dorm E. Although that dormitory includes only individual isolation cells that are locked closed throughout the day, which completely prevents any physical contact among prisoners, the HIV-positive prisoners are placed together in a row, separated from cells occupied by HIV-negative prisoners by a floating metal gate.

*6 Because HIV-positive men are uniformly housed in Limestone's Special Unit, they are necessarily excluded from any benefits that stem from being housed in other dorms. Limestone has, for instance, a Senior Dorm, which provides a safer and calmer environment. There is also a Faith–Based Honor Dorm, whose prisoners enjoy occasional (though rare) benefits such as a family night, during which family members can visit and bring food. Limestone also offers a Pre–Release Dorm for prisoners who are within 120 days of their end-of-sentence dates. This dorm is designed to provide

a supportive atmosphere for prisoners who will soon transition back into the free world.

HIV-positive prisoners are also barred from certain aspects of the Substance Abuse Program (SAP). In that program, which can last either eight weeks or six months, prisoners live together in a special dorm, take classes together, and eat their meals together. Dr. Altice explained at trial that this "milieu environment" is often "extremely effective" because the "minute-by-minute interaction in the bathroom, in the dorms or in their housing units, [and] at meals" creates an "ongoing dialogue about the sort of issues that are taught" in the program.

HIV and substance abuse are frequently comorbid: currently, around 41 prisoners with HIV are enrolled in some component of SAP. However, while HIV-positive prisoners can participate in SAP classes, they are not permitted to live in the SAP dorm, and must return to the Special Unit for meals and when classes end each day. As a result, they are deprived of one of the fundamental qualities that makes SAP effective.[FN9]

> FN9. At trial, the ADOC downplayed the importance of the residential aspect from which HIV-positive prisoners are excluded. However, this representation is belied by the department's own description of SAP's objectives: "The goals of the program are to: (1) offer a stable, quiet and *residential* environment wherein recovering inmates can *live together as a family,* reinforcing each others['] sobriety." Pls.' Ex. 51, at 15 (emphasis added). The very existence of a SAP dorm could be viewed as communicating the ADOC's belief that substance-abuse programming benefits from a residential component.

In addition to the housing-segregation policy, prisoners with HIV at Limestone are required to wear white armbands. The ADOC attests that all prisoners are required to wear armbands of various colors and that each color simply designates the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

dorm to which each prisoner belongs.[FN10] Commissioner Thomas explained that the armbands "help control the flow of inmates throughout a facility": they prevent violence and unauthorized activity because correctional staff can better monitor whether the prisoners are in their proper dorms. However, while no other two dorms share the same armband color, both of the Special Unit dormitories, Dorm B and Dorm C, are assigned white armbands. A correctional officer stated that this makes it difficult to tell whether the HIV-positive prisoners are in their correct dorms, hollowing out the purported security purpose of the armbands.

> FN10. There was conflicting testimony at trial about when the armbands policy was initiated. Testimony from the plaintiffs' witnesses suggested that, originally, only HIV-positive prisoners had armbands and that other dorms were given armbands only after the onset of this litigation. The ADOC disputes this chronology. Currently, every dorm except for the pre-release dorm uses armbands.

There is one circumstance in which HIV-positive prisoners may be housed outside of Limestone: when they participate in the work-release program. Work-release placement allows selected prisoners to work (for pay) for participating employers in the community during the day, and then return to a work-release facility each night. While the ADOC operates a number of work-release facilities, HIV-positive prisoners are housed exclusively at one: Decatur Work Release. There, unlike at Limestone, HIV-positive prisoners are not required to sleep in a designated dorm, but instead share dormitories and the dining hall with prisoners who do not have HIV.

### 2. Women

*7 Tutwiler is the only prison for women in the ADOC. Upon arrival there, each woman is given an ELISA test to determine whether she has HIV. If a woman's test comes back positive, an officer removes the woman from the receiving area and es-

corts her to an isolation cell. The woman then must wait there for several weeks (at times for up to a month) for the results of the Western blot to confirm the diagnosis.[FN11]

> FN11. This period of isolation, occurring just after the woman enters the prison and is newly diagnosed with HIV, is frequently traumatic. The women are provided with no educational materials or counseling. Plaintiff Dana Harley, an HIV-positive prisoner at Tutwiler, is frequently asked to counsel the women herself. "[U]sually they're going crazy," she explained. "Hysterical, crying ... like they're about to pass out, thinking they're going to die. I mean just going absolutely crazy."

When diagnosis is confirmed, HIV-positive women are assigned to Dorm E, which is segregated from the general population. Like the men at Limestone, they are permitted to participate in the prison's various programs. However, also like the men at Limestone, they cannot reside in any specialized dorms, including Tutwiler's SAP dorm and Honor Dorm. HIV-positive women who are mentally ill, instead of being placed in the open-bay area of the mental-health unit, are automatically sent to the isolation cells reserved for the seriously mentally ill (the Intensive Psychiatric Stabilization Unit), regardless of their actual mental-health needs.

### 3. Food–Service Jobs

Many prisoners at Limestone and Tutwiler have jobs in those prisons' kitchens. In the work-release program, many of the approved employers are restaurants or food processing factories in the community. HIV-positive prisoners, however, are wholly excluded from participation in any job related to food services: they may not hold kitchen jobs at Limestone and Tutwiler, and they may not work for food-service employers in the work-release program.

### 4. Work–Release Eligibility Criteria

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

When HIV-positive prisoners are considered for the work-release program, they must meet a number of criteria that are not imposed on other prisoners. For an HIV-positive prisoner (male or female) who is not taking HIV medication, her viral load must be lower than 1,000 and her CD4 count must be greater than 700 (or her CD4 percentage must be greater than 35). An HIV-positive prisoner who is taking HIV medications must be approved for the keep-on-person program and have adhered to it for six consecutive months or more. Her viral load must have been less than 48 for four consecutive readings, and her CD4 count must be greater than 450 (or her CD4 percentage must be greater than 30). Each HIV-positive prisoner is evaluated according to these criteria by an institution's Site Medical Director or an HIV Specialist, who has the option to waive them at her discretion.

Although the ADOC manages populations with a number of illnesses that are equally as serious and as infectious as HIV, HIV is the only disease with a separate subset of criteria dedicated solely to it. It is also the only disease whose criteria are based on rigid numerical thresholds rather than treatment needs or functional abilities. A prisoner who does not have HIV is instead evaluated based on her medical code and the seriousness of her treatment needs. For instance, prisoners who are receiving dialysis, hepatitis chemotherapy treatments, and cancer treatments are not "clear" for work release (but the criteria do not categorically require people with these illnesses to satisfy any numerical criteria divorced from actual treatment or capabilities). Joint Ex. 35.

## II. DISCUSSION
### A. Justiciability
*8 Before reaching the merits of the plaintiffs' claims, the court must decide whether they have standing under Article III of the Constitution to raise them. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that standing, an "indispensable part of the plaintiff's case, ... must be supported ...

at [each] stage[ ] of the litigation"). To satisfy Article III's standing requirements, a plaintiff must show (1) she has "suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quotation marks and citation omitted).

As this case is a class action, "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff [individually has standing to raise] that claim." *Prado–Steiman ex rel. Prado v. Bush,* 221 F.3d 1266, 1280 (11th Cir.2000). To analyze each claim separately, the court must first decide what claims have been raised. That is, surprisingly, not simple here, because the plaintiffs have not framed the dispute in terms of discrete claims.[FN12] For reasons that will become clear below, the governing law in this case requires the court to decide certain issues separately in a manner that amounts to adjudication of several distinct claims for relief. *See Harris v. Thigpen,* 941 F.2d 1495, 1526 (11th Cir.1991) (requiring the district court to evaluate the risk of HIV transmission occurring "with regard to each program from which [HIV-positive prisoners] have been automatically excluded," rather than with respect to prison in general); *see also Miller v. King,* 449 F.3d 1149, 1150–51 (11th Cir.2006) (stating that "it is important for lower courts to determine on a claim-by-claim basis ... which aspects of the State's alleged conduct violate [s] Title II"). The court understands the plaintiffs' claims against the HIV-segregation policies and practices at ADOC prisons to encompass challenges to the following discrete policies: (1) the policy that HIV-positive men are segregated within Limestone from the general-population prisoners; (2) the policy that HIV-positive men are permitted housing only at Limestone and Decatur Work Release, and ex-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
(Cite as: 2012 WL 6681773 (M.D.Ala.))

cluded from all other ADOC men's facilities; (3) the policy that HIV-positive women are segregated within Tutwiler from the general-population prisoners; (4) the policy that women are allowed work-release housing at Montgomery Women's Facility, but not the ADOC's other work-release facility for women; (5) the exclusion of HIV-positive prisoners, male and female, from food-service jobs within the prison and at work release; (6) the eligibility criteria applied to HIV-positive prisoners, male and female, who apply to participate in the work-release program; and (7) the requirement that male HIV-positive prisoners wear white armbands.

> FN12. The plaintiffs assert a challenge both to the ADOC's HIV-segregation practice as a whole and to various aspects of the policy. They also presented significant evidence about the discriminatory effects of the policy, at times making it difficult for the court to discern what the plaintiffs considered to be true aspects of the policy and what were merely its deleterious effects. As previously explained, the court considers the heart of the challenged policy to be a series of automatic determinations made with regard to HIV-positive prisoners. However, the challenged conduct is the determination itself, and not its many effects.

*9 As for the first two claims (segregation within Limestone and exclusion from other ADOC facilities for men), plaintiffs Louis Henderson, Jeffrey Beyer, and James Douglas have standing to challenge these policies. All three reside in the Special Unit at Limestone and wish to be integrated into the general population at Limestone and to be eligible for housing at other facilities. Plaintiffs Dwight Smith and Alqadeer Hamlet, who are currently placed at Decatur Work Release, would like to be eligible for other work-release facilities; they therefore have standing to challenge the ADOC's policy of housing HIV-positive prisoners exclusively at Decatur.

As for the third and fourth claims (segregation within Tutwiler and eligibility for only one women's work-release facility), plaintiff Dana Harley has standing. At the time this case began, Harley was housed in Tutwiler's segregation dormitory and wished to be integrated. She also wanted to be eligible for all women's work-release facilities (rather than only for Montgomery Women's Facility). All plaintiffs have standing to raise the fifth (exclusion from food-service jobs) and sixth (HIV-related eligibility requirements for work release) claims, as all desire the opportunity to work in food-service jobs and to apply for work release without being subjected to eligibility criteria that they argue are discriminatory and unnecessary. In particular, plaintiff Douglas has been excluded from work release because of the eligibility requirements. Lastly, all male plaintiffs have standing to raise the seventh claim, as they all are required to wear white armbands.

The ADOC devoted ample time at trial to the argument that class representatives who were denied certain benefits because of the policy lack standing because they would not have been guaranteed those benefits even if they were not HIV-positive. For instance, the department argues that the male plaintiffs lack standing to challenge their ineligibility for transferring to facilities other than Limestone because no prisoner has a right to transfer to the facility of his choosing. Therefore, the ADOC argues, even if this court were to order relief, the plaintiffs' injuries could not be redressed. However, this argument misses the point. The plaintiffs are not challenging the *outcome* of the department's decisions, but rather, the fact that they are entirely barred from consideration because they have HIV. Therefore, the plaintiffs' standing hinges on the fact that they have not been considered even though they wish to be, not on whether this consideration would result in a particular outcome. It has long been understood that governmental policies of exclusion and segregation create actual, concrete injuries that are redressable by the courts. *See, e.g., Jackson v. Okaloosa Cnty.,* 21 F.3d 1531, 1537

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

(11th Cir.1994) (holding that a claim of "exclusion ... and, as a result of this exclusion, imminent segregation," alleges a "redressable injury"); cf. *Ne. Fla Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.").

*10 The ADOC also contends that, because Harley was transferred out of Tutwiler and into Montgomery Women's Facility after the complaint in this case was filed, her challenge to segregation within Tutwiler is now moot. Further, towards the end of trial, the ADOC conceded certain aspects of the plaintiffs' claims and assured the court that its practices "would change" in certain respects.[FN13] Now, the ADOC urges the court to disregard those claims, arguing that they have been mooted.

> FN13. The policies and practices that the ADOC committed to changing include: (1) the exclusion of HIV-positive prisoners from food-service jobs in prison and in the work-release program; (2) the requirement that all HIV-positive men wear white armbands; and (3) the policy that HIV-positive men are placed together in Dorm E (administrative and disciplinary isolation). The ADOC also committed to evaluating options for removing the fence that currently surrounds the Special Unit at Limestone.

"[T]he voluntary cessation of challenged conduct will moot a claim only when there is no 'reasonable expectation' that the accused litigant will resume the conduct after the lawsuit is dismissed." *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.,* 633 F.3d 1297, 1309 (11th Cir.2011) (citations omitted). "Otherwise a party could moot a challenge to a practice simply by changing the practice during the course of the lawsuit, and then reinstate the practice as soon as the litigation was brought to a close." *Id.* (quotation marks and citations omitted).

The party asserting mootness generally bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur." *Friends of the Earth, Inc.,* 528 U.S. at 170. At the same time, however, a governmental defendant enjoys a "rebuttable presumption that the objectionable behavior will not recur." *Troiano v. Supervisor of Elections in Palm Beach Cnty.,* 382 F.3d 1276, 1283 (11th Cir.2004) (emphasis in original). This court must conduct the mootness inquiry with attention to three relevant factors: (1) "whether the termination of the offending conduct was 'unambiguous' "; (2) "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction"; and (3) "whether the government has 'consistently applied' a new policy or adhered to a new course of conduct." *Nat'l Ass'n of Bds. of Pharmacy,* 633 F.3d at 1310 (citations omitted).

The mootness issue with regard to Harley can be dispensed with easily. The HIV segregation that Harley challenges at Tutwiler never ended: the ADOC simply removed her from the location of the challenged conduct. The only question, then, is whether Harley can expect to be subjected to the ADOC's practices at Tutwiler in the future. Transfers between Tutwiler and Montgomery Women's Facility are common (indeed, Harley has previously been moved back and forth between the facilities), and as such, there is a more than reasonable basis to believe that she will be subjected to segregation in Tutwiler again.

Nor is this court deprived of its power to decide the plaintiff's claims challenging policies that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

the ADOC now agrees to change. The ADOC has provided no information about the department's deliberation process and has provided only vagueries about the basis for its decision to alter its policies. Therefore, its policy changes are far from unambiguous. *See Harrell v. The Fla. Bar,* 608 F.3d 1241, 1267 (11th Cir.2010) ("[T]he Board acted in secrecy, meeting behind closed doors and ... failing to provide any basis for its decision [to change its challenged practices]. As a result, [the court has] no idea whether the Board's decision was well-reasoned and therefore likely to endure.") (quotations and citations omitted). In addition, while "a defendant's cessation before receiving notice of a legal challenge weighs in favor of mootness ... cessation that occurs late in the game will make a court more skeptical of the voluntary changes that have been made." *Harrell,* 608 F.3d at 1266 (quotation marks and citations omitted). In this case, the department committed to policy changes at the close of trial, despite the fact that this litigation has been ongoing for over a year-and-a-half. The concessions therefore seem more likely an attempt to avoid an unfavorable result in this litigation than "the result of substantial deliberation." *Nat'l Ass'n of Bds. of Pharmacy,* 633 F.3d at 1310.

*11 As to the third factor, the court has not received any concrete evidence as to whether and how any changes have, in fact, been made, nor has it received any evidentiary details about when and how future changes to the current policy might occur. Therefore, the court cannot be sure whether the ADOC truly has mooted these claims. All three factors thus counsel against a finding of mootness on the conceded issues.

In sum, all of the plaintiffs' claims present justiciable controversies. Neither the standing nor mootness doctrines preclude the court from reaching the merits of these claims.

B. Title II of the Americans With Disabilities Act and § 504 of the Rehabilitation Act
The plaintiffs assert claims under Title II of the

ADA and under § 504 of the Rehabilitation Act. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity ." 42 U.S.C. § 12132. Section 504 provides that, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ." 29 U.S.C. § 794(a). [FN14] Claims under both statutes are governed by the same standards. *See, e.g., Cash v. Smith,* 231 F.3d 1301, 1305 (11th Cir.2000); *see also Everett v. Cobb County Sch. Dist.,* 138 F.3d 1407, 1409 (11th Cir.1999). To state a claim under either statute, the plaintiffs must show: "(1) that [they are] qualified individual[s] with a disability; (2) that [they were] either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or [were] otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff[s'] disability." *Bircoll v. Miami–Dade Cnty.,* 480 F.3d 1072, 1083 (11th Cir.2007) (citation omitted); *see also Harris,* 941 F.2d at 1522 (applying those elements in the prison context). Because the same standards govern claims under both statutes, in the interest of brevity, the court will refer to both as "the ADA."

> FN14. Both statutes clearly apply to Alabama state prisons. *See Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998)(holding that state prisons and jails are considered public entities for the purposes of the ADA); Pretrial Order (Doc. No. 177) at 12 (Stip.1) (stating that the ADOC receives federal financial assistance, therefore subjecting the ADOC to the requirements of the Rehabilitation Act).

The plaintiffs correctly assert (and the ADOC

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

concedes) that HIV is a disability under the ADA.
[FN15] Therefore, the court's analysis addresses the other elements of a claim under the ADA.

> FN15. The ADA and the Rehabilitation Act define disability as (among other things) "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U .S.C. § 12102(1)(A)(ADA); 29 U.S.C. § 705(20)(B) (Rehabilitation Act). The ADA Amendments Act of 2008 clarifies that "major life activities" includes "the operation of a major bodily function, including ... functions of the immune system." 42 U.S.C. § 12102(2)(B). As HIV critically impacts the immune system, it is within the ambit of the statute.

### 1. Segregation

Among the regulations promulgated under Title II of the ADA is the "integration regulation," which provides that, "A public entity shall administer services, programs, and activities in the *most integrated setting appropriate* to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added). "[T]he most integrated setting appropriate" is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. Pt. 35, App. B (2011). Consonant with the integration mandate, the Supreme Court has concluded that, "Unjustified isolation ... is properly regarded as discrimination based on disability." *Olmstead v. L.C. ex rel Zimring,* 527 U.S. 581, 597, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999).

**\*12** At trial, the ADOC insisted that its policies do not amount to segregation.[FN16] The department argued, in essence, that, because HIV-positive prisoners can participate in certain integrated programs, they are not truly "segregated." [FN17] The ADOC enmeshed these arguments with an emphasis on the adequacy of medical care in the Special Unit and an account of various programs to which HIV-positive prisoners have access. Thus, the department's true

meaning appears to be that, because the prisoners are not denied health care and because they have access to many programs, they have no right to complain about the fact that they are segregated. The court agrees that "segregation" is an uncomfortable term, loaded with implications of prejudice.[FN18] The court also finds that it is an appropriate way to describe the policy at issue here. Mandatory separate housing in a separate dorm (which is, for male prisoners, itself within a separate facility) would doubtlessly violate the ADA if unjustified. The same can be said for the practice of excluding HIV-positive prisoners from food-service jobs.[FN19]

> FN16. The ADOC made this argument despite the fact that, even during the trial, the department's own website described the policy as segregation.

> FN17. The ADOC downplayed the significance of separate dorms for HIV-positive prisoners by referring to them as simply "where the prisoners sleep." *See, e.g.,* Defs.' Pretrial Br. (Doc. No. 211) at 65 ("Class Representatives simply cannot sleep in the dorms ... with the rest of the general population); *id.* at 67 (referring to the plaintiffs' claim as a "sleeping arrangement request"). The ADOC's expert, Dr. George Lyrene, was particularly dismissive, stating that, "The argument about the importance of sleeping together seems petty and spurious to me." Defs.' Ex. 336, at 12. However, the facts show that the dorm is more than where the prisoners sleep. Prisoners spend much of the day in their dorms. (Plaintiff Beyer reported spending an average of 7–8 waking hours in his dorm during the summer months, and 10 hours a day in the winter. Plaintiff Knox testified that he spends around 6–8 hours each day in his dorm.) Residents of the Special Unit (and many other dorms at Limestone) also eat all of their meals there.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

Beyer said of his dorm, "It's the place ... where I sleep, I eat, I read, I watch TV. It's just the place where I live.... [I]t's not just where I sleep." Plaintiff Henderson echoed Beyer's comments, saying of his dorm, "That's where I live."

FN18. "Segregation" is defined as "the separation or isolation of individuals or groups from a larger group or from society," but it can also refer to "the separation or isolation of a race, class, or ethnic group by enforced or voluntary residence in a restricted area, barriers to social intercourse, divided educational facilities, or other discriminatory means." Webster's Third New International Dictionary 2057 (2002).

FN19. The ADOC's work-release policy and its policy requiring male prisoners with HIV to wear white armbands are analyzed under different legal frameworks under the umbrella of the ADA.

However, the ADA extends its protections to only individuals claiming discrimination with respect to, or exclusion from, a public entity's services who were "otherwise qualified" for those services. *Onishea,* 171 F.3d at 1300. " 'An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap.' " *Id.* (quoting *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)).

The "otherwise qualified" analysis entails a two-part inquiry. First, the court must determine whether the plaintiffs are qualified for integration where they are currently segregated. Second, if the plaintiffs are not qualified as an initial matter, "the court must nevertheless evaluate ... whether reasonable accommodations would[, if made by the ADOC,] make [plaintiffs] otherwise qualified." *Harris,* 941 F.2d at 1525; *see also Martinez v. Sch. Bd. of Hillsborough Cnty.,* 861 F.2d 1502, 1505 (11th Cir.1988). The plaintiffs carry the burden of mak-

ing a prima-facie showing that they are otherwise qualified or would be if the ADOC made reasonable accommodations. *Onishea,* 126 F.3d at 1329–30. If the plaintiffs make a prima-facie showing, the burden then shifts to the ADOC to establish that the proposed accommodations are not "reasonable" because implementation would impose "undue financial and administrative burdens" or require "a fundamental alteration in the nature of [the] program" at issue. *Harris,* 941 F.2d at 1572 n. 48 (citations omitted); *see also Henrietta D. v. Bloomberg,* 331 F.3d 261, 280 (2d Cir.2003) ("[I]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits, and ... [o]nce the plaintiff has done this, she has made out a prima facie showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant.") (quotation marks and citation omitted).

**\*13** Courts have prescribed a particular analytical approach where the disability is a contagious illness. If a person with a contagious illness poses a direct threat to the health and safety of others, then she is not "qualified" within the meaning of the statute. *See Onishea,* 171 F.3d 1296–97. To make this determination, courts apply the factors identified by the Supreme Court in *School Board of Nassau County, Florida v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); *see also Martinez,* 861 F.2d at 1505 (explaining that, when a person is handicapped with a contagious illness, a court must first apply the *Arline* factors, and second, evaluate whether reasonable accommodations would make the person otherwise qualified); *Onishea,* 171 F.3d at 1297 (applying the *Arline* factors to a challenge of the ADOC HIV-segregation policy). The factors include: "(a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degress of harm." *Onishea,* 126 F.3d at

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

1297 (quoting *Arline,* 480 U.S. at 288). In applying these factors, the court must take into account the basic principle that "the significance of a risk is a product of the odds that transmission will occur and the severity of the consequences." *Id.*

*Arline* emphasized that these factors must be applied on an individualized basis: only by doing so can the court honor Congress's "goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns ... as avoiding exposing others to significant health and safety risks." *Arline,* 480 U.S. at 287; *see also id.* (stating that "the district court will need to conduct an individualized inquiry" in applying the factors). It follows that, in the context of a class action challenging the treatment of persons with a disability as a group, the court must not make a finding of significant risk as to the entire group unless it can be sure that no individual within the group would not pose such a risk.

When the Eleventh Circuit previously considered whether the ADOC's segregation policy violated the ADA, that court found that the seriousness of HIV, then a death sentence for everyone who contracted it, rendered unacceptable even a small (though plausible) risk of transmission. *See Onishea,* 171 F.3d at 1293 (" HIV infection inevitably progressed to AIDS. AIDS always led to death, often after lengthy suffering."). The court held that, "when transmitting a disease inevitably entails death, the evidence supports a finding of 'significant risk' if it shows both (1) that a certain event can occur and (2) that according to reliable medical opinion the event can transmit the disease." *Onishea,* 171 F.3d at 1299. Because HIV was inevitably fatal, those infected with it fell outside of the ADA's protections. Significantly, the Eleventh Circuit emphasized that its conclusion was based on "the state of medical knowledge and art at the time of trial." *Id.* at 1293.

**\*14** Today, however, HIV does not invariably cause death.[FN20] The vast majority of infected in-dividuals can expect to live a near-normal lifespan. Therefore, the heightened standard that the Eleventh Circuit applied in *Onishea* for fatal illnesses no longer applies to HIV. Instead, this court must apply the "significant risk" test the the Supreme Court outlined in *Arline* .

> FN20. While the ADOC argues that the *Onishea* test still applies to HIV, they, puzzlingly, never argue that HIV is still *invariably* fatal; instead, they state that it is fatal *when left untreated.* Defs.' Prop. Findings (Doc. No. 246) at 6 (" *[I]f left untreated,* HIV has the same affect on people that it did before the development of the current antiretroviral medications, *i.e.,* development of 'full-blown' AIDS and inevitable death.") (emphasis added). It strains credulity to imagine that the Eleventh Circuit meant to encompass in its rule all diseases that are fatal without the benefit of modern medicine; indeed, albeit not contagious, conappendicitis, high blood pressure, and even tooth decay can be fatal when left untreated.

The court may not simply conduct this analysis with respect to HIV in prison in general, however. Instead, the court must consider the risk of transmission with respect to each specific aspect of institutional life in which the plaintiffs claim exclusion. *See Harris,* 941 F.2d at 1526 (reversing the district court because it "should have determined the risk of transmission not merely with regard to prison in general, but with regard to each program from which appellants have been automatically excluded"). Because the plaintiffs have not provided clear guidance on how the court should parse their claims, the court will do so according to the different contexts in which the transmission risk may differ. Assessment of the risk with regard to men must be separate from that with regard to women, since the latter transmit the disease in more limited circumstances. Similarly, the risk differs in the context of food services from the risk posed by integ-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

rated dormitories. The court will therefore analyze each context in turn.

a. The Special Unit Within Limestone

The court first addresses the ADOC's housing segregation policy at Limestone, which requires all HIV-positive prisoners to reside in the Special Unit. [FN21] As this court has explained, HIV can be transmitted through contaminated blood or bodily fluids. In the prison context, this is most likely to occur during unprotected sex or needle sharing (for example, intravenous drug use or tattooing). *See Onishea,* 171 F.3d at 1294–95.

FN21. The court notes the obvious fact that this is not a case in which the plaintiffs are unqualified because of legitimate eligibility requirements unrelated to their HIV status. *See, e.g., Pottgen v. Mo. State High Sch. Activities Ass'n,* 40 F.3d 926, 928 (8th Cir.1994) (addressing argument that student was excluded from interscholastic sports because of legitimate maximum-age-eligibility requirement, not because he had learning disabilities). On the contrary, here, because housing is a necessary component of institutional life that is provided to all incarcerated persons, the plaintiffs clearly "meet all of [the] requirements" for being housed with the general population in ADOC facilities, *Onishea,* 171 F.3d at 1300; as such, the plaintiffs are unqualified for integrated housing only if they would "constitute a direct threat to the health or safety of other individuals" and that threat could not be eliminated with reasonable accommodations. *Id.* at 1296–97 (citations omitted); *Harris,* 941 F.2d at 1525.

The degree to which a person with HIV is infectious can vary over the course of his disease. As the court has already described, modern HIV treatments can not only effectively treat the virus, but, generally speaking, prevent its transmission. Dr. Altice explained that "the newer HIV therapy regimens are so effective in suppressing the virus that

HIV transmission is almost impossible even if high-risk activity occurs between HIV-positive and HIV-negative individuals, if the HIV-positive individual is receiving antiretroviral therapy and their virus is suppressed." Altice Report, Pls.' Ex. 107, at 6. As the viral load drops, so does the risk of transmission, and, once full viral suppression is obtained, the risk is essentially non-existent.

The level of scientific certainly for this general principle, however, differs in different contexts. The best data available come from randomized controlled trials. In 2011, *Science* magazine reported the results of one such trial showing that, among heterosexual couples, the use of antiretroviral therapy dramatically reduces transmissions of the disease. *Science* deemed these results its "Breakthrough of the Year." The randomized control trial studying the effect of antiretroviral therapy on transmissions between men who have sex with men is still underway. However, "community viral load data among men who have sex with men" suggest "a markedly reduced level of transmission" for that group as well. It was clear to the court that both the plaintiffs and the ADOC had adopted the general principle that virally suppressed individuals are highly unlikely to transmit HIV sexually, whether the sexual act is between people of different sexes or of the same sex. None of the ADOC's experts disputed the proposition that viral suppression dramatically reduces a person's ability to transmit HIV through sexual activity: The ADOC's expert witness, Dr. Steven Scheibel, stated that: "[S]omeone's not infectious in terms of sex if they have an undetectable viral load.... If ... people ... are on antiretroviral medication and the virus level is suppressed, they are ... very unlikely to transmit."

**\*15** There has also been no completed randomized controlled trial studying the risk of transmission among virally suppressed individuals who share needles (although one such study is currently underway). Early indicators suggest that antiretroviral drugs have a similarly preventative effect when it comes to transmission through needle shar-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
(Cite as: 2012 WL 6681773 (M.D.Ala.))

ing. This outcome would be logical because, after all, regardless the means of transmission, so long as a person is adherent to antiretrovirals, the virus will be only have a minimal presence in the blood and body fluids. Based on the current state of medical knowledge, Dr. Altice found it probable that viral suppression reduces risk of transmission via needle sharing: "[C]ohort studies and community types of studies ... suggest[ ] that this treatment as prevention paradigm works for all groups. However, he conceded that "the jury's not in 100 percent" in that regard. Dr. Scheibel was more skeptical: "[T]he bottom line is that we do not know how transmission may occur when people are sharing needles and when people are tattooing in terms of HIV transmission." Despite Dr. Altice's optimism and indicators showing that virally-suppressed HIV-positive persons pose a drastically reduced risk of transmission when sharing needles, " '[l]aw lags science; it does not lead it.' " *McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1247 (11th Cir.2005) (quoting *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 319 (7th Cir.1996)). Therefore, at this time, the court cannot conclusively find that virally suppressed HIV-positive individuals who share needles pose no, or only a nominal, risk of transmission.

In addition to individuals who obtain viral suppression through medication, there is another very small group called "elite suppressors" who often have undetectable viral loads without the aid any HIV medications. The risk of elite suppressors spreading the virus is similar to that of persons who have obtained viral suppression throughout treatment. Dr. Scheibel's chart review of HIV-positive prisoners at Limestone reveals that the vast majority of prisoners on antiretroviral medications have achieved viral suppression. He also identified one elite suppressor among those who are not on HIV medication.

Based on this evidence, it is clear that at least some, if not a majority, of HIV-positive prisoners at Limestone present a very low risk of transmitting the virus.[FN22] Prisoners who have achieved viral

suppression pose an infintesimal risk if they abstain from sharing needles, regardless of whether they have sexual intercourse with other prisoners.

> FN22. Despite the power of antiretrovirals to reduce the odds of transmission, adherence is key to the medications' success. People infected with HIV who are virally suppressed can quickly become infectious again if they cease to take their medicines.

The understanding that some people with HIV are very unlikely to transmit the disease is shared by ADOC Commissioner Thomas. In the context of addressing the criteria the department uses to determine whether HIV-positive prisoners are eligible for work release, he explained that "the medical criteria allows ... a person [for] who[m] the risk of transmission is almost zero to have access to a work-release program." Implicit in that testimony is that Commissioner Thomas not only believes that individuals exist within the system who are not infectious, but he also that believes that the ADOC is able to identify those individuals.[FN23]

> FN23. Since HIV-positive prisoners are not segregated at work release, but are housed alongside HIV-negative prisoners, Commissioner Thomas's statement also relates confidence that the department can safely house at least some HIV-positive individuals with prisoners who are HIV-negative.

**\*16** The level of risk is somewhat different for prisoners who were not previously diagnosed with HIV (but had been unknowingly living with the disease) before entering the ADOC's custody. This group is, generally speaking, very infectious until medication takes effect. As the medication takes effect and the viral load lowers, the risk of transmission decreases accordingly. Thus, for these prisoners, the probability of transmission will depend on the length of time over which they are adherent to medication and their behavior. Should they engage in high-risk behavior (including both sex and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

needle-sharing) before achieving viral suppression, the risk of transmission is high. On the other hand, if these prisoners abstain from voluntarily participating in behavior that risks transmission, the risk is minimal. However, even in the absence of high-risk behavior, involuntary occurrences (such as rape) create some risk. Nevertheless, on balance, the probability of transmission posed by even a quite infectious person who does not voluntarily engage in high-risk behavior is generally low, and it will reduce drastically as treatment takes effect.

There may exist a small minority of prisoners who, for various reasons, will never achieve viral suppression (barring further advances in science or changes in behavior). For example, some people with HIV who have poorly adhered to antiretroviral medications develop strains of the virus that are resistant to treatment. Others may, for various reasons, be unwilling to take medications altogether. For these prisoners, the risk and probability of transmission are largely a function of behavior (though this risk will be higher than that posed by prisoners who have achieved viral suppression), and the duration of the risk is indefinite. Essentially, the risk posed by this group is the same as that posed by all HIV-positive prisoners before the advent of antiretroviral treatment.

The ADOC's argument that integrating HIV-positive prisoners would increase the number of transmissions stems from the indisputable fact that integration would increase opportunities for high-risk behavior. However, the picture is more complex than the department suggests. HIV-positive and HIV-negative prisoners at Limestone already have ample opportunity to interact with one another and engage in high-risk activity in areas of the prison other than their housing units. As Dr. James Austin, a nationally renowned expert in prison and jail classification and risk assessment, explained, "sexual contact between prisoners occurs in virtually all areas of prisons except where prisoners are in permanent isolation." Austin Report, Pls.' Ex. 108, at 15. Segregation also does not reduce oppor-

tunities for transmission through sexual activity between staff and prisoners, nor from prisoners who are transferred to county jails or work-release facilities (where they are not segregated) and then back to prison. Meanwhile, the transmission rate for HIV within the ADOC is exceedingly low: at or approaching zero.[FN24] In light of the substantial opportunities for interaction between HIV-positive and HIV-negative prisoners, the virtual nonexistence of transmissions within the ADOC casts serious doubt on the department's assumption that further integration would increase the transmission rate. It instead appears that so long as integration is handled responsibly, it is unlikely to meaningfully increase transmissions, if at all.

> FN24. The low transmission rate is particularly notable because in the earlier litigation challenging the more stringent version of this policy, the ADOC argued, and the district court agreed, that "the transmission risk [was] significant in all programs." *Onishea,* 171 F.3d at 1295. In spite of this finding, no transmissions in fact occurred when programs were integrated.

*17 Further still, it is possible that eliminating the segregation policy could deter high-risk behavior in some instances. Dr. Altice opined that, among HIV-negative prisoners prone to risky behavior, segregation could create a false sense of security. Believing that no one in their midst had HIV, they may be more willing to engage in high-risk behavior than they would otherwise. This could place them at risk for contracting HIV from highly infectious HIV-positive prisoners who were not segregated because they were tested during the "window period" (and for countless other sexually transmitted infections). Thus, perversely, it is at least, arguably, possible that the segregation policy could lead to transmissions that would not occur if the prisoners were integrated.[FN25]

> FN25. Deputy Commissioner Emmitt Sparkman of the Mississippi Department of Corrections testified that he was not

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
(Cite as: 2012 WL 6681773 (M.D.Ala.))

concerned about transmissions when that department integrated HIV-positive prisoners in 2010 because he felt the segregation policy simply created a false sense of security that encouraged high-risk behavior.

There is a small risk of transmission that exists under the current policy: this cannot be eliminated so long as human beings interact. There is no evidence that integrating HIV-positive prisoners in housing would meaningfully increase the probability of transmissions. Although integration would certainly create more opportunities for high risk behavior, such opportunities exist now and have not resulted in any transmissions. The link between the department's lack of transmissions and the segregation policy thus merely amounts to *post hoc ergo propter hoc*.

Regardless of the likelihood of transmissions, the significance of transmission for the person who becomes infected with the virus should not be understated. There is no cure for HIV at this time. Therefore, should a prisoner in the custody of the ADOC become HIV-positive while incarcerated, he will remain so for the rest of his life (barring scientific advances). Accordingly, he would be burdened with a lifelong responsibility to maintain access and adhere to antiretroviral treatment, a failure to do so likely resulting in a dramatically shortened lifespan. For the disproportionately poor prisoners in the ADOC, this responsibility (which is literally a matter of life or death) is no small thing. On the other hand, the consequences of being HIV-positive are not nearly as severe today as they were during an earlier time. As has been discussed, the vast majority of people with HIV enjoy near-normal lifespans. They can typically be treated with a simple one-pill-a-day regimen free of crippling side-effects. And, because of antiretrovirals, they can also engage in ordinary sexual behavior without reasonable fear of transmitting HIV to their partners. With appropriate treatment, they can have lives nearly identical to those of people who do not have HIV (that is, aside from having to take medic-

ations).

Balancing these factors and weighing "the odds that transmission will occur" against "the severity of the consequences," *Onishea*, 126 F.3d at 1297, it is obvious that, given the life-changing advances in HIV treatment, ceasing the housing, categorically, of all HIV-positive prisoners exclusively in Limestone's Special Unit would not create "a direct threat to the health or safety of other individuals" within the meaning of the ADA. *Onishea*, 171 F.3d at 1296–97. A very low risk would be created if the ADOC integrated HIV-positive prisoners on an individual-by-individual basis, based, for example, on whether their viral levels are suppressed and whether they have a demonstrated history of medication adherence and abstinence from high-risk behavior. That description could fit many prisoners currently incarcerated in the Special Unit; segregating them thus violates the ADA. On the other end of the spectrum, a threat could be created if the ADOC integrated (without imposing additional safeguards) HIV-positive prisoners with high viral loads who refuse to take medication and who have a history of risky behavior (for example, attempting to rape other prisoners).[FN26]

FN26. Integrating such persons could, in certain circumstances, amount to a violation of the Eighth Amendment's prohibition of cruel and unusual punishment. *See, e.g., Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir.1974) (finding an Eighth Amendment violation where inadequate medical care resulted in, among other things, "inmates with serious contagious diseases [being] allowed to mingle with the general prison population"); *Clark v. James*, 794 F.2d 595, 596 (11th Cir.1986) (requiring "reconsideration of appellant's claim that by assigning him to prison duties requiring exposure to contagious diseases, prison officials violated his eighth ... amendment rights"); *Billman v. Ind. Dept. of Corr.*, 56 F.3d 785, 788 (7th Cir.1995) (upholding

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
(Cite as: 2012 WL 6681773 (M.D.Ala.))

Eighth Amendment claim alleging that "employees of the prison system, knowing that [a prisoner] had a history of raping his cellmates and was HIV-positive, nevertheless placed [the plaintiff] in the same cell without warning him of the danger he faced, and that they did nothing to interrupt the rape while it was in progress"). However, even with these prisoners, the court can discern no reason why the ADOC would need to treat them differently from other prisoners who have shown sexually predatory behavior and have serious infectious diseases other than HIV.

*18 What is critical here is that, despite this range of risk, the ADOC maintains a blanket policy of precluding all HIV-positive prisoners at Limestone from integrated housing, regardless of their individual circumstances. That policy denies plaintiffs the individualized determinations to which they are entitled under the ADA, see Arline, 480 U.S. at 287, and unjustifiably treats all HIV-positive prisoners identically, despite the fact that their circumstances are materially different, not identical. See Kapche v. City of San Antonio, 304 F.3d 493, 499 (5th Cir.2002) (describing Supreme Court precedent interpreting the ADA as "consistently point[ing] to an individualized assessment mandated by [the act]," and "further not[ing] that [the court is] unaware of any decision from [its] sister Circuits abrogating the requirement of an individualized assessment in favor of a per se exclusion under the ADA."). For this reason, the ADOC is currently violating the rights of the HIV-positive prisoners within its custody by categorically segregating them because of their HIV status and excluding them from the integrated housing for which they may be qualified.

The court witnessed the impact of the segregation policy when it toured Limestone and the Special Unit with both legal teams during the trial. The court recognizes that the prisoners in the Special Unit were locked down during the visit out of consideration for the court's safety. Even discounting the effect of the lockdown, the Special Unit evoked the feeling of a place abandoned. The prisoners there displayed a striking uniformity of disposition. They peered, sullen, from their cells. The quiet, which the ADOC touted at trial as an asset of the unit, seemed instead to accent the dormitories' isolation from the lively general-population dorms, communicating these prisoners' exclusion. The imposing cage around the residential treatment unit, where mentally ill prisoners with HIV are kept, allows any observer to see the activity within. The effect of a severely mentally ill man isolated within the cage, which juts into the common area where the prisoners eat and watch television, would surely be disturbing to those both within it and without. It is evident that, while the ADOC's categorical segregation policy has been an unnecessary tool for preventing the transmission of HIV, it has been an effective one for humiliating and isolating prisoners living with the disease.

As for the precise circumstances that would render a prisoner qualified or unqualified for integrated housing at Limestone, the court need not draw such lines now, at the liability stage. This case is a class action including as plaintiffs all present and future HIV-positive prisoners within the custody of the ADOC. See Henderson v. Thomas, 2012 WL 3777146 (M.D.Ala. Aug.30, 2012) (Thompson, J.) (certifying class). Consequently, for the ADOC to escape liability, there must be not a single HIV-positive prisoner who is or could be qualified for, and thus has the right to, integrated housing. That is clearly not the case. For now, it is sufficient to say that, pursuant to binding Supreme Court and Eleventh Circuit case law, the ADOC is in violation of the ADA with respect to the plaintiff class.

*19 The only barrier to integrated housing for qualified prisoners at Limestone is the ADOC's medical classification system, which treats all HIV-positive prisoners identically and precludes them from being integrated. As such, the sole accommodation necessary for qualified plaintiffs is that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

the ADOC modify its classification system to afford the plaintiffs the individualized determinations to which they are entitled instead of treating HIV status as a dispositive criterion regardless of viral load, history of high-risk behavior, physical and mental health, or any other individual aspects of the prisoner.

The facts (and common sense) compel the conclusion that making such a modification to the ADOC's policies is a reasonable accommodation that would not impose "undue financial and administrative burdens" or require "a fundamental alteration in the nature of" ADOC operations. *Harris,* 941 F.2d at 1527 n. 48 (citations omitted). First, the ADOC has the ability to measure prisoners' viral loads; the ADOC already does so. Second, the department is capable of differentiating among prisoners on the basis of their behavior, since the ADOC already does this in the context of security classification. Third, the department is likewise able to distinguish among HIV-positive prisoners based on their medical needs, as evidenced by the medical coding chart it already uses. Fourth, there is no evidence that modifying its classification policies would require unreasonable cost expenditures. *See Onishea,* 171 F.3d at 1303 (holding that cost is relevant for assessing whether an accommodation imposes an undue burden). In short, requiring the ADOC to modify its classification system in order to effectuate integrated housing at Limestone would be reasonable.[FN27]

> FN27. The ADOC asserts a fundamental-alteration defense to these accommodations. If accommodations amount to a fundamental alteration, the defendants need not make them. "[A] proposed accommodation amounts to a 'fundamental alteration' if it would eliminate an 'essential' aspect of the relevant activity." *Schwarz v. City of Treasure Island,* 544 F.3d 1201, 1220 (11th Cir.2008) (citations omitted). For example, in *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 682–83, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001), the Supreme Court listed as examples of hypothetical fundamental alterations of a golf tournament, "changing the diameter of the hole from three to six inches," which would "alter an essential aspect of the game," or a change that "might ... give a disabled player ... an advantage over others," thus "fundamentally alter[ing] the character of the competition." Here, the ADOC contends that, because its current treatment of HIV-positive prisoners was shaped in part by prior litigation (in particular, the consent decree in, *Leatherwood v. Campbell,* No. CV–02–BE–2812–W (N.D.Ala. Apr. 24, 2004) (Bowdre, J.)), any change from the status quo would constitute a fundamental alteration. This contention is without merit. The fundamental-alteration defense is not intended to serve the purpose of foreclosing successive litigation on related (albeit not identical) issues. Moreover, despite what the ADOC may imply, the *Leatherwood* court did not order the ADOC to segregate HIV-positive prisoners from the general prison population; it merely addressed the unconstitutionally inadequate conditions of confinement that HIV-positive prisoners faced at Limestone at the time, namely, inadequate medical care. The court sees no tension between *Leatherwood* and its decision today.

For those prisoners who are not currently qualified (perhaps because they are highly infectious), the law requires the ADOC to make reasonable accommodations that would render them qualified. *See Bircoll,* 480 F.3d at 1081–82 (citing 28 C.F.R. § 35.130(b)(7), which requires that "[a] public entity ... make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activ-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

ity.").

The plaintiffs have shown that reasonable accommodations exist that would reduce (and even eliminate) most of these individuals' odds of transmitting the disease. Principally, Dr. Altice explained that, "From a public health and clinical perspective, the rational way to reduce the risk of HIV transmission in prison is not through housing segregation but through effective HIV treatment." Altice Report, Pls.' Ex., at 6. Under this approach, antiretroviral medication is offered to every HIV-positive person who is ready and willing to take it so that it will suppress the virus and reduce or eliminate the chances of transmission. Taking this step could eliminate many prisoners' likelihood of transmitting HIV. Thorough education would also play a preventative role. These methods are reasonable ways to reduce the risk of transmission.

**\*20** The court emphasizes that, in affording HIV-positive prisoners the individualized determinations to which they are entitled, the ADA grants the ADOC discretion in choosing how best to do so. *See, e.g., Frame v. City of Arlington,* 657 F.3d 215, 246 (5th Cir.2011) ("Indeed, a municipality is granted the discretion to choose how best to make its services accessible."), *cert. denied,* —— U.S. ——, 132 S.Ct. 1561, 182 L.Ed.2d 168 (2012). This court is "sensitive to ... the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of" prisoners. *Brown v. Plata,* —— U.S. ——, ——, 131 S.Ct. 1910, 1928, 179 L.Ed.2d 969 (2011); *see also Turner v. Safley,* 482 U.S. 78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("[F]ederal courts have ... reason to accord deference to the appropriate prison authorities."). In making determinations as to particular prisoners' qualifications for integration, the ADOC is entitled to rely on the reasonable judgments of its medical professionals. *See Olmstead,* 527 U.S. at 602 ("Consistent with [the ADA's prohibition of unnecessary segregation], the State generally may rely on the reasonable assessments of its own professionals in de-

termining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program."); *Arline,* 480 U.S. at 288 ("[C]ourts normally should defer to the reasonable medical judgments of public health officials.").

However, while the law grants the ADOC deference in choosing how to satisfy its responsibilities, the department is of course obligated to act in good faith as it works to ensure that no prisoner in its custody remains unnecessarily segregated because of his HIV status. *Cf. Griffin v. United Parcel Serv., Inc.,* 661 F.3d 216, 224 (5th Cir.2011) ("[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates [Title I of] the ADA.") (citation omit- ted).

A final aspect of the ADOC's housing policy at Limestone warrants brief discussion: the practices in Dorm E. That dormitory houses both HIV-positive and HIV-negative prisoners who have been placed in administrative or disciplinary isolation. As was noted above, before the end of trial, the ADOC conceded this aspect of the plaintiffs' challenge and assured the court that its practices would change. Now, the ADOC urges the court to disregard the issue, arguing that it has been mooted. The court, however, finds good cause for resolving the matter. For the reasons given earlier, the court has not been deprived of its power to determine the legality of this challenged conduct simply because the ADOC says it has voluntarily ceased that conduct during the course of litigation. *See Nat'l Ass'n of Bds. of Pharmacy,* 633 F.3d at 1309. Moreover, the ADOC's conceded practices have evidentiary relevance; they speak to the credibility of the department with regard to other justifications, and they provide evidence of the department's intentional discrimination against individuals with HIV.

**\*21** Unlike prisoners housed in other parts of Limestone, prisoners in Dorm E are restricted to their closed (and locked) cells (each of which holds only a single prisoner) for almost the entire day.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

They leave their cells only when handcuffed and escorted by ADOC staff. Because of this intensive monitoring, they have no physical contact with one another at any time, and consequently, transmission of HIV between an HIV-positive and HIV-negative prisoner in isolation is not remotely possible. Nevertheless, the HIV-positive and HIV-negative prisoners in Dorm E are segregated: HIV-positive prisoners are clustered together separately from the HIV-negative prisoners. Because the size of each group will differ depending on isolation needs at the time, the dorm features a "floating gate" that the ADOC uses to demarcate the border where the HIV-positive cluster ends and the cells housing HIV-negative prisoners begin.

Because ending segregation in Dorm E would present absolutely no risk of harm, it is clear that the ADOC's policy of separating HIV-positive prisoners and HIV-negative prisoners in the dormitory and using the physical infrastructure of the building to indicate which prisoners have HIV, is, and has always been, wholly unnecessary and promotes no legitimate purpose. As such, it serves only to discriminate for the sake of discrimination. That is precisely the sort of "irrational disability discrimination" that the ADA "seeks to [prohibit]." *Tennessee v. Lane,* 541 U.S. 509, 522, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); *see also Bledsoe v. Palm Beach Cnty. Soil and Water Conservation Dist.,* 133 F.3d 816 821–22 (1998) (holding that the ADA prohibits "all discrimination by a public entity" regardless of the form it takes).

The ADOC's practices in Dorm E are most relevant in that they illuminate the intent underlying the department's treatment of HIV-positive prisoners. In order to accommodate assumed and actual anti-HIV prejudice among its staff and prisoners in its custody, and to some extent due to prejudice that stems from department decision-makers, the ADOC has sought to segregate HIV-positive prisoners from the general population in all possible contexts regardless of whether any legitimate purpose is served by doing so. Moreover, the ADOC has been

uninterested in reexamining seemingly irrational policies. Only at the eleventh hour, during the last days of trial, after the ADOC was at a loss for words in mustering a justification for its practices in Dorm E, did the department seek to assure the court that these practices would change. *See* Defs.' Resp. to Judicial Request (Doc. No. 240) at 1–2 (responding to a judicial inquiry about the purpose of the Dorm E practices by referencing unspecified prior "conflicting statements," but not attempting to put forth any actual purported purpose).

In addition to Dorm E, certain other unnecessary features remain in place at Limestone. One standard operating procedure, which remains on the books (though purportedly unenforced), warns that, "Routine physical contact with Special Unit inmates should be kept at a minimum at all times." Joint Ex. 7, at 3. "Any staff member who enters the cell of a Special Unit inmate may wear ... 1) plastic or latex gloves; 2) Face mask; 3) Goggles; 4) Protective Rainwear." *Id.* A barbed-wire fence surrounds the two Special Unit dorms. Originally, that fence separated HIV-positive prisoners from general-population prisoners in the common yard. The gate to the fence is kept open now, but the fence is no less visible; it remains a stark reminder of the HIV-positive prisoners' separation.[FN28] These relics of the department's earlier policies, unaltered despite having no current purpose, suggest that other aspects of the policy are likewise relics of a different era, retained by the department due more to inertia than because they are truly needed today.

> FN28. The fence's purpose (enforcing segregation) is obvious in the layout of the prison. Much of Limestone's grounds are symmetrical. After entering the prison's front entrance, to the left is the "A–Side" of the facility, and to the right is the "B–Side." Each side is made up of five separate dormitories (all of which are identical) that are laid out in a circle with a common yard in the middle. Two of A–Side's dormitories, Dorms B and C,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

make up the Special Unit. A–Side and B–Side are completely identical in their physical appearance, except that for the large, barbed-wire fence that cuts through the middle of the common yard and around the two Special Unit dormitories. Of course, no such fence exists on B–Side (which is otherwise identical in all re- spects).

*22 Moreover, these other unnecessary features matter in their own right, even if unused. They impress upon both the prisoners and ADOC staff that HIV-positive prisoners are different and dangerous. Despite the ADOC's modifications to its policy in recent years, the symbolic power of the segregation policy has not been diluted. Like the fence with its unlocked gate, the barrier between the prisoners with HIV and the rest of the prison is more visible and more imposing than the narrow doorways that allow them access.

b. Exclusively Housing HIV-positive Men at Limestone and Decatur Work Release

The ADOC has neither argued nor given the court any reason to believe that the transmission risk posed by housing HIV-positive prisoners in general-population dorms at Limestone would differ in any meaningful way from housing HIV-positive prisoners in general-population dorms at other facilities throughout the State. Nor has the ADOC argued or presented evidence that housing HIV-positive prisoners at a work-release facility other than Decatur would pose any additional risk of transmission. Therefore, the court may answer the "otherwise qualified" question with the same analysis under *Arline* articulated with respect to housing within Limestone. In terms of the *Arline* analysis, to the extent that HIV-positive prisoners are qualified for integrated housing within Limestone, they are, to the same extent, qualified for integrated housing at any other facility. Similarly, the same accommodations that the court has already found reasonable (modifying the ADOC's classification system and various prevention measures)

would suffice to consider HIV-positive men for prisons other than Limestone. Since HIV-positive prisoners are already housed in an integrated setting at Decatur Work Release, the court finds that no concerns about transmission justify a blanket bar on housing HIV-positive prisoners at other work-release facilities.

The question, instead, is whether housing prisoners at facilities other than Limestone and Decatur would impose an undue burden on the State. In essence, the ADOC argues that its current system of providing HIV care at Limestone is effective, and that housing HIV-positive prisoners at other facilities would inevitably denigrate the quality of care. Likewise, the department explains that HIV-positive prisoners in the work-release program are housed exclusively at Decatur because it is close to Limestone, which allows prisoners at Decatur ready access to Limestone's medical facilities. The ADOC states that housing prisoners at other facilities would force it to alter its current system of providing medical care to prisoners who have HIV. This, they attest, would drastically diminish quality of care for HIV-positive prisoners and would be cost the State more money than it has to spend.[FN29]

> FN29. As context for its argument, at trial the ADOC emphasized the significant advances in HIV care that the department made pursuant to its settlement with a class of male HIV-positive prisoners incarcerated at Limestone in *Leatherwood v. Campbell,* No. CV02–BE–2812–W (N.D.Ala. Nov. 18, 2002) (Bowdre, J.). In that case, the plaintiffs challenged the inadequate medical treatment and substandard housing provided to HIV-positive prisoners. In the 2004 settlement, the ADOC agreed to significant changes to its housing and standard of medical care for prisoners with HIV. In 2006, the consent decree expired. However, the ADOC has continued to adhere to its terms. Experts on both sides agree that the current level of care is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
(Cite as: 2012 WL 6681773 (M.D.Ala.))

good, and the ADOC has shown that it may well exceed the level of care typically provided in the community.

The court first considers what accommodations would be necessary in order to house HIV-positive prisoners at other facilities. In doing so, the court will not assume that the ADOC would have to house prisoners with the most dire medical needs at every facility in the State. Instead, the court will simply evaluate what would be required to end the ADOC's current policy of categorically housing *all* HIV-positive prisoners in one prison and one work-release facility.[FN30]

FN30. The ADOC argues that the plaintiffs can find no relief here because the ADOC's prisoners, regardless of any diseases they may have, do not have a right to be transferred to the facility of their choice and, therefore, this court cannot "allow[ ] HIV-positive inmates greater access or rights to the benefits of services and programs afforded to all inmates." Defs.' Pretrial Br. (Doc. No. 211) at 31. The ADOC misconstrues the plaintiffs' claim. The plaintiffs do not request a right to transfer to the facility of their choosing; the plaintiffs ask only not to be segregated on account of their HIV status. *Cf. United States v. Jefferson Cnty. Bd. of Educ.,* 380 F.2d 385, 390 (5th Cir.1967) (school children have the right to desegregated education despite the fact that "a schoolchild has no inalienable right to choose his school").

**\*23** The court first observes that care for HIV-positive individuals can be highly variable, ranging from profoundly complex care to a regime that is relatively simple. In assessing the ADOC's claims, the question is not whether *every* facility or even whether *any* additional facility could provide adequate care for the most ill prisoners, but rather whether *any* facility could provide HIV care for *any* of the system's HIV-positive prisoners.

One critical component of the ADOC's current system of care is the availability of an HIV specialist to meet with prisoners at Limestone. The parties dispute how often and to what extent a specialist must be involved in care. Dr. Altice opined that, while it is appropriate for HIV patients initially to be monitored quarterly by a specialist, patients who become stabilized and virally suppressed do not require such frequent consultation with a specialist: instead, they can be monitored by a specialist as little as twice a year. Dr. Altice found that, for a stable patient, a specialist may also evaluate laboratory results without even seeing the patient. The ADOC's experts contested Dr. Altice's view. Dr. Lyrene noted that some very sick patients must see a specialist every day. Dr. Schiebel stated that, while biannual appointments with a specialist may be appropriate for a stabilized and adherent patient, a more conservative approach is appropriate in the prison environment, where adherence to medication is a challenge. Dr. Scheibel also emphasized the value of a specialist's opinion in evaluating lab results, addressing drug interaction concerns, and treating comorbitities.

It is clear that every person infected with HIV will require access to a specialist at certain points. However, the degree to which this is required varies both from patient to patient and from one time to another as a patient's disease progresses. No expert has testified that every person with HIV requires daily or even weekly treatment from a specialist. Moreover, no expert disputed that, for at least some patients, quarterly or even biannual meetings with a specialist are adequate to manage their HIV (although Dr. Scheibel expressed skepticism as to whether any prisoner within the ADOC falls into this category). Dr. Lyrene testified that the HIV-positive prisoners at Limestone are generally healthy. Dr. Scheibel found, through a chart review, that most have achieved viral suppression. Therefore, the court concludes that, for at least some of the HIV-positive prisoners, daily or weekly access to an HIV specialist is not necessary for their care.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

The court also finds that, to the extent that specialty care is needed, reasonable accommodations are available that could make HIV specialty care available at multiple facilities. One means of doing so, much debated at trial, is telemedicine, whereby an HIV specialist would virtually consult with primary care providers in other locations.[FN31] The ADOC's primary argument against telemedicine is based on cost. To that end, the department presented Hal White, the director of an information technology consultancy. White conducted a thorough evaluation of the costs of implementing telemedicine within the ADOC and visited various facilities to assess potential challenges. He estimated that the total cost of installing the necessary technological equipment for *all* ADOC prison sites for five years would be $2,026,619.53. While the ADOC emphasized this larger number at trial, the cost for each individual facility was estimated at $21,184 for equipment with an additional $8,217.53 to install special equipment at Limestone, from which it is presumed the HIV-specialist would operate. The facilities would then have highly variable maintenance costs, ranging from a total of $8,000 per facility over a five-year period to $49,250 per facility. The General Fund Appropriation for the ADOC for fiscal year 2012 is $377,900,000; the total cost of adding telemedicine at one facility for five years at even the most expensive facilities therefore amounts to .02% of the ADOC's budget. At the least expensive facilities (of which there are 13, according to White's expert report), the cost would amount to less than .01% of the budget. Given this, while the court stops short of deciding whether telemedicine is the best or even a good option for the ADOC, the court concludes that it would not be prohibitively costly to install telemedicine in at least one additional facility (and, indeed, the plaintiffs do not insist that it should be installed at every facility in the system).

> FN31. The court finds it clear the telemedicine is an adequate means of providing access to specialty care. However, the debate over its merits at trial

warrants some discussion. Dr. Altice testified that telemedicine has been effectively used for the provision of HIV specialty care in a number of other prison systems. Dr. Scheibel suggested that telemedicine is less than ideal because the primary care physician may lack experience with HIV and may not report back to the specialist. However, he also reported that most patients he had consulted via telemedicine had good outcomes, although several experienced nonadherence problems, which he attributed to unknowledgable primary care physicians. Dr. Lyrene expressed concern about practical matters, such as the handling of patient files. The court finds that these concerns can be addressed through simple planning and training, particularly since telemedicine has been effectively implemented elsewhere. Further, while the ADOC's experts identified concerns about telemedicine, neither suggested that it is an inadequate means of providing HIV care.

*24 Even if telemedicine were not possible, however, the plaintiffs also make the plausible suggestion that an HIV specialist could travel to different locations within the system to see patients. Further, the plaintiffs presented evidence that in certain other states, HIV-positive prisoners travel to a designated prison for HIV specialty care. The court finds both of these options particularly feasible since stable HIV patients require care only quarterly or biannually. In sum, the court is not convinced that the ADOC could not find a reasonable, cost-effective way to provide HIV specialty care on an as-needed basis in at least one facility other than Limestone.

The ADOC similarly argues that the other members of its medical staff, from doctors to pharmacists, cannot provide adequate HIV care at any facility other than Limestone. The department contends that it cannot train staff at other facilities to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
(Cite as: 2012 WL 6681773 (M.D.Ala.))

provide adequate HIV care. Further still, the ADOC claims that its staff cannot adequately provide the routine monitoring necessary to track the progress of HIV.

However, even if the court takes the ADOC's experts at their word when they say that the department's medical staff is not currently equipped to handle even basic care for HIV-positive prisoners, the court does not find it credible that the ADOC cannot sufficiently train at least some medical staff enough that they could provide the most basic HIV care. The plaintiffs have shown that an abundance of resources exist in Alabama from organizations that specialize in the provision of HIV care and are ready and willing to train ADOC staff for free. For instance, Dr. James Raper, who directs the 1917 Clinic, a multispecialty HIV practice at the University of Alabama at Birmingham with vast experience in the provision of HIV care (including to patients exiting the correctional system) testified that he would be open to having health care providers at his clinic assist with the delivery of health care to HIV-positive prisoners on a consulting basis. Madeleine LaMarre, a nurse practitioner who served as nursing director and clinical services manager for the Georgia Department of Corrections and participated in a committee to oversee that department's transition from a segregated to integrated system for HIV-positive prisoners, evaluated the resources available in Alabama for HIV treatment and concluded that these resources were adequate to train ADOC staff at multiple facilities. Given LaMarre's experience overseeing Georgia's transition from a segregated to integrated system and her personal outreach to HIV care professionals in Alabama, the court finds that her testimony merits substantial weight.

Dr. Altice also presented evidence that effective training has been possible in several state systems, many of which he consulted during that process. In Florida, for instance, he helped create a mini-residency program to train correctional medical staff throughout the state in routine primary HIV care. On-site training helped to "create[ ] de-facto treating experts where there had previously been a complete void." Moreover, this was all achieved at a time when, unlike today, HIV care was "really, really complex" across the board.

*25 It is readily apparent that, if the ADOC wishes to train medical staff at other facilities (at least enough to equip them to address the basic needs of stabilized, virally suppressed HIV-positive prisoners), it may do so. Further, it may do so at minimal or no cost.

The ADOC's protestations do not alter the court's opinion. They do, however, expose a persistent pattern in the ADOC of maintaining the status quo on the basis of mere assumptions rather than actual investigation. For instance, Assistant Commissioner of Health Services Ruth Naglich admitted that she was unfamiliar with any of the options that the plaintiffs offered for the provision of free training for medical staff in HIV care. Further still, in making a determination that delivering HIV care at facilities other than Limestone would raise costs, she did not consult with a single community health-care organization in Alabama. This would have been fruitless, she assumed, because "community providers ... generally do not wish to come into the confines of the prison. So therefore, we would have to take our inmates out into the community to receive care." Based on the testimony of the plaintiffs' witnesses, her assumption was incorrect.

Dr. Scheibel testified that, even if training was provided, the individuals trained would still not rise to the level of expertise. This may well be. However, this argument does nothing to disrupt the court's conclusion that medical staff could learn the basic HIV care needed for at least some HIV-positive prisoners within the system.

The ADOC further argues that, if prisoners were housed outside of Limestone, it could compromise their adherence to HIV medications. The court takes very seriously the ADOC's concerns about adherence. It is evident that adherence to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 27

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

medications is both highly important and a persistent problem in the provision of HIV care. However, the court does not find that the ADOC has provided any meaningful link between its segregation policy and adherence. Dr. Scheibel's testimony showed that it would be possible for a prisoner to feel embarrassed by his medications or its side effects, particularly diarrhea, when housed in general population, and that this could result in nonadherence. However, this argument is counter-weighed by Dr. Altice's equally convincing opinion that segregation can cause depression and deprives prisoners of the mental-health and substance-abuse services offered at other facilities, which can lead to nonadherence. Moreover, while several of the ADOC's experts speculated that segregation could create a community that encourages adherence, Dr. Altice emphatically and credibly attested that no medical literature supports the premise that *involuntary* immersion in a community of people with HIV has any positive effect on adherence (or any therapeutic benefits whatsoever). Indeed, the plaintiffs in this case uniformly expressed only deep sadness at being segregated, and the ADOC presented no prisoner witnesses to contradict this testimony. Therefore, while the court finds that adherence is of tantamount concern for HIV patients, the court does not find that housing prisoners in a segregated environment makes adherence more likely. To the extent that the ADOC argues that adherence issues are better addressed by professionals who are knowledgeable about HIV, the court finds that, given the resources available, this concern can be addressed through training. In any event, and perhaps most importantly, the ADOC has also not shown why it could not identify prisoners with an adherence problem and address those prisoners' behavior separately from adherent patients; indeed, Dr. Scheibel was able to identify such individuals in his chart review. In sum, adherence should be addressed on an individual-by-individual basis, as the ADA requires, rather than categorically.

**\*26** The ADOC's arguments about medical care are also undermined by the wide variety of correc-

tional systems that have successfully provided care in more than one facility. It is evident that there is no one-size-fits-all approach. Each system approaches this issue differently based on its needs. Dr. Altice provided several examples of systems in which he served as a consultant. In California, for example, the largest prison system in the country, facilities throughout the State can manage HIV, but the State also maintains a central unit where patients with complex medical needs can go on a purely voluntary basis. In Texas, routine HIV care is provided at prisons throughout the State, often supplemented by specialty care provided via telemedicine. Texas also maintains specialty centers for more intensive treatment. Florida maintains six to eight "centers of excellence" to manage complex HIV, but does not require HIV-positive prisoners to remain at these centers if their conditions are stable. In Massachusetts, HIV patients are monitored on-site throughout the entire system, and specialty services are provided as needed from the central office. LaMarre testified to the success of the integration program in Georgia, which relies on its medical prison for complex HIV care but does not require HIV-positive prisoners to be housed there when stable. While Alabama is different from each of these States, each of these States is equally different from every other. Therefore, while this court does not go so far as to prescribe which of these systems might suit Alabama,[FN32] the court does not find it credible that Alabama is uniquely unable to provide HIV at even one additional facility.

> FN32. Dr. Altice also stopped short of prescribing which system would work best for Alabama. This task is impossible, he said, without serious discussion among the key stakeholders. He described the process used in other States, which he testified that Alabama should pursue: "[Y]ou get the ... health professional leaders. You also get the correctional ... staff involved. You draw up a map ... and you put in a lot more information in terms of which places have

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

got medical facilities. Sometimes the places will make some decisions about augmenting some of their staffing, or they may move staffing around. But it's a process. It's not something that you can just go in in five minutes and say, 'here's the fix.' "

The ADOC's current mechanisms for assessing the needs of prisoners with other serious diseases casts further doubt on its contention that it cannot change its current system. The department's own medical coding guide provides a powerful example. While the ADOC does medically cluster individuals with certain conditions, in the case of other chronic diseases, it does so by assessing the actual medical needs of the prisoner, not diagnosis alone. For instance, a chronic-care clinic patient, such as a person suffering from hepatitis C, who has been diagnosed for at least three months, is stable, and requires provider follow-up no less than every 120 days, can be placed at any institution within the system. However, a person with hepatitis C who requires chemotherapy may only be housed at four institutions: St. Clair, Tutwiler, Donaldson, and Limestone. Even adopting Dr. Scheibel's more conservative estimate that a stable, virally suppressed person with HIV must see a specialist every three months, under the medical coding guide as it is applied to all other prisoners, that person would be eligible for any institution in the ADOC. However, instead of providing any sort of scale for HIV-positive prisoners with different needs, the guide instead limits them to Limestone and Tutwiler alone.[FN33]

> FN33. The guide also indicates that HIV-positive prisoners may be housed at Kilby, which is the classification prison for men. HIV-positive prisoners are housed in isolation cells during the classification process at Kilby before being transferred to Limestone.

**\*27** Testimony at trial revealed that other diseases routinely managed by the department are as,

or more, challenging to manage than HIV.[FN34] The ADOC's ability to place them based on their actual medical needs and provide them with adequate care deeply discredits its arguments that it cannot do the same for HIV. The only plausible differences that the ADOC's experts identified between HIV and these diseases are that medication adherence is more important for HIV patients and that HIV has no cure. The former distinction can be easily dismissed: good adherence can, and should be addressed on an individual-by-individual basis. The second distinction is irrelevant to the feasibility of providing care.

> FN34. For example, Hepatitis B, a viral infection that is transmitted in the same way as HIV, is two to two-and-a-half times more prevalent in prisons nationwide than HIV and is 20 times more infectious than HIV. Hepatitis C is 10 to 15 times more prevalent in prisons nationwide and is 30% more infectious than HIV. Since 2007, the mortality rate for Hepatitis C has exceeded that for HIV.

The plaintiffs have also presented evidence that the ADOC's HIV-segregation policy may actually undermine the level of care provided to HIV-positive prisoners in certain respects. First, the policy of automatically sending HIV-positive prisoners to Limestone necessarily bars those prisoners from other facilities, some of which provide care that is not available at Limestone. A key example is Bullock, where prisoners with complex mental-health problems are treated. Dr. Altice testified that, "[O]ftentimes, HIV is the least of [a prisoner's] worries.... [F]or individuals who don't have access to the kind of full array of treatment that is going to be most optimal and important to them, it can actually detract from HIV treatment outcomes." Further, because HIV-positive prisoners are barred from the residential aspect of the substance-abuse treatment program within Limestone and cannot participate in the much more robust therapeutic-community program at St. Clair, they are denied the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

best treatment for their substance-abuse needs. This is significant because HIV is commonly comorbid with substance abuse. Dr. Altice found in a study that HIV patients whose substance-abuse needs are met are five times more likely to adhere to their HIV medications.

In sum, the ADOC has failed to show that it is necessary to categorically house all HIV-positive males only at Limestone (and Decatur Work Release) in order to provide adequate care. Indeed, it is possible that the policy actually worsens treatment outcomes, particularly for patients with other severe needs that cannot be adequately addressed at Limestone.

In reaching these conclusions, the court does not speculate as to how many institutions could feasibly provide HIV care or how many HIV-positive prisoners could be removed from Limestone and housed elsewhere. Instead, the court simply concludes that the ADOC's current assumption, that no HIV-positive prisoner could receive adequate care at any other institution within the system, lacks credence. The ADOC's own expert, Dr. Scheibel, perhaps expressed the court's impression best: "HIV is a complex disease, and we have to ... examine it *patient by patient.*" (emphasis added.) When determining the medical needs of people with HIV, "[y]ou can't group all patients together."

**\*28** In addition to its contentions that the required accommodations would impose an undue burden, the ADOC contends that housing HIV-positive prisoners at additional facilities would constitute a fundamental alteration of its system for providing medical care. A fundamental alteration exists where a proposed accommodation would "elimininate an 'essential' aspect of the relevant activity." *Schwarz,* 544 F.3d at 1220. The basic purpose of a prison medical system is to provide care to its prisoners. *See id.* at 1221 (considering the "basic purpose" of zoning in order to determine whether a proposed change amounted to a fundamental alteration). Thus, while a fundamental alter-

ation may exist if the plaintiffs requested that the ADOC fire all of its doctors or eliminate its pharmacies, the accommodations necessary to house HIV-positive prisoners at additional facilities do not amount to such a drastic change, particularly because this step may be taken without compromising the quality of medical care given to prisoners (and, indeed, it must not be compromised). *See Henderson,* 2012 WL 3777146, at \*6 ("Notwithstanding any relief that may be ordered in this case and the expiration of the *Leatherwood* consent decree, the defendants are still obliged to provide HIV+ inmates a constitutionally adequate level of care. The Eighth Amendment and federal anti-discrimination statutes are not mutually exclusive.").

In evaluating a State's fundamental-alteration defense, a district court must also be attentive to the cost of the proposed changes to the system in light of both the resources at the State's disposal and the State's other responsibilities. *See Olmstead,* 527 U.S. at 597. The ADOC vigorously argued that enacting any of the changes proposed by the plaintiffs would be prohibitively costly. It emphasized the dire state of the department's finances: Steve Brown, the Associate Commissioner for Administrative Services in the ADOC, testified that the department is facing a \$15 million budget shortfall and is operating on a severely constrained budget.

The court does not doubt that the ADOC suffers from severe shortages of funding. However, the court is not convinced that dismantling its segregation policy would add any significant costs to the department's budget. The ADOC has presented evidence that an increase in transmissions within the prison would cost the department a substantial amount of money because it would then have to treat the infected prisoners' HIV. However, the court is not convinced that the transmission rate would rise upon integration.

The department also argued that the cost of providing medical care at facilities other than Limestone would be cripplingly high. The evidence

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

showed, however, that medical-training resources are available to the ADOC at low cost or cost-free. Moreover, the options for specialty care, which could range from telemedicine to the specialist traveling to select facilities to prisoners traveling to meet the specialist, present a number of cost-effective options from which the ADOC may choose.

*29 The ADOC might even save costs by dismantling its segregation policy. Indeed, Emmitt Sparkman, Deputy Commissioner of the Mississippi Department of Corrections, testified that ending the HIV-segregation policy actually saved his department money on the whole. He explained: "[W]henever you have a specialized population it's more costly, because they can only be housed in one location." This limits the department's flexibility in placing and moving prisoners. As an example, Sparkman explained that, if a prison maintains a housing unit with 50 beds in the HIV unit, but only 20 HIV-positive prisoners, the prison still must staff that unit for 50 beds, which wastes resources. Sparkman's analysis can be easily applied to the ADOC. For instance, while Limestone is not designed to house close custody prisoners, it must do so within the Special Unit because all HIV-positive prisoners are assigned there. [FN35] Therefore, the court finds it likely that the expenses that the ADOC incurs in changing its policy will be at least somewhat offset by the money it saves by having a more flexible system. In sum, then, the court does not find that ending the HIV-segregation policy would be prohibitively costly for the ADOC. Therefore, the department's cost-based fundamental alteration defense must fail.

> FN35. Special measures (and, by basic inference, additional resources) are required for prisoners in close custody: they must be housed in a single cell, and, when outside of the housing area, restrained and accompanied by armed correctional person- nel.

The court concludes that the ADOC's current policy of categorically housing HIV-positive prisoners within Limestone and Decatur Work Release violates the ADA. The court need not decide now how far the ADOC must go to act within the confines of the law, and this holding should not be interpreted to mean that integrating HIV-positive prisoners at every facility in the state is necessary nor that integrating them at only one additional facility is enough. It sufficient at this stage to find that the current categorical policy violates the law.

### c. The HIV–Segregation Policy for Women at Tutwiler and Montgomery Women's Facility

The court now turns to the female plaintiffs' claims. The female plaintiffs challenge the ADOC's policy of requiring all HIV-positive women to be housed in Dorm E at Tutwiler, which precludes them from integrated housing in the general-population dormitories, and also from housing alongside HIV-negative prisoners in the infirmary and mental-health unit. They also challenge the fact that they are eligible to be housed only at Montgomery Women's Facility when they participate in the work-release program. The court will first address the segregation policy at Tutwiler.

While it is clear that some men at Limestone could be provided integrated housing without posing a meaningful risk, it is even more obvious that this is true for the women at Tutwiler. The vast majority of women (four out of five) within the ADOC who are taking antiretroviral medication have achieved viral suppression, which dramatically reduces the probability of transmission. [FN36] In addition, the transmission risk among women is significantly lower than it is among men because women cannot transmit the virus through sexual activity. As the court has already stated, there has never been a documented case of HIV that was sexually transmitted from one woman to another. [FN37]

> FN36. The one patient who had not yet achieved it had recently begun the medication, and so there had not been enough time for her virus to become undetectable.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

FN37. The department argued that transmission is possible when women use sexual devices ("toys") and presented this evidence that such devices have been used at Tutwiler. However, even accepting this fact as true, it is obvious that the chances of transmission through sexual activity between women are significantly lower than the chances of transmission through sexual activity between men.

**\*30** Further, as is the case with male prisoners, the opportunities for high-risk behavior that already exist have not yielded any transmissions. Women are integrated in programs at Tutwiler and thus have the opportunity to engage in high-risk behavior in places other than their dorms. Sexual conduct with staff (including staff-on-prisoner sexual assault) and travel between county jails and work-release centers present further opportunities for high-risk behavior. Nevertheless, the transmission rate among female prisoners within the ADOC is at or approaching zero. Moreover, there is no evidence that the transmission rate is any higher in other prison systems where female prisoners with HIV are integrated.

The evidence also casts doubt on the ADOC's characterization of its policy as a practical necessity divorced from any discriminatory intent. The court gained the impression that animus against HIV-positive prisoners has emanated from the top at Tutwiler, particularly from its warden, Frank Albright. Dana Harley described Warden Albright's reaction when, in preparation for a legal challenge, she and the other women in Dorm E began filing requests for access to various programs from which they were excluded because of their HIV-positive status.[FN38] A week after they filed the requests, Warden Albright "[s]tormed in" with a captain, a lieutenant, and the entire classification team, and said: "[T]he next request you write, write it to me so I can deny it personally. Because when you file the lawsuit, I want it to say 'Albright' with one 'L.' ... Y' all will not walk my halls and spread HIV."

At trial, Warden Albright demonstrated willful ignorance about HIV: he testified that he did not know, and did not need to know, whether HIV can be transmitted through food preparation. Harley also reported that correctional officers at Tutwiler commonly refer to Dorm E as the "AIDS dorm."[FN39] From the attitude exhibited by Albright and his staff, it is plainly apparent that prejudice, at least, infects the way that the HIV-segregation policy is implemented.

FN38. This incident occurred in 2007 before Tutwiler had integrated its programs.

FN39. Disclosure of HIV-positive status is an inevitable byproduct of segregation at Tutwiler just as it is as Limestone. The HIV-positive women at Tutwiler do not wear white armbands; however, because they are housed together in the small facility, it is abundantly clear who they are. Dana Harley echoed male prisoners' feelings about forced disclosure: "It doesn't bother me for people to know my status if I choose to disclose it," she said, but she did not want "to be labeled in the HIV dorm."

The court's impression of the atmosphere at Tutwiler is powerfully informed by the court's tour of the prison during the trial. During the tour, part of Dorm E was under construction, but this did not influence the court. Only four HIV-positive women are currently housed in Tutwiler, and, when the court visited, only three were present in Dorm E. The court struggles to convey the depression in that room, so thick it felt possible to reach out and touch it. While the other dorms in Tutwiler were vibrant, Dorm E was nearly empty. Vacant bunk beds lined the room, stripped of sheets and mattresses. It resembled an isolation cell more than it did a dorm.

Balancing the relevant factors and weighing "the odds that transmission will occur" against "the severity of the consequences," *Onishea,* 171 F.3d at 1297, it is obvious that HIV-positive female prisoners in the custody of the ADOC are not categoric-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

ally unqualified for integrated housing. Requiring the ADOC to modify its procedures to make individualized determinations is at least as reasonable for female prisoners as it is for men. Given that there are usually hundreds of HIV-positive male prisoners and under ten HIV-positive female prisoners in the ADOC's custody at any given time, the burden imposed on the ADOC in making individualized determinations for female prisoners is far lighter.

**\*31** Further, the department's cost-based defense is even weaker in the context of Tutwiler than it is for men. Indeed, it is almost certain that the department is in fact wasting valuable resources by maintaining the segregation policy: Dorm E at Tutwiler—a large space filled with empty beds—is being used to house only a few women. Therefore, requiring the ADOC to dismantle its policy of segregating HIV-positive women would neither impose "undue financial and administrative burdens" nor require "a fundamental alteration in the nature of" ADOC operations. *Harris,* 941 F.2d at 1572 n. 48 (citations omitted).

The court now turns to the ADOC's practice of housing HIV-positive women exclusively at Montgomery Women's Facility. The ADOC justifies this policy on the same basis that it justifies housing HIV-positive men exclusively at Decatur: Montgomery Women's Facility is close to Tutwiler, allowing women in the work-release program access to the medical services at the prison. [FN40] For the same reasons that this court concluded that the ADOC can provide (at a minimum) basic HIV care for men in at least one additional facility, the court finds that the department can do so in this context as well. This is particularly feasible since the ADOC operates only one work-release facility for women other than Montgomery Women's Facility. Thus, for the same reasons expressed above, ceasing to place women categorically at Montgomery will not impose an undue burden on the State or cause it to fundamentally alter its system of providing medical care.

FN40. HIV-positive women already reside in integrated housing at Montgomery Women's Facility, and the ADOC has not suggested that there are any differences in the transmission risks at its other work-release facility for women. Therefore, the court easily concludes that no concerns about transmission justify this policy.

### d. Food–Service Jobs

The court now turns to two policies that impact both male and female prisoners: the exclusion of HIV-positive prisoners from kitchen jobs within Limestone and Tutwiler and from holding food-service jobs in the work-release program. The ADOC committed to changing these policies at the end of trial and no longer attempts to defend them. Although the ADOC argues that the issues are moot, the court, for reasons already given, disagrees. *See Nat'l Ass'n of Bds. of Pharmacy,* 633 F.3d at 1309.

The challenged policies are obviously irrational. As both parties agreed, the science is unanimous: there is no risk of HIV spreading through food. Therefore, there is no plausible argument (and the ADOC did not attempt to make one) that barring HIV-positive prisoners from food-service jobs within the prisons and at work release prevents the transmission of HIV. However, before the ADOC conceded these issues at the end of trial, it first attempted to put forth other justifications. For one, the ADOC argued that, if it allowed HIV-positive prisoners to take food-service jobs on work release, employers may withdraw from the program because of their own anti-HIV prejudices. The ADOC wisely no longer contends that accommodating assumed prejudice is a legitimate justification for discriminating against the plaintiffs in this way.[FN41]

FN41. The ADOC also argued that a primary motivation for excluding HIV-positive prisoners from food-service jobs within prisons is the threat that HIV-negative prisoners would react with violence. The ADOC used this justification for several of its policies and presented evid-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
(Cite as: 2012 WL 6681773 (M.D.Ala.))

Page 33

ence about this risk generally, rather than how this risk would manifest with regard to specific policy changes. The court addresses this argument later in this opinion.

Moreover, despite the ADOC's insistence that concern about transmission risk played no role in the food-service policy, the evidence suggests that many ADOC staff members are unaware that HIV cannot be transmitted through food preparation and that staff members acted on their misconceptions. Plaintiff Knox testified that, after he ate with the general-population prisoners that were in SAP with him, prison officials disciplined him for creating a health hazard and searched for the utensils and plates that he had used to eat his meal (presumably fearing that they were contaminated). Further, as the court has already noted, the warden of Tutwiler did not know that HIV could not be transmitted through food. Therefore, despite the ADOC's protestations that its food-service policy is not based on transmission risk, it is evident that false beliefs about this risk, at the very least, have impacted the way that this policy is implemented.

*32 At this stage, the ADOC puts forth no further justifications for this policy, and the court will not search for one. Because the challenged policies irrationally exclude the plaintiffs from programs to which they are unquestionably qualified, those policies violate the plaintiffs' rights under the ADA.

But, most importantly, the ADOC's adherence to its food-service policy throughout most of this litigation, (including the trial), its reluctance to reexamine its policy, and its seemingly deliberate indifference to the unfounded prejudice that the policy reinforced, buttress this court's earlier conclusions that the ADOC's arguments in support of its overall segregation policy are based in large measure on a failure to reexamine that policy in more detail in light of what other States have done and in light of the resources that are available in this State.

2. Work Release

In addition to the integration mandate, the ADA prohibits the unnecessary exclusion of disabled individuals. The implementing regulations to the ADA state:

"A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be *necessary* for the provision of the service, program, or activity being offered."

28 C.F.R. § 35.130(b)(8) (emphasis added). "[L]egitimate safety requirements" may be imposed, but only when they are "necessary for safe operation" and "based on actual risks and not mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. § 36.301(b) .

The plaintiffs argue that the work-release criteria that the ADOC imposes on HIV-positive prisoners constitute unnecessary eligibility criteria and therefore violate the ADA. It is evident that the eligibility criteria at issue tend to screen out individuals with HIV. Indeed, screening out at least some individuals with the virus is precisely what the criteria were designed to do. Of course, because the ADA's protections extend to only qualified individuals with disabilities, the plaintiffs must also show that at least some of the class members on whom the criteria were imposed are otherwise qualified for work release. This, however, is easily satisfied: the work-release criteria are imposed upon (and therefore burden and diminish the chances of participation for) all HIV-positive prisoners who are considered for work release. This includes those prisoners who ultimately satisfy the work-release criteria and are admitted into the work-release program and therefore obviously are qualified for participation.[FN42] However, under the current criteria, even these individuals have a lower chance of being admitted and are subjected to standards that prisoners who do not have HIV are not.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN42. The plaintiffs also provide specific examples of how the criteria have in fact screened out individuals who are qualified. For instance, James Douglas was denied medical clearance because of a "blip" that showed a viral load measurement over the required threshold, even though viral load returned to undetectable levels after the blip. The ADOC argues that Douglas was denied participation in work release because of his history of escapes; however, this does nothing to change the fact that eligibility criteria were imposed on him with regard to his viral load despite the fact that they were unnecessary. Moreover, plaintiffs who have not achieved viral suppression but have consistently abstained from any high-risk behavior may be qualified for work release; the criteria categorically disallow any such individuals to participate.

The ADOC therefore bears the heavy burden of showing that the criteria are necessary. *See Guckenberger v. Boston University,* 974 F.Supp. 106, 139 (D.Mass.1997) (Saris, J.) ("[The defendant's] burden is a heavy one because it must show that the more stringent eligiblity criterion is 'necessary' to achieve [the defendant's] goal.").

*33 At trial, however, the ADOC sought to justify these criteria under an incorrect standard. By the department's account, the standard for evaluating the work-release criteria is the one the Supreme Court identified in *Turner v. Safely,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), in which the Court held that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. The ADOC argues that the *Turner* doctrine applies to statutory rights (including those afforded by the ADA) as well as constitutional rights, and cites *Onishea* for support. Thus, under *Turner,* the ADOC argues, the work-release criteria must merely satisfy a

"reasonableness" test. Defs.' Br. (Doc. No. 247) at 7.

But *Onishea* rendered no such holding. Indeed, the court explained that *Turner* "does not, by its terms, apply to statutory rights." *Onishea,* 171 F.3d at 1300; *see also Pope v. Hightower,* 101 F.3d 1382, 1384 (11th Cir.1996) (referencing the *Turner* doctrine as balancing judicial restraint against "the need to protect *constitutional rights* ") (emphasis added); *Al–Amin v. Smith,* 511 F.3d 1317, 1327 (11th Cir.2008) (" *Turner* ... adopted a ... test for determining whether prison practices impermissibly burden inmates' *constitutional rights* ") (emphasis added).[FN43]

FN43. While the Eleventh Circuit in *Onishea* noted that penological interests are relevant in determining whether the plaintiffs meet the essential eligibility criteria of a program, the potential relevance of such concerns does not, of course, absolve the ADOC of the obligation to meet its burden under the ADA.

Because the ADOC has applied the wrong standard, it has neither argued nor presented evidence that the work-release criteria are necessary. Therefore, the court has not been adequately informed by the department, and must therefore reserve its decision on this issue to be addressed at a later time.

3. The White–Armband Policy
The ADA's prohibition on discrimination is not limited to exclusion from "programs, services, or activities." *Bledsoe,* 133 F.3d at 821–22. Rather, the ADA "prohibits *all discrimination* by a public entity, regardless of the context." *Id.* (emphasis added; citation omitted).[FN44]

FN44. The ADOC argues that "a plaintiff cannot maintain an ADA claim if the alleged exclusion does not pertain to or involve a service program, or activity." Defs.' Pretrial Br. (Doc. No. 211) at 32

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
(Cite as: 2012 WL 6681773 (M.D.Ala.))

(quotations and citations omitted). However, as the Eleventh Circuit's decision in *Bledsoe, supra,* reveals, the department is incorrect. The department nevertheless runs with its interpretation, citing, first, a Ninth Circuit case that, by its terms, expressly disagreed with the Eleventh Circuit's opinion in *Bledsoe,* and, second, the district court's decision in *Bledsoe* that was reversed on appeal. *See* Defs.' Pretrial Br. (Doc. No. 211) at 32–33 (relying on *Zimmerman v. Or. Dep't of Justice,* 170 F.3d 1169 (9th Cir.1999) and *Bledsoe v. Palm Beach Soil and Water Conservation Dist.,* 942 F.Supp. 1439 (S.D.Fla.1996)). As these arguments contradict Eleventh Circuit law, the court easily dispenses with them.

The ADOC's policy of requiring male HIV-positive prisoners to wear white armbands implicates this broad prohibition against discrimination. At trial, the ADOC insisted that the sole purpose of the armbands policy at Limestone is to allow correctional officers to identify easily whether a prisoner is in a dormitory other than the one to which he is assigned (which would implicate legitimate safety concerns). That justification is not credible. *Cf. United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ( "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."). Throughout Limestone, each dormitory has its own assigned colored armbands. The sole exception is that the two Special Unit dormitories are *both* assigned white armbands. As a correctional officer frankly told the court during its site visit, Limestone staff have no way of knowing whether a prisoner assigned to Dorm B is impermissibly present in Dorm C when he should not be, and vice versa. The department's justification for the armband policy presents no evidence of its neutrality. The justification (dorm identification) is pretextual, for the white armbands do not identify which dorm (B or C) a prisoner is from but rather identifies the

prisoner as HIV-positive.[FN45] The policy, therefore, tellingly portrays the ADOC's willingness to discriminate against HIV-positive prisoners and then dress naked discrimination in the guise of neutral policy. Here, the emperor has no clothes. The purpose of the white armbands has been to identify the HIV-positive prisoners.

> FN45. During the site visit of Limestone, the court took notice that, in the HIV-negative areas of the prison, large numbers of prisoners were not wearing any armband at all. Prison officials explained that the HIV-negative prisoners are frequently moved from one dorm to another and there is a time lag between the move and the officials' ability to obtain a new armband. This substantial failure in effectiveness of the use of armbands among HIV-negative prisoners would seem to support the plaintiffs' contention that armband use was later expanded to HIV-negative prisoners as a cover for the initial discriminatory purpose behind their use for HIV-positive prisoners. *See supra* n. 10. Regardless, the court need not rely on this contention.

**\*34** Indeed, when combined with the presence of the Special Unit itself, the armbands make disclosure of the prisoners' HIV status all but inevitable. As Dr. Altice explained: "If you have an HIV unit within your facility, there just aren't any secrets.... The notion that every time you may be walking out into a yard or with visitors walking by, that somebody may recognize ... that you're the person who's wearing the white arm band," amounts to a constant outing of the prisoners' HIV-positive status. And, regardless of whether or not a person which HIV wishes to disclose his status, voluntary disclosure is different from forced disclosure.[FN46]

> FN46. Plaintiff Henderson testified, "I am comfortable with who I am and what I'm dealing with. HIV doesn't define me.... But I still should have that right to be able to disclose this to whoever I want to disclose

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

it to." Plaintiff Knox said: "I think that should be our choice and our choice alone who we should disclose [our HIV status] to."

The white armbands are also profoundly stigmatizing. Plaintiff Henderson said: "I feel like it's a tag.... Just like you put a tag on cattles.... It's branding me. Everywhere I go ... it sticks out." Henderson communicated the cumulative effect of the ADOC's treatment of HIV-positive prisoners, from their segregation in the Special Unit to the requirement that they wear white armbands:

"In Limestone it's like no matter what you do, you just there.... It's like ... putting a bunch of fishes in an aquarium. And that's it. They're just in this aquarium, just swimming around in this aquarium 24/7, all day long, all night, all year.... And ... to be placed in this aquarium and have individuals outside of this aquarium to pass by ... it's like a zoo ... or a circus ... where people just pass by and ... look at you like you some kind of exotic animal.... When the tours came, it was like I was placed in that aquarium, and these people came to the museum to see exotic fishes. And the guide ... would point their finger inside the aquarium at the fishes.... [O] ne time ... I was outside working out ... and a tour came through with some young kids.... And they couldn't tell whether or not I was HIV positive ... [b]ecause I had a long sleeve shirt [which hid the white armband]. They stopped, and [ the guard giving the tour] was pointing towards the dorm, and he told the tour, the kids, that this is where we house our HIV/AIDS patients.... And they was like ... amazed, like they was looking at some exotic stuff.... I want to say something real bad, because it touched me.... I am one of these people that he's talking about with this virus, you know, and it hurts. It really did. It hurt [ ]." [FN47]

> FN47. Henderson's account recalls Frantz Fanon in his essay, "The Fact of Blackness": "I found that I was an object in the

midst of other objects.... [T]he movements, the attitudes, the glances of the other fixed me there, in the sense in which a chemical solution is fixed by a dye." Frantz Fanon, *Black Skin, White Masks* 109 (Charles Lam Markmann trans., Grove Press 1967) (1952).

Requiring all HIV-positive prisoners to wear white armbands that disclose their HIV status does not serve a legitimate purpose. This policy constitutes unlawful, and, indeed, intentional, discrimination under the ADA. *Bledsoe*, 133 F.3d at 821–22.

### 4. Penological Concerns

The ADOC contends that, even if the plaintiffs show a violation of the ADA, the department will face no liability if it justifies its segregation policies on the basis of legitimate penological concerns. The department relies on the Supreme Court's holding in *Turner v. Safley* that a regulation that impinges on constitutional rights is valid so long as it is "reasonably related to legitimate penological interests." 483 U.S. at 89. However, as this court has already explained, *Turner* does not apply to statutory rights. *See Onishea*, 171 F.3d at 1300 (noting that *Turner* "does not, by its terms, apply to statutory rights").

**\*35** This does not mean that the factors identified in *Turner* have no relevance. In *Onishea*, the Eleventh Circuit found that the lower court's consideration of *Turner* factors did not warrant vacatur, reasoning that it "seems obvious ... that the requirements for participation in prison programs are determined in part by the same 'legitimate penological interests' that *Turner* respects in the [constitutional rights] context." *Onishea*, 171 F.3d at 1300. Thus, because of the substantial overlap between factors that must be considered in both *Turner* analysis and ADA analysis, "the district court could properly use factors such as *Turner's* to determine whether the plaintiffs were otherwise qualified to participate in the programs." *Id.* at 1301.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 37

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

Neither *Turner* nor *Onishea* require this court to treat penological interests as a trump on the plaintiffs' statutory rights as the ADOC contends it must.[FN48] But even when the court gives full consideration to the ADOC's purported penological justifications, the department still cannot prevail. For example, the ADOC argues that it has a " 'legitimate penological interest[ ]' ... [in] curtail[ing] the spread of HIV to the general population inmates." Defs.' Pretrial Br. (Doc. No. 211) at 55. That is undoubtedly true, but, as the court has discussed, it is also true that the ADOC can in fact effectuate the plaintiffs' rights under the ADA while simultaneously preventing HIV transmissions. Cost is also a legitimate concern. *See Onishea,* 171 F.3d at 1300. However, the court has already found that none of the accommodations necessary to dismantle the challenged policies would be unreasonably costly.

FN48. In *Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), the first Supreme Court case to affirm the ADA's application to state prisons, the Court provided entirely no indication that *Turner* would apply (nor did the Court cite *Turner* a single time), and that case was decided eleven years after *Turner.* Additionally, the Religious Land Use and Institutionalized Persons Act (RLUIPA) provides a useful analogy for illustrating *Turner's* application to constitutional rights only. Congress enacted that statute to afford a greater right of religious freedom to prisoners than is provided by the Constitution. *See Cutter v. Wilkinson,* 544 U.S. 709, 714–15, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (describing RLUIPA). Eighteen years after the *Turner* decision, in *Cutter v. Wilkinson,* the Supreme Court upheld RLUIPA's validity. *Id.* at 719–20. If the ADOC were correct that any state prison practice that impinges statutory rights created by Congress is nevertheless valid if merely reasonably related to legitimate penological interests, the Court's upholding of RLUIPA's heightened strict-scrutiny standard for impingments on religious rights is difficult to square. *See Van Wyhe v. Reisch,* 581 F.3d 639, 651 (8th Cir.2009) (rejecting the prison officials' "argu[ment] that RLUIPA violates the doctrine of the separation of powers because the statute improperly overturns the more deferential constitutional standard set forth by [*Turner* ]").

The ADOC also argues that its policies are supported by its penological interests in safety and security within the prison. Security is indeed a valid penological interest, and, pursuant to the Eleventh Circuit's analysis in *Onishea,* it can go to whether an individual is otherwise qualified under the ADA. *Id.* ("Security is [a] legitimate interest."). The department posits that dismantling the segregation policy in housing and in food services would result in violence, placing prisoners and correctional staff at risk.

To support this claim, the department principally relies on a survey conducted by Drs. Brent Maulden and Jerry Ingram. The two administered their survey in July 2012 to 1,186 prisoners at different correctional institutions throughout Alabama.

Among other results, the survey found that 52.2% of prisoners believe that acts of violence such as threats, stabbings, and beatings will occur if HIV-positive prisoners are integrated into the general population. In addition, 39% expressed agreement with the statement, "I would use force to keep an inmate with HIV away from me." Other results suggest widespread discomfort born of misinformation. For instance, 62.4% of prisoners would be concerned about transmission if HIV-positive inmates prepared their food, and 38.5% answered that it would bother them if an HIV-positive prisoner worked in the laundry and washed their clothes and bedsheets.

**\*36** Drs. Maulden and Ingram also conducted a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

survey of correctional officers, surveying 155 officers representing 42 institutions in the ADOC. That survey's results suggest, above all, that many members of the ADOC correctional staff lack basic understanding of HIV and seem to harbor severe prejudice against those who have it. Troublingly, 44.4% responded that they would be less likely to stop acts of violence in the prison if prisoners with HIV were involved.

The plaintiffs' expert on polling, Dr. Faye Taxman, found numerous faults with the survey. Among them were that Drs. Maulden and Ingram did not follow basic protocols for conducting research on human subjects, that their sampling strategy was inadequate to guarantee a representative sample, and that the questions in the survey were too convoluted to merit confidence in the accuracy of the responses.

Further, Dr. Ingram conducted a nearly identical survey in 1989 when HIV-positive prisoners challenged the ADOC's policy. That survey predicted that violence would occur if programs were integrated: it did not. This result casts doubt on Dr. Ingram's similar predictions in this case.

However, the greatest damage to the credibility of the survey was done by Dr. Ingram himself at trial. Dr. Ingram testified, for example, that he included questions about the prisoners' attitudes about homosexuality because, "Homosexuality is a high-risk behavior ." [FN49] Dr. Ingram is incorrect to equate sexual orientation to unprotected sexual activity, and his error exemplifies a mutually reinforcing relationship between prejudice against HIV and homophobia. The court was disturbed by his attitudes. More pertinently, because much of the survey assessed attitudes about homosexuality, the court is concerned that the study was tainted by Dr. Ingram's own biases. Therefore, while the court considers the results of the survey, it lends them only limited credence.

> FN49. Dr. Ingram later corrected himself and said that he meant to say that homo-

sexual acts are high-risk, not homosexual orientation. Dr. Ingram's deposition transcript shows that when asked how he would respond to the statement, "I would use force to keep a homosexual away from me," he stated, "I would." According to the transcript, Dr. Ingram answered the question this way in *two separate instances.* At trial, Dr. Ingram said that the transcript of the deposition was incorrect *in both places* where this answer was shown, and that it should have shown that his response was: "I would *not.* " The court finds both Dr. Ingram's claim that the transcript was incorrect and his post-hoc corrections of his statements disingenuous. It was evident from both his testimony and his demeanor in editing his own words that Dr. Ingram harbors prejudice against homosexual people.

Even if the study were an exemplar of professional integrity (and it is not), its results do not show that violence would necessarily result if the ADOC changed its policy. This conclusion can only be drawn when the study's results are coupled with the fatalistic assumption that potential backlash cannot be prevented.

The evidence, however, reveals that this is not the case. There was not significant unrest, for instance, when the ADOC integrated HIV-positive prisoners into various programs and activities, although department officials, including Associate Commissioner DeLoach, feared that violence would occur. [FN50] Deputy Commissioner Emmitt Sparkman attests to a similar result when the Mississippi Department of Corrections integrated its HIV-positive prisoners in 2010: though violence was anticipated, none, in fact, took place. Sparkman credits this success to a robust education effort that the Mississippi Department of Corrections conducted in anticipation of integration. And indeed, since the results of the prisoners' survey revealed widespread misinformation about how HIV is spread, it it im-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

minently possible that education would both dispel these assumptions and reduce the fear (and the potential violent backlash) that accompany them.

> FN50. Based largely on Dr. Ingram's survey, ADOC argued that violent backlash would result from program integration in *Onishea,* interpreting the evidence to show "that residential and program integration would be equally objectionable to certain inmates." *Onishea,* 171 F.3d at 1300.

**\*37** The ADOC has an equally scant basis for assuming that correctional officers could not be educated to better address potential unrest. Moreover, the ADOC has a responsibility to ensure that its officers are informed and would treat all prisoners equally. Therefore, if correctional officers really would hesitate to break up fights involving HIV-positive prisoners, then the appropriate response is certainly not to accommodate it.

Indeed, rather than justifying the ADOC's policy, the correctional officers' responses to the survey instead provide strong evidence that prejudice against prisoners who have HIV is prevalent within the department. And as a general matter, the department's arguments about the results of the survey (which suggested that bias, misinformation, and homophobia are persistent problems within the ADOC) demonstrate the ADOC's willingness to defer to prejudiced viewpoints rather than correct them. Associate Commissioner DeLoach's testimony on the potential threat of violence exemplifies this approach:

"DELOACH: Inmates still have this mindset that HIV-positive offenders—in large part, they equate that to homosexual activity.

"THE COURT: So the real animating trait here is really not the HIV-positive quality, but the gay quality.

"DELOACH: Yes, sir."

Associate Commissioner DeLoach testified that

this impacted his assessment of whether HIV-positive inmates could be safely housed in cells with prisoners who do not have HIV. Thus, De-Loach demonstrated a willingness to allow homophobia to drive the department's policy with regard to HIV-positive prisoners.

Despite this, however, Associate Commissioner DeLoach largely testified directly against the ADOC's position on security justifications for its policy. According to DeLoach, today, there is no security reason that HIV-positive prisoners could not share open bay dormitories with general-population prisoners at Limestone. He testified that he now has no concerns about integrating HIV-positive prisoners at Tutwiler. He is also concerned about integration at facilities other than Limestone, but believed that an incremental process accompanied by education could allow the department to integrate successfully at those facilities as well. Integration could be achieved, he said, as long as the process is "slow and gradual." That the very man responsible for implementing the segregation policy (and a person who has not shied away from accommodating prejudice) finds no security justification today for maintaining it discredits deeply the department's insistence that its approach is essential to the safety and good operation of the prison system. DeLoach's last-minute concessions also deepen the court's impression that the ADOC's policy has stood on stale assumptions.

In sum, the ADOC has not demonstrated that integrating the plaintiffs in housing or including them in food-service jobs would create a serious threat of disorder; the court's conclusion that the plaintiffs are not categorically unqualified therefore remains in tact. Even if the court were to apply *Turner* formally, it would not find the ADOC's current segregation policies justified. To the extent that violence is a credible concern, the "existence of ... ready alternative[s]", such as education, renders segregation precisely the sort of " 'exaggerated response' to prison concerns" that the *Turner* doctrine is not intended to shield. *Turner,*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

482 U.S. at 90.

### C. Res Judicata

**\*38** The court now turns to a defense asserted by the ADOC at early stages of this litigation. The court set this issue aside for further factual development at trial. *See Henderson v. Thomas,* —— F.Supp.2d ——, 2012 WL 3846439, at \*6 (M.D.Ala.2012) (Thompson, J.). The ADOC contends that the plaintiffs' claims under the ADA are identical to those adjudicated in *Onishea* and *Edwards,* and are thus precluded from relitigation in this case under the doctrine of *res judicata.*

*Res judicata* bars a subsequent action where four elements are satisfied: "(1) a final judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) the parties, or those in privity with them, must be identical in both suits, and (4) the same cause of action must be involved in both cases." *Hart v. Yamaha–Parts Distribs., Inc.,* 787 F.2d 1468, 1470 (11th Cir.1986) (citations omitted). The plaintiffs concede that the first three elements are met. However, they contend that the fourth element is not satisfied because the underlying facts have changed.

In determining whether two causes of action are identical for the purposes of *res judicata,* the court must consider "not only whether the same legal claim is asserted, but also whether the factual underpinnings of the causes of action are constant." *Edwards,* 81 F.Supp.2d at 1249. Thus, "in determining whether to apply *res judicata,* [the court] must look to the factual issues to be resolved in the second cause of action, and compare them with the issues explored in the first cause of action. If there has been a modification of significant facts creating new legal conditions, *res judicata* is no defense." *Southeast Fla. Cable, Inc. v. Martin County,* 173 F.3d 1332, 1336 (11th Cir.1999) (punctuation marks and citations omitted).

Here, the plaintiffs argue that the "central factual premise of the *Onishea* decision—that HIV infection inevitably progresses to AIDS and then to death—is no longer true." Pls.' Br. (Doc. No. 37) at 3. As the court has already concluded, that is correct. HIV is no longer inevitably fatal. Because the *Onishea* court's holding hinged on this fact, *Onishea* cannot preclude the plaintiffs from litigating the case at issue here.

In addition, the ADOC has significantly changed its policy with regard to HIV-positive prisoners since *Onishea* was litigated. These changes include abandoning policies that the ADOC argued in *Onishea* were necessary to protect the safety of all prisoners within the system.[FN51] Therefore, the ADOC's own actions are powerful evidence that circumstances since *Onishea* have significantly changed.

> FN51. The district court in the *Onishea* litigation "concluded that the transmission risk [was] significant in all programs." *Onishea,* 171 F.3d at 1295.

It is clear, then, that the factual underpinnings of this action are different from those in *Onishea.* In *Edwards,* this court dismissed the lawsuit as an attempted relitigation of the *Onishea* claims; thus, if this case is not precluded because of *Onishea,* nor is it precluded because of *Edwards. Res judicata* is therefore no bar to this suit.

### III. RELIEF

**\*39** Having decided the ADOC's liability, the court now turns to the issue of appropriate relief. The Prison Litigation Reform Act requires that the relief imposed be "narrowly drawn, extend[ ] no further than necessary ..., and [be] the least intrusive means necessary to correct the violation of the Federal right[s]." *Brown,* 131 S.Ct. at 1929 (quoting 18 U.S.C. § 3626(a)(1)(A)). At the end of the trial in this case, the court promised that, should it find in favor of the plaintiffs on liability, it would afford the defendants an opportunity to propose appropriate relief to the court and that this opportunity would include time for both sides to meet and attempt to agree upon relief. The court will keep its promise. *Cf. Davoll v. Webb,* 194 F.3d 1116, 1132

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6681773 (M.D.Ala.)
**(Cite as: 2012 WL 6681773 (M.D.Ala.))**

n. 8 (10th Cir.1999) ("The federal regulations implementing [Title I of] the ADA envision an interactive process that requires participation by both parties.... Both parties thus have an obligation to interact in good faith to determine how to reasonably accommodate the employee.") (quotation marks and citations omitted).

\* \* \*

In conclusion, the court holds that, except as to the work-release policy, the ADOC's HIV-segregation policy violates the ADA. In reaching this holding, the court will emphasize three points.

First, the court finds that the segregation policy is based on outdated and unsupported assumptions about HIV and the prison system's ability to deal with HIV-positive prisoners. The policy is also infected, and the reasons the ADOC has proffered for its continued existence undermined, by an intentional bias against HIV-positive people, as reflected in a bias from those in charge (for example, with the white-armband policy) and in a system-wide tolerance for a culture of bias, rooted in large measure in ignorance about HIV, from among not only prisoners but employees in general (for example, with the food-service policy and the fear that guards will not protect HIV-positive prisoners). More specifically, in response to the question of why the ADOC continued to exclude HIV-positive prisoners from food-service jobs in the prison kitchens and in the work-release program when it was clear that HIV was not transmitted by handling food and when there had been no complaints from employers about HIV-positive prisoners having food-service jobs, Associate Commissioner De-Loach responded: "[W]e live in Alabama, and there are a lot of prejudices.... [I]t doesn't sound nice. It doesn't sound ... chic .... Prejudices ... die hard in Alabama." Therefore, any remedy the defendants might propose to the court must be based not only on a willingness to revisit assumptions and to look to all reasonably available and untapped resources; and must not only be uninfected by bias against those with HIV, but it must also address the lack of

education and ignorance among both prisoners and prison employees about HIV. "We live in Alabama" is not an excuse.

**\*40** Second, the court cannot overemphasize that it is not holding that all HIV-positive prisoners are entitled to be co-mingled with HIV-negative prisoners; indeed, the court is not even holding that any particular HIV-positive prisoner is entitled to such. Rather, the court is simply holding that how prisoners should be treated based on their HIV-positive status must depend upon an individual-by-individual assessment of these prisoners that honors each prisoner's rights under the ADA, and the court is convinced that resources are reasonably available to do this. The essential thrust of this court's opinion today is simply that the ADOC must look at each HIV-positive prisoner separately and individually based upon that prisoner's particular circumstances.

Third and finally, the court will address later and by a separate order how the parties are to proceed as to the unresolved challenge to the ADOC's work-release policy.

An appropriate judgment will be entered.

M.D.Ala.,2012.
Henderson v. Thomas
Slip Copy, 2012 WL 6681773 (M.D.Ala.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.